# 23 - 1

_____
UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
_____

Vicky Ware Bey, In Propria Persona

John Doe 1 - 1000, Jane Doe 1 - 1000

Plaintiffs / Petitioners / Claimants / Crime Victims / Aggrieved and
Injured Parties - Appellants

VS

Eric Adams, Mayor for THE CITY OF NEW YORK CITY OF NEW

YORK

Louis Molina, Commissioner for
NEW YORK CITY DEPARTMENT OF CORRECTIONS NEW YORK

CITY DEPARTMENT OF CORRECTIONS Melanie Whinnery, Executive

Director
NEW YORK CITY EMPLOYEE RETIREMENT SYSTEM NEW YORK

CITY EMPLOYEE RETIREMENT SYSTEM CITY OF NEW YORK

JOHN DOE 1-10000, JANE DOE 1-10000

DEFENDANT(S)

_____
On Appeal from the District Court for the Southern District and
Supreme Court for New York, Kings County
_____

APPENDIX VOLUME 7
Vicky Ware Bey, In Propria Persona, Sui Juris
Ex Relatione, Vicky Ware
All Rights Reserved, Without Prejudice
c/o 80 Patton Avenue
Wyandanch Territory, New York Republic [11798] 347-869-8529

## TABLE OF CONTENTS

Appellants Notice of impairment and Diminishment of pension…………… ...........Pages 1-17

Appellants Request for medical record ……………………………..………..……..Pages 18-22

Appellants Unusual Incident Report pertaining to employment retaliation
And proof of being barred from employment as a tenured employee.……………..…Pages 23-45

Appellants Notice of Crime Victim Status and request to return to work
the Defendants Directive on Victims of Domestic Violence, Sex offenses and Stalking; Equal
Employment Opportunity Office; General Assembly Declaration of Basic Principles of Justice
for Victims of Crime and Abuse of Power; New York Attorney General Stalking Realities and
Responses; ...……………………………………………………………………..Pages 46-81

Proof of Defendants Maladministration Negligent hiring, retention and training
practices……………………………….…………………………………….……Pages 82-141

New York City Correction Officer Benevolent Associations Collective Bargaining
Agreement…………………………………………………………………….Pages 142-211

New York City Correction Officer Benevolent Associations Memorandum of
Agreement…………………………………………………………………….Pages 212-233

New York State Constitution…………………………………………….……..Pages 234-278

Proof of Appellants Average Salary…………………………………………...Pages 279-281

Bill of Particulars……………………………………………………...........Pages 282-286

Note of Issue…………………………………………………………………Pages 287-288

   Ted Gunderson Expert Testimony........................................................................Pages 290-296

Vicky Ware
c/o 80 Patton Avenue
Wyandanch Territory, New York Republic [11798]

August 27, 2018

Melanie Whinnery, Executive Director
NEW YORK CITY EMPLOYEE'S RETIREMENT SYSTEM
335 Adams Street, Suite 2300
Brooklyn Territory, New York Republic [11798]
Certified Mail Return Receipt Requested: 7017 2400 0000 9860 0198

RE:  Vicky Ware Pension #▮▮▮▮▮,
     Reference / request numbers 1-1-1608671205, and 1-1-1609578038

Dear Ms. Melanie Whinnery, Executive Director:

I am writing to you regarding reference and service request number # 1-1-1608671205 (see attachment) dated August 24, 2018, pertaining to the error N.Y.C.E.R.S made with my pension number.  Recently NYCERS made a mistake pertaining to my pension number and confused it with another number.  My pension number is 511681, and has been confused with pension number 411346-0, which is not my pension number.  Please correct this error as soon as possible.

I am also contacting you regarding my pension benefits under Disability Retirement.  March 23, 2018, I received a letter from N.Y.C.E.R.S stating that this office is in receipt of an application for Disability Retirement pursuant to 507-a, and 507-c of Article 14 of the Retirement and Social Security Law (RSSL) filed on February 13, 2017.  My claim for disability is based on incidents which occurred in May 2010, May 2013, and December 13, 2014.  Please see attached letter from N.Y.C.E.R.S Medical Unit.

I was employed by the NEW YORK CITY DEPARTMENT OF CORRECTIONS July 1, 1998 and became a NYCERS member July 6, 1998, and I am a Tier 3 member who is covered under the provisions of Article 14 of the RSSL.  I have also sent this inquiry directly to you via NYCERS Email system please locate reference/service request number 1-1-1609578038 (see attachment).

Thank you, for your consideration and attention in this matter, please feel free to contact me at 347-869-8529.

Sincerely,

All Rights Reserved

E005

Vicky Ware
80 Patton Avenue
Wyandanch Territory, New York Republic [11798]

November 6, 2018

Melanie Whinnery, Executive Director
New York City Employee Retirement Systems
335 Adams Street, Suite 2300
Brooklyn Territory, New York Republic [11201]

RE: Disability Retirement, Pension # ████

Dear Melanie Whinnery:

I am contacting you again in good faith regarding my disability retirement. October 2018, I received a letter from NYCERS requesting an option package, I submitted an option package to NYCERS in person and then resubmitted a copy of the option package to NYCERS via email. I am contacting you again in good faith because I received a letter dated March 2018 from NYCERS Medical Board stating I am covered under Article 14 of the RSSL 507a and 507C . This letter also stated that New York City Department of Corrections claimed they did not have any other records pertaining to some of my other work and inmate related injuries. I have also filed applications for disability retirement prior to February 2017 while I was an active member with a sufficient amount of medical documentation, and I have more that 17 years of active service with New York City Department of Corrections.

February 2017, I filed an application for disability retirement, my employer New York City Department of Corrections did not allow me to return to work because of my physical work and inmate related injuries which resulted in my physical disability in addition to my employer claiming to perceive me as having a mental disability. New York City Department of Corrections never cleared me to return to work based upon my work and inmate related physical injuries that are the proximate cause of my physical disabilities, and the Departments claim of perceiving me as having a mental disability which is occupationally related.

November 2017, I submitted another application for disability retirement provided NYCERS with medical documentation and a medical separation / termination letter

from my employer again which has already proven my eligibility for disability retirement under Article 14 RSSL 507c.

Recently, I received a letter from NYCERS requesting additional medical documentation, I have already submitted a sufficient amount of medical documentation to NYCERS pertaining to my applications for disability retirement, and as a result of being discriminated against by my employer NEW YORK CITY DEPARTMENT OF CORRECTIONS who constructively forced me out of employment based upon my work and inmate related injuries that caused my disabilities I am enduring an undue hardship because of their unlawful discriminatory actions towards me. I was already deprived of hazard pay while I was working for them and now, I don't have medical insurance because the Department refused to complete the medical change form I sent to them. They refuse to complete it because I didn't have a pension payability receipt. NYCERS sent a letter to me stating my pension payability date, I submitted this letter to the Department and they still refused to complete section J of the health insurance change form. This is causing an another hardship in addition to not receiving full disability retirement benefits I am eligible for.

The regular retirement pension benefits I received from July to the present time have been incorrect. The last three consecutive years I worked for Corrections I earned 99,900.86 ; 97,269.63 and 89,935.17, my average earnings are 95,701.88 per year, which means at this time I should at least be receiving 3,987.53 in regular pension benefits until my disability pension benefits become effective. So far I have been getting 2,868.00 which is 1,119.53 short.

As a Tier 3 Member who sustained work and inmate related physical injuries that resulted in my physical disabilities I am eligible for disability retirement pursuant to Article 14, RSSL 507c.

Sincerely,

Cc:     Thomas P. DiNapoli
        OFFICE OF THE NEW YORK STATE COMPTROLLER
        110 State Street,
        Albany Territory, New York Republic [12236]

        Thomas P. DiNapoli
        OFFICE OF THE NEW YORK STATE COMPTROLLER
        59 Maiden Lane
        New York Territory, New York Republic [10038]

From: reply <reply@customerservice.nyc.gov>
To: C21RES <C21RES@AOL.COM>
Subject: City of New York Auto Acknowledgment Correspondence # 1-1-1690201978
Date: Mon, Mar 4, 2019 5:25 am

Dear VICKY WARE:

Thank you for contacting the City of New York. Your message has been forwarded to the appropriate agency for review and handling.

For future reference, your service request number is 1-1-1690201978.

Sincerely,

The City of New York

This is an auto-generated system message. Please do not reply to this message. Messages received through this address are not processed.

Thank you.

The information you have provided is as follows:
Form: Customer Comment
Topic: Other
Name: VICKY WARE
Street Address: 80 PATTON AVENUE
City, State Zip: WYANDANCH, NY 11798
Country: United States
Email: C21RES@AOL.COM
Company:
Work Phone:
Message:
Good Morning Ms. Whinnery:

I am contacting you regarding a letter I received dated February 25, 2019, On or about January 21, 2019 I completed another option package and mailed it to NYCERS at 30-30 47th Avenue, Long Island City Territory, New York Republic

1 of 2    E008    3/16/2019, 1:44 PM

From: Vicky <c21res@aol.com>
To: MelanieWhinnery <MelanieWhinnery@nycers.gov>
Subject: Fwd: OPTION SELECTION FORM
Date: Mon, Mar 4, 2019 5:24 am

-----Original Message-----
From: Vicky <c21res@aol.com>
To: melaniewhinnery <melaniewhinnery@nycers.gov>
Sent: Mon, Mar 4, 2019 5:15 am
Subject: OPTION SELECTION FORM

Good Morning Ms. Whinnery:

I am contacting you regarding a letter I received dated February 25, 2019. On or about January 21, 2019 I completed another option package and mailed it to NYCERS
at 30-30 47th Avenue, Long Island City Territory, New York Republic [11101] along with my beneficiaries birth certificate.

Please contact them to see what happened to it or confirm if they have it. The letter I received dated February 25, 2019 did not have the form I needed to resubmit to you.
If you still require these forms again with my beneficiaries birth certificate. Please email it to me and I will return it back to you as soon as possible.

Please feel free to contact me at 347-869-8529. If you would like I could email the copy of the letter that was sent to me (Pension # 511681)

Sincerely,
Vicky Ware Bey
All Rights Reserved, UCC 1-207, 1-308, 1-103



**NYCERS USE ONLY**    **F610**

REC'D NYCERS
MEDICAL

2017 FEB 13 PM 12: 43

### Receipt For Disability Retirement Application

Please return this document for future reference.

Name
**Vicky Ware**    Member Number ▓▓▓▓

Title
**Correction Officer**    Agency **Dept of Correction**

This will acknowledge receipt of the Disability Retirement Application filed with the New York City Employees' Retirement System on

MM/DD/YYYY:
**01/13/17**

### Processing of the Disability Retirement Application

The NYCERS Medical Division will determine your eligibility. You will be notified in writing if you are not eligible. If eligible, in order for your application to be processed, you must provide sufficient medical evidence to support the claim for Disability Retirement.

Upon receipt of the required medical evidence, the Medical Division will schedule you to appear before the NYCERS Medical Board for an interview and/or examination.

If the Medical Board recommends approval of the application, you will be entitled to receive an advance disability payment until your case is finalized.

If the Medical Board recommends denial of the application, we will provide you with a copy of the Medical Board report which will state the reasons for the denial. You will also be notified of the appeal process (if it is applicable in your case).

Issued by    NYCERS Medical Division
340 Jay Street
Mezzanine Level
Brooklyn, NY 11201

R12/10    WALK-IN    340 Jay Street    ASK a Tier@NYCERS    MAIL ONLY    30-30 47th Avenue, 10th Floor
CENTER    Brooklyn, NY 11201    Calculate your claim MyNYCERS account at:    RECORD ROOM    Long Island City, NY 11101    Page 1 of 1
(347) 643-3000    www.nycers.org

E010

a116



**NYCERS**
Mail completed form to:
30-30 47th Avenue, 10th Fl
Long Island City, NY 11101

INR-ISSUED

NYCERS USE ONLY   F603

REC'D NYCERS
MEDICAL
2017 FEB 13 PM 12: 42

**Application for Disability Retirement**
**Tier 3 Uniformed Correction Force Only**

Member Number | Last 4 Digits of SSN | Home Phone Number | Date of Birth (MM/DD/YYYY)
[redacted] | [redacted] | (___) ___-____ | [redacted]

**Select a Benefit**
Be sure to read the requirements on the Terms pages to determine which you qualify under. All applicants will be processed as indicated. I am applying for (Mark all that apply):

[X] 507-a Disability Retirement   [ ] 507-c Performance of Duty Disability Retirement

[ ] 207-a Heart Bill   [ ] 506 Ordinary Disability   [ ] 507 Accidental Disability

[ ] Disability Retirement under the World Trade Center Law (see WTC Fact Sheet for more information)

This application is for Tier 3 Correction members who wish to apply for Disability Retirement. In order for NYCERS to process this application, this form must be filled out in its entirety and notarized before submitting it for review. Please be sure you read and understand the requirements for filing for Disability Retirement found on the terms pages. In addition to this form you must also submit to NYCERS Medical Board):

- Applicant's Report of Personal Disability (form 605)
- Physician's Report of Disability (form 606)
- General Authorization (form 608)
- NYCERS Questionnaire (form 609)

**NOTE: If the address you provide on this form is different from your address in our system, the new address will become your official address in our records.** Should you have any questions please contact our Medical Unit at 347/643-3000.

First Name | M.I. | Last Name
_____ | | _____

Address
80 Pathans Avenue | Apt. Number

City | | State | Zip Code
Woodbench | | New York | 11358

Agency | | Title
NYC Department of Correction Officer

**Select a Temporary Option**
This section allows you to select a temporary option, which determines what will happen to your benefit if you should die before the date of your first full payment. If you select either the Ten Year Certain or 100% Joint-And-Survivor option, you must select a beneficiary on the next page. If you do not die before selecting an option or if you fail to name a beneficiary, **NO DEATH BENEFIT WILL BE PAYABLE FROM NYCERS.** If you wish to select a different option, please contact NYCERS to get detailed information. Please choose only one of the following:

[ ] **Ten Year Certain** - Under this option, if you die within ten years of your retirement, the reduced monthly retirement benefit will be paid to your surviving primary beneficiary for the unexpired balance of the ten-year period. If the designated primary beneficiary predeceases you, the balance of the payments continues to your contingent beneficiary. If none exists, it is paid in a lump-sum to your estate. Should a primary beneficiary die after receiving payments, the balance will be paid in a lump-sum to your contingent beneficiary. If none exists, the lump-sum balance is paid to the estate of the primary beneficiary. You may designate both a primary and a contingent beneficiary under this option.

[ ] **100% Joint-and-Survivor** - This option assures you that your designated beneficiary, a reduced benefit for lifetime. Should you die, your designated beneficiary will receive a percentage of your benefit. Choosing this option guarantees two specific people an income for life, the life expectancies of the retiree as well as the beneficiary are taken into consideration. Therefore, once you designate a beneficiary and the option is in force, your change your beneficiary designation, even if he/she predeceases you at death. You may only nominate a primary beneficiary under this option.

[X] **The Maximum Retirement Allowance** - This option provides the greatest benefit payment to you while you are retired, for as long as you live. However, under the Maximum Retirement Allowance, no further payments will be made after your death.

**Sign this form and have it notarized Page 3**

R12/16

WALK-IN: 340 Jay Street | MAIL: 30-30 47th Ave [NYCERS] | MAIL ONLY + 30-30 47th Avenue, 10th Floor
CENTER: Brooklyn, NY 11201 | Write a Trip to NYCERS! | NO DROP-OFF Long Island City, NY 11101   Page 1 of 3
(347) 643-3000 | Actually use our NYCERS account at
www.nycers.org

**NYCERS**

Mail completed form to:
30-30 47th Avenue, 10th Fl
Long Island City, NY 11101

NYCERS USE ONLY  F603

REC'D NYCERS
MEDICAL

2017 FEB 13 PM 12: 42

Member Number                    Last 4 Digits of SSN

I, the undersigned, request to make application for disability retirement

Signature of Member                                              Date
_____                                   2/13/2017

This form must be acknowledged before a Notary Public or Commissioner of Deeds

State of _____ County of _____  On this ___ day of _____ 20__ personally appeared
before me the above named _____ to me known, and known to
me to be the individual described in and who executed the foregoing instrument and he or she acknowledged to me that he or she
executed the same and that the statements contained therein are true.

Signature of Notary Public or
Commissioner of Deeds
Official Title
Expiration Date of Commission

**Performance of Duty Disability Retirement §507-a:** To apply for this benefit a member must have a minimum of ten or more years
of credited service (of which 2 years must be membership service)

There is no minimum service requirement if you apply for this duty retirement from a line of duty injury that occurred while you are
a member and while you were in City service and as a natural and proximate result of an accidental injury, not caused by your own
negligence.

**Performance of Duty Disability Retirement §507-c:** If you apply for a performance of duty disability there is no minimum
service requirement. However, you must be disabled by, or as a natural and proximate cause of an act of an inmate. You may
also apply under §507-a if you have contracted HIV through the bodily fluids of an inmate, tuberculosis or hepatitis while in
the performance of your duties.

**Heart Bill §207-k:** You may apply for a disability retirement benefit under the Heart Bill for heart disease which will be
presumed to have been contracted in the course of your performance of duty.

**You may apply for Disability retirement under all of the above provisions.**

**Eligibility requirements for Disability under §507-a and §507-c of Article 14 and under §207-a of the General Municipal Law**
You must file the application while you are actually employed in City service or
within three months from the last day you were being paid on the payroll, or
no later than 12 months from the end of the payroll period for which you were entitled to regular pay. If you were on a leave of absence
for medical reasons, including Workers Compensation.

Sign this form and have it notarized. THIS PAGE

R12/16  WALK-IN  340 Jay Street  Stop & Form a NYCERS  MAIL ONLY  30-30 47th Avenue, 10th Floor  Page 3 of 3
CENTERS  Brooklyn, NY 11201  Answers to your questions at NYCERS' accounts at  NO DROP-OFF  Long Island City, NY 11101
(347) 643-3000  www.nycers.org

E012

a118

**NYCERS** — Mail completed form to:
30-30 47th Avenue, 10th Fl
Long Island City, NY 11101

NYCERS USE ONLY    F266

Member Number

Last 4 Digits of SSN

☑ **100% Joint-and-Survivor**

This option assures you and your designated beneficiary a reduced lifetime benefit. Upon your death, your designated beneficiary will receive the same lifetime benefit. Because this option guarantees two specific people an income for life, the life expectancies of the retiree as well as the beneficiary are taken into consideration. If more than one designated beneficiary and this option is in force, you cannot change your beneficiary designation, even if he or she precedes you in death. You may nominate only a primary beneficiary under this option.

First Name: **Desmond**    M.I.    Last Name: **Ware**

Full Social Security number    Date of Birth (Month/Day/Year)    Relationship: **Son**

Address: **80 Anthos Avenue**    Apt. Number

City: **Wyandanch**    State: **NY**    Zip Code: **11798**

☐ If the beneficiary is a minor, check here and complete the guardian information on Form #137. If Form #137 is not submitted, NYCERS will require Letters of Guardianship for the Estate of the minor in order to pay a benefit to a minor.

**OR**

☐ **Ten-Year Certain**

If you die within ten years from the date of your retirement, the reduced monthly retirement benefit will continue to be paid to your surviving, primary beneficiary for the unexpired balance of the ten-year period. If the designated primary beneficiary predeceases you, the balance of the payments due for the remainder of the ten-year period will be paid in a lump sum to your contingent beneficiary or, if none exists, to your estate. Should it then pay beneficiary die after receiving some, but not all, of the payments due for the remainder of the ten-year period, the remaining balance will be paid in a lump sum to your contingent beneficiaries. If none exists, the lump-sum balance is paid to the Estate of the primary beneficiary. You may nominate both a primary and a contingent beneficiary under this option.

**Tier 3 and 22-Year Plan** members: you may nominate your Estate instead of a person. You may name a Trust, an approved organization as a Contingent Beneficiary only. NYCERS will not pay a continuing benefit to a Trust or nonprofit organization, only to a person.

**Tier 4, Tier 6 and Special Plan** members: You may nominate your estate as either the Primary or Contingent Beneficiary. You may name a Trust or nonprofit organization as a Contingent Beneficiary only. NYCERS will not pay a continuing benefit to a Trust or nonprofit organization, only to a person.

First Name:    M.I.    Last Name:

Full Social Security Number    Date of Birth (Month/Day/Year)    Relationship:

Address:    Apt. Number

City:    State:    Zip Code:

☐ If this beneficiary is a minor, check here and complete the guardian information on Form #137. If Form #137 is not submitted, NYCERS will require Letters of Guardianship for the Estate of the minor in order to pay a benefit to the minor.

R12/16    WALK-IN CENTER  340 Jay Street, Brooklyn, NY 11201  (347) 643-3000    Skip a trip to NYCERS!  Activate your account MyNYCERS online account at www.nycers.org    MAIL ONLY  NO DROP-OFF  30-30 47th Avenue, 10th Floor, Long Island City, NY 11101    Page 3 of 4

E013

Case 23-1, Document 76, 01/25/2023, 3458054, Page12 of 296

a110

**NYCERS**  Mail completed form to:
30-30 47th Avenue, 10th Fl.
Long Island City, NY 11101

NYCERS USE ONLY    F266

Member Number                Last 4 Digits of SSN

Ten-Year Certain Contingent Beneficiary

First Name                          M.I.      Last Name

Full Social Security Number      Date of Birth (MM/DD/YYYY)      Relationship

Address                                                         Apt. Number

City                                                State      Zip Code

-OR-

**Designation of Estate as Beneficiary - TIER 3 and 22 YEAR PLAN MEMBERS ONLY**

☐ I understand that by checking this box, the benefit payable under the Ten-Year Certain option will be payable to my Estate.

**Federal Tax Withholding**

Federal tax law provides, in all payers are required to withhold Federal income tax on periodic payments (similar to wages), unless you elect to be excluded from such withholding. This election will remain in effect until revoked by you. If you do not complete this election, Federal income tax will be withheld at the rate of a married individual claiming three exemptions.

**Please indicate your withholding selection by marking the appropriate choice below.**

1. ☑ Do not withhold Federal income tax from my pension. (Do not complete 2 or 3 if you select this option.)

2. ☐ Withhold based on _____ number of exemptions using the following status (You may also enter a dollar amount in choice 3.)

(Check one only)    ☐ Single    ☐ Married    ☐ Married, but withhold at higher "Single" rate

3. ☐ In addition to the amount withheld based on my exemptions and filing status in choice 2,
   ☐ I would like to withhold $ _____ per month (must specify dollar amount only)

**Note:** You cannot enter an amount here without entering a number of exemptions in choice 2 (even if that number is zero).

I, the undersigned, hereby make application for payment of a vested Retirement Benefit under the applicable provision of the Retirement and Social Security Law (RSSL).

Signature of Member                                    Date

**This form must be acknowledged before a Notary Public or Commissioner of Deeds**

State of _____ County of _____      On this _____ day of _____ personally appeared before me the above named _____ to me to be the individual described in and who executed the foregoing instrument, and he/she duly acknowledged that he/she executed the same, and that the statements contained therein are true.

Signature of Notary Public or
Commissioner of Deeds

Official Title

Expiration Date of Commission

WALK-IN    340 Jay Street
CENTER    Brooklyn, NY 11201
(347)643-3000

MAIL ONLY    30-30 47th Avenue, 10th Floor
NYCERS OFF.    Long Island City, NY 11101

FILED: NEW YORK COUNTY CLERK 11/08/2019 01:58 PM
NYSCEF DOC. NO. 195
INDEX NO. 518540/2019
INDEX NO. 152946/2019
RECEIVED NYSCEF: 10/08/2019
RECEIVED NYSCEF: 03/20/2019

Case 23-1, Document 76, 01/25/2023, 3456884, Page13 of 296

a123

Case 17-3373, Document 59, 03/05/2018, 2248800, Page164 of 172

FILED: KINGS COUNTY CLERK 02/20/2019 02:52 PM    INDEX NO. 558540/2019
NYSCEF DOC. NO. 596    Case 23-1, Document 76, 01/25/2023, 3458054, Page14 of 296    RECEIVED NYSCEF: 02/20/2019

a127



November 23, 2011

Vicky Ware

M#:

Dear Ms. Ware:

As you were previously advised, the NYCERS' Medical Board recommended denial of the application filed on May 31, 2011 for disability retirement. In this regard, please find enclosed a copy of the Medical Board report based on the findings of the NYCERS' Medical Board.

Very truly yours,

Ornela Killishew
Manager, Medical Unit
Operations Division

OK: dc

cc: M. Kalmus, Esq.

Client    340 Jay Street    (347) 643-3000    Mailing    335 Adams Street, Suite 2300
Services  Brooklyn, NY 11201  www.nycers.org    Address   Brooklyn, NY 11201-3724.

163

E016

Case 23-1, Document 76, 01/25/2023, 3458054, Page15 of 296

FW: Relinquishment of DOC Property re: Vicky Ware, Sh#10901,...   a134      https://mail.aol.com/webmail-std/en-us/PrintMessage

New York City Department of Correction
Health Management Division / C.A.R.E.
59-17 Junction Boulevard – Suite 1403
Rego Park, New York 11368

Office: 718 595-2554
Fax: 718 595-2573
Cell: 917 832-0059

From: Grant, Dahlia
Sent: Monday, January 30, 2017 9:30 AM
To: Smith, Helena <Helena.Smith@doc.nyc.gov>
Cc: Pinnock, Nadene M. <Nadene.Pinnock@doc.nyc.gov>; Wynter, Claudette <Claudette.Wynter@doc.nyc.gov>; Villalona, Angel <Angel.Villalona@doc.nyc.gov>; Juarbe, David Jr. <david.juarbe@doc.nyc.gov>
Subject: FW: Employment Status re: Vicky Ware, Sh#10901, Ref#0448823, OBCC

Good morning,

Ms. Ware is Medically Separated from DOC. That action is correct. See PMS screen below.

When she reaches her 20 year anniversary, which, according to NYCERS, **is something in July 2018**, she will be eligible to receive pension benefits through NYCERS. This information was explained to her by a NYCERS representative when she submitted her Vesting application to them. Thereafter, David Juarbe spoke with Ms. Ware and once again explained the Vesting process to her as well as her status with the agency. *According to David, Ms. Ware does not seem to comprehend the Vesting process/status with agency.

Since she is Medically separated from the agency, she must relinquish her departmental properties.

*We are willing to send her something in writing regarding the above.

```
EMPLOYEE ID:▮▮▮▮        EMP NAME: WARE        VICKY
PAY NO:  072        JOB SEQ#:  1        CURR LV STAT: A
EFF DATE:  01/30/17
        RSN TYPE
CHG NO  EFF DATE  B T M L X  RSN CD  ----------DESCRIPTION---------- LV STAT
 01  01/22/17      -       F37   DISMISSED MED DISABI SEC 71/73  A
```

Thanks.

Best Regards,

**Dahlia R. Grant - Director, Employee Services - Human Resources|**
**Phone: 718-546-3172 | Mobile: 347-415-6024**
**75-20 Astoria Boulevard, Suite 320, E. Elmhurst, NY 11370**

E017
10/12/2018, 10:10 AM

Case 23-1, Document 76, 01/25/2023, 3458654, Page16 of 296

e135

## CITY OF NEW YORK DEPARTMENT OF CORRECTION
### PERSONNEL DIVISION
### DEPARTMENTAL PROPERTY RECEIPT FORM

| FORM # 887 | REV. 12/87 | REFERENCE: GEN. ORDER #008/87 |
|---|---|---|

### SECTION #1 - TO BE COMPLETED BY MEMBER'S COMMAND

**RECEIVED FROM (EMPLOYEE'S NAME)** *Ware, Vicky*

| RANK/TITLE | *C.O.* | SHIELD # | *10901* | COMMAND | *OBCC* |
|---|---|---|---|---|---|

**REASON (CHECK ONE)**
[X] RETIREMENT   [ ] RESIGNATION   [ ] SUSPENSION
[ ] TERMINATION   [ ] OTHER (SPECIFY)

| FIREARMS INFORMATION | SERIAL NUMBER | | PISTOL PERMIT (CHECK ONE) |
|---|---|---|---|
| | MAKE | *N/A* | |
| [ ] CHECK IF APPLICABLE | MODEL NUMBER | | [ ] YES    [ ] NO |

| RECEIVED BY (PRINT NAME) | | RANK/TITLE | | SHIELD# | |
|---|---|---|---|---|---|
| SIGNATURE | | | DATE | | |

### SECTION #2 - TO BE COMPLETED BY THE APPLICANT INVESTIGATION UNIT, OR HR

| ITEMS (CHECK) | | |
|---|---|---|
| | SHIELD # | *10901* |
| [1] SHIELD — M | HAT PIECE # | — |
| [2] HAT PIECE — N | RULES & REGULATIONS # | *yes* |
| [3] RULES & REGULATIONS — N | ID CONTROL # | ▮▮▮▮ |
| [4] IDENTIFICATION CARD — N | STAB/SLASH VEST # | — |
| [5] STAB/SLASH VEST — | BALLISTIC VEST # | — |
| [6] BALLISTIC VEST — | | |
| [7] PARKING PASS — | | |

| PROPERTY IN SECTION #2 RECEIVED BY | PRINT NAME | *[signature]* | DATE | *8/10/17* |
|---|---|---|---|---|
| | SIGNATURE | *[signature]* | | |
| | RANK/TITLE | *C.O.I.* | SHIELD # | *2096* |

**IDENTIFICATION CARD RETURNED TO MEMBER (CHECK ONE)**   [ ] YES   [X] NO

| SIGNATURE OF MEMBER CONCERNED | *[signature]* |
|---|---|

### SECTION #3 - DISTRIBUTION

| ORIGINAL TO BE FILED AT MEMBER'S COMMAND | COPY TO PERSONNEL DIVISON |
|---|---|
| | COPY TO MEMBER |





November 23, 2011

Vicky Ware

Ms#

Dear Ms. Ware:

As you were previously advised, the NYCERS' Medical Board recommended denial of the application filed on May 31, 2011 for disability retirement. In this regard, please find enclosed a copy of the Medical Board report based on the findings of the NYCERS' Medical Board.

Very truly yours,

Oneta Killiebrew
Manager, Medical Unit
Operations Division

OK: dc

cc: M. Kahnus, Esq.

Client    340 Jay Street    (347) 643-3000    Mailing    335 Adams Street, Suite 2300
Services  Brooklyn, NY 11201    www.nycers.org    Address   Brooklyn, NY 11201-3724

FILED: KINGS COUNTY CLERK 03/20/2019 05:04 PM    INDEX NO. 513544/2019
NYSCEF DOC. NO. 196    Case 23-1, Document 76, 01/25/2023, 3458654, Page18 of 296    RECEIVED NYSCEF: 03/20/2019

a313

Case 17-3373, Document 59, 03/05/2018, 2248800, Page164 of 172

**NYC Health**

DIVISION OF HEALTH CARE ACCESS AND IMPROVEMENT
CORRECTIONAL HEALTH SERVICES    NAME: _____

Facility: _____    Shield#: _____

DATE/TIME: 5/22/13

## MEDICAL EVALUATION AND TREATMENT OF CORRECTION OFFICER / CIVILIAN

Employee reported for medical attention at Time: 7 AM / PM

S: _____

O: VITAL SIGNS: _____

Assessment / plan

[ ] Follow up with PVT physician / DOC health management division
[ ] Transfer to ER/ hospital

COMPLETED COPY OF THIS FORM MUST BE FAXED TO PHS Employee H&S 718 546-3645

COMPLETED BY _____    PRINT / STAMP: _____

Clearly document all treatment and times.
Use an additional blank progress note to document as needed.
Employee discharged from medical clinic at Time: _____ AM / PM

REMINDER: FULLY COMPLETE THIS FORM    Page 1 of 1

*FILED*

Vicky Ware
80 Patton Avenue
Wyandanch, New York 11798

August 23, 2016

New York City Department of Corrections
Health Management Division
57-19 Junction Boulevard, 15th Floor
Rego Park, N.Y. 11368

Re: Freedom of Information Law Request

To: Records Access Officer/Manager
Via Certified Mail: 7015 0640 0001 7619 6975

Under the provision of the New York Freedom of Information Law Article 6 of the Public
Officers Law, I hereby request a complete copy of my medical records again.

If there are any fees for copying the records required please inform me if the fee exceed
$ 60.00. However, I would also like to request a waiver of the fee.

New York Freedom of Information Law requires a response time of five business days. If
access to the records I am requesting will take longer the amount of time please contact
me with information about when I might expect copies.

If you deny any or all of this request please cite each specific reason you feel justifies the
refusal to release this information in writing.

Sincerely,

Vicky Ware
Correction Officer

CC: Commissioner Joseph Ponte

Vicky Ware Bey
c/o 80 Patton Avenue
Wyandanch Territory, New York [11798]

February 27, 2017

Commissioner Joseph Ponte
New York City Department of Corrections
75-20 Astoria Boulevard
East Elmhurst, New York 11370
Certified Mail: 7015 1530 0001 8330 9842

Dear Commissioner Joseph Ponte:

I have 37 vacation days, and 51 days in compensatory hours a total of 88 days, plus I have 48 terminal leave days. I have been off the payroll for more than two weeks, please submit a check for the amount that is owed for the about days.

I am also requesting my w2 forms, and 1127 forms for 2015 and 2016 along with an employment verification letter that has the entire duration of my employment with the New York City Department of Corrections.

I am also requesting a copy of my medical records from the Health Management Division along with a copy of my Personnel file in its entirety. I also need to know who made the decision to send me to the Health Management Division on December 23, 2015 and to place me out of sick leave.

Truly,

Vicky Ware Bey, Ex Relatioqal
All Rights Reserved

017

E023

FILED: KINGS COUNTY CLERK 08/20/2019 02:52:28 PM
INDEX NO. 518946/2019
NYSEF DOC. NO. 198
Case 23-1, Document 76, 01/25/2023, 3458054, Page21 of 296
RECEIVED NYSCEF: 08/20/2019
a418
Case 17-3373, Document 92, 04/13/2018, 2279018, Page19 of 19

Vicky Ware Bey
c/o 80 Patton Avenue
Wyandanch Territory, New York Republic [11798]

April 6, 2018

NEW YORK CITY DEPARTMENT OF CORRECTIONS
Health Management Division
Helena Smith, Deputy Warden in Command
c/o 57-19 Junction Boulevard, 15th Floor
Rego Park Tetritory, New York Republic [11368]

Re:    Request for Medical file (Vicky Ware Shield # 10901),
       Freedom of Information Law Request

To: Helena Smith, Deputy Warden in Command and all involved parties
Via Certified Mail:  7017 3380 0000 3838 9736

Under the provision of the New York Freedom of Information Law Article 6 of the Public
Officers Law, I hereby request a complete copy of my medical records again.

Attached is a copy of a Subpoena Duces Tecum that was served upon you and each and
every party involved in Civil Case 17-3476 on or about June 29, 2017.

If there are any fees for copying the records required please inform me if the fee exceeds
$ 30.00. However, I am requesting a waiver of any fees.

New York Freedom of Information Law requires a response time of (5) five business
days. Please submit and mail copies of my medical records / medical file in its entirety to
me by April 13, 2018.

If you deny any or all of this request please cite each specific reason you feel justifies the
refusal to release this information in writing.

Sincerely,

Vicky Ware Bey
**Vicky Ware**, Ex Relational
All Rights Reserved, UCC 1-208, 1-307

a112

500AR

NYC DOC HMD
FRONT DESK - 14TH FL.

Department of Correction – Intradepartmental Memorandum JUL -8    12 06

**DATE** : July 8, 2016

**TO** : Helena M. Smith, Commanding Officer, Health Management Division

**FROM** : WARE, Vicky Correction Officer 10901

**SUBJECT** : REQUEST FOR MEDICAL RECORDS

Submitted herein is a request for my medical Records

I am requesting a copy of my entire medical Record folder my Reference number is 0448683 Please contact me at 347 864-8599 to let me know when my records are available to be picked up or you could mail the requested copies to me At 80 Patton Avenue, Wyandanch, N.Y. 11798

This Request was submitted to Mr. McAteer, Assistant Dir. through channels

Respectfully Submitted
WARE, V
Correction Officer 7074

E025



PRESIDENTIAL COMMISSION FOR THE STUDY OF BIOETHICAL ISSUES

July 27, 2011

Dear Commenter:

We are writing to advise you on our ongoing work and plans for the next meeting of the Presidential Commission for the Study of Bioethical Issues. We appreciate the time that you have taken to engage with us.

We would like to clarify for your information that the Commission is not investigating or reviewing any concerns or complaints concerning claims about targeted individuals. This includes claims concerning: MK-ULTRA; COINTELPRO; electromagnetic torture or attacks; organized stalking; remove influencing; microwave harassment; covert harassment and surveillance; human tracking; psychotromic or psychotropic weapons and radio frequency or military weapons or other claims.

As such the Commission will not hear further testimony on these subjects. Many of these issues have been investigated in the past. The Commission is not a law enforcement, regulatory or legislative body. It does not control any federal monies. In addition, the Commission has no involvement with the public or private grants and has no power to open or undertake criminal cases.

As advisors to the President, we will ensure that all of your concerns, information and testimony are provided to the White House. We sincerely appreciate your interest in the work of the Commission and the time you have taken to share your personal history with us.

Sincerely,

Valerie H. Bonham
Executive Director

600AR          Department of Correction – Intradepartmental Memorandum

DATE     : December 21, 2015

TO       : Warden Carolyn Saunders (through channels)

FROM     : Ware V. Correction Officer

SUBJECT: ORGANIZED GANG STALKING VICTIMIZATION

Submitted herein is a report pertaining to the victimization of my family and myself through Organized Gang Stalking.

I have been a victim of Organized Gang Stalking since December 2014 and for the last few months my family members have also been stalked as well. Friday December 18, 2015 my son was approached by Eight (8) males who were attempting to to solicit an illegal substance to him in Manhattan on 30th Street and Broadway. He refused their solicitation and continued walking as he was walking they became hostile and verbally abusive and tried to physically prevent him from walking past by intentionally gathering together and standing in his way in an attempt to impede his ability to pass

Case 23-1, Document 76, 01/25/2023, 3458054, Page25 of 296

a044

600AR        Department of Correction – Intradepartmental Memorandum

DATE    December 21, 2015

TO      Warden Carolyn Saunders

FROM    Ware, K. Correction Officer W901

SUBJECT: ORGANIZED GANG STALKING VICTIMIZATION

(Cont page)

Prior to the beginning of this Organized Stalking he NEVER EXPERIENCED this type of mobbing or solicitation I have personally witnessed people stalk and follow him as he was leaving home going to work. December 18, 2015, Friday he arrived home late at night to find that someone had broke into the house by picking the lock and urinated on the top of his bed, he found the blankets soaked as far as we know and could see that was the only type of vandalism that took place I arrived home Saturday and also witnessed the evidence of the account the blanket, sheet and mattress had been saturated with urine and neither one of us had

E029

Case 23-1, Document 76, 01/25/2023, 3458054, Page26 of 296
a046

600AR          Department of Correction – Intradepartmental Memorandum

DATE : December 21, 2015

TO      Warden Carolyn Saunders

FROM : Wade V. Correction Officer 1094

SUBJECT: ORGANIZED GANG STALKING VICTIMIZATION

(cont page 3)

been home all day Friday And when we
left home Friday morning the blanket
sheet and bed was dry. Prior to this
incident my house was broken into
on three different occasions and a brown
sticky substance/liquid was left on
the carpet each time. April 3, 2016 I
was seeking help for this ongoing situation.
Upon driving through my neighborhood As
I was returning home I witnessed A
Hispanic, male, approximately 5'10 with
coarse black and gray hair outside on
South 31 Street in Wyandanch across
from his vehicle which was a 2007 Gray
Honda, Passport I believe he was an
Officer who was displaying a piece of paper

FILED: KINGS COUNTY CLERK 03/03/2019 02:52:08 PM
INDEX NO. 518546/2019
NYSCEF DOC. NO. 899
RECEIVED NYSCEF: 03/03/2019

Case 23-1, Document 76, 01/25/2023, 3458054, Page27 of 296

a046

Case 1:17-cv-03476-BMC-JO   Document 4   Filed 06/15/17   Page 45 of 84 PageID #: 125

600AR          Department of Correction – Intradepartmental Memorandum

DATE    : December 21, 2015

TO      : Warden Carolyn Saunders

FROM    : Ware, V. Correction Officer 1494

SUBJECT: ORGANIZED GANG STALKING VICTIMIZATION

(cont page 4)

With my picture on it to a motorist and other neighboring people. I was unable to read the false accusatory instrument he was displaying to people. I continued to drive down the street because I didn't want to have a confrontation with him. This false accusatory instrument was used to fabricate rumors about me throughout the neighborhood & surrounding areas. I believe he was working in concert with others. This false accusatory instrument was used to convince my neighbors and people who live in surrounding areas to participate in stalking me. I dont know the nature of the rumor/falsehood that was spread about me. My family and I are experiencing electronic harrassment via

FILED: KINGS COUNTY CLERK 08/28/2019 02:52:38 PM   INDEX NO. 558940/2019
NYSCEF DOC. NO. 899   Case 23-1, Document 76, 01/25/2023, 3458054, Page28 of 296   RECEIVED NYSCEF: 08/28/2019

a047

Case 1:17-cv-03476-BMC-JO   Document 4   Filed 06/15/17   Page 46 of 84 PageID #: 126

600AR        Department of Correction -- Intradepartmental Memorandum

DATE : December 01, 2015

TO : Warden Carolyn Saunders

FROM : WARG V Correction Officer Way

SUBJECT: ORGANIZED GANG STALKING VICTIMIZATION

(Cont pages)

Personal cell phones and personal computers. This stalking started at work in retaliation for the exposure of an Officers inappropriate behavior. I fear for my life and the lives of my family members. As each and every day passes I dont know what to expect or whats going to happen to any of us. I pleading for help for my family and myself, we are being victimized everyday. I go to and from work quietly every day I dont bother anyone at work or in the neighborhood nor does my family. Covert surveillance equipment was installed in my house during the course of these break ins. We just want to be left alone

Case 23-1, Document 76, 01/25/2023, 3458054, Page29 of 296

a050

Case 1:17-cv-03476-BMC-JO   Document 4   Filed 06/15/17   Page 49 of 84 PageID #: 129

| CORRECTION DEPARTMENT CITY OF NEW YORK | Form #109A Eff.: 11/19/94 Ref.: Dir. #9009R-A |
|---|---|
| **UNUSUAL INCIDENT REPORT - PART A** | Page 1 of 6 Pages |

| FACILITY: DBCC | FACILITY LOG NO.: | CENTRAL OPERATIONS DESK (C.O.D.) LOG NO.: |
|---|---|---|

**INSTRUCTIONS: COMPLETE ALL APPLICABLE SECTIONS ON ALL PARTS - A, B, C, AND D**

TYPE OF INCIDENT: Organized Gang Stalking

| DATE OF INCIDENT: 12/18/15 | TIME: | SPECIFIC LOCATION: Multiple locations Manhattan & Wyandach |
|---|---|---|

| INITIAL TELEPHONE REPORT: | NAME AND TITLE OF PERSON REPORTING FROM FACILITY: |
|---|---|

| DATE: | TIME: | NAME: | TITLE: |
|---|---|---|---|

NAME AND TITLE OF PERSON RECEIVING TELEPHONE REPORT AT CENTRAL OPERATIONS DESK (C.O.D.):

| NAME: | TITLE: |
|---|---|

| WRITTEN REPORT: | NAME AND TITLE OF PERSON REPORTING: |
|---|---|

| DATE: 12/21/15 TIME: | NAME: Vicky Ware | TITLE: Correction Officer |
|---|---|---|

DESCRIPTION OF INCIDENT: I have been a victim of Organized Gang Stalking since December 2014 and for the last few months my family members have also been stalked as well. Friday, December 18, 2015 my son was approached by eight (8) males who were attempting to solicit an illegal substance to him in Manhattan on 30 street and Broadway. He refused their solicitation and continued walking as he was walking they became hostile and verbally abusive and tried to physically prevent him from walking past by intentionally gathering together and standing

DISTRIBUTION: ORIGINAL AND ONE (1) COPY TO THE ASSISTANT CHIEF OF SPECIAL OPERATIONS
ONE (1) COPY TO DEPUTY COMMISSIONER OF INVESTIGATIONS
ONE (1) COPY TO THE INSPECTOR GENERAL'S OFFICE
ONE (1) COPY TO FACILITY FILE

| CORRECTION DEPARTMENT CITY OF NEW YORK | Form #1089 Eff.: 11/19/04 Ref.: Dir. #5900R-A |
| UNUSUAL INCIDENT REPORT - PART B | Page 2 of 2 Pages |

| FACILITY: | FACILITY LOG NO.: | CENTRAL OPERATIONS DESK (C.O.D.) LOG NO.: |

**INSTRUCTIONS: COMPLETE ALL APPLICABLE SECTIONS ON ALL PARTS - A, B, C, AND D**

**DESCRIPTION OF INCIDENT: (CONTINUED)**

in his way in an attempt to impede his ability to pass. Prior to the beginning of this organized stalking he never experienced this type of mobbing or solicitation. I have personally seen people stalk and follow him as he was leaving home going to work. He arrived home late Friday night 10/18/15 to find that someone had broke into the house by picking the lock and urinated on the top of his bed, he found the blankets soaked as far as we know and could see that the only type of vandalization that took place. I arrived home Saturday and also witnessed the evidence of the account the blanket, sheet and mattress had been saturated with urine and neither one of us had been home all day Friday and when we

DISTRIBUTION: ORIGINAL AND ONE (1) COPY TO THE ASSISTANT CHIEF OF SPECIAL OPERATIONS
ONE (1) COPY TO DEPUTY COMMISSIONER OF INVESTIGATIONS
ONE (1) COPY TO THE INSPECTOR GENERAL'S OFFICE
ONE (1) COPY TO FACILITY FILE.

| | **CORRECTION DEPARTMENT**<br>**CITY OF NEW YORK** | Form #1608<br>BM.: 11/19/04<br>Ref.: Dir. #8000R-A | |
|---|---|---|---|
| | **UNUSUAL INCIDENT REPORT - PART B** | Page 5<br>of<br>6 Pages | |
| **FACILITY:** | **FACILITY LOG NO.:** | **CENTRAL OPERATIONS DESK (C.O.D.) LOG NO.:** | |

**INSTRUCTIONS: COMPLETE ALL APPLICABLE SECTIONS ON ALL PARTS - A, B, C, AND D**

**DESCRIPTION OF INCIDENT (CONTINUED)**

blanket, sheet and bed was dry. Prior to this incident my house was broken into on three different occasions and brown sticky liquid was left on the carpet each time. April 3, 2005 I was seeking help for this ongoing situation. Upon driving through my neighborhood as I was returning home I witnessed a hispanic, male approximately 5'10 with black + gray coarse hair outside on South 31 Street across from his vehicle which was a 2007 gray Honda Passport. I believe he was an officer who I witnessed with a false accusatory instrument with my picture on it showing it to a motorist and other neighboring people. I couldn't read what the paper had on it. I continued to drive down the street because I didn't want to have

**DISTRIBUTION:** ORIGINAL AND ONE (1) COPY TO THE ASSISTANT CHIEF OF SPECIAL OPERATIONS<br>ONE (1) COPY TO DEPUTY COMMISSIONER OF INVESTIGATIONS<br>ONE (1) COPY TO THE INSPECTOR GENERAL'S OFFICE<br>ONE (1) COPY TO FACILITY FILE

FILED: KINGS COUNTY CLERK 03/2019 09:52:30 PM INDEX NO. 558946/2019

NYSCEF DOC. NO. 899

Case 23-1, Document 76, 01/25/2023, 3458054, Page32 of 296

RECEIVED NYSCEF: 02/28/2019

a053

Case 1:17-cv-03476-BMC-JO   Document 4   Filed 06/15/17   Page 52 of 84 PageID #: 132

| | CORRECTION DEPARTMENT CITY OF NEW YORK | Form #169B Eff.: 11/18/04 Ref.: Dir. #5000R-A |
|---|---|---|
| | UNUSUAL INCIDENT REPORT - PART B | Page 2 of 2 Pages |
| FACILITY: | FACILITY LOG NO.: | CENTRAL OPERATIONS DESK (C.O.D.) LOG NO.: |

**INSTRUCTIONS: COMPLETE ALL APPLICABLE SECTIONS ON ALL PARTS - A, B, C, AND D**

**DESCRIPTION OF INCIDENT (CONTINUED)** left home Friday morning the blanket, sheet and bed was dry. Prior to this incident my house was broken into on three different occasions and brown sticky liquid was left on the carpet each time. April 3, 2005 I was seeking help for this ongoing situation. Upon driving through my neighborhood as I was returning home I witnessed a Hispanic, male approximately 5'10 with black-gray coarse hair outside on South 31 Street across from his vehicle which was a 2004 Gray Honda Passport. I believe he was an officer who I witnessed with a false accusatory instrument with my picture on it showing it to a motorist and other neighboring people. I couldn't read what the paper had on it. I continued to drive down the street because I didn't want to have

**DISTRIBUTION:** ORIGINAL AND ONE (1) COPY TO THE ASSISTANT CHIEF OF SPECIAL OPERATIONS
ONE (1) COPY TO DEPUTY COMMISSIONER OF INVESTIGATIONS
ONE (1) COPY TO THE INSPECTOR GENERAL'S OFFICE
ONE (1) COPY TO FACILITY FILE

FILED: KINGS COUNTY CLERK 08/20/2019 02:52:28 PM

INDEX NO. 518948/2019

NYSCEF DOC. NO. 899

Case 23-1, Document 76, 01/25/2023, 3458054, Page33 of 296

RECEIVED NYSCEF: 08/20/2019

e054

Case 1:17-cv-03476-BMC-JO   Document 4   Filed 06/15/17   Page 53 of 84 PageID #: 133

| | **CORRECTION DEPARTMENT**<br>**CITY OF NEW YORK** | Form #150B<br>Eff.: 11/19/84<br>Ref.: Dir. #5600R-A |
|---|---|---|
| | **UNUSUAL INCIDENT REPORT - PART B** | Page 5<br>of<br>6 Pages |

| FACILITY: | FACILITY LOG NO.: | CENTRAL OPERATIONS DESK (C.O.D.) LOG NO.: |
|---|---|---|

**INSTRUCTIONS: COMPLETE ALL APPLICABLE SECTIONS ON ALL PARTS - A, B, C, AND D**

DESCRIPTION OF INCIDENT: (CONTINUED) bother Anyone I live quietly PEACefully in my Neighborhood And I dont bother Anyone there Nor does my family.

DISTRIBUTION: ORIGINAL AND ONE (1) COPY TO THE ASSISTANT CHIEF OF SPECIAL OPERATIONS
ONE (1) COPY TO DEPUTY COMMISSIONER OF INVESTIGATIONS
ONE (1) COPY TO THE INSPECTOR GENERAL'S OFFICE
ONE (1) COPY TO FACILITY FILE

FILED: KINGS COUNTY CLERK 08/20/2019 02:52 PM
NYSCEF DOC. NO. 299
INDEX NO. 518940/2019
RECEIVED NYSCEF: 08/20/2019
Case 23-1, Document 76, 01/25/2023, 3458054, Page34 of 296
a055
Case 1:17-cv-03476-BMC-JO   Document 4   Filed 06/15/17   Page 54 of 84 PageID #: 134

| | **CORRECTION DEPARTMENT**<br>**CITY OF NEW YORK** | Form #168C<br>Eff.: 11/19/04<br>Ref.: Dir. #9800R-A |
|---|---|---|
| | **UNUSUAL INCIDENT REPORT - PART C** | Page 6 of 6 Pages |

| FACILITY: OBCC | FACILITY LOG NO.: | CENTRAL OPERATIONS DESK (C.O.D.) LOG NO.: |
|---|---|---|

**INSTRUCTIONS: COMPLETE ALL APPLICABLE SECTIONS ON ALL PARTS - A, B, C, AND D**

**EVENTS LEADING TO OR CAUSING INCIDENT:**

Retaliation for the Exposure of an Officers inappropriate behavior, Sexual harassment

**ACTION TAKEN TO CONTROL INCIDENT:**

**OTHER AGENCIES NOTIFIED: (State name of agencies and persons, time and date)**

NYC Commission of Human Rights state

**PROPOSED DISCIPLINARY ACTION:**

**EXTENT AND COST OF PROPERTY DAMAGE:** Unestimated At this time

**STATUS OF INJURED AND PROGNOSIS FOR RECOVERY: (Include full description of injuries claimed)**

**NOTIFICATION OF FAMILY, IN EVENT OF SERIOUS INJURY OR DEATH : (Include date, time and person notified)**

**NAMES, TITLES, SHIELDS OR IDENTIFICATION NUMBER OF EMPLOYEES INVOLVED:**

**DISTRIBUTION:** ORIGINAL AND ONE (1) COPY TO THE ASSISTANT CHIEF OF SPECIAL OPERATIONS
ONE (1) COPY TO DEPUTY COMMISSIONER OF INVESTIGATIONS
ONE (1) COPY TO THE INSPECTOR GENERAL'S OFFICE
ONE (1) COPY TO FACILITY FILE

FILED: KINGS COUNTY CLERK 08/20/2019 02:52 PM
INDEX NO. 518940/2019
NYSCEF DOC. NO. 899
RECEIVED NYSCEF: 08/20/2019
a048
Case 23-1, Document 76, 01/25/2023, 3458054, Page35 of 296

The City of New York

Dian Shane, Acting Fire Supply Commissioner
Claudette Wynter, Acting Deputy Commissioner
Human Resources and Training
75-20 Astoria Boulevard, Suite 320
East Elmhurst, New York, 11370
718 • 546 • 3105
Fax 718 • 278 • 6084

## Human Resources Division
## Issuance of Departmental Property
## Shield & ID Section

I _Vicky Ware_ hereby

Acknowledge the receipt of the following item(s) of the
City Of New York Department of Correction.

| I/D Conversion |
| --- |
| Appearance |
| Child Care Leave |
| Comp. of Modified |
| L.W.O.P. |
| Lost HP |
| Lost ID |
| Lost Shield |
| Modified Duty |
| Name Change |
| No Firearm |
| No Personal |
| Personal Firearm |
| Promotion |
| Shield Exchange |
| New Perm Employee |
| College Aide |
| Temp Employee |
| Comp. Of Susp. |
| Damaged ID |
| Bulova ID |
| Misc |

ID CARD#            Items Received        Items Lost

Shield#

Hat Piece#

R & R#

I/D Card Holder

Total Issued  1    Total Rec'v  0    Total Lost  0

Issued By _L Stout_  Date _12/24/15_  Title _____

Received By _____    Date _12/24/15_

Member's Title _CO_

Amount Paid for Lost Items: $ _____

Case 23-1, Document 76, 01/25/2023, 3458054, Page36 of 296

## THE CITY OF NEW YORK DEPARTMENT OF CORRECTION
### HEALTH MANAGEMENT DIVISION
## CASE DISPOSITION

Date: 2/3/16

Name: Ware, Vicky   Rank: CO   Shield or ID#: 10901   Command: OBCC   Soc. Sec. No.: ▮▮▮

TYPE OF VISIT: ___ Walk-In   ___ Scheduled   ___ Chronic   Comp ☐ Yes ☐ No

## DISPOSITION

**Sick** ✓ Assigned to Sick List by H.M.D.
Continued on Sick List ✓
TIME OUT OF RESIDENCE: (Hours) 1—5 through 2/23/16 Date

**MMR** ___ Assigned to MMR _____ Date   Complete MMR Restrictions Form ____
___ Continued MMR _____ Date   Review MMR Restrictions Form ____
___ Reassigned to MMR _____ Date
**Full Duty** ___ Return to Full Duty _____ Date

**Revisit** ✓ Revisit HMD  2/24/16 Date  0800 Time
3 wks

**Referral** ___ Refer to _____

**Medical Information** ___ Obtain medical information from the following source(s): Dr/ Thomas Nott

**Other** _____

Your sick occasion began when your absence was reported to the H.M.D. Sick Desk or you were assigned to the Sick List by H.M.D., whichever came first.

You are not required to log in or out for the specified time out of residence that has been granted by H.M.D. However, if you have not been granted time out of residence or for time before or after your authorized time out of residence, should you need to leave your place of confinement, you are required to notify the Sick Desk to log out prior to leaving and log back in upon returning. PLEASE NOTE: If you have been returned to duty on your pass day, you must call your command immediately.

Your signature as affixed, confirms that you are aware of your status, time out of residence, revisit date, and all other instructions listed above.

UNIFORM PERSONNEL MUST FULLY COOPERATE & PROVIDE ALL RELEVANT INFORMATION REQUESTED BY EVALUATING PHYSICIAN. FAILURE TO OBEY THIS ORDER MAY RESULT IN TERMINATION OR OTHER PENALITIES PERSUANT TO RULE 3.20.030

X _____ MD./R.N. Signature

X _____ Member's Signature

X _____ H.M.D. Authorizing Signature

Time Departed H.M.D. _____

E040

a102

## THE CITY OF NEW YORK DEPARTMENT OF CORRECTION
### HEALTH MANAGEMENT DIVISION

**CASE DISPOSITION** ▮▮ ▮

2/24/16
Date

WARE, VICKY    C.O    10901    OBCC    ▮
Name     Rank    Shield or ID#    Command    Soc. Sec. No.

**TYPE OF VISIT:** _____ Walk-In    _____ Scheduled    _____ Chronic    Comp ☐ Yes ☐ No

## DISPOSITION

| | | | | |
|---|---|---|---|---|
| Sick | ✓ | Assigned to Sick List by H.M.D. | | |
| | | Continued on Sick List | 1-5 | 3/22/16 |
| | | TIME OUT OF RESIDENCE: (Hours) | through | Date |
| MMR | | Assigned to MMR | | Complete MMR Restrictions Form _____ |
| | | | Date | |
| | | Continued MMR | | Review MMR Restrictions Form _____ |
| | | | Date | |
| | | Reassigned to MMR | | |
| | | | Date | |
| Full Duty | | Return to Full Duty | | |
| | | | Date | |
| Revisit | ✓ | Revisit HMD | 3/23/16   1015   THEO | |
| 2 wks | | | Date    Time | |
| Referral | | Refer to | | |
| Medical Information | ✓ | Obtain medical information from the following source(s) | | |
| | | DR/THEO... NOTE | | |
| Other | | | | |

Your sick occasion began when your absence was reported to the H.M.D. Sick Desk or you were assigned to the Sick List by H.M.D., whichever came first.

You are not required to log in or out for the specified time out of residence that has been granted by H.M.D. However, if you have not been granted time out of residence or for time before or after your authorized time out of residence, should you need to leave your place of confinement, you are required to notify the Sick Desk to log out prior to leaving and log back in upon returning.
PLEASE NOTE: If you have been returned to duty on your pass day, you must call your command immediately.
Your signature as affixed, confirms that you are aware of your status, time out of residence, revisit date, and all other instructions listed above.

UNIFORM PERSONNEL MUST FULLY COOPERATE & PROVIDE ALL RELEVANT INFORMATION REQUESTED BY EVALUATING PHYSICIAN. FAILURE TO OBEY THIS ORDER MAY RESULT IN TERMINATION OR OTHER PENALTIES PURSUANT TO RULE 3.20.030

X _____
MD./R.N. Signature

X _____
Member's Signature

X _____
H.M.D. Authorizing Signature

_____
Time Departed H.M.D.

a103

## THE CITY OF NEW YORK DEPARTMENT OF CORRECTION
### HEALTH MANAGEMENT DIVISION

### CASE DISPOSITION

Date: 3/23/16

Name: Ware, Vicky

Rank: CO

Shield or ID#: 10901

Command: OBCC

Soc. Sec. No.: ___

TYPE OF VISIT: _____ Walk-In    ✓ Scheduled    _____ Chronic    Comp ☐ Yes ☐ No

### DISPOSITION

| | | | |
|---|---|---|---|
| Sick | ✓ | Assigned to Sick List by H.M.D. | |
| | | Continued on Sick List | |
| | | TIME OUT OF RESIDENCE: (Hours) 1-5 through 4/5/16 Date | |

| | | | |
|---|---|---|---|
| MMR | | Assigned to MMR _____ Date | Complete MMR Restrictions Form _____ |
| | | Continued MMR _____ Date | Review MMR Restrictions Form _____ |
| | | Reassigned to MMR _____ Date | |

| | | |
|---|---|---|
| Full Duty | | Return to Full Duty _____ Date |

| | | |
|---|---|---|
| Revisit | ✓ | Revisit HMD 4/6/16 Date    1015 Time    TMO |
| 2 wk | | |

| | | |
|---|---|---|
| Referral | _____ | Refer to |

| | | |
|---|---|---|
| Medical Information | ✓ | Obtain medical information from the following source(s) FUN RIVER ORL. BIRDER (OUTSIDE PROVIDER) * 2nd request |

| | |
|---|---|
| Other | |

Your sick occasion began when your absence was reported to the H.M.D. Sick Desk or you were assigned to the Sick List by H.M.D. whichever came first.

You are not required to log in or out for the specified time out of residence that has been granted by H.M.D. However, if you have not been granted time out of residence or for time before or after your authorized time out of residence, should you need to leave your place of confinement, you are required to notify the Sick Desk to log out prior to leaving and log back in upon returning.

PLEASE NOTE: If you have been returned to duty on your pass day, you must call your command immediately.

Your signature as affixed, confirms that you are aware of your status, time out of residence, revisit date, and all other instructions listed above.

UNIFORM PERSONNEL MUST FULLY COOPERATE & PROVIDE ALL RELEVANT INFORMATION REQUESTED BY EVALUATING PHYSICIAN. FAILURE TO OBEY THIS ORDER MAY RESULT IN TERMINATION OR OTHER PENALTIES PERSUANT TO RULE 3.20.030

X _____ MD./R.N. Signature

X _____ Member's Signature

X _____ H.M.D. Authorizing Signature

_____
Time Departed H.M.D.

E042

# THE CITY OF NEW YORK DEPARTMENT OF CORRECTION
## HEALTH MANAGEMENT DIVISION

### CASE DISPOSITION

Date ____

Name **Ware, Vicky**   Rank **00**   Shield or ID# **1094**   Command ____   Soc. Sec. No. ____

**TYPE OF VISIT:** ____ Walk-In   ____ Scheduled   ____ Chronic   Comp ☐ Yes ☐ N

### DISPOSITION

**Sick**   ✗   Assigned to Sick List by H.M.D.
Continued on Sick List
TIME OUT OF RESIDENCE: (Hours) ____ through ____ Date ____

**MMR**   ____   Assigned to MMR ____ Date   Complete MMR Restrictions Form ____
____   Continued MMR ____ Date   Review MMR Restrictions Form ____
____   Reassigned to MMR ____ Date

**Full Duty**   ____   Return to Full Duty ____ Date

**Revisit**   ✗   Revisit HMD 2/8/16   Time ____
RV 2 wh   Date ____

**Referral**   ____   Refer to ____

**Medical Information**   ✗   Obtain medical information from the following source(s) ____

**Other**   ____

Your sick occasion began when your absence was reported to the H.M.D. Sick Desk or you were assigned to the Sick List by H.M.D. whichever came first.

You are not required to log in or out for the specified time out of residence that has been granted by H.M.D. However, if you have been granted time out of residence for time before or after your authorized time out of residence, should you need to leave your place of confinement, you are required to notify the Sick Desk to log out prior to leaving and log back in upon returning.
**PLEASE NOTE:** If you have been returned to duty on your pass day, you must call your command immediately.
Your signature as affixed, confirms that you are aware of your status, time out of residence, revisit date, and all other instructions listed above.

UNIFORM PERSONNEL MUST FULLY COOPERATE & PROVIDE ALL
RELEVANT INFORMATION REQUESTED BY EVALUATING PHYSICIAN.
FAILURE TO OBEY THIS ORDER MAY RESULT IN TERMINATION OR
OTHER PENALTIES PERSUANT TO RULE 3.10.030

X ____   M.D./R.N. Signature ____

X ____   Member's Signature ____

Time Departed H.M.D. ____   X ____   H.M.D. Authorizing Signature ____

E043

a105

# THE CITY OF NEW YORK DEPARTMENT OF CORRECTION
## HEALTH MANAGEMENT DIVISION

Date: 7/8/16

### CASE DISPOSITION

Name: Ware, Vicky    Rank: CO    Shield or ID#: 11904    Command: OBCC    Soc. Sec. No.: ▓▓▓

**TYPE OF VISIT:** _____ Walk-In    _____ Scheduled    _____ Chronic    Comp ☐ Yes ☐ No

## DISPOSITION

| | | | |
|---|---|---|---|
| Sick | X | Assigned to Sick List by H.M.D. | |
| | | Continued on Sick List | |
| | | TIME OUT OF RESIDENCE: (Hours) 1-5 through 7/28/16 (Date) | |
| MMR | | Assigned to MMR _____ Date | Complete MMR Restrictions Form _____ |
| | | Continued MMR _____ Date | Review MMR Restrictions Form _____ |
| | | Reassigned to MMR _____ Date | |
| Full Duty | | Return to Full Duty _____ Date | |
| Revisit | X | Revisit HMD 7/29/16 Date   1100 1145 Time   neo LO | |
| | | App + Med → RV 2-3 dd | |
| Referral | | Refer to | |
| Medical Information | X | Obtain medical information from the following source(s) _____ | |
| | | Bnf Fun Psychiatric Report (attach provided) | |
| Other | | | |

Your sick occasion began when your absence was reported to the H.M.D. Sick Desk or you were assigned to the Sick List by H.M.D., whichever came first.

You are not required to log in or out for the specified time out of residence that has been granted by H.M.D. However, if you have not been granted time out of residence or for time before or after your authorized time out of residence, should you need to leave your place of confinement, you are required to notify the Sick Desk to log out prior to leaving and log back in upon returning.

**PLEASE NOTE:** If you have been returned to duty on your pass day, you must call your command immediately.

Your signature as affixed, confirms that you are aware of your status, time out of residence, revisit date, and all other instructions listed above.

UNIFORM PERSONNEL MUST FULLY COOPERATE & PROVIDE ALL RELEVANT INFORMATION REQUESTED BY EVALUATING PHYSICIAN. FAILURE TO OBEY THIS ORDER MAY RESULT IN TERMINATION OR OTHER PENALTIES PERSUANT TO RULE 3.20.030.

X _____ MD./R.N. Signature

X _____ Member's Signature

X _____ H.M.D. Authorizing Signature

Time Departed H.M.D. _____

Case 23-1, Document 76, 01/25/2023, 3458054, Page41 of 296

a106

## THE CITY OF NEW YORK DEPARTMENT OF CORRECTION
### HEALTH MANAGEMENT DIVISION

### CASE DISPOSITION

Date: 7/9/16

| Name | Rank | Shield or ID# | Command | Soc. Sec. No. |
|------|------|---------------|---------|---------------|
| Ware, Vicky | CO | 10961 | OBCC | |

**TYPE OF VISIT:** _____ Walk-In    ✓ Scheduled    _____ Chronic    Comp ☐ Yes ☐ No

## DISPOSITION

**Sick** ✓  Assigned to Sick List by H.M.D.
Continued on Sick List
TIME OUT OF RESIDENCE: (Hours) _____ through 8/4/16 Date

**MMR**  Assigned to MMR _____ Date    Complete MMR Restrictions Form _____
Continued MMR _____ Date    Review MMR Restrictions Form _____
Reassigned to MMR _____ Date

**Full Duty**  Return to Full Duty _____ Date

**Revisit** ✓  Revisit HMD 8/5/16 Date    1115 Time    Urena
4 wk    8/25/16    1015    Theo

**Referral**  Revisit Dr Urena 1 week
Refer to _____

**Medical Information** ✓  Obtain medical information from the following source(s):
River ___ on admission

**Other** ✓  No fever ___ admitted (on admission)
Need medical records from Dr ___ with all MD reports
EMG results - need actual most recent physical exam by
specific work restrictions requesting for RTW

Your sick occasion began when your absence was reported to the H.M.D. Sick Desk or you were assigned to the Sick List by H.M.D., whichever came first.

You are not required to log in or out for the specified time out of residence that has been granted by H.M.D. However, if you have not been granted time out of residence or for time before or after your authorized time out of residence, should you need to leave your place of confinement, you are required to notify the Sick Desk to log out prior to leaving and log back in upon returning.
**PLEASE NOTE:** If you have been returned to duty on your pass day, you must call your command immediately.
Your signature as affixed, confirms that you are aware of your status, time out of residence, revisit date, and all other instructions listed above.

**UNIFORM PERSONNEL MUST FULLY COOPERATE & PROVIDE ALL RELEVANT INFORMATION REQUESTED BY EVALUATING PHYSICIAN. FAILURE TO OBEY THIS ORDER MAY RESULT IN TERMINATION OR OTHER PENALTIES PERSUANT TO RULE 3.20.030**

X _____ MD./R.N. Signature

X _____ Member's Signature

X _____ H.M.D. Authorizing Signature

Time Departed H.M.D. _____

Case 23-1, Document 76, 01/25/2023, 3458054, Page42 of 296

# THE CITY OF NEW YORK DEPARTMENT OF CORRECTION
## HEALTH MANAGEMENT DIVISION

### CASE DISPOSITION

| | | | | |
|---|---|---|---|---|
| Ware, Vicky | a | 10901 | OBCC | |
| Name | Rank | Shield or ID# | Command | Soc. Sec. No. |

**TYPE OF VISIT:** _____ Walk-In _____ Scheduled _____ Chronic      Comp ☐ Yes ☐ No

### DISPOSITION

**Sick** ___X___   Assigned to Sick List by H.M.D.
Continued on Sick List
TIME OUT OF RESIDENCE: (Hours) _1300-1730_ through _09-22-16_
                                                          Date

**MMR** _____   Assigned to MMR _____   Complete MMR Restrictions Form _____
                                     Date
         Continued MMR _____   Review MMR Restrictions Form _____
                                     Date
         Reassigned to MMR _____
                                     Date

**Full Duty** _____   Return to Full Duty _____
                                     Date

**Revisit** _____   Revisit HMD _9-23-16_   _1100_   _DH LO_
                                     Date            Time
RV Sick medically

**Referral** _____   Refer to _____

**Medical Information** _____   Obtain medical information from the following source(s) _Mb Note (RTD Note)_

**Other** _____

Your sick occasion began when your absence was reported to the H.M.D. Sick Desk or you were assigned to the Sick List by H.M.D., whichever came first.

You are not required to log in or out for the specified time out of residence that has been granted by H.M.D. However, if you have not been granted time out of residence or for time before or after your authorized time out of residence, should you need to leave your place of confinement, you are required to notify the Sick Desk to log out prior to leaving and log back in upon returning.
PLEASE NOTE: If you have been returned to duty on your pass day, you must call your command immediately.
Your signature as affixed, confirms that you are aware of your status, time out of residence, revisit date, and all other instructions listed above.

UNIFORM PERSONNEL MUST FULLY COOPERATE & PROVIDE ALL
RELEVANT INFORMATION REQUESTED BY EVALUATING PHYSICIAN.
FAILURE TO OBEY THIS ORDER MAY RESULT IN TERMINATION OR
OTHER PENALTIES PERSUANT TO RULE 3.20.030

X _____
MD./R.N. Signature

X _____
Member's Signature

X _____
H.M.D. Authorizing Signature

_____
Time Departed H.M.D.

E046

## THE CITY OF NEW YORK DEPARTMENT OF CORRECTION
### HEALTH MANAGEMENT DIVISION

### CASE DISPOSITION Ref # ▮▮▮▮        10/28/16
                                         Date

Ware, Vicky _____ CO ___ 10901 ___ OBCC ___ ▮▮▮▮
   Name          Rank    Shield or ID#   Command      Soc. Sec. No.

**TYPE OF VISIT:** _____ Walk-In _____ Scheduled _____ Chronic     Comp ☐ Yes ☐ No

## DISPOSITION

**Sick** _____ Assigned to Sick List by H.M.D.
Continued on Sick List
TIME OUT OF RESIDENCE: (Hours) 173 _____ through 11/13/16
                                                      Date

**MMR** _____ Assigned to MMR _____ Date _____ Complete MMR Restrictions Form _____

Continued MMR _____ Date _____ Review MMR Restrictions Form _____

Reassigned to MMR _____ Date _____

**Full Duty** _____ Return to Full Duty _____ Date _____

**Revisit** _____ Revisit HMD 11/16/16 _____ 1115 _____ CO
                        Date                  Time        THFO

**Referral** _____ Refer to _____

**Medical Information** _____ Obtain medical information from the following source(s)
DR. KOTF _____

**Other** _____

Your sick occasion began when your absence was reported to the H.M.D. Sick Desk or you were assigned to the Sick List by H.M.D., whichever came first.

You are not required to log in or out for the specified time out of residence that has been granted by H.M.D. However, if you have not been granted time out of residence or for time before or after your authorized time out of residence, should you need to leave your place of confinement, you are required to notify the Sick Desk to log out prior to leaving and log back in upon returning.
PLEASE NOTE: If you have been returned to duty on your pass day, you must call your command immediately.
Your signature as affixed, confirms that you are aware of your status, time out of residence, revisit date, and all other instructions listed above.

UNIFORM PERSONNEL MUST FULLY COOPERATE & PROVIDE ALL
RELEVANT INFORMATION REQUESTED BY EVALUATING PHYSICIAN.
FAILURE TO OBEY THIS ORDER MAY RESULT IN TERMINATION OR
OTHER PENALTIES PERSUANT TO RULE 3.20.030

X _____ MD./R.N. Signature

X _____ Member's Signature

X _____ H.M.D. Authorizing Signature

_____ Time Departed H.M.D.

E047

Case 23-1, Document 76, 01/25/2023, 3458054, Page44 of 296

## THE CITY OF NEW YORK DEPARTMENT OF CORRECTION
### HEALTH MANAGEMENT DIVISION

**CASE DISPOSITION**

Date: 11/16/16

| Name | Rank | Shield or ID# | Command | Soc. Sec. No. |
|------|------|---------------|---------|---------------|
| WARE, VICKY | CO | 10901 | OBCC | |

**TYPE OF VISIT:** _____ Walk-In  _____ Scheduled  _____ Chronic  Comp ☐ Yes ☐ N

## DISPOSITION

**Sick** ✓
Assigned to Sick List by H.M.D.
Continued on Sick List
TIME OUT OF RESIDENCE: (Hours) 1300-1700 through E 12/13/16 Date

**MMR**
Assigned to MMR _____ Date     Complete MMR Restrictions Form _____
Continued MMR _____ Date      Review MMR Restrictions Form _____
Reassigned to MMR _____ Date

**Full Duty** _____ Return to Full Duty _____ Date

**Revisit** ✓
Revisit HMD 12/14/16 0845 THEO
4 wk psych + medical 12/14/16 09:45 L2

**Referral** Refer to _____

**Medical Information** ✓
Obtain medical information from the following source(s)
- Dr'l NOTE of TREATMENT
(PSYCHIATRIC REPORT + NEVER PHYG TESTING REPORT WHEN AVAILABLE)

**Other** _____

Your sick occasion began when your absence was reported to the H.M.D. Sick Desk or you were assigned to the Sick List by H.M. whichever came first.

You are not required to log in or out for the specified time out of residence that has been granted by H.M.D. However, if you have been granted time out of residence or for time before or after your authorized time out of residence, should you need to leave place of confinement, you are required to notify the Sick Desk to log out prior to leaving and log back in upon returning. PLEASE NOTE: If you have been returned to duty on your pass day, you must call your command immediately. Your signature as affixed, confirms that you are aware of your status, time out of residence, revisit date, and all other instruct listed above.

UNIFORM PERSONNEL MUST FULLY COOPERATE & PROVIDE ALL
RELEVANT INFORMATION REQUESTED BY EVALUATING PHYSICIAN.
FAILURE TO OBEY THIS ORDER MAY RESULT IN TERMINATION OR
OTHER PENALTIES PERSUANT TO RULE & REGULATION.

X _____ MD/R.N. Signature
X _____ Member's Signature
_____ H.M.D. Authorizing Signature

E048

# THE CITY OF NEW YORK DEPARTMENT OF CORRECTION
## HEALTH MANAGEMENT DIVISION

Date: 12/19/16

### CASE DISPOSITION

| Name | Rank | Shield or ID# | Command | Soc. Sec. No. |
|---|---|---|---|---|

TYPE OF VISIT: _____ Walk-In _____ Scheduled _____ Chronic    Comp ☐ Yes ☐ N

### DISPOSITION

**Sick** _____ Assigned to Sick List by H.M.D.
Continued on Sick List
TIME OUT OF RESIDENCE: (Hours) 1300 X 1700 through 1/11/17 — 1/24/17

**MMR** _____ Assigned to MMR _____ Date    Complete MMR Restrictions Form _____
_____ Continued MMR _____ Date    Review MMR Restrictions Form _____
_____ Reassigned to MMR _____ Date

**Full Duty** _____ Return to Full Duty _____ Date

**Revisit** ✓ Revisit HMD 1/12/17 Date    08:45 Time    THEN
psych RV 6uk audit 1/25/17 (09:45 LO

**Referral** _____ Refer to _____

**Obtain medical information** from the following source(s) RWK POPT

Your sick occasion began when your absence was reported to the H.M.D. Sick Desk or you were assigned to the Sick List by H.M. whichever came first.

You are not required to log in or out for the specified time out of residence that has been granted by H.M.D. However, if you have been granted time out of residence or for time before or after your authorized time out of residence, should you need to leave y place of confinement, you are required to notify the Sick Desk to log out prior to leaving and log back in upon returning.
PLEASE NOTE: If you have been returned to duty on your present day you must call your command immediately.
Your signature as affixed, confirms that you are aware of your status, time out of residence, revisit date, and all other instructi listed above.

UNIFORM PERSONNEL MUST FULLY COOPERATE & PROVIDE ALL
RELEVANT INFORMATION REQUESTED BY EVALUATING PHYSICIAN
FAILURE TO OBEY THIS ORDER MAY RESULT IN TERMINATION OR
OTHER PENALTIES PURSUANT TO RULE 3.20.030

X _____ MD./R.N. Signature

X _____ Member's Signature

Time Departed H.M.D. _____    X _____ H.M.D. Authorizing Signature

E049

Case 23-1, Document 76, 01/25/2023, 3458054, Page46 of 296

a111



# NEW YORK CITY DEPARTMENT OF CORRECTION
## PERSONNEL DIVISION

## DEPARTMENTAL PROPERTY RECEIPT FORM

| FORM # 887 | REV. 12/87 | REFERENCE: GEN. ORDER # 008/87 |
| --- | --- | --- |

## SECTION # 1 - TO BE COMPLETED BY MEMBER'S COMMAND

| RECEIVED FROM (EMPLOYEE'S NAME) | WARE VICKY #10901 |
| --- | --- |
| RANK/TITLE Correction Officer | COMMAND OBCC |

| REASON (CHECK ONE) | ☐ RETIREMENT ☐ TERMINATION | ☐ RESIGNATION ☐ OTHER (SPECIFY) | ☐ SUSPENSION |
| --- | --- | --- | --- |

| FIREARMS INFORMATION ☒ CHECK IF APPLICABLE | SERIAL NUMBER | | PISTOL PERMIT (CHECK ONE) |
| --- | --- | --- | --- |
| | MAKE | | |
| | MODEL NUMBER | | ☒ YES ☐ NO |

| RECEIVED BY (PRINT NAME) | | RANK/TITLE |
| --- | --- | --- |
| SIGNATURE | | DATE |

## SECTION # 2 - TO BE COMPLETED BY THE APPLICANT INVESTIGATION UNIT

| ITEMS (CHECK) | | | |
| --- | --- | --- | --- |
| SHIELD | ☐ | SHIELD # | |
| HAT PIECE | ☐ | HAT PIECE # | |
| RULES & REGULAITONS | ☐ | RULES & REGULATIONS # | |
| INDENTIFICATION CARD | ☑ | CONTROL # | ▮▮▮ |
| PARKING PASS | ☐ | PARKING PASS # | |
| STAB / SLASH VEST | ☐ | STAB / SLASH VEST # | |
| BALLISTIC INSERT | | BALLISTIC INSERT # | |

| PROPERTY IN SECTION # 2 RECEIVED BY | PRINT NAME | William Pelletier #886 |
| --- | --- | --- |
| | SIGNATURE | william Pellet |
| | RANK / TITLE | Captain | DATE 12/23/14 |

| IDENTIFICATION CARD RETURNED TO MEMBER (CHECK ONE) | ☐ YES ✓ NO |
| --- | --- |
| SIGNATURE OF MEMBER CONCERNED | |

## SECTION # 3 - DISTRIBUTION

| ORIGINAL TO BE FILED AT MEMBER'S COMMAND | COPY TO PERSONNEL DIVISION |
| --- | --- |
| COPY TO APPLICANT INVESTIGATION UNIT (A.I.U.) | COPY TO MEMBER |

E050

FILED: KINGS COUNTY CLERK 08/20/2019 09:52:38 PM

INDEX NO. 518946/2019

NYSCEF DOC. NO. 999

Case 23-1, Document 76, 01/25/2023, 3458054, Page47 of 296

RECEIVED NYSCEF: 08/20/2019

a042

Case 1:17-cv-03476-BMC-JO   Document 4   Filed 06/15/17   Page 41 of 84 PageID #: 121

600AR

## NYC DEPT OF CORRECTIONS INTRA-DEPARTMENTAL MEMORANDUM

**DATE:**      August 25, 2016

**TO:**        Helena Smith, Commanding Officer (through channels)

**FROM:**      Ware, Vicky, Correction Officer # 10901

**SUBJECT:**   CRIME VICTIM STATUS

Submitted herein is a notice of my status as a crime victim.

I was subjected unprovoked ongoing harassment by another co-worker whose behavior towards me was brought to the attention of the Commissioner.    Shortly thereafter, I began to get stalked in retaliation for his behavior being exposed.

May 19, 2015, I notified the Equal Employment Opportunity Office via email about the crime that was being committed against me before my family became affected by it. Unfortunately, no action had been taken by the Department and I had to continue to work in a hostile environment.   Unfortunately, the stalking advanced and became more organized.

December 21, 2015, I submitted an Unusual Incident Report /Complaint of work related stalking and harassment which also affected a family members.  I was intentionally and wrongfully referred to the Health Management Division for a so called psychological reasons.  I am still a crime victim . and I have already submitted two medical forms signed by a licensed Psychologist, and a LSCW which confirms my status as a crime victim and the affect it has on me as a result of being a victim. I am still a crime victim.

Stalking is a real crime not a mental illness, attached is a brief report from the Department of Justice pertaining to the dynamics of this crime that being committed against me.   This crime is now preventing me from seeing a psychologist who is unbiased,  therefore I can not produce a full psychological report.  I have submitted three medical forms pertaining to my state of mental health which already clears me to work.

Respectfully submitted,

Ware, Vicky,
Correction Officer, # 10901

Case 23-1, Document 76, 01/25/2023, 3458054, Page48 of 296

a056

415R

### THE CITY OF NEW YORK
### DEPARTMENT OF CORRECTION

# DIRECTIVE

| [ ] NEW | [ ] INTERIM | [X] REVISED | SUBJECT | | |
|---|---|---|---|---|---|
| **EFFECTIVE DATE** 04/20/11 | | *TERMINATION DATE / / | **VICTIMS OF DOMESTIC VIOLENCE, SEX OFFENSES OR STALKING** | | |
| CLASSIFICATION # **6301** | SUPERSEDES **6300** | DATED **03/28/08** | APPROVED FOR WEB POSTING [X] YES [ ] NO | DISTRIBUTION **A** | PAGE 1 OF 7 PAGES |
| RECOMMENDED FOR APPROVAL BY REVIEW BOARD MEMBER | | | AUTHORIZED BY THE COMMISSIONER | | |
| LARRY W. DAVIS SR., CHIEF OF DEPARTMENT   SIGNATURE | | | DORA B. SCHRIRO   SIGNATURE | | |

## I. PURPOSE

To establish the New York City Department of Correction (Department) policies and procedures regarding victims of domestic violence, sex offenses or stalking.

## II. POLICY

A. The New York City Human Rights Law prohibits employment discrimination against persons who are victims of domestic violence, or sex offenses or stalking, as defined by that law and the New York State Penal Law. The Department shall provide reasonable accommodations that do not create undue hardship and that enable such persons to satisfy the essential requisites of a job, provided that the status as a victim of domestic violence or victim of sex offenses or stalking is known, or should have been known, by the Department.

B. This directive sets forth the Department's policies and procedures to ensure that the Department fully complies with the City's Equal Employment Opportunity Policy and Human Rights Law by ensuring that applicants for employment and employees are not subject to unlawful discrimination on the basis of being a victim of domestic violence, sex offenses or stalking. This directive incorporates several aspects of Directive #2232R, REASONABLE ACCOMMODATION, which will assist an applicant for employment, or an employee, in requesting a reasonable accommodation as a victim of domestic violence, sex offenses or stalking.

## III. DEFINITIONS

A. The following are definitions that are set forth in the Human Rights Law, as published in the Administrative Code of the City of New York at Section 8-107.1(1) and are included here for reference:

1. "Acts or Threats of Violence" include, but are not limited to, acts, which would constitute violations of the New York State Penal Law.

FILED: KINGS COUNTY CLERK 08/30/2019 02:52:28 PM
NYSCEF DOC. NO. 999
INDEX NO. 518940/2019
RECEIVED NYSCEF: 08/30/2019
Case 23-1, Document 76, 01/25/2023, 3458054, Page49 of 296

a057

416R

| | | |
|---|---|---|
| **EFFECTIVE DATE** **04/20/11** | **SUBJECT** | |
| **CLASSIFICATION #** **6301** | **VICTIMS OF DOMESTIC VIOLENCE, SEX OFFENSES OR STALKING** | |
| **DISTRIBUTION** **A** | **APPROVED FOR WEB POSTING** [X] YES [ ] NO | **PAGE 2 OF 7 PAGES** |

## III.  DEFINITIONS (cont.)

2.  "Victim of Domestic Violence" means a person who has been subjected to acts or threats of violence, not including acts of self-defense, committed by a current or former spouse of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim, by a person who is or has been in a continuing social relationship of a romantic or intimate nature with the victim, or a person who is or has continually or at regular intervals lived in the same household as the victim.

3.  "Victim of Sex Offenses or Stalking" means a victim of acts which would constitute violations of Article 130 of the New York State Penal Law, which include, but are not limited to sexual misconduct, rape, sexual abuse, or victims of acts which would constitute violations of Article 120 of the New York State Penal Law, which include stalking in the fourth degree (§120.45), stalking in the third degree (§120.50), stalking in the second degree (§120.55), or stalking in the first degree (§120.60).

4.  Practices "based on," "because of," "on account of," "as to," "on the basis of," or "motivated by" an individual's "status as a victim of domestic violence," or "status as a victim of sex offenses or stalking" include, but are not limited to, those based solely upon the actions of a person who has perpetrated acts or threats of violence against the individual.

B.  The following terms are contained within the New York City's Equal Employment Opportunity Policy and are set forth in Directive #2232R, REASONABLE ACCOMMODATION:

1.  "Reasonable Accommodations" means modifications or adjustments to the application process, work environment, or to the manner or circumstances under which a position is customarily performed, that promote equal employment opportunity for a victim of domestic violence, sex offenses or stalking and enable the individual to reasonably perform the essential functions of the job or position applied for. Accommodations are not reasonable if they impose an undue hardship on the employer.

2.  "Undue Hardship" means an action that is excessively costly, extensive, substantial, and disruptive or that would fundamentally and negatively impact on the operation, or alter the nature of the employer's business.

FILED: KINGS COUNTY CLERK 08/20/2019 09:52:38 PM    INDEX NO. 518946/2019
NYSCEF DOC. NO. 199    Case 23-1, Document 76, 01/25/2023, 3458054, Page50 of 296    RECEIVED NYSCEF: 08/20/2019

a058

Case 1:17-cv-03476-BMC-JO    Document 4    Filed 06/15/17    Page 57 of 84 PageID #: 137

416R

| | EFFECTIVE DATE **04/20/11** | SUBJECT **VICTIMS OF DOMESTIC VIOLENCE, SEX OFFENSES OR STALKING** | |
|---|---|---|---|
| | CLASSIFICATION # **6301** | | |
| | DISTRIBUTION **A** | APPROVED FOR WEB POSTING [X] YES  [ ] NO | PAGE 3 OF **7 PAGES** |

## IV. CONFIDENTIALITY

All information, including a statement of the person requesting a reasonable accommodation or any other documentation, record, and the fact that the individual has requested or obtained a reasonable accommodation, shall be retained in confidence by the Department, except to the extent that disclosure is requested or consented to in writing by the person requesting the reasonable accommodation, or is otherwise required by applicable federal, state or local law.

## V. PROCEDURES

A. A person seeking a reasonable accommodation as a result of being a victim of domestic violence, sex offenses and stalking shall follow the procedures outlined in Directive #2232R, REASONABLE ACCOMMODATION.

B. A person may satisfy the certification requirement of this section by providing documentation from an employee, agent, or volunteer of a victim services organization, an attorney, a member of the clergy, or a medical or other professional service provider, from whom the individual seeking a reasonable accommodation or that individual's family or household member has sought assistance in addressing domestic violence, sex offenses or stalking and the effects of the violence or stalking; a police or court record; or other corroborating evidence.

C. Because victims of domestic violence, sex offenses or stalking may initially lack documentation or may have difficulty obtaining documentation without compromising their safety, the Department's Equal Employment Opportunity (EEO) Office will consult with the employee to identify what documentation he/she might have, or be able to obtain, that will not compromise his/her safety-related needs and will satisfactorily meet the documentation requirements of the Department. The EEO Office must authenticate all submitted documentation.

D. The EEO Office shall maintain confidential records of all employees who report that they have been the victims of domestic violence, sex offenses or stalking and/or who seek a reasonable accommodation for their status as a victim of domestic violence, sex offenses or stalking.

E. Employees who are victims of domestic violence, sex offenses or stalking are encouraged to contact the Correction Assistance Response for Employees (CARE) unit or the Office for Victim Services for support and other available resources and referrals.

FILED: KINGS COUNTY CLERK 08/20/2019 02:52:28 PM
NYSCEF DOC. NO. 999
INDEX NO. 518940/2019
RECEIVED NYSCEF: 08/20/2019

Case 23-1, Document 76, 01/25/2023, 3458054, Page51 of 296

a059

Case 1:17-cv-03476-BMC-JO   Document 4   Filed 06/15/17   Page 58 of 84 PageID #: 138

416R

| | EFFECTIVE DATE **04/20/11** | SUBJECT | |
|---|---|---|---|
| | CLASSIFICATION # **6301** | **VICTIMS OF DOMESTIC VIOLENCE, SEX OFFENSES OR STALKING** | |
| | DISTRIBUTION **A** | APPROVED FOR WEB POSTING [X] YES [ ] NO | PAGE **4** OF **7** PAGES |

## V. PROCEDURES (cont.)

F. The EEO Office shall engage in an interactive process to work with an employee or applicant who needs a reasonable accommodation, for example, to be absent from work as a result of being a victim of domestic violence, sex offenses or stalking, including assisting the employee in determining the best use of her/his attendance and leave benefits, taking into consideration the employee's particular situation as well as the needs of the Department, and maintain the confidentiality of all information related to an employee's involvement in a situation relating to domestic violence subject to the Department's need to share that information to assist the employee and to meet its legal obligations. Where possible, prior notification of disclosure will be discussed with the person making a request and consented to in writing by the person requesting the reasonable accommodation, or is otherwise required by applicable federal, state or local law.

G. An applicant for employment or employee can appeal the denial of a reasonable accommodation to the Appeals Committee, pursuant to Directive #2232R, REASONABLE ACCOMMODATION.

## VI. RESPONSIBILITIES

A. Victim's Responsibilities

Any person seeking a reasonable accommodation as a result of being a victim of domestic violence, sex offenses or stalking must follow the procedures outlined in Directive #2232R, REASONABLE ACCOMMODATION. If under certain exceptional circumstances, an individual is unable to provide EEO necessary documentation in advance of any needed accommodation, then the employee is to provide the proper documentation to certify his/her status as a victim of domestic violence, sex offenses or stalking as soon as possible after the employee's return to work. Exceptional circumstances refer to unpredictable events which are not foreseeable by the employee and which require immediate action, such as leaving early that same day or being unable to return to work the next day.

B. Management, Supervisors (civilian and uniform), and Health Management Division (HMD)

Management, supervisors, and HMD staff shall immediately refer any employee, known to be the victim or the perpetrator of domestic violence, to the EEO Office and encourage the employee to visit CARE.

FILED: KINGS COUNTY CLERK 08/20/2019 02:32:38 PM    INDEX NO. 518940/2019
NYSCEF DOC. NO. 999    Case 23-1, Document 76, 01/25/2023, 3458054, Page52 of 296    RECEIVED NYSCEF: 08/20/2019

a060

Case 1:17-cv-03476-BMC-JO   Document 4   Filed 06/15/17   Page 59 of 84 PageID #: 139

416R

| | EFFECTIVE DATE 04/20/11 | SUBJECT |
|---|---|---|
| | **04/20/11** | **VICTIMS OF DOMESTIC VIOLENCE, SEX OFFENSES OR STALKING** |
| | CLASSIFICATION # **6301** | |
| | DISTRIBUTION **A** | APPROVED FOR WEB POSTING [X] YES [ ] NO | PAGE **5** OF **7** PAGES |

## VI.   RESPONSIBILITIES (cont.)

**C.**   Personnel Division

Ensure that all employees are provided with a copy of this Directive. Ensure that employees who are victims of domestic violence, sex offenses and stalking and who separate from a spouse (or terminate a relationship with a domestic partner, if covered), can make reasonable changes in benefits where possible, and in accordance with statute, regulation, contract and policy.

**D.**   CARE and Office for Victim Services

Shall maintain up-to-date referral resources on domestic violence hotlines, advocacy groups, shelters, counseling services and legal services (pro bono legal assistance and domestic violence/family court information).   Refer to Directive #7511, CORRECTION ASSISTANCE RESPONSE TO EMPLOYEES (C.A.R.E). The Office for Victim Services will work in collaboration with CARE to ensure the victim is provided with resources, information and support.   The Office for Victim Services can be reached at (718) 546-0899.

**E.**   EEO Office

If an employee is certified to be a victim of domestic violence, sex offenses or stalking, the agency will engage in the interactive process to determine a reasonable accommodation that will allow the employee to satisfy the essential functions of the position and which does not impose an undue hardship.

**F.**   Investigations Division

1.   Hold accountable employees who engage in the following behavior:

a.   misusing Department or City resources to commit an act of domestic violence, a sex offense or stalking;

b.   committing an act of domestic violence, a sex offense or stalking from or at the workplace or from any other location while on official business; or

c.   misusing their job-related authority and/or Department or City resources in order to harm victims and/or assist perpetrators in locating a victim and/or in perpetrating an act of domestic violence, a sex offense or stalking.

2.   Refer all criminal acts to the New York City Police Department and the Inspector General.

FILED: KINGS COUNTY CLERK 03/2019 02:52 PM    INDEX NO. 558946/2019
NYSCEF DOC. NO. 999    Case 23-1, Document 76, 01/25/2023, 3458054, Page53 of 296    RECEIVED NYSCEF: 02/28/2019

416R

| | EFFECTIVE DATE<br>**04/20/11**<br>CLASSIFICATION #<br>**6301** | SUBJECT<br>**VICTIMS OF DOMESTIC VIOLENCE, SEX<br>OFFENSES OR STALKING** | |
|---|---|---|---|
| | DISTRIBUTION<br>**A** | APPROVED FOR WEB POSTING<br>[X] YES   [ ] NO | PAGE **6** OF<br>**7** PAGES |

## VI.    RESPONSIBILITIES (cont.)

3.    Take corrective or disciplinary action, up to and including seeking termination, in accordance with existing collective bargaining unit agreements, statutes and regulations against any employee who is found to have engaged in domestic violence, a sex offense, or stalking by means of threatening, harassing, or abusing a family or household member or other individual at the workplace, from the workplace, or on City business using any workplace resources such as, but not limited to, work time, workplace telephones, facsimile machines, mail, or electronic mail.

4.    In cases in which an agency has verification that an employee is responsible for a domestic violence-related offense, sex offense or stalking or is enjoined by a final order of protection as a result of domestic violence, sex offenses or stalking and the employee, as per the employee's command, has job functions that include the authority to take actions that directly impact victims of domestic violence and/or actions that may protect abusers from appropriate consequences for their behavior, determine if corrective action is warranted, in accordance with existing collective bargaining unit agreements, statutes and regulations.

## VII.   FIREARMS

Firearms privileges will be approved, reviewed and/or revoked in accordance with the procedures set forth in Directive #4511R-A, FIREARMS POLICY AND PROCEDURE, and all applicable federal, state and local laws.

## VIII.  REFERENCES (In the event a referenced document is superseded, the successor document shall apply.)

A.    New York City Human Rights Law (NYC Administrative Code Sections 8-102(16) and (8-107)).

B.    New York City: Citywide Equal Employment Opportunity Policy.

C.    Directive #2232R, REASONABLE ACCOMMODATION, dated 09/04/01

D.    Directive #7511, CORRECTION ASSISTANCE RESPONSE ASSISTANCE FOR EMPLOYEES (C.A.R.E) dated 01/12/07.

E.    Directive #4511R-A, FIREARMS POLICY AND PROCEDURES, dated 06/12/06 (as amended).

FILED: KINGS COUNTY CLERK 03/20/2019 02:52 PM    INDEX NO. 518546/2019
NYSCEF DOC. NO. 199    Case 23-1, Document 76, 01/25/2023, 3458054, Page54 of 296    RECEIVED NYSCEF: 03/20/2019

a062

Case 1:17-cv-03476-BMC-JO   Document 4   Filed 06/15/17   Page 61 of 84 PageID #: 141

'416R

| EFFECTIVE DATE **04/20/11** | SUBJECT |  |
|---|---|---|
| CLASSIFICATION # **6301** | **VICTIMS OF DOMESTIC VIOLENCE, SEX OFFENSES OR STALKING** | |
| DISTRIBUTION **A** | APPROVED FOR WEB POSTING [X] YES [ ] NO | PAGE **7** OF **7** PAGES |

## IX.  ATTACHMENT

REASONABLE ACCOMMODATION REQUEST FORM (FORM #2232R)


## X.  SUPERSEDES

A.   Directive #6300 entitled, DOMESTIC VIOLENCE, dated 03/28/08.

B.   Any other Directive, Operations Order, Teletype, Memorandum, etc., that may be in conflict with the policies and procedures outlined herein.


## XI.  SPECIAL INSTRUCTIONS

A.   Within ten (10) days of the effective date of this order Commanding Officers of Facilities and Divisions shall promulgate a Command Level Order to ensure strict compliance with the provisions outlined herein.

B.   Copies of all Command Level Orders shall be forwarded to the office of the respective Supervising Warden.

FILED: KINGS COUNTY CLERK 02/20/2019 09:52:38 PM   INDEX NO. 518946/2019

NYSEF DOC. NO. 199   Case 23-1, Document 76, 01/25/2023, 3458054, Page55 of 296   RECEIVED NYSCEF: 02/20/2019

a063



| CORRECTION DEPARTMENT<br>CITY OF NEW YORK | FORM NO. 2232R<br>EFF. 09/04/01<br>REF. DIR. #2232R |
|---|---|
| REASONABLE ACCOMMODATION<br>REQUEST FORM | Page 1 of<br>3 Pages |



**INSTRUCTIONS:** Current employees should complete Sections I and III and submit this form pursuant to section V., step I., a. Applicants should complete Sections I and II and submit this form pursuant to section V., step I., b. Return one copy of the completed form to the applicant or employee requesting the accommodation, and immediately forward a second copy of the form to either the agency Disability Rights Coordinator (DRC) or where applicable, to the employee's Supervisor (IV.E.). The DRC should complete and update Section V as appropriate. Agency supervisory staff shall assist applicants or employees in completing this form where requested.

**SECTION I**   *(This section should be completed by both applicants and current employee)*

Name: _____

Address: _____

Telephone Number: _____

**Accommodation Requested (attach additional sheets and supporting**

**documentation as appropriate)** _____

_____

_____

_____

_____

**This accommodation is necessary to assist me in doing the following:**

_____

_____

_____

_____

**SECTION II**   *(Complete this section only if you are a job applicant)*

Position/Title applied for: _____

Unit/Division (if known): _____

Location of Position (if known): _____

E060

FILED: KINGS COUNTY CLERK 08/20/2019 02:52 PM   INDEX NO. 518946/2019
NYSCEF DOC. NO. 199   Case 23-1, Document 76, 01/25/2023, 3458054, Page56 of 296   RECEIVED NYSCEF: 08/20/2019



### CORRECTION DEPARTMENT
### CITY OF NEW YORK

FORM NO. 2232R
EFF. 09/04/01
REF. DIR. #2232R

### REASONABLE ACCOMMODATION
### REQUEST FORM

Page 2 of
3 Pages



**SECTION II** *(for applicants only), continued*
**Job Vacancy Notice Number (if known):** _____

**Part(s) of employment process for which an accommodation is requested (e.g., application, examination, interview):** _____

_____

**Agency Contact Person (if known):** _____

**Date of Examination/Interview:** _____

**SECTION III**   *Complete this section only if you are an employee (even if you are currently on leave).*
**Position/Title:** _____

**Unit or Division:** _____

**Location:** _____

**Supervisor:** _____

**SECTION IV**   *To be completed by agency staff supervising the employment application process or supervising an employee requesting a reasonable accommodation.*
**Supervisor Name and Title:** _____

**Unit/Agency:** _____

**Location:** _____

**Phone:** _____   **Date Request Received:** _____

**Accommodation Provided:** _____

**To make a determination, we need the following additional information (this may include additional medical information)** _____

_____

**The request is denied for the following reasons:** _____

_____

**Supervisor Signature:** _____

*After completing this section, supervisors must return a copy of this form to the applicant or employee, immediately send a copy to the Department DRC, and take such further action as is required by the Reasonable Accommodation Policy and Procedure.*

FILED: KINGS COUNTY CLERK 03/20/2019 02:52:28 PM
NYSCEF DOC. NO. 199
INDEX NO. 558946/2019
RECEIVED NYSCEF: 03/20/2019
Case 23-1, Document 76, 01/25/2023, 3458054, Page57 of 296

a065

| | CORRECTION DEPARTMENT CITY OF NEW YORK | FORM NO. 2232R EFF.09/04/01 REF. DIR. #2232R | |
|---|---|---|---|
| | REASONABLE ACCOMMODATION REQUEST FORM | Page 3 of 3 Pages | |

**SECTION V**   *To be completed by the Department Disability Right Coordinator*

**Name:** _____

**Location:** _____

**Phone:** _____   **Date Received:** _____

**Disability Rights Coordinator Signature:** _____

**DRC comments, with date (DRC should consult the Reasonable Accommodation Policy and Procedure for further guidance on documenting progress and monitoring implementation of any reasonable accommodation).**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Signature:** _____

FILED: KINGS COUNTY CLERK 08/20/2019 02:52:30 PM INDEX NO. 518946/2019
NYSCEF DOC. NO. 99 RECEIVED NYSCEF: 08/20/2019
Case 23-1, Document 76, 01/25/2023, 3458054, Page58 of 296
a066

Case 1:17-cv-03476-BMC-JO   Document 4   Filed 06/15/17   Page 65 of 84 PageID #: 145




## THE CITY OF NEW YORK
## DEPARTMENT OF CORRECTION

# DIRECTIVE

| [X] NEW   [ ] INTERIM*   [ ] REVISED | SUBJECT |
|---|---|
| **EFFECTIVE DATE**   *TERMINATION DATE<br>2/10/92 | **EQUAL EMPLOYMENT<br>OPPORTUNITY OFFICE** |

| CLASSIFICATION<br># 2221 | SUPERSEDES | DATED | DISTRIBUTION<br>A | PAGE 1<br>OF 6 PAGES |
|---|---|---|---|---|

| RECOMMENDED FOR APPROVAL BY REVIEW BOARD MEMBER | AUTHORIZED BY THE COMMISSIONER |
|---|---|
| SIGNATURE | SIGNATURE |

**I.   PURPOSE**

The purpose of this Directive is to define the role of the Department's Equal Employment Opportunity Office (hereinafter referred to as E.E.O. or E.E.O. Office) and to establish policy and procedure governing the internal functioning of the Department's E.E.O. Office. Furthermore, purpose is to ensure the processing and resolution of all employee complaints of discrimination under Title VII, of the Civil Rights Act, as well as State and City Laws, promptly and fairly.

**II.   POLICY**

A.   Employment discrimination, which includes sexual harassment as a form of sex discrimination, is a violation of Federal, State, and City anti-discrimination statutes, and is also a violation of both this Department's Equal Employment Opportunity Policy Statement (see attached Exhibit "A") and this Directive. Employees of this Department who are found by the Departments' E.E.O. Office to have engaged in acts which constitute employment discrimination shall be counseled and/or disciplined accordingly.   The Director of Equal Employment Opportunity may in certain circumstances, seek corrective action to rectify past or current discrimination.

B.   Retaliation
It is unlawful to retaliate against and/or harass any person for filing an Equal Employment Opportunity Complaint or for cooperating in the investigation of an Equal Employment Opportunity Complaint.   Any employee found to have engaged in such conduct shall be disciplined.

FILED: KINGS COUNTY CLERK 03/20/2019 09:52:28 PM   INDEX NO. 518546/2019
NYSCEF DOC. NO. 299   Case 23-1, Document 76, 01/25/2023, 3458054, Page59 of 296   RECEIVED NYSCEF: 03/20/2019

a067

Case 1:17-cv-03476-BMC-JO   Document 4   Filed 06/15/17   Page 66 of 84 PageID #: 146



| EFFECTIVE DATE | SUBJECT | |
|---|---|---|
| 2/10/92 | **EQUAL EMPLOYMENT OPPORTUNITY OFFICE** | |
| CLASSIFICATION # 2221 | | |
| DISTRIBUTION A | | PAGE 2 OF 6 PAGES |

**III.   DEFINITION**

"Equal Employment Opportunity" exists when employment decisions are made without unlawful discrimination based on race, color, sex, national origin, religion, religious observance, age, disability, marital status, sexual orientation, citizenship, or alienage status.

Federal, State and City laws prohibit the following types of discrimination:

**A.** Discriminatory treatment of employees in hiring, assignments, working conditions, salary and benefits, evaluation, promotions, training, transfers, discipline, termination, and any other terms and conditions of employment;

**B.** Policies that have a disparate impact on a group protected by law, unless they are justified by business necessity;

**C.** Failure to make a reasonable accommodation for an employee with a disability, or for an employee's religious observance; and/or

**D.** Discriminatory harassment, intimidation, ridicule, or insults.

**IV.   PROCEDURE**

**A.   DUTIES AND RESPONSIBILITIES OF THE E.E.O. OFFICER**

1. It is the responsibility of the Director of Equal Employment Opportunity to receive and investigate complaints of employment discrimination. An E.E.O. Investigator or Counselor may also receive and investigate employment discrimination complaints under the direction and supervision of the Director. (Supervisors who are aware of a problem involving discrimination or sexual harassment within their areas of responsibility shall counsel those involved as to the illegality of said conduct and as to the Department's policy on those issues. Any case requiring further investigation and/or corrective action shall be referred to the Director of the Equal Employment Opportunity Office immediately for further action. A person accused of discrimination or harassment may also request that the complaint be referred to the Director of E.E.O. for resolution.)

FILED: KINGS COUNTY CLERK 03/20/2019 02:52:28 PM    INDEX NO. 558940/2019
NYSCEF DOC. NO. 199    Case 23-1, Document 76, 01/25/2023, 3458054, Page60 of 296    RECEIVED NYSCEF: 03/20/2019

a068



| | EFFECTIVE DATE 2/10/92 | SUBJECT | EQUAL EMPLOYMENT OPPORTUNITY OFFICE | |
|---|---|---|---|---|
| | CLASSIFICATION # 2221 | | | |
| | DISTRIBUTION A | | PAGE 3 OF 6 PAGES | |

IV.   PROCEDURE   (cont.)

   A.   DUTIES AND RESPONSIBILITIES OF THE E.E.O. OFFICE

      Employees of this Department who believe that they have
      been the victim of employment discrimination may:

        a.   Informally approach their facility, unit, or
            division E.E.O. counselor and seek informal
            resolution of their complaint;

        b.   Seek counselling from the Director of E.E.O.
            without having to pursue further action, such
            as the filing of a complaint;

        c.   File an internal formal complaint of employment
            discrimination with the Director of E.E.O.;
            and/or

        d.   File a formal complaint of discrimination with
            the Federal, State, or Local Civil Rights
            Enforcement Agencies (see attached Exhibit
            "B").

     2.   The Director of E.E.O. shall ensure that upon
        receipt of a formal written complaint of employment
        discrimination, received internally or from an
        external civil rights enforcement agency, the
        following procedures will be followed:

        a.   The complaint shall be logged onto an open case
            list and become active;

        b.   A target date for case disposition shall be
            assigned:

           i. Internal complaints - Sixty (60) days

          ii. External complaints - Ninety (90) days

           These deadlines may be extended by the Director
           of E.E.O on an internal case if extenuating
           circumstances exist, and on external cases with
           the consent of the outside civil rights
           enforcement agency;

        c.   An investigator is assigned to investigate the
            complaint under the direct supervision of the
            Director of E.E.O.;

FILED: KINGS COUNTY CLERK 08/20/2019 02:52:18 PM INDEX NO. 518940/2019
NYSCEF DOC. NO. 999 Case 23-1, Document 76, 01/25/2023, 3458054, Page61 of 296 RECEIVED NYSCEF: 08/20/2019

a069

Case 1:17-cv-03476-BMC-JO   Document 4   Filed 06/15/17   Page 68 of 84 PageID #: 148

| | EFFECTIVE DATE 2/10/92 | SUBJECT EQUAL EMPLOYMENT OPPORTUNITY OFFICE | |
|---|---|---|---|
| | CLASSIFICATION # 2221 | | |
| | DISTRIBUTION A | PAGE 4 OF 6 PAGES | |

IV.  PROCEDURE  (cont.)

A.  DUTIES AND RESPONSIBILITIES OF THE E.E.O. OFFICE

    d.  The investigator reports their findings to the Director who renders a determination of either "Probable Cause" or "No Probable Cause" to believe that employment discrimination has occurred;

    e.  In cases of Probable Cause where formal discipline is appropriate, the director shall recommendation for discipline to the Commissioner;

    f.  The Commissioner may adopt or reject those findings.  If adopted, the Director shall the complainant reserves the right to file with an outside civil rights enforcement agency;

    g.  In appropriate cases, where the Director of E.E.O. has found Probable Cause, and the underlying conduct may constitute a violation of Departmental rules or regulations, the Director may refer the complaint to the Department's Trial Division for appropriate action;

    h.  The Director may also, pursuant to an E.E.O. based grievance and make the appropriate referral;

    i.  In all cases, the complainant must be advised of the disposition of the complaint and in cases where an investigation is conducted so must the respondent be advised

CONCILIATION: In appropriate cases, an attempt will be made to mediate a complaint with the goal that the parties will voluntarily agree to a resolution of the matter involved.  The conciliation process is designed to be concluded within forty-five (45) business days from the time complaint is filed.

C.  The Director of Equal Employment Opportunity shall ensure that both the integrity and confidentiality of the investigation are maintained.

FILED: KINGS COUNTY CLERK 08/20/2019 02:52:20 PM INDEX NO. 518540/2019
NYSCEF DOC. NO. 999
Case 23-1, Document 76, 01/25/2023, 3458054, Page62 of 296
RECEIVED NYSCEF: 08/20/2019

416R

| EFFECTIVE DATE **04/20/11** | SUBJECT | |
|---|---|---|
| CLASSIFICATION # **6301** | **VICTIMS OF DOMESTIC VIOLENCE, SEX OFFENSES OR STALKING** | |
| DISTRIBUTION **A** | APPROVED FOR WEB POSTING  [X] YES  [ ] NO | PAGE 5 OF 7 PAGES |

## VI.   RESPONSIBILITIES (cont.)

C.   Personnel Division

Ensure that all employees are provided with a copy of this Directive.  Ensure that employees who are victims of domestic violence, sex offenses and stalking and who separate from a spouse (or terminate a relationship with a domestic partner, if covered), can make reasonable changes in benefits where possible, and in accordance with statute, regulation, contract and policy.

D.   CARE and Office for Victim Services

Shall maintain up-to-date referral resources on domestic violence hotlines, advocacy groups, shelters, counseling services and legal services (pro bono legal assistance and domestic violence/family court information).   Refer to Directive #7511, CORRECTION ASSISTANCE RESPONSE TO EMPLOYEES (C.A.R.E). The Office for Victim Services will work in collaboration with CARE to ensure the victim is provided with resources, information and support.  The Office for Victim Services can be reached at (718) 546-0899.

E.   EEO Office

If an employee is certified to be a victim of domestic violence, sex offenses or stalking, the agency will engage in the interactive process to determine a reasonable accommodation that will allow the employee to satisfy the essential functions of the position and which does not impose an undue hardship.

F.   Investigations Division

1.   Hold accountable employees who engage in the following behavior:

a.   misusing Department or City resources to commit an act of domestic violence, a sex offense or stalking;

b.   committing an act of domestic violence, a sex offense or stalking from or at the workplace or from any other location while on official business; or

c.   misusing their job-related authority and/or Department or City resources in order to harm victims and/or assist perpetrators in locating a victim and/or in perpetrating an act of domestic violence, a sex offense or stalking.

2.   Refer all criminal acts to the New York City Police Department and the Inspector General.

FILED: KINGS COUNTY CLERK 03/20/2019 03:52:08 PM INDEX NO. 518940/2019
NYSCEF DOC. NO. 199 RECEIVED NYSCEF: 03/20/2019

Case 23-1, Document 76, 01/25/2023, 3458054, Page63 of 296

416R



| EFFECTIVE DATE **04/20/11** | SUBJECT | |
|---|---|---|
| CLASSIFICATION # **6301** | **VICTIMS OF DOMESTIC VIOLENCE, SEX OFFENSES OR STALKING** | |
| DISTRIBUTION **A** | APPROVED FOR WEB POSTING [X] YES [ ] NO | PAGE **6** OF **7** PAGES |



## VI. RESPONSIBILITIES (cont.)

3. Take corrective or disciplinary action, up to and including seeking termination, in accordance with existing collective bargaining unit agreements, statutes and regulations against any employee who is found to have engaged in domestic violence, a sex offense, or stalking by means of threatening, harassing, or abusing a family or household member or other individual at the workplace, from the workplace, or on City business using any workplace resources such as, but not limited to, work time, workplace telephones, facsimile machines, mail, or electronic mail.

4. In cases in which an agency has verification that an employee is responsible for a domestic violence-related offense, sex offense or stalking or is enjoined by a final order of protection as a result of domestic violence, sex offenses or stalking and the employee, as per the employee's command, has job functions that include the authority to take actions that directly impact victims of domestic violence and/or actions that may protect abusers from appropriate consequences for their behavior, determine if corrective action is warranted, in accordance with existing collective bargaining unit agreements, statutes and regulations.

## VII. FIREARMS

Firearms privileges will be approved, reviewed and/or revoked in accordance with the procedures set forth in Directive #4511R-A, FIREARMS POLICY AND PROCEDURE, and all applicable federal, state and local laws.

## VIII. REFERENCES (In the event a referenced document is superseded, the successor document shall apply.)

A. New York City Human Rights Law (NYC Administrative Code Sections 8-102(16) and (8-107)).

B. New York City: Citywide Equal Employment Opportunity Policy.

C. Directive #2232R, REASONABLE ACCOMMODATION, dated 09/04/01

D. Directive #7511, CORRECTION ASSISTANCE RESPONSE ASSISTANCE FOR EMPLOYEES (C.A.R.E) dated 01/12/07.

E. Directive #4511R-A, FIREARMS POLICY AND PROCEDURES, dated 06/12/06 (as amended).

FILED: KINGS COUNTY CLERK 08/2019 09:52:38 PM

INDEX NO. 518946/2019

NYSCEF DOC. NO. 199

Case 23-1, Document 76, 01/25/2023, 3458054, Page64 of 296

RECEIVED NYSCEF: 08/28/2019

a072

Case 1:17-cv-03476-BMC-JO   Document 4   Filed 06/15/17   Page 71 of 84 PageID #: 151

416R

| EFFECTIVE DATE | SUBJECT | | |
|---|---|---|---|
| 04/20/11 | **VICTIMS OF DOMESTIC VIOLENCE, SEX OFFENSES OR STALKING** | | |
| CLASSIFICATION # 6301 | | | |
| DISTRIBUTION | APPROVED FOR WEB POSTING | PAGE 7 OF | |
| A | [X] YES   [ ] NO | 7 PAGES | |

## IX.  ATTACHMENT

REASONABLE ACCOMMODATION REQUEST FORM (FORM #2232R)

## X.  SUPERSEDES

A.   Directive #6300 entitled, DOMESTIC VIOLENCE, dated 03/28/08.

B.   Any other Directive, Operations Order, Teletype, Memorandum, etc., that may be in conflict with the policies and procedures outlined herein.

## XI.  SPECIAL INSTRUCTIONS

A.   Within ten (10) days of the effective date of this order Commanding Officers of Facilities and Divisions shall promulgate a Command Level Order to ensure strict compliance with the provisions outlined herein.

B.   Copies of all Command Level Orders shall be forwarded to the office of the respective Supervising Warden.

**United Nations**                                                    **A/RES/40/34**



# General Assembly

Distr. GENERAL

29 November 1985

ORIGINAL:
ENGLISH

A/RES/40/34
29 November 1985
96th plenary meeting

Declaration of Basic Principles of Justice
for Victims of Crime and Abuse of Power

The General Assembly,

Recalling that the Sixth United Nations Congress on the Prevention of
Crime and the Treatment of Offenders recommended that the United Nations
should continue its present work on the development of guidelines and
standards regarding abuse of economic and political power,

Cognizant that millions of people throughout the world suffer harm as a
result of crime and the abuse of power and that the rights of these victims
have not been adequately recognized,

Recognizing that the victims of crime and the victims of abuse of power,
and also frequently their families, witnesses and others who aid them, are
unjustly subjected to loss, damage or injury and that they may, in addition,
suffer hardship when assisting in the prosecution of offenders,

1.     Affirms the necessity of adopting national and international
measures in order to secure the universal and effective recognition of, and
respect for, the rights of victims of crime and of abuse of power;

2.     Stresses the need to promote progress by all States in their efforts
to that end, without prejudice to the rights of suspects or offenders;

3.     Adopts the Declaration of Basic Principles of Justice for Victims of
Crime and Abuse of Power, annexed to the present resolution, which is designed
to assist Governments and the international community in their efforts to
secure justice and assistance for victims of crime and victims of abuse of
power;

4.     Calls upon Member States to take the necessary steps to give effect
to the provisions contained in the Declaration and, in order to curtail
victimization as referred to hereinafter, endeavour:

(a)   To implement social, health, including mental health, educational,
economic and specific crime prevention policies to reduce victimization and
encourage assistance to victims in distress;

(b)   To promote community efforts and public participation in crime
prevention;

(c)    To review periodically their existing legislation and practices in order to ensure responsiveness to changing circumstances, and to enact and enforce legislation proscribing acts that violate internationally recognized norms relating to human rights, corporate conduct, and other abuses of power;

(d)    To establish and strengthen the means of detecting, prosecuting and sentencing those guilty of crimes;

(e)    To promote disclosure of relevant information to expose official and corporate conduct to public scrutiny, and other ways of increasing responsiveness to public concerns;

(f)    To promote the observance of codes of conduct and ethical norms, in particular international standards, by public servants, including law enforcement, correctional, medical, social service and military personnel, as well as the staff of economic enterprises;

(g)    To prohibit practices and procedures conducive to abuse, such as secret places of detention and incommunicado detention;

(h)    To co-operate with other States, through mutual judicial and administrative assistance, in such matters as the detection and pursuit of offenders, their extradition and the seizure of their assets, to be used for restitution to the victims;

5.    Recommends that, at the international and regional levels, all appropriate measures should be taken:

(a)    To promote training activities designed to foster adherence to United Nations standards and norms and to curtail possible abuses;

(b)    To sponsor collaborative action-research on ways in which victimization can be reduced and victims aided, and to promote information exchanges on the most effective means of so doing;

(c)    To render direct aid to requesting Governments designed to help them curtail victimization and alleviate the plight of victims;

(d)    To develop ways and means of providing recourse for victims where national channels may be insufficient;

6.    Requests the Secretary-General to invite Member States to report periodically to the General Assembly on the implementation of the Declaration, as well as on measures taken by them to this effect;

7.    Also requests the Secretary-General to make use of the opportunities, which all relevant bodies and organizations within the United Nations system offer, to assist Member States, whenever necessary, in improving ways and means of protecting victims both at the national level and through international co-operation;

8.    Further requests the Secretary-General to promote the objectives of the Declaration, in particular by ensuring its widest possible dissemination;

9.    Urges the specialized agencies and other entities and bodies of the United Nations system, other relevant intergovernmental and non-governmental organizations and the public to co-operate in the implementation of the provisions of the Declaration.

ANNEX

Declaration of Basic Principles of Justice for Victims
of Crime and Abuse of Power

## A. Victims of Crime

1. "Victims" means persons who, individually or collectively, have suffered harm, including physical or mental injury, emotional suffering, economic loss or substantial impairment of their fundamental rights, through acts or omissions that are in violation of criminal laws operative within Member States, including those laws proscribing criminal abuse of power.

2. A person may be considered a victim, under this Declaration, regardless of whether the perpetrator is identified, apprehended, prosecuted or convicted and regardless of the familial relationship between the perpetrator and the victim. The term "victim" also includes, where appropriate, the immediate family or dependants of the direct victim and persons who have suffered harm in intervening to assist victims in distress or to prevent victimization.

3. The provisions contained herein shall be applicable to all, without distinction of any kind, such as race, colour, sex, age, language, religion, nationality, political or other opinion, cultural beliefs or practices, property, birth or family status, ethnic or social origin, and disability.

### Access to justice and fair treatment

4. Victims should be treated with compassion and respect for their dignity. They are entitled to access to the mechanisms of justice and to prompt redress, as provided for by national legislation, for the harm that they have suffered.

5. Judicial and administrative mechanisms should be established and strengthened where necessary to enable victims to obtain redress through formal or informal procedures that are expeditious, fair, inexpensive and accessible. Victims should be informed of their rights in seeking redress through such mechanisms.

6. The responsiveness of judicial and administrative processes to the needs of victims should be facilitated by:

   (a) Informing victims of their role and the scope, timing and progress of the proceedings and of the disposition of their cases, especially where serious crimes are involved and where they have requested such information;

   (b) Allowing the views and concerns of victims to be presented and considered at appropriate stages of the proceedings where their personal interests are affected, without prejudice to the accused and consistent with the relevant national criminal justice system;

   (c) Providing proper assistance to victims throughout the legal process;

   (d) Taking measures to minimize inconvenience to victims, protect their privacy, when necessary, and ensure their safety, as well as that of their families and witnesses on their behalf, from intimidation and retaliation;

   (e) Avoiding unnecessary delay in the disposition of cases and the execution of orders or decrees granting awards to victims.

7. Informal mechanisms for the resolution of disputes, including mediation, arbitration and customary justice or indigenous practices, should be utilized where appropriate to facilitate conciliation and redress for victims.

### Restitution

8. Offenders or third parties responsible for their behaviour should, where appropriate, make fair restitution to victims, their families or dependants. Such restitution should include the return of property or payment for the harm or loss suffered, reimbursement of expenses incurred as a result of the

victimization, the provision of services and the restoration of rights.

9.   Governments should review their practices, regulations and laws to consider restitution as an available sentencing option in criminal cases, in addition to other criminal sanctions.

10.   In cases of substantial harm to the environment, restitution, if ordered, should include, as far as possible, restoration of the environment, reconstruction of the infrastructure, replacement of community facilities and reimbursement of the expenses of relocation, whenever such harm results in the dislocation of a community.

11.   Where public officials or other agents acting in an official or quasi-official capacity have violated national criminal laws, the victims should receive restitution from the State whose officials or agents were responsible for the harm inflicted. In cases where the Government under whose authority the victimizing act or omission occurred is no longer in existence, the State or Government successor in title should provide restitution to the victims.

<div align="center">Compensation</div>

12.   When compensation is not fully available from the offender or other sources, States should endeavour to provide financial compensation to:

   (a)   Victims who have sustained significant bodily injury or impairment of physical or mental health as a result of serious crimes;

   (b)   The family, in particular dependants of persons who have died or become physically or mentally incapacitated as a result of such victimization.

13.   The establishment, strengthening and expansion of national funds for compensation to victims should be encouraged. Where appropriate, other funds may also be established for this purpose, including those cases where the State of which the victim is a national is not in a position to compensate the victim for the harm.

<div align="center">Assistance</div>

14.   Victims should receive the necessary material, medical, psychological and social assistance through governmental, voluntary, community-based and indigenous means.

15.   Victims should be informed of the availability of health and social services and other relevant assistance and be readily afforded access to them.

16.   Police, justice, health, social service and other personnel concerned should receive training to sensitize them to the needs of victims, and guidelines to ensure proper and prompt aid.

17.   In providing services and assistance to victims, attention should be given to those who have special needs because of the nature of the harm inflicted or because of factors such as those mentioned in paragraph 3 above.

<div align="center">B.   Victims of abuse of power</div>

18.   "Victims" means persons who, individually or collectively, have suffered harm, including physical or mental injury, emotional suffering, economic loss or substantial impairment of their fundamental rights, through acts or omissions that do not yet constitute violations of national criminal laws but of internationally recognized norms relating to human rights.

19.   States should consider incorporating into the national law norms proscribing abuses of power and providing remedies to victims of such abuses. In particular, such remedies should include restitution and/or compensation, and necessary material, medical, psychological and social assistance and

Case 23-1, Document 76, 01/25/2023, 3458054, Page69 of 296

A/RES/40/34. Declaration of basic principles of justice for victims of crime and abuse of ...    Page 5 of 5

support.

20.    States should consider negotiating multilateral international treaties relating to victims, as defined in paragraph 18.

21.    States should periodically review existing legislation and practices to ensure their responsiveness to changing circumstances, should enact and enforce, if necessary, legislation proscribing acts that constitute serious abuses of political or economic power, as well as promoting policies and mechanisms for the prevention of such acts, and should develop and make readily available appropriate rights and remedies for victims of such acts.

FILED: KINGS COUNTY CLERK 08/2012 09:52:38 PM
INDEX NO. 558940/2019
NYSCEF DOC. NO. 999
RECEIVED NYSCEF: 08/28/2019

Case 23-1, Document 76, 01/25/2023, 3458054, Page70 of 296

B262

Case 17-3373, Document 59, 03/05/2018, 2248800, Page103 of 172

Case 1:17-cv-08475-BMC-JO Document 29-2 Filed 07/28/17 Page 11 of 50 PageID #: 204

State of New York ✦ Office of the Attorney General

# STALKING
## REALITIES AND RESPONSES

**IF YOU BELIEVE YOU ARE IN IMMEDIATE DANGER, CALL 911 FOR EMERGENCY ASSISTANCE.**

**IF YOU ARE IN AN ABUSIVE SITUATION, DO NOT TAKE THIS BOOKLET HOME.**



**ELIOT SPITZER**
Attorney General

This guide provides information concerning the serious crime

FILED: KINGS COUNTY CLERK 08/20/2019 02:52:38 PM
INDEX NO. 518948/2019
NYSCEF DOC. NO. 999
Case 23-1, Document 76, 01/25/2023, 3458054, Page71 of 296
RECEIVED NYSCEF: 08/20/2019
a253

Case 17-3373, Document 59, 03/05/2018, 2248800, Page104 of 172

Case 1:17-cv-09476-BMC-JO   Document 29-2   Filed 07/28/17   Page 12 of 50 PageID #: 295

of **stalking** and an overview of the rights, resources, and remedies available to victims.

## WHAT IS STALKING?

**Stalking** is a persistent and unwanted pursuit of an individual by another that would cause a reasonable person to fear. It is an intentional and unpredictable course of conduct that can be annoying, intrusive, intimidating, threatening and harmful. Victims may be followed or watched, or harassed with relentless unwanted tokens of affection or messages. Even behaviors that seem harmless, such as sending flowers or gifts, may be deemed important incidents, depending on the context.

## *REALITIES OF STALKING*

**Stalking** frequently involves an escalating series of incidents. The vast majority of stalkers are obsessed with their victims, intent on exerting power and control over their target, using a variety of tools including high-tech devices. Common behaviors of stalkers include, but are not limited to:

-1-

FILED: KINGS COUNTY CLERK 08/20/2019 02:52:28 PM

NYSCEF DOC. NO. 990

INDEX NO. 518940/2019

RECEIVED NYSCEF: 08/20/2019

a254

Case 23-1, Document 76, 01/25/2023, 3458054, Page72 of 296

Case 17-3373, Document 59, 03/05/2018, 2248800, Page105 of 172

Case 1:17-cv-03476-BMC-JO   Document 28-2   Filed 07/28/17   Page 13 of 50 PageID #: 296

- Following or watching the victim
- Trespassing or being present near the victim's home or workplace
- Stealing or vandalizing mail or property of the victim
- Initiating unwanted contact or communications through deliveries, telephone calls, mail, pagers, e-mail, or any
  other medium to the victim and her/his family, neighbors or co-workers
- Using digital or video cameras, GPS (global positioning systems) and other tracking devices
- Monitoring the victim's Internet history and computer usage

In this information age, **Cyberstalking**, which is the use of electronic means to stalk another person, is a harsh reality.

## STATISTICS

**Stalking** affects men and women without regard for race, socioeconomic status, or individual associations and preferences. According to the National Violence Against Women Survey (NVAWS):

- One out of every 12 women will be stalked during her lifetime

~2~

E077

FILED: KINGS COUNTY CLERK 08/20/2019 02:32 PM INDEX NO. 558946/2019
NYSCEF DOC. NO. 199 Case 23-1, Document 76, 01/25/2023, 3458054, Page73 of 296 RECEIVED NYSCEF: 08/20/2019

s255

Case 17-3373, Document 59, 03/05/2018, 2248800, Page106 of 172

Case 1:17-cv-03478-BMC-JO Document 29-2 Filed 07/28/17 Page 14 of 50 PageID #: 297

- One out of 45 men will be stalked during his lifetime
- 1,006,970 women are stalked annually
- 370,990 men are stalked annually
- The average duration of stalking behavior is 1.8 years

According to the National Institute of Justice, stalking, intimacy and domestic violence repeatedly intersect:

- Strangers are the perpetrators in only 23 percent of female stalking incidents.
- 30% of male victims are stalked by current or former intimate partners
- 38% of female victims are stalked by current or former husbands
- 13% of college women were stalked during one six to nine month period and 80% of those victims knew their stalkers

## *IMPACT*

Stalking often has devastating and far-reaching consequences. It can escalate to violence and result in murder. According to the NVAWS, 81% of women stalked by a present or a former intimate partner have been physically assaulted by that person and 31% of women stalked by an intimate have been sexually assaulted by that person. According to the National Center for

-3-

Victims of Crime, 76% of female murder victims and 85% of attempted murder victims were stalked by their intimate partners during the year prior to their homicide or attempted murder.

The impact of stalking includes emotional, physical and financial consequences. Because of the danger and feelings of insecurity and vulnerability, victims of stalking are frequently forced to relocate, change jobs, obtain orders of protection and other security devices, and seek counseling. There are also increased costs for society which are attributed to absenteeism, lost productivity, health care and law enforcement.

## *RESPONSES*

Potential victims who suspect that they are being stalked should report all incidents to local law enforcement. Early intervention is key. Evidence collection is an important part of investigating a stalking situation. To assist law enforcement, stalking victims should thoroughly document every incident by keeping a journal noting the time, date, and other relevant information for each. Further, victims should avoid contact with the stalker as any response, even a negative one, may be viewed by the stalker as encouraging.

-4-

FILED: KINGS COUNTY CLERK 08/20/2019 02:52 PM

INDEX NO. 518946/2019

NYSCEF DOC. NO. 990

RECEIVED NYSCEF: 08/20/2019

Case 23-1, Document 76, 01/25/2023, 3458054, Page75 of 296

a257

Case 17-3373, Document 59, 03/05/2018, 2248800, Page108 of 172

Case 1:17-cv-03476-BMC-JO Document 29-2 Filed 07/20/17 Page 16 of 50 PageID #: 299

An individual who is being stalked (or thinks they might be), may take the following precautions:

- Make no response to cards, letters, gifts, or phone calls by the stalker
- Be very aware of surroundings
- Change locks, passwords and pin numbers
- Create a personalized safety plan
- Seek an Order of Protection
- Take photographs of damaged property
- Use a corded phone, or a pay phone, for sensitive conversations—not a cordless or cellular phone that can be intercepted
- Use a safe computer, such as one at a local library if there is concern that the stalker may have access to a personal computer
- Consider getting a new cell phone and arranging for a pre-paid cell phone—inquire about a phone donation program for victims
- Check cell phone settings for services that will reveal locations at any time—turn off this feature
- Search for personal information on the Internet and contact the various agencies to request that this information be kept private

Various domestic violence and victim service agencies in your community may assist stalking victims in developing a safety plan and an incident log.

-5-

FILED: KINGS COUNTY CLERK 08/20/2019 02:52:38 PM
Case 23-1, Document 76, 01/25/2023, 3458054, Page76 of 296
NYSCEF DOC. NO. 999
INDEX NO. 558946/2019
RECEIVED NYSCEF: 08/20/2019

a258

Case 17-3373, Document 59, 03/05/2018, 2248800, Page109 of 172

Case 1:17-cv-03476-BMC-JO   Document 29-2   Filed 07/28/17   Page 17 of 50 PageID #: 300

# NEW YORK STATE LAWS
# RELATING TO STALKING

New York State has enacted several statutes addressing domestic violence and stalking.   Specifically, these laws, which can mostly be found in the Penal Law, Family Court Act and the Executive Law focus on the security and safety of the victim and holding the perpetrator accountable.

Both family court and criminal court have jurisdiction over these designated family offenses (Family Ct. Act § 812): disorderly conduct, harassment in the first degree, harassment in the second degree, aggravated harassment in the second degree, stalking in the first degree, stalking in the second degree, stalking in the third degree, stalking in the fourth degree, menacing in the second degree, menacing in the third degree, reckless endangerment, assault in the second degree, assault in the third degree or an attempted assault.  However, only a victim who is related to the abuser by blood or marriage (including former spouses) or has a child in common with the abuser can choose to go to either or both family court and criminal court for help and an order of protection.  Other victims may seek protection from criminal court.

Key laws that address the impact of stalking are described below:

**N.Y. Penal Law §§ 120.45, 120.50, 120.55, 120.60**

-6-

E081

FILED: KINGS COUNTY CLERK 08/20/2019 02:52 PM
NYSCEF DOC. NO. 399
INDEX NO. 518940/2019
RECEIVED NYSCEF: 08/20/2019

Case 23-1, Document 76, 01/25/2023, 3458054, Page77 of 296

a259

Case 17-3373, Document 59, 03/05/2018, 2248800, Page110 of 172

Case 1:17-cv-03476-BMC-JO   Document 29-2   Filed 07/28/17   Page 18 of 50 PageID #: 301

These statutes create the separate crime of stalking. Four degrees of the crime are established; violators could face up to seven years in prison for a class D Felony conviction for the first degree offense. The law escalates the level of the offense based on whether the offender has committed a stalking offense in the past, committed the act of stalking against several individuals, or stalked a person under the age of fourteen, among other factors. The stalking offenses cover the primary victim, members of the victim's immediate family and acquaintances of the victim.

**N.Y. Penal Law §§ 250.00, 250.40, 250.45, 250.50, 250.55, 250.60, 250.65**
These statutes establish criminal penalties for acts of video voyeurism. It is unlawful for someone to intentionally and for the purpose of degrading or abusing a person, or for his/her own sexual arousal, amusement, entertainment or profit, to use or install a digital, mechanical, or other electronic imaging device to secretly view, broadcast or record images of sexual or intimate body parts of an unknowing person at a time and in a location where that person has a reasonable expectation of privacy, such as in a bedroom, restroom, shower or fitting room. The first-degree offense is a class D Felony punishable by a term of up to seven years in state prison and the second-degree offense is a class E Felony punishable by incarceration up to four years. The Penal law also provides for misdemeanor and felony penalties for the crime of disseminating an unlawful surveillance image in the first and second degree.

-7-

E082

FILED: KINGS COUNTY CLERK 08/20/2019 02:52:28 PM INDEX NO. 518946/2019
NYSCEF DOC. NO. 199 RECEIVED NYSCEF: 08/20/2019

Case 23-1, Document 76, 01/25/2023, 3458054, Page78 of 296

a260

Case 17-3373, Document 59, 03/05/2018, 2248800, Page111 of 172

Case 1:17-cv-03476-BMC-JO  Document 28-2  Filed 07/28/17  Page 19 of 50 PageID #: 302

## N.Y. Penal Law §250.05

This law provides for a criminal penalty for eavesdropping. A person is guilty of eavesdropping when he unlawfully engages in wiretapping, mechanical overhearing of a conversation, or intercepting or accessing of an electronic communication. The offense is a class E Felony.

## Criminal Procedure Law § 530.14 and Family Court Act §842-a

These statutes authorize firearm license suspension and revocation by the court in certain stalking cases.

## Executive Law § 631

This law establishes eligibility for compensation from the crime victims board. Victims of harassment, menacing and stalking who are not physically injured as a direct result of the crime may file for an award that includes loss of earning or support, the unreimbursed cost of repair or replacement of essential personal property that has been lost, damaged or destroyed, the unreimbursed cost for security devices to enhance the personal protection of the victim, transportation expenses incurred for necessary court appearances in connection with the prosecution of the crime, the unreimbursed costs of counseling and the costs associated with occupational or job training.

-8-

Case 23-1, Document 76, 01/25/2023, 3458054, Page79 of 296

*RESOURCES*

If you are a victim of stalking, several resources are available for assistance and information:

# NEW YORK STATE

**New York State Crime Victims Board**
(800) 247-8035
New York City  (800) 579-0689
Buffalo  (716) 847-7992
Albany  (800) 579-9541

**New York State Office for the Prevention of Domestic Violence**
(518) 457-5800
*www.opdv.state.ny.us*

**New York State Coalition Against Domestic Violence**
English: (800) 942 - 6906;
Spanish: (800) 942 - 6908
*www.nyscadv.org*

**New York State Capital District Anti-Stalking Task Force**
*www.stalkmenot.org*

-9-

Case 23-1, Document 76, 01/25/2023, 3458054, Page80 of 296

Binghamton
**Crime Victim Assistance Center, Inc.**
(607) 723-3200
*www.cvac.us*

Broome County
**SOS Shelter, Inc.**
(607) 748-7453
*www.sosshelter.org*

Jefferson County
**Victims Assistance Center of Jefferson County**
(315) 782-1855

New York City
**Safe Horizon**
(212) 577-7777
*or* (800) 821-HOPE
*www.safehorizon.org/page.php?page=stalking*

Oneida County
**YWCA of Mohawk Valley**
(315) 797-7740

Plattsburgh
**Crisis Center of Clinton, Essex, and Franklin Counties**
315.422.7273
*or* (518) 561-2330

-10-

FILED: KINGS COUNTY CLERK 08/20/2019 02:52:23 PM

NYSCEF DOC. NO. 999

INDEX NO. 558940/2019

RECEIVED NYSCEF: 08/28/2019

Case 23-1, Document 76, 01/25/2023, 3458054, Page81 of 296

a263

Case 17-3373, Document 59, 03/05/2018, 2248800, Page114 of 172

Case 1:17-cv-03476-BMC-JO  Document 29-2  Filed 07/28/17  Page 22 of 50 PageID #: 305

Rochester
**Alternatives for Battered Women**
(585) 232-7353
*www.abwrochester.org*

St. Lawrence County
**CAVA Crisis & Counseling Center**
(315) 386-3777

Suffolk County
**Suffolk County Coalition Against Domestic Violence**
(631) 666-8833

Syracuse
**Vera House**
(315) 425-0818
*www.verahouse.org*

## NATIONAL

**CyberAngels**
*www.cyberangels.org/stalking/*

**Family Violence Prevention Fund**
(415) 252-8900
*www.endabuse.org*

-11-

FILED: KINGS COUNTY CLERK 08/20/2019 02:52:28 PM

INDEX NO. 558946/2019

NYSCEF DOC. NO. 199

Case 23-1, Document 76, 01/25/2023, 3458054, Page82 of 296

RECEIVED NYSCEF: 08/20/2019

a264

Case 17-3373, Document 59, 03/05/2018, 2248800, Page115 of 172

Case 1:17-cv-03476-BMC-JO   Document 29-2   Filed 07/28/17   Page 23 of 50 PageID #: 306

**National Center for Victims of Crime**
(800) FYI-CALL
TTY: (800) 211-7996   www.ncvc.org

**NOW Legal Defense and Education Fund**
(212) 925-6635
*www.nowldef.org*

**Stalking Resource Center**
(202) 467-8700
*www.ncvc.org/src*

-12-

E087

Case 23-1, Document 76, 01/25/2023, 3458054, Page83 of 296

# The New York Times

# Rikers Tumult Rises: Prison Official Accused of Spying on Investigator

By William K. Rashbaum and Michael Schwirtz

May 8, 2017

New York City's Department of Investigation has picked apart practically every facet of the troubled Rikers Island jail complex in recent years, including abuses committed by guards and inmates and the misuse of official cars by the commissioner and his staff.

Now it is taking aim at the very person who is supposed to prevent wrongdoing at the jail from within — the head of the Correction Department's Investigation Division.

The Department of Investigation believes the jail official, Gregory Kuczinski, has orchestrated a spying campaign against it and has called for his removal. On Monday morning, Mr. Kuczinski was removed from his position and placed on modified duty.

In a long letter to Mayor Bill de Blasio, the Department of Investigation said Mr. Kuczinski and his subordinates violated city rules and regulations by repeatedly listening in on telephone calls between an investigator with the agency and inmates who were serving as informants, several people with knowledge of the letter said.

In an interview late on Sunday, the Correction Department commissioner, Joseph Ponte, insisted that "there was no improper eavesdropping." As soon as Correction Department investigators determined that they had been listening in on a conversation involving a Department of Investigation staff member, he said, they stopped the surveillance.

"Clearly there was no intent to interfere with D.O.I. and anything they were doing," he said.

Mr. Kuczinski, in a separate phone interview on Sunday, denied wrongdoing and called the reaction of officials at the investigation agency "ridiculous," saying: "Are they trying to cover something up? I don't know."

The letter from the head of the department, Mark G. Peters, was sent to Mayor de Blasio on Wednesday, according to the people. They spoke on the condition of anonymity because the contents of the letter were confidential.

The letter said that Mr. Ponte had learned of the surveillance in February, after another official had shut it down, the people said. But Mr. Ponte did not report the surveillance to the investigation agency, nor did he take any action against Mr. Kuczinski, whom he had promoted into his current job.

The accusation came just a week after the Department of Investigation issued a report sharply rebuking Mr. Ponte, Mr. Kuczinski and two other top correction officials for misusing their city cars. It was the latest in a series of embarrassing revelations of deep systemic problems in the city jails uncovered by the agency.

Paired with the rebuke over the cars, the accusations in the letter underscore how Rikers continues to be plagued with problems, including brutality on the cell blocks, corruption in the correction officer ranks and a disturbing level of mismanagement from the commissioner's suite on down.

But the accusations against the city jails' chief investigator, by another department's investigators, represent a low point for the jails system. They suggest that the very person responsible for ferreting out wrongdoing at Rikers may have been focused instead on protecting the jail, and those who work there, from further scrutiny.

The mayor, in a statement issued by his press secretary, Eric F. Phillips, acknowledged the gravity of the accusations and suggested that they would lead to change.

"These are serious and troubling allegations," the statement said. "We will work with the Department of Correction and the Department of Investigation to determine what happened and what changes must occur to ensure that it doesn't happen again."

Two city officials said the mayor was expected to order that Mr. Kuczinski be removed from his post as early as Monday and that he be placed on modified duty.

Mr. Kuczinski, in the interview on Sunday, defended his actions and disputed some aspects of the Department of Investigation's account. He said he learned of the recordings only in early February, soon after he took over the unit that monitors phone calls, when Mr. Ponte asked him to investigate the suspicions of a senior Correction Department official. That official, Mr. Kuczinski said, believed that four of the calls suggested that someone from the investigations agency was trying to frame Correction Department officials.

Mr. Kuczinski said he never listened to the recorded calls himself. Instead, he said, he assigned two members of his staff to investigate, but because of the demands of his new role, it took him two weeks to do so. It took the staff members several weeks to review the recordings and conclude that the calls did not indicate an attempt to frame anyone, he said. He said he did not initially notify the Department of Investigation about the matter in February because he believed it would have posed a conflict for the agency.

Case 23-1, Document 76, 01/25/2023, 3458054, Page85 of 296

b003



Gregory Kuczinski
City of New York Department of Corrections

Mr. Ponte defended Mr. Kuczinski, affirming Mr. Kuczinski's assertion that he was not initially involved with the call monitoring unit that had picked up the conversation between the Department of Investigation employee and an inmate informant. Mr. Ponte acknowledged that better communication with the Department of Investigation could have prevented the monitoring of the investigator's calls, but he placed some of the blame on the investigation agency.

"There are ways that D.O.I. could have told us that, these numbers, don't listen to them," he said.

The hiring of Mr. Kuczinski at the Correction Department remains something of a mystery.

As the deputy commissioner in charge of the agency's Investigation Division, he is responsible for uncovering administrative misconduct in the ranks of the department's 10,000 officers and investigating crimes committed by inmates.

But when he joined the jail agency in March 2015 as the division's No. 2 official, Mr. Kuczinski, a retired New York Police Department sergeant and a lawyer, had little investigative and no internal affairs experience from his police tenure. Nonetheless, Mr. Ponte promoted him to the division's top position about a year later, just days after he was rebuked and fined $1,500 for assigning an on-duty subordinate to drive him and his family to the airport for a summer vacation.

Officials at City Hall, the Department of Investigation and the Correction Department could not explain how Mr. Ponte came to hire and then promote Mr. Kuczinski despite his limited relevant experience. Mr. Kuczinski said he was hired after responding to a newspaper advertisement.

The investigation agency did not conclude that the spying was undertaken because of the report on vehicle misuse, the people with knowledge of the letter said. But the letter "did note concerns of the timing of certain actions regarding monitoring of D.O.I. investigator phone calls, especially at the direction of Kuczinski, that immediately followed D.O.C. being notified about the vehicle investigation," one of the people said.

Mr. Kuczinski's investigators at the Department of Correction are permitted to listen to inmate calls, but not when they know they are with lawyers, clergy, doctors or investigators with the Department of Investigation. If Mr. Kuczinski believed he had uncovered a corrupt investigator, the person said, he should have notified the agency or some other city or law enforcement official. There is no indication, the person said, that he did so.

In recent years, the Department of Investigation has prioritized inquiries into corruption and brutality at Rikers Island. Its investigations have identified officers who have smuggled drugs and weapons into the jails and determined that the Correction Department had hired gang members and people with criminal backgrounds as officers. Since 2014, 38 jail staff members have been arrested as a result of Department of Investigation inquiries.

The Department of Investigation report on the misuse of city vehicles by Mr. Ponte, Mr. Kuczinski and other senior officials said they had been referred to the city's ethics watchdog, the Conflicts of Interest Board, for possible discipline.

Mayor de Blasio is facing increasing criticism for his vocal support of Mr. Ponte — and by implication, other correction officials. The mayor has said he accepts Mr. Ponte's defense that he inadvertently violated city rules by repeatedly driving his government vehicle to Maine, where he spent a total of 90 days last year, because he had been advised by unnamed staff members that he was allowed to do so.

The mayor's support of the commissioner and other correction officials has prompted comparisons by department critics with the fate of low-level city employees who in recent years have been docked as much as 10 vacation days for using a city car for personal reasons for one day.

Mr. Ponte has made a number of questionable appointments and promotions since becoming commissioner in April 2014. Months into his tenure, Mr. Ponte promoted William Clemons to chief of department, the top uniformed position, despite an objection

from the Department of Investigation. Several years earlier, an internal Correction[b005] Department audit had recommended Mr. Clemons be fired for presenting distorted data that made it appear as if violence was decreasing when in fact it was going up. Mr. Ponte's predecessor ignored the recommendation and also promoted Mr. Clemons.

Mr. Clemons was forced to resign after a New York Times investigation into the distorted data.

The Correction Department's Investigation Division has been in disarray for a long time. In August 2014, Preet Bharara, then the United States attorney for the Southern District of New York, published a report documenting astounding brutality at city jails and singled out the division for aiding what was described as a "deep-seated culture of violence" by failing to properly discipline guards.

Shortly after, Mr. Ponte appointed Michael Blake, a former senior official with the Police Department, to lead the division. Mr. Blake was another unusual appointment. Previous division heads had spent many years as prosecutors. Mr. Blake had never been a prosecutor, and his only experience investigating officer misconduct came during a stint that lasted less than two years in the Patrol Services Bureau two decades ago.

Mr. Blake lasted a little more than a year in the position. He left in December 2015, replaced by Mr. Kuczinski, who served as acting head of the division until April 2016.

Although the unit has expanded in recent years and closes cases more rapidly than in the past, under Mr. Kuczinski it has still suffered from many of the same deficiencies outlined in Mr. Bharara's report three years ago.

In a report last month, a federal monitoring team responsible for overseeing the reform effort at Rikers harshly criticized the division, accusing it of failing "to pursue disciplinary action in cases where there was objective evidence of wrongdoing."

A version of this article appears in print on May 7, 2017, on Page A1 of the New York edition with the headline: Rikers Tumult Rises: Monitor Accused of Spying

READ 64 COMMENTS

b006



The City of New York
Department of Investigation

**MARK G. PETERS**
**COMMISSIONER**

90 MAIDEN LANE
NEW YORK, NY 10038
212-825-5900

Release #22-2018
nyc.gov/doi

**FOR IMMEDIATE RELEASE**
**THURSDAY, MAY 3, 2018**

**CONTACT: DIANE STRUZZI**
**NICOLE TURSO**
**(212) 825-5931**

## DOI INVESTIGATION REVEALS CONTINUING FAILURES BY THE DEPARTMENT OF CORRECTION (DOC) TO PROPERLY SCREEN RECRUITS FOR RED FLAGS
### *Failures identified by DOI in 2015 remain and recommended changes were never adopted by DOC*

Mark G. Peters, Commissioner of the New York City Department of Investigation ("DOI") today issued a Report detailing the findings of a year-long probe of the City Department of Correction's ("DOC") hiring practices for Correction Officers ("COs"), exposing persistent problems at the agency's Applicant Investigation Unit ("AIU"). DOI's investigation found a significant number of the COs hired in the January, June, and December 2016 classes continued to have red flags signaling corruption and safety hazards that should have precluded their hiring or required them to undergo monitoring once they were hired, including previous arrest records, employment termination, and contact with inmates. This investigation is a follow up to DOI's 2015 Report, which is linked here (2015 report) and uncovered vulnerabilities and breakdowns in the AIU's screening processes, including antiquated and haphazardly filed personnel documents and a failure to perform basic background and credit checks on individuals applying to become COs, that allowed recruits with significant background issues to be hired. As a result of its 2015 investigation, DOI made several recommendations to improve and strengthen DOC's hiring processes. DOI began looking at whether DOC had strengthened its protocols around hiring after a December 2016 arrest of a CO charged with bringing in contraband. When DOI reviewed that CO's file, it found significant red flags that should have precluded his hiring.

The Report released today demonstrates that DOC did not implement some recommendations and only partially implemented others, leading to the continued hiring of underqualified candidates. A copy of DOI's Report is attached to this release and can be found at the following link: DOI's 2018 Report.

DOI Commissioner Mark G. Peters said, "DOI continues to arrest correction officers who have red flags in their backgrounds that should have precluded their hiring. Until the City Department of Correction (DOC) creates and implements a proper screening system, we will not solve the problems that plague Rikers and DOI arrests of DOC staff will likely only increase. This was a systemic problem in 2015 when we released our first Report and DOC's failure to act on DOI's findings continues to be a problem."

As part of DOI's investigation, a random sample of 291 candidate files from the January, June and December 2016 classes were examined using factors set out in the Notice of Examination for COs and DOC's own automatic disqualifiers. The review found that more than a quarter -- and almost a third -- of the candidates (88 of the 291 candidates) should not have been hired or should have been monitored after their hiring because of red flags. Specifically in its review, DOI found:

- 42 files, or 40% of files reviewed from the January 2016 Class, indicated friends and relatives who were or had been previously incarcerated.
- 33 files, or 33% of files reviewed from the June 2016 Class, indicated a past employment termination.
- 28 files, or 30% of the files reviewed from the December 2016 Class, indicated candidates had at least one prior arrest. Seven of these files indicated that the candidate had been arrested more than once.

Nonetheless, these candidates were hired by DOC.

*more*

b007

DOI's review identified a number of troubling examples of underqualified individuals with red flags being hired by DOC in these sensitive positions, including:

- A candidate that DOC knew was previously employed by the New York State Department of Correction and Community Supervision ("DOCCS") and had left his employment after he had an inappropriate relationship with an inmate.

- A candidate that DOC knew had been previously arrested for criminal possession of a weapon and harassing a fellow worker at a prior job.

- A candidate who, prior to applying to be a CO, had multiple visits to inmates with gang affiliations and failed to list those inmate visits as required in the application submitted to DOC.

The review also exposed continued vulnerabilities in DOC's screening process first brought to light in DOI's 2015 Report, including the failure of AIU investigators to conduct thorough applicant background checks, relying instead on self-reported information from candidates to meet time constraints; a lack of field visits to assess a candidate's suitability; and a failure to wait for third-party employment verifications when candidates reported being terminated or resigning from a past employer. DOI found that AIU still does not verify personal information through public record databases and infrequently obtains paperwork on police contacts or inmate phone calls when a candidate notes an association with a past or present inmate. The investigation also revealed that despite DOI's 2015 recommendation to computerize AIU record-keeping, AIU's files are still paper-based and, as a result, many were incomplete.

DOI's investigation demonstrates that its original recommendations have not been fully realized or implemented, and underscores the critical need for DOC to make significant improvements to its screening process for those applicants seeking to become COs in City jails. DOC should now implement the following recommendations from the 2015 Report:

- DOC should have a more thorough and standardized applicant review process; the application and review process should be computerized;

- DOC should implement in-house training for investigators in investigative and interview techniques that is relevant to recruiting and evaluation COs, and have a written AIU Investigator manual;

- AIU investigators should use law enforcement and public databases as investigative tools and as collateral checks on applicants;

- DOC should staff AIU properly to enable investigators to thoroughly investigate and vet candidates;

- DOC should engage in a more rigorous review of the psychological testing presently employed and decisions by supervisors should be more thoroughly explained in writing; and

- DOC should have a system in place to proactively monitor applicants who are hired despite red flags.

DOI Commissioner Mark G. Peters thanked DOC Commissioner Cynthia Brann, and her staff, including General Counsel Heidi Grossman, for their cooperation in this investigation.

This investigation was conducted by DOI's Inspector General for DOC, specifically Special Investigators Lawrence Bond, Robert Ellis, LaShana M. Taylor, Cindy Tsui, Vincent Valerio, Lauren Kerstein, Rhonda Young, and Ferdinand Torres, Chief Investigator Anthony DeLeo, Confidential Investigators Matthew London, Kelly Melendez, and Zoe Swenson, Assistant Inspector General Michael Garcia, and Deputy Inspector General Richard Askin, under the supervision of Inspector General Dana A. Roth, Associate Commissioner Paul Cronin, Deputy Commissioner/Chief of Investigations Susan Lambiase, and First Deputy Commissioner Lesley Brovner.

*DOI is one of the oldest law-enforcement agencies in the country and New York City's corruption watchdog. Investigations may involve any agency, officer, elected official or employee of the City, as well as those who do business with or receive benefits from the City. DOI's strategy attacks corruption comprehensively through systemic investigations that lead to high-impact arrests, preventive internal controls and operational reforms that improve the way the City runs.*

**DOI's press releases can also be found at twitter.com/NYC_DOI
Bribery and Corruption are a Trap. Don't Get Caught Up. Report It at 212-3-NYC-DOI.**

b008



# New York City Department of Investigation Report on the Recruiting and Hiring Process for New York City Correction Officers

**MARK G. PETERS**
**COMMISSIONER**

**January 2015**

FILED: KINGS COUNTY CLERK 08/20/2019 02:52 PM                INDEX NO. 518946/2019
NYSEF DOC. NO. 201    Case 23-1, Document 76, 01/25/2023, 3458054, Page91 of 296    RECEIVED NYSCEF: 08/20/2019

b009

Over the past year, the Department of Investigation (DOI) has conducted an extensive investigation into systemic illegal conduct at the Department of Correction (DOC) Rikers Island facility. As a result, DOI has already arrested or referred for discipline 23 Rikers staff and more than 30 inmates for crimes related to violence, contraband smuggling and falsification of documents and evidence. DOI has also issued a detailed report on the problem of contraband smuggling that resulted in unprecedented changes in security and screening, including the agreement to use drug-detecting canines.

Related to these problems is a failure to recruit and hire consistently excellent staff at the Correction Officer (CO) level. Most COs perform a difficult and dangerous job in a professional and competent manner. However, DOI's investigation reveals that DOC's hiring process has failed to recruit sufficient talented COs and has failed, in some instances, to weed out those who would abuse their position.

As an integral part of DOI's investigation of DOC's recruitment and applicant screening procedures, DOI has now reviewed over 150 applications of recently hired COs. Of these, 54 had significant red flags that should have either precluded their hiring altogether or at least required significant follow up or monitoring.[1] For example, among the more than 150 files DOI reviewed, we observed the following:

- Ten of the CO files indicated that the applicant had been arrested more than once. One CO had pleaded guilty to harassment in a domestic violence case. Another had several arrests and had previously been fired as a security guard after being caught stealing from the store he was hired to guard.

- 65 of the CO files indicated that the applicant's psychological exam raised some form of concern about his/her ability to perform his/her duties. More troubling, several raised significant red flags. In one case, the applicant's psychological exam indicated "low personality development" and the applicant was rejected by the Director of the Applicant Investigation Unit (AIU). However, despite this finding, a DOC Deputy Commissioner reversed that decision and hired the CO anyway. A detailed explanation for the reversal is missing and the file includes notation that the applicant was a "family friend of [Correction Officers Benevolent Association President] Norman Seabrook."

- 79 of the CO files indicated that the applicant had friends or relatives who were or had been incarcerated. More troubling, a number of these included current inmates and situations in which significant contact could not be explained. Such relationships between inmates and COs present a considerable security threat, especially as inmates often use these relationships to extort, coerce and control COs. One applicant had nine relatives who had been incarcerated.

---

[1] We note that during our review, DOI identified many more files that had at least some cause for concern. However, these 54 files are representative of those that DOI identified as having multiple and/or significant red flags.

1

b010

Another received calls from inmates on her personal telephone and could provide no viable explanation to AIU for the calls.

- In 54 of the CO files, the applicants clearly failed to demonstrate the "good character and satisfactory background" required of every CO. The failures ranged from significant personal debt of over $400,000, to a candidate with multiple arrests and previous employment at a strip club that was the target of prior criminal investigations.

All of the above applicants were hired.

Beyond the specific problems noted above, DOI conducted over 200 hours of interviews with DOC staff and site visits and review of more than 75,000 documents related to the hiring process. This review demonstrated significant systemic problems that clearly contributed to a process in which many applicants with significant red flags could be hired. For example:

- DOC did not properly train the staff assigned to handle candidate screening: Many red flags in files were simply missed or the staff had no ability to evaluate or follow up on the problems. Indeed, while staff evaluated all candidates on a scale of 1 to 5, interviews indicated confusion even on the basic fact of whether a "1" or a "5" was the best score. In any event 90 percent of applicants received a "3" rating, thus making the rating system effectively useless.

- DOC did not make use of basic background screening tools: DOC did not check credit reports nor did it effectively verify personal information for candidates. Most troubling, DOC did not require screening staff to check DOC's Visitor Express database to find out whether applicants have visited inmates in jail – a sign that applicants may have connections to the very people they are to guard.

- Until recently, DOC had no significant process to screen applicants for gang affiliation. Even where DOC was aware of gang affiliation in newly hired recruits, it previously failed to coordinate with its own gang intelligence unit to take appropriate precautions. While DOC has now corrected this problem in its screening process, DOC's Correction Intelligence Bureau (CIB) still estimates that there are dozens of staff with gang affiliations.

- DOC did not have a meaningful recruitment strategy: DOC disbanded its Recruitment Unit in 2009 and since then has had no real recruitment outreach efforts. As a result, DOC is not able to recruit sufficient, qualified applicants such that even after a rigorous screening process there will be the requisite number of candidates to fill the ranks of new COs.

2

b011

The failure of DOC to properly screen CO applicants has had real world consequences. Of the 23 staff that DOI arrested or recommended for discipline in the past year, DOC was able to readily produce 13 of their applicant files. Of these, six had red flags of the type described in this Report. In other words, proper recruitment and screening should have eliminated at least 25% percent of the arrests and disciplinary referrals that DOI was forced to make last year alone. Moreover, of the 54 newly hired staff with red flags noted above, already three no longer work for DOC after being implicated in incidents of misconduct and two have since resigned for unknown reasons.

This report describes all of these problems in further detail and makes recommendations for improvements going forward. We hasten to note that these problems are the result of a decade or more of institutional neglect. They cannot be quickly or easily solved. This is especially so now, given the numerous, and immediate issues that DOC management must confront. However, these problems must be tackled as part of any long lasting reform.

Since DOI's review of the AIU, DOC has already made some improvements. Notably, both the Director and Deputy Commissioner who were responsible for the hiring of the applicants DOI reviewed have been replaced. DOC has also allocated additional staff to the unit, including COs. Finally, DOC has now agreed to implement the additional recommendations contained in this report. At a recent meeting, DOC outlined a series of further aggressive steps to solve this problem that are addressed in the recommendation section below. We are encouraged by these changes.

## I.    Background: DOC's CO Application Process

The DOC CO application process begins when the Department of Citywide Administrative Services (DCAS) publishes a Notice of Examination (NOE) on its website. The NOE provides the public with basic information about the job of CO and the application process, as well as the basic qualifications required for the position.[2] Anyone who wants to become a CO first must take a Civil Service examination, administered by DCAS. After the applicants have completed the examination, it is rated. Once the exam is rated and scores are finalized, the civil service list resulting from the exam is made public and eligibles receive a Notification of Results (NOR) card with their score and civil service list number. The civil service list, which is issued by DCAS, ranks the applicants by their score.[3] DOC's AIU List Management Unit

---

[2] These published standards include the requirement that applicants successfully complete the requirements established by the State of New York for Peace Officers and that they maintain their status as Peace Officers for the duration of their employment.

[3] DOI learned that there is a delay of over three years between the test date and the date that AIU receives a certified copy of the list from DCAS. In October 2014, DCAS certified CO Exam 1318, which was held in June 2011. AIU Executive Director Larry Johnson told DOI that this delay costs DOC the opportunity to hire high-quality applicants who will find employment elsewhere. DCAS confirmed that lists must be published and then established in exam date order. This does not prevent hiring opportunities as lists are established based on DOC's hiring needs and the timeframe for DOC to exhaust older lists. This particular list was made public in

3

FILED: KINGS COUNTY CLERK 08/20/2019 02:32 PM
NYSCEF DOC. NO. 281

Case 23-1, Document 76, 01/25/2023, 3458054, Page94 of 296

INDEX NO. 558946/2019
RECEIVED NYSCEF: 08/20/2019

b012

(LMU) then contacts every applicant on this civil service list to begin the investigation process to ensure that they meet certain criteria, including possessing a valid driver's license, being a United States citizen, and meeting educational and work experience requirements. The list is established, as needed, and certified to the agency to make appointments.

As part of the recruitment process, LMU invites eligible applicants to an orientation program. During this program, AIU, among other things, informs the applicants about the duties of a CO and initiates a criminal history check.

Following this orientation, the candidates undergo medical and psychological screenings – by DOC's Medical and Psychology Units, respectively – and a background investigation. For the background investigation, an AIU "case coordinator" interviews the applicant to review his or her background questionnaire, which includes questions about the applicant's current and prior residences, family, education, employment record, criminal background, family's criminal background, driver's license, financial debts, and drug and alcohol use. The case coordinator then contacts the applicant's former employers, reviews his or her social media pages, examines some inmate visitation and telephone call history, and confirms information that the applicant has provided on the background questionnaire.

Once both the Medical and Psychology Units have found the applicant qualified, and the background investigation is complete, the case coordinator prepares an analysis of the candidate on a Case Review Sheet, which is sent to AIU's Executive Director.[4] In turn, the AIU Executive Director examines the file and Case Review Sheet, makes a hiring recommendation, and forwards the applicant's Case Review Sheet and medical reports to the Deputy Commissioner of Operations.[5] The Deputy Commissioner has final say over whether to hire the applicant, pending an agility test, and may reject the AIU Executive Director's recommendation.[6]

AIU can determine that a list eligible is Not Qualified for medical, psychological, or character reasons. If DOC determines that an eligible is not qualified, he or she may appeal to the Civil Service Commission. Absent a successful appeal, however, eligible is removed from the Civil Service list. After unqualified

---

March of 2012. The list remains public until the agency requests that it be established. DOC requested that the list be established in May of 2014 and DOC requested that the list be certified to them for hiring in October 2014.
[4] Since August 18, 2014, Larry Johnson, Ed.D., has been AIU's Executive Director. Before Director Johnson's appointment, the position was held by AIU Director David A. Safran, Ph.D., who resigned on August 1, 2014.

[5] Deputy Commissioner of Operations Errol Toulon, Jr. currently is in charge of hiring. At the time that AIU completed its review of the files that DOI examined, the Deputy Commissioner for Human Resources and Training Alan Vengersky was in charge of hiring. Vengersky retired effective August 9, 2014. At the time that these files were processed by AIU, the first round of review was done by a civilian investigator, the second by then AIU Director Safran, and the third by then Deputy Commissioner Vengersky.

[6] The agility test, also known as the physical ability test, measures, among other things, an applicant's strength and endurance. Components of the test include running, lifting the weight of an inmate, and ascending stairs.

4

FILED: KINGS COUNTY CLERK 08/20/2019 02:52 PM
NYSCEF DOC. NO. 201
INDEX NO. 518940/2019
RECEIVED NYSCEF: 08/20/2019

Case 23-1, Document 76, 01/25/2023, 3458054, Page95 of 296

b013

candidates are removed from the list, DOC must choose who to hire from the remaining candidates using the "1 in 3" rule. This rule requires DOC to hire one of the top three candidates on the list for the first available CO position, and fill each remaining CO position by choosing one of the next three eligible candidates. The remaining two candidates who are not selected will be considered as part of the next group of three. If a candidate is considered but not selected three times, that person is removed from the list without the opportunity to appeal DOC's decision.

Once hired, the CO commences employment subject to a two-year probationary period where the CO can be terminated without many of the civil service protections afforded to officers who have completed their probationary period.

## II. DOI Reviewed Over 150 Random Applicant Files For Recently Hired COs. In Many Cases the Applicants Were Not Fit for Service and Should Not Have Been Hired.

As noted above, DOI reviewed a random sample of 153 applicant files for recently hired COs.[7] 54 files, 35%, presented significant red flags that should have either precluded their hiring outright or required further follow-up or monitoring. None of these necessary safety measures occurred. Moreover, in just the past year, at least three of the applicants with red flags have already had some sort of disciplinary issue.

Below, we discuss some of the significant red flags that went unaddressed in the DOC hiring process.

### A. The Applicant File Review Revealed that AIU Hired 54 COs Despite the Fact Their Files Showed Potentially Disqualifying Criteria

According to DCAS's NOE, "proof of good character and satisfactory background" is an "absolute" prerequisite to appointment. The most recent NOE lists the following specific factors as possible causes for disqualification: "(a) conviction of a felony; (b) conviction of any offense, the nature of which indicates lack of good moral character or disposition towards violence or disorder; (c) repeated convictions of an offense, where such convictions indicate a disrespect for the law; (d) discharge from employment, where such discharge indicates poor behavior or inability to adjust to discipline; (e) dishonorable discharge from the Armed Forces; (f) conviction for petit larceny and (g) conviction of domestic violence." The NOE also states that DOC may reject an applicant for intentional misrepresentations on his or her application forms.[8]

---

[7] The majority of the files were chosen at random from one recently hired class of new COs. DOI also reviewed files from recent subjects of DOI investigations who were hired in 2012 or later. In total, over 160 files were reviewed. These additional files should not significantly influence the overall numbers in our findings.
[8] DCAS issues a new NOE for each examination, but the factors listed here were used at the time that all the COs, whose files were reviewed by DOI, took the CO examination, and they were listed on the most recent NOE posted by DCAS.

5

DOI found that, using these criteria, 25 of the hired COs lacked the "good character" that DOC requires for its COs and therefore should have been rejected as "not qualified." For example, one application indicated that the applicant had several prior arrests, was fired from his former employment as a security guard, and was arrested after he was caught stealing from the store he was hired to guard. A second CO's application indicated that he had pleaded guilty to disorderly conduct in a domestic violence case, had been fired from a job for poor behavior, and failed the NYPD's background check. Both officers were hired without any monitoring put in place.

DOC also hired COs whose files had evidence of generalized poor character, although not any of the specific attributes found on the NOE's list. Although these CO's did not have any of the specifically prohibited factors, their applications cast serious doubt about whether the COs had the "good character and satisfactory background" required of every CO. Moreover, even if such problems would not eliminate the candidates for character reasons, AIU had the option of not selecting them from the civil service list – an option it failed to exercise.

For example, ten of the hired COs whose files DOI reviewed had been arrested more than once, and some of the COs had significant signs of financial instability. In one instance, DOC hired one CO with $400,000 in debt, despite the Director's acknowledgement in his recommendation that this put him at risk for corruption.

Moreover, DOC hired 79 COs with friends and relatives who were or had been incarcerated, including one CO who listed nine relatives who had been incarcerated. More troubling, a number of these included current inmates and situations in which significant contact could not be explained. Other hired COs had received calls from inmates on their personal telephones, and the assigned case coordinator failed to offer any reasonable explanation for why they received those calls. Such relationships between inmates and COs present a considerable security threat, especially as inmates often use these relationships to extort, coerce, and control the COs. Through its investigations, DOI has found that inappropriate contact with inmates is associated frequently with criminal conduct, including taking bribes for contraband smuggling and committing sexual offenses.[9]

DOI found that twelve of the hired COs had previously been rejected for employment by the NYPD. While it is not surprising that someone would apply to both agencies, DOI found that DOC used significantly lower hiring standards than the NYPD. (As discussed below, DOC's failure to maintain a robust recruitment process may partly contribute to its lower hiring standards.) Of the twelve applicants subsequently hired by DOC, the NYPD rejected six for psychological reasons, one for failing a drug test, one for excessive Vehicle and Traffic Law (VTL) violations, one for

---

[9] DOC prohibits uniformed staff members from having "unduly familiar" relationships with inmates, and requires them to notify DOC whenever a relative, friend, or someone else with whom they have a relationship is incarcerated and housed in the same facility. Failure to make such a notification can result in disciplinary charges. *See* DOC Rules & Regulations §§ 3.25.040, 3.25.041, 3.25.050, 3.25.060.

6

b015

problems uncovered during the background review process, and one because she "failed to appear for appointment or [was] uncooperative," according to a letter from the NYPD Applicant Processing Division (APD).[10] In addition to the twelve applicants rejected by the NYPD, the NYPD had fired one hired CO from a position as Police Cadet for her failure to disclose an arrest for petit larceny. Thus, it appears that most of these candidates were simply unfit for law enforcement – whether working on the streets of New York City as police officers or in its jails.

DOC's hiring of six applicants previously disqualified by the NYPD based on psychological exam results suggests that the NYPD's psychological examination process is more stringent. DOI's visits to both DOC and NYPD psychological testing facilities revealed that the NYPD obtains more information from applicants by giving a lengthier psychological exam and administering a drawing test aimed at revealing personality traits. Thus, while the exams are subjective, the NYPD obtains more information from its applicants to enhance the examination process.

**B.    DOC Failed to Document Its Determinations Properly: The Director of AIU Excused Bad Conduct for Inadequate Reasons and the Deputy Commissioner at Times Hired CO's after the Director Rejected Them, But Provided No Viable Explanation. At Times, Political Rather than Merits Based Reasoning Applied.**

In any hiring system, it is important that decisions be documented, especially where senior staff overrule the initial determination of line investigators. Not only does this provide an important record of the agency's overall thinking and process, but it forces supervisors to explain their decisions and thus increases the chances that they will be made thoughtfully. Such documentation was woefully absent in 25 of the files reviewed by DOI.

DOI found that, at each stage of the process, AIU officials lacked a clear system of recommendation for CO hires. Case coordinators often did not give recommendations. The Director, who is responsible for recommending hires, until recently, used a number system that offered little guidance. And the former Deputy Commissioner, who had final authority over hires, wrote only brief notes by hand in the reviewed files that offered little to no reasoning behind his hiring decisions.

DOI further found that AIU case coordinators summarized their findings for an application, but, in many cases, did not clearly recommend or exclude candidates. Further, former AIU Director Safran evaluated candidates on an apparent scale of 1 to 5, but this system offered little guidance as to whether a candidate should be hired. DOI was unable to determine the meaning of this rating system, even after speaking with former Deputy Commissioner Vengersky, who stated on nearly all applications reviewed by DOI that he "agreed" with Safran's candidate assessments. This, despite

---

[10] Another CO failed the Police Officer civil service exam and a CO was rejected from a position as a police cadet for a reason unclear from the AIU file.

7

Case 23-1, Document 76, 01/25/2023, 3458054, Page98 of 296

the fact that Vengersky told DOI that he was unsure of whether 1 or 5 is the highest rating. DOI did not speak to former Director Safran, who left DOC in early August 2014.

In any event, the 5-point scale was meaningless because almost all of the applicants received the same score regardless of their merit. Of the 153 reviewed files, the AIU Director rated approximately ninety percent of the applicants a "3" and rated approximately eight percent of the applicants a "4." Two percent received no rating.[11] No applicants from the reviewed group received a rating of 1, 2, or 5.

Further, the quality of applicants whom the Director rated a "3" varied drastically. For example, Candidate A was working in a federal government security position at the time of her application and had no inmate associations, no prior arrests, no prior terminations, slight debt from credit cards and school loans, and no psychological issues. Candidate B was terminated from his prior employment as a security guard after he was caught stealing from the store he was assigned to guard, and he was arrested four times. Yet both applicants received a rating of "3." Nor were the Deputy Commissioner's handwritten comments of any use. Typically, he gave only limited, generalized comments, such as "Agree. Some risk. Hire pending agility test." This level of "analysis," or a slight variation of it, appears in nearly every file examined by DOI.

When the process got to the AIU Director it was further flawed. DOI found that, in 18 files, approximately 12% of those reviewed, the AIU Director excused serious red flags without adequate explanation. Indeed, in several applications, the AIU Director excused prior arrests and other bad conduct as isolated incidents or youthful indiscretions.

In one case, the CO's application file contained signs of potential corruption, including serious financial instability, that were dismissed as mere "immaturity." This CO was arrested earlier this year after meeting with a DOI undercover investigator, accepting money and placebos that he believed to be real drugs, and delivering them to an inmate who was a DOI confidential informant. The fee he charged and accepted for this delivery was $500. DOI's investigation determined that the CO had engaged in similar conduct, and accepted similar fees, on multiple occasions. In this CO's AIU Case Review Sheet, then Director Safran commented, "He has shown no major issues in the vocational sphere, albeit he has quite a few jobs and appears to be unable to focus on career choices. Given his age, much of this behavior may be due to immaturity." He further stated, "His traffic violations and lack of due diligences with regard to paying his student loan may indicate some issues with impulse control, but again this may also be attributed to immaturity. As such, he will be qualified and rated a 3." While these traits might not be an absolute bar to hiring, the Director offered a notably weak excuse for the serious problems identified and

---

[11] Seven applicants received no rating number – all of them because they were not recommended by the Director who gave the ratings, a decision which was later overturned.

8

FILED: KINGS COUNTY CLERK 08/20/2019 02:52:38 PM INDEX NO. 518940/2019
NYSCEF DOC. NO. 281 Case 23-1, Document 76, 01/25/2023, 3458054, Page99 of 296 RECEIVED NYSCEF: 08/20/2019

b017

failed to provide sufficient justification for recommending this applicant for hire.

DOI further observed flawed and arbitrary hiring decisions by the former Deputy Commissioner in charge of the applicant review process, including seven cases where the Deputy Commissioner hired an applicant whom the Director had rejected. In all cases, as demonstrated below, the Deputy Commissioner – despite the unusual nature of his action – gave only a brief, and barely legible, handwritten justification for his decision.

In one file, the Director rejected the applicant, whom the file notes was a "family friend of Norman Seabrook," president of the Correction Officers Benevolent Association, because he was concerned, based upon the nature of her past employment, that she could not handle the stress of working as a CO. In addition, the Director noted that, due to the low personality development score of three on a scale of seven that she received in her psychiatric exam, she was a poor candidate for law enforcement and that she would be too deferential to other people, including inmates. Initially, the Deputy Commissioner, in his note, asked whether DOC had hired COs with a personality development score of only three. But, later, without explanation, he overruled the Director and recommended her hire.

In a second case, the Director found that the CO's application had several problems – including questionable receipt of public assistance and a potentially false statement about her termination from a prior job. In hiring this CO, the Deputy Commissioner offered no explanation except for sparse, illegible notes, and a reference to the candidate's internship on Rikers Island.

In a third case, the Director, in his summary, found that the candidate "present[ed] as a sycophantic individual who ha[d] some questionable moral undertakings in his life." In addition, the applicant had over one million dollars in the bank, and the Director questioned why the candidate "would desire [the CO position] unless there was some secondary gain that he had in mind." In overruling the Director, however, the Deputy Commissioner merely wrote, "Reviewed; hire pending agility test results."

In the fourth case, among other cited issues, the Director stated that the candidate's "psychological exam was indicative of being inattentive and defensive, characteristics which are not ideal in a prospective CO." The Deputy Commissioner, however, approved the hire, writing a brief, illegible comment before recommending, "Some issues, but hire pending agility test results."

In the fifth case, the Director noted that the candidate had failed the NYPD psychological exam three times and the DOC psychological exam one time – all for poor stress tolerance – but the results of the DOC exam were overturned on appeal. The Director recommended not hiring her "based on poor stress tolerance and poor adjust [sic] to the demands of adulthood." The Deputy Commissioner then approved her hire with a brief illegible note.

9

Case 23-1, Document 76, 01/25/2023, 3458054, Page100 of 296

b018

In the sixth case, the Director stated that it was unclear that the candidate could accede to the demands of correctional work, as he had no work experience until he was 30 years old and seemed to have substantial "off time" for travel at his prior job. He also questioned his ability to adjust to the demands of adulthood. He did not recommend the candidate for hire. The Deputy Commissioner overruled the Director, with a brief, illegible note.

In the seventh case, the candidate had previously been shot by a gang member in a street altercation. He had a prior employment termination and an arrest record. The Director disapproved the candidate, but the Deputy Commissioner overruled the Director noting only: "Disagree. Some risk, but hire pending agility test results."

With all of these applications, the Deputy Commissioner had the duty and responsibility to overrule the Director if he disagreed with his decision. However, in each instance he failed to explain why the Director's judgment was incorrect or address the serious issues raised by the Director.

### C.    AIU's Files Lacked Any Indication that the Applicants Had Been Screened for Gang Affiliation.

Significantly, prior to recent changes to the applicant screening process, AIU did not screen the reviewed applications for gang affiliation. Indeed, DOI found no notations in the files that AIU screened for gang affiliation or consulted with the DOC's Correction Intelligence Bureau (CIB).[12] As DOI has learned through interviews with CIB personnel, CO gang membership is potentially the greatest threat to DOC's security because gang members generally place their gang allegiance above their CO duties. CIB estimates that dozens of DOC employees are members of gangs and states that inmates frequently report that COs are involved in gang activity.

More concerning, DOI discovered one file during review where the applicant admitted to prior associations with known gang members during his psychological exam. Also concerning was that he initially denied these associations in the screening sheet he completed for AIU, apparently only admitting to such after it was discovered in the psychological exam. Although the candidate denied gang membership, he submitted a detailed statement to supplement his admission explaining that a close family friend was an identified gang member, and the applicant regularly socialized with him and his fellow gang members during his teenage years. He also admitted to still having limited contact with some of these individuals during the time of his AIU background investigation.

What is not clear from the file is whether the association was discovered through AIU's background screening or was merely self-reported by the applicant. Notwithstanding having the applicant resubmit his screening sheet to indicate he had

---

[12] CIB is responsible for policing the City's jails. Among other things, it monitors gang activity in the facilities, investigates crimes committed by inmates, including slashings and stabbings, and processes arrests.

10

b019

prior associations, the file lacks any further follow up or targeted investigation on the matter once the information was reported. Instead, AIU staff made a notation of the risk this association presented, noting in the applicant's file that "if he is approved for hire his past gang associations should be made known to [DOC's] gang intelligence." The candidate was hired. However, DOI has confirmed that no such notification was made to DOC's gang intelligence unit.

DOI investigators, however, have learned that CIB is now assisting AIU in screening applicants for gang membership. The AIU medical unit photographs applicants' tattoos and sends the photos to CIB, which then analyzes the tattoo alone, without any other identifying information on the candidate, to determine gang affiliation in an objective manner. According to Director Johnson and Medical Unit Supervisor Pamela Eanes, DOC has rejected six applicants after CIB found that their tattoos suggested gang membership.

### III. DOI's Review of the Hiring Process Showed Various Systemic Flaws that Led to the Hiring Problems Found in the DOI Case Review Discussed Above.

In addition to the extensive review of CO applicant files detailed above, DOI also interviewed eleven AIU staff and made multiple visits to AIU's offices to understand their hiring process. To assist in our evaluation of DOC, DOI also consulted with DCAS staff responsible for developing the NOE and tracking DOC's CO hiring decisions and consulted with the NYPD APD to learn their hiring process. As a result, we found various systemic failures that directly contributed to the problems identified in the case review. The most important of these problems are discussed below.

#### A. DOC Does Not Properly Train its AIU Staff. As a Result, the Staff Does Not Conduct Thorough Investigations and Does Not Make Use of Modern Investigative Tools.

Through its discussions with AIU staff, DOI investigators discovered that AIU lacks a regimented training program. AIU does not train its case coordinators in interviewing techniques, case management, or basic investigative practices. Indeed, AIU lacks a written manual describing its investigative strategies and procedures.

By contrast, supervisors at the NYPD informed DOI that the APD provides a two-week training course for new investigators, offers refresher training courses, and has written guidelines for the unit. The two-week course includes training in investigator responsibilities, use of computer databases, processing candidates, interview techniques, preparing reports, and using APD forms. Further, investigators within APD's Computer Investigations Unit have special training in identifying signs of gang membership.

11

FILED: KINGS COUNTY CLERK 08/20/2019 02:52 PM    INDEX NO. 518940/2019
NYSCEF DOC. NO. 201    Case 23-1, Document 76, 01/25/2023, 3458054, Page102 of 296    RECEIVED NYSCEF: 08/20/2019

b020

The contrast in the DOC and NYPD process is striking. As a result, DOC screening is not sufficiently thorough, does not follow up on obvious issues and does not make use of modern investigative technology. We discuss these specific concerns below.

### i. AIU fails to thoroughly investigate applicants' backgrounds.

DOI found that AIU case coordinators do not thoroughly investigate applicants' backgrounds. DOI investigators discovered, through their interviews with AIU personnel, as well as their examination of applicant files discussed above, that case coordinators rarely made field visits and failed sufficiently to investigate applicants with past problems that may be a basis for disqualification.

AIU case coordinators reported to DOI that they visit applicants' personal references and homes infrequently. Director Johnson told DOI, and case coordinators confirmed, that case coordinators make these field visits in their discretion, and only if a problem is uncovered during the applicant's background investigation. For instance, a case coordinator reported that he once visited an applicant's former employer with his supervisor's permission. AIU ultimately rejected the applicant after the visit uncovered negative information in the applicant's work history.

By contrast, the NYPD APD has a "Residency Unit" that conducts field investigations and completes personal reference reports for every viable candidate eligible for the position of Police Officer. This unit ensures that the applicants comply with residency requirements, and it interviews the applicants' friends, coworkers, and/or neighbors.

Further, DOI, in reviewing the files discussed below, found that AIU hired several applicants without ever obtaining key background information required in their applications. For example, DOI found eleven questionnaires where the hired applicants did not answer whether they had ever been disqualified or barred from employment by any City, State, or Federal agency, and the case coordinators never addressed the omission.

These types of omissions are not possible in an NYPD application because its APD uses computerized application forms that require the applicant to answer every question.

Moreover, in its file review, DOI found more than one file in which a CO applicant denied knowing inmates who called his or her phone number and the CO was still hired without further inquiry. For example, one CO reported that she did not have any current or former incarcerated associates, but her cell phone was called once by an inmate in 2010 and she received over 20 calls to her home phone, one lasting 15 minutes, from five inmates between 2002 and 2007. She gave AIU a statement saying that she did not know any of the people who called her home phone, but provided no further information, including who was living with her at the time

12

and might have received the calls. Nor did she give a statement about the call to her cell phone. The AIU Director did not address these phone contacts in his comments, and the CO was hired without any further follow-up or explanation of the phone calls.

In addition, DOI found files where AIU failed to address applicants' suspicious explanations of inmate contact adequately. For example, one hired CO initially told AIU, in her application, that she had no incarcerated associates. After her case coordinator found that an inmate had called the CO's cell phone twenty times, she claimed that she had not spoken to anyone and that she could think only of one possible caller. In a notarized statement the CO said that she met the caller in her neighborhood, had a few brief conversations with him when he was on Rikers Island, tried to "disassociate herself" from him, and knew only his nickname. In the Case Review Sheet, the case coordinator appeared skeptical, but the AIU Director, in his summary statement on the case review sheet, completely ignored the issue, approving the CO for hire. The Deputy Commissioner gave final approval, commenting only: "Agreed, some risk, hire pending agility test results."

### ii. AIU fails to make use of modern investigative technology.

DOI investigators discovered that AIU has failed to provide its case coordinators with the necessary tools to conduct thorough background investigations. AIU does not check credit scores or personal information in a LexisNexis database, use "Virtual Identity Reports" to find all applicant social media sites,[13] or listen to recorded conversations between applicants and inmates at DOC facilities when they are detected by DOC's call monitoring system.

DOI found that AIU does not check the credit histories of its applicants, despite the known risk for corruption associated with personal debt. Nor does it use a database, like LexisNexis, to verify personal information of all candidates, including their addresses, telephone numbers, and household members, and to determine whether they have associations with inmates. Indeed, DOI discovered that AIU case coordinators currently lack access to LexisNexis or similar databases, in part, because AIU's current director mistakenly believed that a case coordinator had access to LexisNexis, when the coordinator did not.

By contrast, the NYPD APD checks the credit history and personal information of every Police Officer applicant to verify the information provided by the candidates.

In addition, DOI found that, until recently, case coordinators lacked access to social media sites, including Facebook, YouTube, Instagram, and Twitter. Instead, case coordinators had applicants display their social media accounts on their own

---

[13] Virtual Identity Reports are generated by the LexisNexis Accurint service and can tell whether a person's email address is linked to certain social networking sites, including Facebook and LinkedIn, and can provide links to the person's profiles on those sites.

13

phones during interviews. Even now, AIU has not provided its case coordinators with access to "Virtual Identity Reports," which can identify applicants' unreported social media websites. As a result, case coordinators must rely upon the applicants to disclose their social media websites.

By contrast, DOI learned that the NYPD APD has a "Computer Inquiry Unit" that completes a comprehensive computer background check. Among other things, this unit is trained in identifying signs of gang activity among the applicants, which are often apparent from an applicant's social media presence.

Further, AIU does not require its case coordinators to check DOC's Visitor Express database to find out whether applicants have visited inmates in jail. Although case coordinators regularly check DOC's Inmate Information System (IIS) to see if applicants have visited inmates, Visitor Express is newer, is updated more regularly, and allows users to view photos of the visitors to confirm identity. Not utilizing Visitor Express could result in AIU failing to uncover applicant relationships with inmates that present significant integrity concerns.

Also, DOI found that AIU fails to listen to DOC recorded telephone calls between applicants and inmates, even though inappropriate personal relationships between inmates and COs are a serious corruption risk that have surfaced in previous DOI investigations. The Inmate Financial Commissary Management System (IFCOM) is a telephone monitoring system that tracks inmate telephone calls, and AIU has the ability to use it to investigate whether applicants have had telephone conversations with inmates. DOI's file review, however, found at least two files where the case coordinator had failed to run an applicant's telephone number in IFCOM.

Moreover, DOI found that case coordinators, upon identifying a telephone call between an applicant and a DOC inmate, do not listen to the recording of that telephone call. Indeed, of the approximately 150 files discussed above, seven files had IFCOM printouts showing calls from inmates to the hired CO's telephone that lasted over a minute and that were recent enough for AIU to obtain a recording.[14] When DOI investigators asked about the general failure to obtain recordings, case coordinators responded that they believed that DOC policy prohibited them from listening to inmate calls in the context of a background investigation. Director Johnson informed DOI that he did not know whether anything prohibited coordinators from listening to these recordings and said that he would review this matter.[15]

---

[14] DOC records inmate telephone calls and maintains those calls for eighteen months. Inmates are warned by posted signs and recordings before the call that the contents of their conversations are being recorded.

[15] One case coordinator told DOI that he was denied permission to listen to an applicant's telephone calls after submitting a formal request. During DOI's conversations with former Deputy Commissioner Vengersky, he said that uniformed executive staff resisted giving AIU this authority because they thought that a unit outside of AIU should listen to the calls. But AIU never pursued the matter, and nobody at DOC, in AIU or any other unit, listens to inmate calls for AIU background investigations.

14

b023

### B.    DOC Does Not Have A Meaningful Recruitment Strategy.

In order to have sufficient qualified candidates to put through a rigorous screening, DOC must first have a proper recruitment plan. However, as discussed below, no such plan exists or has existed since at least 2009.

During conversations with AIU Director Johnson, DOI investigators, learned that DOC does not have a meaningful CO recruitment strategy. DOC does not have an advertising campaign, recruitment pamphlets to distribute to the public, or a functioning recruitment website. Furthermore, DOC does not have any program to reach out to college students with an interest in careers as COs. According to Director Johnson, DOC's only recent recruitment event took place at Briarcliffe College, and only because that institution reached out to DOC.

DOI investigators learned that DOC previously had a Recruitment Unit under the DOC Office of the Chief of Administration, which was located at the Correction Academy and was run by at least one Captain and eight to ten COs. The Recruitment Unit was established in 2004 but was disbanded in 2009 because of budget cuts and because DOC executives were satisfied that the program had recruited approximately 8,000 candidates to take the CO exam. When the Unit was active, the recruitment officers would attend job affairs in New York City, Long Island, and at military bases. The Unit also had a website which no longer functions, and an automated telephone hotline. That number – 877-NY1-BOLD – is still in service, providing inaccurate information about the availability of walk-in CO examinations and referring people to the defunct website.

In addition, DOI learned from a former member of the Recruitment Unit that, until about 2008, DOC had participated in the New York City Law Enforcement Exploring Program, a law enforcement education, outreach, and training program aimed at young people aged fourteen to twenty years old.[16] This is a popular recruitment tool with a range of law enforcement agencies, including the FBI and NYPD, and, at the end of 2013, it had 4,271 youth participants. DOI asked the citywide coordinator[17] for Law Enforcement Exploring why DOC withdrew from the program, and he responded that the woman who had run the program retired from DOC. The citywide coordinator also said that the Boy Scouts of America, a partner in the program, has tried to renew DOC's participation, but their attempts have been unsuccessful.

By contrast, the NYPD maintains a recruitment website at www.nypdrecruit.com. This website contains a variety of useful information about benefits and salary, the hiring process, the police exam, and job requirements. It even has special features, including an interactive overview of the hiring process, a "Day in

---

[16] www.nyexploring.org

[17] The citywide coordinator is a detective with the NYPD who oversees the Law Enforcement Exploring Program for the NYPD and is the liaison to all other NYC Law Enforcement agencies with Law Enforcement Exploring programs.

15

FILED: KINGS COUNTY CLERK 08/20/2019 02:52:38 PM    INDEX NO. 518946/2019
NYSCEF DOC. NO. 201    Case 23-1, Document 76, 01/25/2023, 3458054, Page106 of 296    RECEIVED NYSCEF: 08/20/2019

b024

the Life" video of a police officer, an interactive video precinct tour, and the opportunity to chat online with a recruiter.

DOC has informed DOI that it has discussed the recruitment issue internally and currently is developing ideas for recruiting, but nothing has been finalized and there is no set date for implementation.

### C. DOC does not continue to investigate COs after they are hired, even if problems were uncovered during their background investigation.

When a questionable CO is hired, DOC does not continue to investigate issues that arose during the application process. The former AIU Director wrote in two Case Review Sheets that DOC should continue to monitor the applicants for concerns raised during their background investigation, but DOC lacks procedures to monitor these applicants once they are hired. Indeed, the current AIU director has told DOI that he is unaware of any such procedure.

One of these two hired COs, whom the former AIU director suggested for monitoring because of concern that she might be too conciliatory toward inmates, was subsequently fired for having an "unduly familiar" relationship with an inmate, in violation of DOC rules, following an investigation by DOI. Even more concerning, the CO was linked to the inmate's criminal activities after he was released from DOC custody, and she was present when the inmate met with an undercover officer posing as a "hitman." The inmate was subsequently arrested for his involvement in a murder-for-hire conspiracy.

The CO had listed this same inmate as an incarcerated friend during her AIU background investigation. IFCOM detected many telephone calls between the two, and, in response to the IFCOM information, the CO submitted supplementary forms for her application, admitting that she spoke to the inmate and visited him, but advised she would cease contact with this inmate.

In the applicant's case review sheet, based in part upon her prior associations with inmates, the Director wrote, "It is possible that she may relate to inmates she is charged to watch in a more conciliatory fashion than would be desired. Thus, if she is approved for hire, it is recommended that she be monitored while on the job." The Director, giving her a rating of "3," then approved her for hire. As discussed above, however, DOC lacked any procedure to monitor this applicant, and, as DOI learned, her relationship with the inmate continued in violation of DOC rules. During an interview with DOI after the inmate's arrest, the officer denied involvement in any criminal activity, but admitted that she failed to notify DOC of her continued contact with the inmate as she was required to do. She was subsequently terminated, less than a year after her start date.

16

FILED: KINGS COUNTY CLERK 08/20/2019 02:52 PM          INDEX NO. 518946/2019
NYSEF DOC. NO. 281     Case 23-1, Document 76, 01/25/2023, 3458654, Page107 of 296     RECEIVED NYSCEF: 08/20/2019

b025

**D.    AIU uses pen and paper applications and its computer system cannot process basic statistical information about applicants.**

DOI investigators found that AIU uses a highly inefficient pen and paper application system, keeping each application and its supporting documents in a paper folder instead of storing that information in a computer. Moreover, AIU's computerized tracking system tracks only the status of files and is unable to generate useful statistical information, including how many applicants it rejects and the reasons for those rejections.

In addition, DOI found that applicant files are deficient beyond AIU's failure to use available technology. The files lack uniform components and have no checklists to document what the files contain. The application questionnaire itself appears unprofessional and apparently was copied from NYPD's form. Indeed, page 17 of the AIU background questionnaire mistakenly tells CO applicants that they must adhere to the NYPD's Patrol Guide procedure 203-10 "Public Contact/Prohibited Conduct" if appointed to the "New York City Police Department."

By contrast, as DOI found, the NYPD APD uses both a computerized application form, which is completed by applicants online, and a computerized investigator case review sheet that tracks the status of each case and whether or not specific materials have been collected. The computer case review sheet allows investigators to comment on each form or piece of information they gather and record when the form was obtained or the candidate provided the information. The computer system is also accessible by supervisors, allowing them to monitor the status of pending applications.

**E.    DOC does not allow investigators to eliminate candidates efficiently.**

During their conversations with DOI's investigators, AIU case coordinators complained most about the time that they wasted investigating a large number of severely deficient candidates. According to the case coordinators, even if they find a candidate unqualified early in the background investigation, they still must complete the entire background process before officially eliminating the applicant. One case coordinator told DOI that she had investigated an applicant with a felony conviction for statutory rape. She ultimately convinced the applicant to withdraw, but did not reject him automatically because she thought that rules prohibited her from doing so.

The current Director initially confirmed to DOI that investigations must continue even after case coordinators discover that applicants are clearly unqualified. During ongoing conversations with Director Johnson, however, the Director said that AIU recently eliminated an applicant for the first time in his tenure without reviewing the entire file, based upon gang affiliation and an arrest history.

17

b026

increasing the difficulty of eliminating bad candidates, AIU has no background and character factors that it uses to disqualify candidates automatically. The NOE tells exam takers: "Proof of good character and satisfactory background will be absolute prerequisites to appointment." But the NOE's listed character and background factors, discussed in detail in Section II A above, are mere guidelines to determine whether candidates are qualified. Even the felon, who had a statutory rape conviction discussed above, could have been hired as a CO because DOC still could have found him "qualified" despite his criminal background.

By contrast, the NYPD Police Officer NOE specifically states what will automatically disqualify a candidate. For example, the NYPD NOE states that convictions of a felony or a domestic violence misdemeanor automatically disqualify a person from becoming a police officer. In addition, NYPD APD stops its investigation immediately if it uncovers a felony conviction, a domestic violence misdemeanor conviction, or a dishonorable discharge from the military, and then begins procedures to eliminate the candidate from the applicant pool.

### IV. Based upon its findings, DOI recommends a series of changes to the hiring process.

DOC must improve its procedures for recruiting, screening, and hiring to ensure it hires the most qualified COs. To do this, DOC must invest resources in AIU to ensure that it has the best trained personnel and most effective technology. Hiring COs of the highest talent and character is necessary both to handle the difficult tasks facing the City jails today and to nurture the future supervisors and leaders of DOC. Therefore, DOI makes the following recommendations for DOC to increase its applicant pool, improve its screening process, and, if needed, to monitor new hires.

#### A. DOC needs an aggressive recruitment strategy and clear disqualification standards to improve the applicant pool.

DOC currently has no viable plan to recruit COs. It lacks a recruitment unit, does not participate in job fairs, and fails to recruit at local universities. Nor does it have a recruitment website, brochure, or any other reasonable means to inform the public about DOC job opportunities.

Having failed to develop a recruitment strategy, DOC can consider only a limited number of quality applicants for hire. Often, DOC applicants already have been rejected for hire by other city agencies, including the NYPD.[18] As discussed above, DOC has hired many candidates with suspect backgrounds, relationships with inmates, and other corruption risks. The lack of a more robust pool of candidates clearly contributes to this problem.

---

[18] DOC also has hired COs rejected by the Bridge & Tunnel police, the Port Authority police, the New York State Department of Correction, the Human Resources Administration, and the Department of Probation.

18

FILED: KINGS COUNTY CLERK 08/20/2019 02:52:28 PM    INDEX NO. 518540/2019
NYSCEF DOC. NO. 201    Case 23-1, Document 76, 01/25/2023, 3456054, Page109 of 296    RECEIVED NYSCEF: 08/20/2019

b027

Additionally, as DOI has found, AIU wastes considerable resources investigating applicants who are clearly at risk for corruption instead of eliminating them early in the process. As DOI has determined, DOC's lack of clear standards for disqualifying certain candidates automatically contributes to this waste.

In order to remedy these failings, DOI makes the following recommendations:

1. DOC should reestablish its Recruitment Unit. This Unit should advertise and recruit aggressively, especially at law enforcement oriented schools, and should ensure that its recruitment materials and website are accessible and professional. In addition, DOC should resume participation in the Law Enforcement Exploring program, which, as discussed in Section III B above, has the potential to recruit many young people with a genuine interest in law enforcement. DOC is slated to meet with DCAS to discuss the scheduling of future exams after the current exam schedule ends on June 30, 2015. DOC should have a recruitment plan to attract candidates for those exams.

2. DOC should adopt automatic disqualifying factors, including the conviction of certain crimes, with a goal to eliminate unqualified applicants as quickly and efficiently as possible. Once it becomes clear that a candidate lacks the "good character" required of a CO, such as felony convictions or dishonorable discharge from the armed forces, case coordinators should have the discretion to reject the applicant as "not qualified" without going through the entire process. AIU has eliminated at least one candidate in this manner, and DOI hopes that this represents a change in its practice.

3. DOC should expand its list of potential disqualifying factors to include corruption risks unique to DOC. For instance, DOC should list financial instability because it makes a CO vulnerable to accepting bribes in exchange for contraband smuggling. It should also list current and prior associations with inmates because these associations potentially increase the risk that a CO will have inappropriately familiar relationships with inmates. Finally, it should list present affiliation with gang members as this too presents a considerable risk.

4. In an attempt to curb the number of unqualified applicants, DOC should meet with DCAS to update the language in the Correction Officer NOE. These updates should include any new automatically disqualifying criteria developed by DOC, and be tailored, as necessary, to specific corruption vulnerabilities

19

unique to the agency. Implementing this list and using strict criteria to eliminate certain candidates immediately would allow AIU to devote resources to the background investigations of truly qualified candidates.

**B. DOC must make AIU's candidate screening uniform, thorough, and tailored to the unique corruption vulnerabilities at DOC. Decisions must be properly documented.**

Throughout DOI's investigation, investigators received conflicting information about the screening process from AIU staff, and at times staff was not even able to articulate a clear policy in response to investigators' questions. Equally as concerning, AIU investigators reported that they were not trained in conducting background investigations, and that they failed to use all available investigative resources. Finally, decisions by supervisors were at times not properly documented.

In general, DOC's applicant screening process sharply contrasts that of the NYPD APD. The NYPD investigators receive formal training that includes interview techniques and the use of law enforcement databases. Moreover, the APD tracks applicant files in an efficient electronic database, has strict standards to disqualify certain candidates automatically, and employs multiple layers of supervisory review before selecting an applicant. DOI also found evidence that the NYPD's process is more stringent. For example, several of the reviewed AIU files included a notation that the candidate was previously rejected by the NYPD.

To improve DOC's application process, DOI makes the following recommendations:

1. DOC should have a more thorough applicant review process. DOC should adopt a system, comparable to the NYPD APD, in which each applicant must pass through multiple levels of review, by both civilian and uniformed staff, before being approved by a panel of executives. On August 6, 2014, DOC announced vacancies for COs and a Captain in AIU. Since that time, DOC has assigned seven COs and one Captain to AIU.

2. AIU should create a standard detailed checklist identifying all documents that it requires applicants to submit and all AIU investigative steps necessary to complete the background investigation. This, along with a new computer system, should help ensure that all required information is obtained for every applicant.

3. DOC should ensure that all case coordinators are using IFCOM as an investigative tool. Specifically, not only should DOC check

Case 23-1, Document 76, 01/25/2023, 3458054, Page111 of 296

b029

IFCOM databases for telephone contact with inmates, but it should listen to the recorded telephone calls between the inmate and the applicant. The identification of an applicant's phone number in the inmate database is concerning, and only a review of the content of these calls will allow DOC to determine the extent of the relationship and whether it should disqualify the candidate.

4. DOC should implement standardized training for case coordinators in investigative and interview techniques, to explain the application process, to teach them to use computer databases and other law enforcement tools, and to provide guidance on appropriate hiring recommendations. In particular, gang identification and disqualifying factors related to gang activity must be part of the training course as this type of affiliation by a CO presents a serious threat to the safety and security of DOC facilities. The NYPD APD's two-week training course for investigators with follow-up refresher courses provides one effective model.

5. DOC, using the NYPD APD system as a model, should computerize its applicant file review system. At present, all AIU files are paper based, and many that DOI reviewed were incomplete. Computerization would enhance DOC's ability to store and access information, and ensure that a standard process is followed for every applicant. Additionally, an electronic application questionnaire similar to that used by NYPD would prevent applicants from advancing in the process without filling out required information and allow AIU to develop useful statistical information to help guide its hiring practices.

6. DOC must engage in a more rigorous review of the psychological testing presently employed.

7. Decisions by supervisors, especially the Director and Deputy Commissioner that overrule the judgment of subordinates, must be explained in writing.

**C.    DOC must have a system in place to proactively monitor applicants who are hired but are considered vulnerable to corruption.**

Once a CO is hired, DOC fails to investigate issues that arose during the application process and has no procedure to monitor problematic applicants after

21

they become COs. DOI, however, found more than one instance where the AIU Director recommended that DOC continue to monitor the applicants for questions raised during their background investigation. As discussed above, a hired CO continued her unduly familiar relationship with an inmate after she was working inside DOC facilities and after telling AIU that the relationship would stop after she was hired. No monitoring was done, and this officer was ultimately fired less than a year after her start date for continuing to this unduly familiar relationship.

It is particularly important for DOC to monitor newly hired COs, because they are on probation for two years, and, therefore, can be fired summarily without a lengthy disciplinary process. Terminating the COs at this stage is far easier than eliminating corrupt COs who have tenure and all the procedural rights that it carries.

Therefore, DOI recommends that DOC continue the investigation after hiring the candidate if any issues implicating integrity concerns arose during the application process. At the very least, DOC should monitor these identified candidates on a regular basis to ensure they are not engaging in prohibited conduct. The monitoring should include regular checks of IFCOM, more frequent evaluations by supervisors and enhanced training for the officer.

**V.     DOC is in agreement with the above recommendations, and has already outlined a series of further aggressive steps to address the problems DOI uncovered.**

In a recent meeting with DOC, DOI discussed the findings contained in this report in further detail. We were encouraged to learn that DOC has started outlining a plan to implement DOI's recommendations, has already scheduled a meeting with the NYPD APD to discuss their process, and that they have outlined further aggressive steps to address these problems. Of particular importance:

- DOC will seek to modify their NOE so that it is in line with the standards in place for the NYPD. This will result in stricter disqualifiers for prior convictions, prior summonses and traffic violations, and prior job terminations. DOC is also prepared to adopt an automatic disqualifier for individuals who have previously been terminated from government employment.

- DOC is prepared to adopt an additional disqualifier for individuals who have had prior contact with two or more inmates. Additionally, DOC will use the CIB to listen to recorded phone calls uncovered between applicants and inmates. Candidates will be disqualified based on the nature of these calls.

- DOC will begin using additional investigative tools, including running full credit report checks for applicants. DOC will also use databases to check for

22

FILED: KINGS COUNTY CLERK 08/20/2019 03:52:28 PM
INDEX NO. 518946/2019
NYSCEF DOC. NO. 201
RECEIVED NYSCEF: 08/20/2019
Case 23-1, Document 76, 01/25/2023, 3458054, Page113 of 296

b031

additional phone numbers, social media sites, and other things that candidates may have not reported in their application.

- DOC will implement a formal training program for staff assigned to the AIU and responsible for screening candidates. This training program will cover not only interview techniques and database training, but staff will also be trained by DOC's CIB to learn about gang affiliation.

- DOC will enhance the oversight of hiring decisions. Specifically, a "disapproval" decision by anyone in the hiring process can no longer be unilaterally overturned. Additionally, DOC will enhance the review process for probationary officers, before they become tenured.

We are encouraged by DOC's prompt response to these findings and will continue to monitor the implementation of these and all of the recommendations contained in this report.

## VI.    Conclusion

DOI's investigation has demonstrated that significant flaws in AIU's hiring system have contributed to the hiring of corrupt COs. DOI discovered that poor recruitment efforts, inadequate training of AIU investigators, and a deficient applicant evaluation process have all contributed to serious problems within AIU, and ensured that DOC is not meeting its goal of hiring "the most qualified" individuals to become COs. Although DOC has taken some initial steps to remedy this problem, the findings of this investigation conclusively demonstrate that DOC must continue to reform its hiring process. The people entrusted with the care and custody of the City's inmates are essential to any plan to reform its jails. Finding quality candidates to fill this role, and ultimately ensuring that quality candidates are available for promotion to higher ranks, begins with AIU.

In order to achieve the desired goal of a safe and corruption free jail system, DOC must hire applicants with the strength of character to handle the stress of the demanding job of a CO and the integrity required to reject the temptations of corruption. COs must consistently ensure the safety of inmates without resorting to excessive force, refuse to accept bribes for smuggling contraband, and enforce DOC regulations without favor to any particular group of inmates. Therefore, AIU must improve its vetting process to screen for corruption vulnerabilities unique to DOC. Particularly, screening for prior associations with inmates, gang affiliation, and prior arrests or misconduct indicative of poor moral character is of paramount importance. DOC must also consistently monitor any CO that, while ultimately hired, showed signs of corruption vulnerabilities during the screening process. Quick implementation of these recommendations will improve the quality of the men and women who will be tasked with the immense challenge of reforming the City's jails.

23

Case 23-1, Document 76, 01/25/2023, 3456054, Page114 of 296

- Appointed, Commissioner of Corrections, State of Maine, January 24, 2011

## Caucuses/Non-Legislative Committees (#)

- *No caucus information on file.*

## Professional Experience (#)

- Warden, Pahrump County, Nevada Southern Detention Center, Corrections Corporation of America, 2006
- Administrator, Shelby County Jail, Memphis, Tenessee, 2001
- Administrator, Union County, New Jersey State Prison, 1996
- Head, East Coast Operations, Cornell Corrections Corporation, 1992
- Assistant Warden, Walpole, Massachusetts State Prison, 1980
- Correctional Officer, Massachusetts Department of Corrections, 1969

## Religious, Civic, and other Memberships (#)

- *No organizational membership information on file.*

Site Search Form

Search site...    SUBMIT

## About Vote Smart

- Background (/about)
- Board (/about/board)
- Staff (/about/staff)
- Advisors (/about/advisors)
- Finances (/about/finances)
- Jobs (/jobs)
- News Room (/media)
- Contact Us (/about/contact)

## WAYS TO HELP

- Donate (/donate?utm_source=votesmart&utm_medium=bottomnav&utm_campaign=donate)
- Volunteer (/volunteer?utm_source=votesmart&utm_medium=bottomnav&utm_campaign=donate)
- Ambassador (/ambassadors) (/ambassadors)
- (/ambassadors)Leave a Legacy (/legacy) (/legacy)
- (/legacy)Internships (/internships)

## EDUCATION

- Government 101 (/education/government)
- For Teachers (/education)

b033



# New York City Department of Investigation

## Persistent Problems in the Hiring of City Correction Officers

**MARK G. PETERS**
**COMMISSIONER**

**Dana A. Roth**
Inspector General for the Department of Correction

**May 2018**

## I.    Executive Summary

The New York City Department of Investigation (DOI) has conducted a year-long probe of the City Department of Correction's hiring procedures for Correction Officers (COs), finding that serious problems continue to plague the Applicant Investigation Unit (AIU) within the Department of Correction (DOC). These findings are especially troublesome in light of DOI's 2015 Report that examined the same issue and uncovered similar hiring vulnerabilities that allowed underqualified individuals and individuals with serious arrest records and gang affiliations to become COs. Most significantly, this investigation, a follow up to the 2015 Report, found that while DOC stated it would implement DOI's 2015 recommendations to improve and strengthen DOC's hiring process, in fact, DOC did not implement some recommendations and only partially implemented others.

In this investigation, DOI examined AIU files for recently hired COs from the January, June and December 2016 classes and found that many of the same vulnerabilities found in DOI's 2015 investigation continue to exist.    DOI's investigation found that for the files reviewed of COs hired in 2016, after DOC claimed it had implemented the recommendations DOI called for in 2015, over one-quarter of these COs continued to have red flags that should have precluded their hiring. For example, DOC hired:

- A candidate that DOC knew was previously employed by the New York State Department of Correction and Community Supervision (DOCCS) and had left his employment after he had an inappropriate relationship with an inmate (the candidate's file contained a report from DOCCS).

- A candidate that DOC knew had previously been arrested on charges related to domestic violence (the candidate's file contained the candidate's rap sheet, and the Court's Certificate of Disposition).

- A candidate that DOC knew had previously been arrested for criminal possession of a weapon and harassing a fellow worker at a prior job (the candidate's file contained the Court's Certificate of Disposition).

- A candidate who, prior to applying to be a CO, had made multiple visits to inmates with gang affiliations and failed to list those inmate visits as required in the application submitted to DOC.  DOC visitor records clearly demonstrated the visits.

1

FILED: KINGS COUNTY CLERK 08/20/2019 02:52:28 PM     INDEX NO. 518946/2019
NYSEF DOC. NO. 201     Case 23-1, Document 76, 01/25/2023, 3458054, Page117 of 296     RECEIVED NYSCEF: 08/20/2019

b035

One of the candidates hired with red flags has since been arrested by DOI as part of its ongoing investigation into prison contraband smuggling. Other candidates remain employed by DOC.[1]

This investigation underscored the critical need for DOC not only to accept, but also to actually implement the recommendations DOI has issued that would strengthen DOC's hiring process and help to close multiple vulnerabilities that are allowing individuals with serious integrity issues to be hired in the City's jails. Specifically, DOC should now implement the following recommendations from DOI's 2015 Hiring Report:

- DOC should have a more thorough and standardized applicant review process; the application and review processes should be computerized;

- DOC should implement in-house training for investigators in investigative and interview techniques that is relevant to recruiting and evaluating COs, and have a written AIU investigator manual;

- AIU investigators should use Securus[2] and other law enforcement and public databases as investigative tools and as collateral checks on applicants;

- DOC should engage in a more rigorous review of the psychological testing presently employed; decisions by supervisors, especially the Director and Deputy Commissioner of AIU, should be more thoroughly explained in writing; and finally

- If DOC is going to continue to hire applicants who are considered vulnerable to corruption, DOC should have a system in place to proactively monitor those applicants.

Furthermore, this investigation also found that while the above recommendations are crucial to improving hiring protocols, AIU has yet to determine ideal staffing for its workload. DOI recommends that DOC review its AIU staffing, including staffing sufficient personnel and supervisors to thoroughly investigate and vet candidates, and report its results back to DOI.

DOC must immediately implement these policy and procedure recommendations.

---

[1] The names of those who remain employed have been withheld to protect the integrity of DOC's disciplinary process.

[2] DOC inmate calls were previously recorded and maintained on DOC's Inmate Financial Commissary Management System (IFCOM). Beginning around March 2015, DOC began recording and maintaining recorded inmate calls on a secure call platform through Securus Technologies (Securus).

2

Case 23-1, Document 76, 01/25/2023, 3458054, Page118 of 296

b036

## II.    Summary of DOI's 2015 Hiring Report

### i.    DOI's 2015 Findings and Recommendations

DOI's 2015 Hiring Report highlighted the need for reform in DOC's hiring practices.  DOI discovered that out of the over 150 files of then-recently hired COs reviewed:  10 COs had more than one arrest; 65 COs' psychological exams raised concerns about their ability to perform the job duties; 79 COs had friends or relatives who had been incarcerated (a number of whom had significant contact with inmates over DOC phone calls that AIU failed to follow up on); 54 COs files failed to show the "good character and satisfactory background" of a correction officer; and 25 COs lacked the "good character" listed on the New York City Department of Citywide Administrative Services' (DCAS) Notice of Examination (NOE), which is also required by DOC.[3]

Furthermore, through review of the 2014 files, interviews with DOC staff, and site visits, DOI identified systemic problems that fostered an environment in which many applicants with significant red flags were nonetheless hired.  For example, DOI found that DOC's AIU did not properly train its staff to handle candidate screenings, and did not have a written manual describing its investigative strategies and procedures.  AIU staff failed to evaluate the severity of red flags when they were discovered, and simply missed other red flags altogether.  AIU did not use basic investigative tools, including running credit checks and verifying personal information through public record database checks such as LexisNexis or CLEAR (a law enforcement database).  AIU utilized an inefficient pen and paper application questionnaire and submission system.

Additionally, AIU rated all candidates on a scale of 1 to 5, but DOI found AIU staff demonstrated confusion on whether "1" or "5" was the best score and that 90 percent of candidates were rated at a "3," making the system effectively useless.  In 12% of the files reviewed by DOI, the AIU Director excused serious red flags without adequate explanation, as isolated incidents, or as youthful indiscretions.  AIU had no system in place to detect gang affiliations among applicants, nor did AIU staff cross-reference applicants with DOC's Visitor Express database to uncover connections between applicants and their incarcerated friends or family.  AIU staff further failed to run applicants' phones numbers in the inmate telephone system.  When an applicant's number was found to have been contacted by an inmate, AIU staff often failed to review recorded phone calls, despite their availability.  DOI found DOC did not continue to proactively monitor applicants who were hired but considered vulnerable to corruption.  Finally, DOI found DOC did not have a meaningful CO recruitment strategy, an advertising campaign, recruitment pamphlets, a functioning

---

[3] DCAS puts out Notices of Examination to fill civil service job vacancies.  The NOE for COs does not define the term "good character."  DOC should request that in the NOE for COs, DCAS include a definition, which likely would provide significant guidance as to the traits that a candidate needs to become an exemplary CO.

3

FILED: KINGS COUNTY CLERK 08/28/2019 01:52:38 PM          INDEX NO. 518546/2019
NYSEF DOC. NO. 281     Case 23-1, Document 76, 01/25/2023, 3456054, Page119 of 296     RECEIVED NYSCEF: 08/28/2019

b037

recruitment website, or any programs to reach out to college students interested in careers as COs.

As a result of the foregoing findings in DOI's 2015 Hiring Report, DOI made a number of policy and procedure recommendations to DOC, including expanding recruitment outreach, adopting automatic disqualifying factors, increasing use of the inmate phone system to cross-check applicants' phone numbers, and implementing a system to monitor applicants who were hired but considered vulnerable to corruption.

### ii.     DOC's 2015 Response to DOI

In response to DOI's 2015 Hiring Report, DOC agreed to adopt most of DOI's recommendations and reported that they began implementing the requested policy changes in stages. DOC stated that they revamped their external marketing to attract qualified applicants. To that end, they showcased DOC's specialized units to help market DOC to potential candidates, and participated in recruiting events.

DOC also reported they adopted in-house automatic disqualifiers related to the following areas: employment, felony and domestic violence misdemeanor convictions, and total numbers of criminal court summonses and driving record violations.[4] DOC also reported that they provided the AIU investigators with access to various web-based investigative tools, including IFCOM, upon their appointment to the unit. DOC partially accepted DOI's recommendation that it computerize the process; it reported AIU would use an electronic system to track applicants' appointments and documents submitted through the hiring process, but AIU's candidate files would remain paper-based. DOC reported AIU's Psychological Unit would establish a tiered system of review, whereby investigators' findings would be initially reviewed by a member of AIU's Psychological Unit, and finally by AIU's Executive Director or Deputy Commissioner. According to Dr. Christopher Sbaratta, Assistant Director of AIU's Psychological Unit, he and two colleagues established this system in August 2015, in time for the 2016 classes of incoming COs. DOC further reported that AIU's Executive Director or Deputy Commissioner would provide a written summary on an applicant's file, whether for approval or disqualification. DOC stated that AIU proposed a monitoring system for probationary COs who were hired but identified as "questionable" during their background investigation. DOC reported AIU investigators would be required to take an in-house training course. AIU also implemented a dedicated Field Team Unit to conduct site visits to candidates' homes and neighborhoods.

---

[4] These disqualifiers are enumerated in DOC's Response to DOI's 2015 Report, attached in the Appendix.

4

### III. DOI's 2018 AIU Follow-Up Investigation

#### i. DOI's Arrest of CO Brown Revealed DOC's Misrepresentation that it Had Implemented DOI Recommendations

In December 2016, less than a year after he was hired, DOI arrested probationary CO James Brown at the Otis Bantum Correctional Center (OBCC) front gate after a DOI K-9 alerted to the presence of contraband on his person. Probationary CO Brown was transporting alcohol camouflaged in an iced tea bottle, and eight Ziploc bags containing tobacco and marijuana concealed in his underwear. He was one of the 665 recruits in DOC's January 2016 academy class. After his arrest, DOI reviewed probationary CO Brown's applicant file and found significant red flags that should have precluded his hiring.

First, probationary CO Brown had a spotty employment history. In 2001, the City Parks and Recreation Department terminated him for excessive lateness, and in 2004, he resigned from the United States Park Police, having failed a probationary evaluation.

Second, during his psychological examination, probationary CO Brown falsely stated he was not delinquent on child support payments. DOI interviewed CO Brown post-arrest and he indicated he had significant debt and defaults. Indeed, when DOI investigators questioned him following his December 2016 arrest, probationary CO Brown stated his reason for attempting to smuggle the contraband into OBCC for inmates was because he had been having great financial difficulty, due in large part to owing approximately $8,000 in child support. The information collectively detailed above should have prevented CO Brown's hiring, especially in light of the hiring reforms DOC said it had implemented. DOC's reforms should have flagged CO Brown but failed to do so, illustrating the same flaws DOI identified.

CO Brown's arrest, coupled with other DOI investigations into probationary COs, raised suspicions that DOC had not adopted all of DOI's recommendations, and was not adhering to the NOE's specific factors as causes for disqualification which would have covered several of the red flags in CO Brown's file.[5]

---

[5] The full list of factors includes: (a) arrest record or conviction of an offense, the nature of which indicates lack of good moral character or disposition towards violence or disorder; (b) repeated arrests or convictions of an offense, where such convictions or arrests indicate a disrespect for the law; (c) discharge from employment, where such discharge indicates poor behavior or an inability to adjust to discipline; (d) dishonorable discharge from the Armed Forces; (e) conviction of petit larceny; and (f) conviction of a felony or domestic violence misdemeanor. Under the "Penalty for Misrepresentation" section of the NOE, any intentional misrepresentation on the application or examination, even after appointment, may result in disqualification. Probationary CO Brown had been discharged from employment, and included several intentional misrepresentations on his application, either of which should have disqualified him from being hired as a CO.

5

FILED: KINGS COUNTY CLERK 08/20/2019 09:52:28 PM INDEX NO. 518946/2019
NYSCEF DOC. NO. 281    Case 23-1, Document 76, 01/25/2023, 3458054, Page121 of 296    RECEIVED NYSCEF: 08/20/2019

b039

### ii.    DOI Review of 2016 DOC Probationary CO Applicant Files

DOI reviewed a random sample of 291 candidate files for the January, June, and December 2016 classes.[6]  For each class, DOI used the factors set out in the NOE, along with DOC's in-house automatic disqualifiers.  DOI's review concluded that 88 of the 291 candidates, equaling more than a quarter and almost a third of the files DOI reviewed, should not have been hired or should have been monitored after hire.

DOI reviewed 102 files of the 665 total number of files for candidates appointed to the January 2016 CO class.  Twenty-seven presented significant red flags that either should have precluded their hiring outright or required follow-up or monitoring.  Twenty-seven of the 103 candidates indicated a past employment termination.  Forty-two had friends and relatives who were or had been incarcerated.  Twenty-seven candidates had at least one prior arrest; six had been arrested more than once.  One of the candidates who reported multiple arrests prior to his appointment, including one for harassment, was subsequently arrested again for assault and harassment after starting with DOC.  That CO is still an active employee with DOC (although his probationary period was extended).[7]

In one case, AIU did conduct a follow-up investigation after hiring a probationary CO.  During his background investigation, the candidate disclosed he was previously employed with DOCCS and resigned because his long commute led to child care issues.  However, a re-review of his file during the follow-up showed DOCCS' documented response was in the file, and contained information contrary to information the candidate provided.  That response reported the candidate had an inappropriate relationship with an inmate after he was found in a female parolee's home, and made false statements to the New York State Office of the Inspector General (NYSIG).  It appears the AIU investigator did not address the DOCCS response in the CO candidate's case review sheet (CRS)[8] – whether by oversight or design is not clear – and cleared the candidate to be hired by DOC.  DOC terminated the probationary CO for his intentional misrepresentation, once it was discovered during the follow up investigation.

DOI reviewed 98 files of the 756 total number of files for candidates appointed to the June 2016 CO class.  Thirty-two files presented significant red flags that either should have precluded their hiring outright or required follow-up or monitoring.  Thirty-three of the 98 candidates indicated a past employment termination.  Thirty-three had friends and relatives who were or had been incarcerated.  Another 28 candidates had at least one prior arrest; six had been arrested more than once.

---

[6] In addition to the files selected at random from the three DOC CO classes, DOI also reviewed seven files from recent subjects of DOI investigations.

[7] This candidate's history is discussed in further detail commencing on page 11, Example C.

[8] The CRS is a summary of the AIU investigator's findings regarding the candidate's background investigation.

6

b040

DOI reviewed 91 files of the 950 total number of files for candidates appointed to the December 2016 CO class. Twenty-nine files presented significant red flags that either should have precluded their hiring outright or required follow-up or monitoring. Eighteen of the 91 candidates indicated a past employment termination. Forty-two had friends and relatives who were or had been incarcerated. Twenty-eight candidates had at least one prior arrest; seven had been arrested more than once.

### Summary Table of DOI Review of 2016 CO Candidate Files[9]

| | | Correction Officer Class | | |
|---|---|---|---|---|
| | | January 2016 Class Size: 665 (102 files reviewed) | June 2016 Class Size: 756 (98 files reviewed) | December 2016 Class Size: 950 (91 files reviewed) |
| DOI Findings | Significant Red Flags[10] | 27 files or 26% | 42 files or 43% | 29 files or 32% |
| | Past Employment Termination | 27 files or 26% | 33 files or 34% | 18 files or 19% |
| | Incarcerated Associates | 42 files or 40% | 39 files or 40% | 42 files or 46% |
| | Prior Arrests | 27 files or 26% | 25 files or 26% | 28 files or 30% |

### iii. DOC's Ongoing Vulnerabilities Regarding AIU Hiring Procedures

DOI's 2017 review revealed that AIU's hiring procedures and policies remain vulnerable. As demonstrated above, DOI found AIU investigators often do not thoroughly investigate applicants' backgrounds. AIU staff often approved candidate files based on self-reported information, and did not do independent, collateral checks to corroborate that information, simply to meet DOC's time constraints, based on interviews with staff. AIU's lack of field visits and failure to obtain third party

---

[9] The percentages are greater than 100% for each of the January, June, and December 2016 classes because there were multiple findings for some of the candidate files reviewed.

[10] DOI defines a significant red flag to be an explicit, objective violation of NOE's or DOC's automatic disqualifying factors (detailed in Appendix), or, more subjectively, a candidate having multiple or a combination of factors, including prior criminal arrests, past employment termination, incarcerated associates, poor driving record, and insufficient college credits (a single deficiency in any of those criteria may not be sufficient to preclude hiring).

7

b041

employment verifications were referenced in the *Nunez* Independent Monitor's[11] Reports as potential problems.

Through interviews with several AIU personnel, including AIU then-Executive Director – now Assistant Commissioner - Dr. Larry Johnson, DOI determined AIU was significantly backlogged on conducting field visits for CO candidates.  Dr. Johnson acknowledged there were only four investigators assigned to the Field Team Unit and the unit wasn't large enough to handle the amount of work allotted.  DOI's arrest of a probationary CO in December 2016 for contraband smuggling, referenced in Section III, above, shows just how important field visits are to assessing a candidate's suitability.    Assessing  appropriate  levels  of  staffing,  including supervisory personnel, to thoroughly investigate candidates is of paramount necessity.

The Fourth Report of the *Nunez* Independent Monitor[12] found it was reasonable, and DOI agrees, for AIU to continue with a candidate's appointment without third party employment verifications if the rest of the candidate's background appears spotless.  However, DOI found AIU frequently failed to wait for third-party employment verifications when the candidate reported being terminated or resigning in lieu of termination from a past employer, circumstances that blemish a candidate's record and can be disqualifying per NOE's specific factors.  If a candidate reported being terminated from a past employer, especially if it was fairly recent and close to DOC's background investigation, AIU should make every effort to contact that candidate's employer for a collateral check.

DOI found AIU still does not verify personal information through public record databases, such as LexisNexis or CLEAR.  These public record databases provide investigators with a detailed listing of a person's past and present addresses and telephone numbers, and are useful in ascertaining objective and truthful information.  DOI also found AIU infrequently obtains New York City Police Department (NYPD) paperwork to corroborate a candidate's description of police contacts and AIU rarely contacts outside correctional institutions, including DOCCS, to obtain documentation

---

[11] As part of a November 1, 2015, consent judgment in the federal class action lawsuit *Nunez v. City of New York et al.*, Case 1:11-cv-05845-LTS (SDNY), entered in the Southern District of New York, the court appointed Independent Monitor Steven J. Martin to oversee and report on DOC reforms intended to prevent use of unnecessary and excessive force, protect inmates from inmate-on-inmate violence, and prevent inappropriate placement of 16- to 18-year-old male inmates in punitive segregation for excessive periods of time.  The *Nunez* Independent Monitor found AIU's background checks were largely adequate.  However, the Independent Monitor's focus was on whether or not AIU reported it had conducted checks, rather than whether those checks occurred or resulted in proper hiring decisions.

[12] This report covered the monitoring period from January 1, 2017 through June 30, 2017, and can be found at

https://www1.nyc.gov/assets/doc/downloads/pdf/Fourth_Report_Nunez_Independent_Monitor_10.10.17.pdf.

and inmate phone calls, if applicable, when a candidate notes a past or present incarcerated associate at that institution.

At present, and as noted in the *Nunez* Independent Monitor's Third and Fourth Reports, AIU still lacks a written AIU investigator manual, another tool to establish standardized, thorough and objective hiring investigations. By contrast, the NYPD has written policy and procedures that provide its investigators with guidance relating to the standards to be used while conducting an investigation, what information should be collected, and how the information should be documented in candidate files. Without a comprehensive investigator manual and standardized background investigation specific training, AIU investigations are inconsistent and hiring decisions are subjective.

DOI's review found that AIU files are still paper-based and, as a result, many are incomplete. For example, if the file was computerized, it could be designed so that an applicant could not finalize an application without finishing every question. DOI found that candidates oftentimes failed to completely fill out the screening sheet and application questionnaire booklet and that AIU investigators failed to address the omissions. As previously addressed in DOI's 2015 Hiring Report, errors in the application questionnaire booklet still appear uncorrected, with page 17 of the booklet telling CO applicants that they must adhere to the NYPD's Patrol Guide if appointed to the "New York City Police Department."

Although DOI found that DOC implemented a "New Investigator Training Plan" for AIU investigators, its curriculum devoted several weeks to subjects such as conducting a compelled statement pursuant to Mayoral Executive Order, and medical reports and Medical Examiner consults, training not applicable to conducting background investigations.

While DOC implemented a monitoring system for probationary COs who were hired but identified as "questionable" during their background investigation, DOI determined that this system entailed a mere cursory review of all candidates approximately three months prior to expiration of probation (probation is generally 24 months). This undercuts the effectiveness of consistent and ongoing monitoring of truly problematic candidates.

DOI's recent review of CO candidate files also found that, although Dr. Larry Johnson and then-Deputy Commissioner Errol Toulon did complete summaries in the CRS, they were generic and were not indicative that the author had reviewed the full files.

9

b043

## IV. Specific Hiring Failures as a Result of DOC's Flawed Hiring Practices

In January 2017, former Deputy Commissioner Toulon informed DOI that under Commissioner Joseph Ponte, the DOC Administration had been pressuring AIU to process larger academy classes in a shorter amount of time than had previously been done. Although AIU increased the staff size and number of investigators from 2014, in 2016, the average number of background investigations per investigator also increased. Since that time, in 2017 and 2018, the average number of files per investigator has decreased. However, DOI still sees the same issues in 2017 and 2018 (DOC hiring candidates who are deficient and cannot make it through their probationary period without being reprimanded, modified, administratively punished, or terminated), showing that there is a problem in practice and supervision that still needs to be rectified.

DOI has not conducted an intensive review of DOC's hiring practices for the 2017 and 2018 classes, but when probationary COs of those classes have been administratively or legally charged, and DOI has reviewed their applicant files, some files contain red flags that should have been addressed. DOI recommends DOC to conduct the same or similar type of review for their 2017 and 2018 classes that DOI conducted for the 2016 classes, and to report their findings back to DOI.

Former Deputy Commissioner Toulon reported concern that DOC pressure to hire increasingly large classes was leading AIU to hire candidates who otherwise would not have cleared the screening process. DOI spoke with several AIU investigators who corroborated Toulon's information. DOI's review found that in order to meet the new time constraints, investigators were relying on candidates' self-reported information without obtaining corroboration through objective sources, checking boxes on the checklist AIU developed without completing the required tasks, and submitting files for closure without obtaining essential information.

Additionally, the individual investigations DOI has conducted indicate that from the end of 2016 to present, there has been an increase in the number of allegations against probationary COs, some of which have resulted in arrests and terminations. While increased allegations against probationary COs may be partially explained by the fact there are simply more probationary COs being hired, DOI investigations have found these allegations also reflect the continued hiring of problematic probationary COs, who are susceptible to corruption hazards due to deficiencies that were overlooked during the hiring process, and otherwise should have excluded them from the applicant pool.

10

b044

## V.    Examples from Recent DOI Investigations[18]

a)    Probationary CO [REDACTED] (January 2016 class) was arrested on August 3, 2017 for Strangulation in the Second Degree, a class D felony. In her background file, probationary CO [REDACTED] listed two prior arrests, one in 2010 for driving with a suspended license, the other in 2012 for shoplifting. She reported being employed by a police department in Georgia at the time of both arrests, but AIU did not make contact with this previous employer prior to hiring her. Probationary CO [REDACTED]'s background file also showed she had four accounts in collection, and her license was suspended in 2014. According to NOE's and DOC's criteria, she should not have been hired. A review of her background file showed on the two occasions (in the screening sheet and in the application questionnaire booklet) probationary CO [REDACTED] was asked to list her social media accounts, she left those sections blank. AIU never addressed the omissions, and should have. Nevertheless, AIU reported an investigator reviewed probationary CO [REDACTED]'s Instagram and Facebook accounts, and found no derogatory information (the background file does not set forth the name of the social media accounts the investigator checked, if indeed the check was done, nor were there any printouts of the accounts to reference for comparison). However, the NYPD complaint report associated with probationary CO [REDACTED]'s arrest did list her Instagram account name, which DOI investigators reviewed and observed the notation "Loc Nation" and two pitchforks, references to possible Crip gang affiliation. DOI could not determine whether the gang-related red flags found after her 2017 arrest were present in her social media accounts during her DOC background investigation due to the lack of specificity in the AIU file. Because of the 2017 arrest, DOC terminated probationary CO [REDACTED] on November 11, 2017.

b)    Probationary CO [REDACTED] (January 2016 class) was previously employed by DOCCS. He claimed that he resigned from DOCCS because his long commute led to child care issues. DOC conducted a follow-up review of probationary CO [REDACTED] file and found DOCCS' documented response in it, which refuted probationary CO [REDACTED] claims. DOCCS' response stated probationary CO [REDACTED] had been found in a parolee's home, had had an inappropriate relationship with an inmate, and made false statements to the NYSIG. There is no indication the AIU investigator addressed DOCCS' response in candidate [REDACTED] a case review sheet and cleared the candidate to be hired by DOC. DOC terminated probationary CO [REDACTED] for his intentional misrepresentation October 19, 2017.

c)    Probationary CO [REDACTED] (January 2016 class) had two arrests prior to being hired; one for driving under the influence, and one for aggravated harassment related to a domestic dispute with his wife. On March 8, 2017, after he was hired, he was arrested (off duty) for assault and harassment related to another

---

[18] All names have been redacted except in the one case where DOI arrested the CO.

b045

domestic dispute with his wife.[14] A review of his background file indicates that in addition to the two reported arrests, the candidate's credit check showed that several of his accounts were in collection. Probationary CO ███████ also reported two incarcerated associates, his brother and a friend. He had visits with and calls from his brother from 2012 - 2015, and stated that his brother was transferred to state prison. AIU investigators made no attempt to obtain visitor logs, documents, or recorded calls from DOCCS. Visitor Express also showed two visits to his friend in 2011. Thus, with all of these issues considered together, according to NOE's and DOC's criteria (mainly "proof of good character and satisfactory background"), this candidate should not have been hired. Probationary CO ███████ remains employed.[15]

d)    Probationary CO ███████████ (January 2016 class) was hired despite his failure to have the 39 college credits required by the NOE. However, his background file contains a notation that an AIU investigator verified official educational transcripts showing that probationary CO ███████ met NOE's college credit requirement. Additionally, there was a discrepancy by the AIU investigator about how many credits the candidate actually earned. In one section of the CRS, the AIU investigator reported probationary CO ███████ had 52 credits, and in another section, the AIU investigator reported probationary CO ███████ had 61 college credits. The Executive Director and Deputy Commissioner both approved the candidate for hire. In his decision section, the Executive Director noted "[t]here is evidence of good vocational and educational skills with no difficulties in either area."[16] In reality, the only college transcript in the file indicated probationary CO ███████ earned only 14 credits. Thus, according to NOE's and DOC's criteria, this candidate should not have been hired. Probationary CO ███████ remains employed.

e)    Probationary CO ███████████ (January 2016 class) was the subject of an administrative investigation conducted by DOC's ID in regards to excessive use of force. ID concluded probationary CO ███████ utilized unnecessary force against an inmate, and did not provide an accurate account of the incident. As a result, ID recommended CO ███████'s probation be extended six months. A review of her background file indicates that in 2006, she was arrested for menacing, criminal possession of a weapon, and harassment after a fight in the bathroom with a co-worker. The case was ultimately dismissed, but she was terminated from her employment following the incident. Probationary CO ███████'s background file further showed her salary was garnished to repay defaulted student loans, and in 2015, she was issued a summons for boarding a bus without a ticket. According to NOE's and DOC's criteria (mainly "proof of good character and satisfactory

---

[14] When a member of service is arrested off-duty, the investigation goes to DOC's Investigation Division (ID), which then may refer the member for disciplinary proceedings.
[15] ID originally sought to terminate probationary CO ███████. However, on January 9, 2018, ID/Correction Intelligence Bureau Acting Deputy Commissioner Antonio J. Cruz reviewed probationary CO ███████'s case and recommended no action. First Deputy Angel Villalona recommended that CO ███████'s probation be extended six months, to September 13, 2018. Neither Cruz nor Villalona explained their decisions.
[16] ███████ CRS, page five, dated January 2, 2016.

b046

background" NOE designation), this candidate should not have been hired. Probationary CO          resigned on January 9, 2017.

f)    Probationary CO                    (June 2016 class) also failed to meet the college credit threshold.   In his background file, the AIU investigator noted probationary CO          met the NOE requirements.  However, the only college transcript in the file indicated he had 49 attempted credits, but earned only 13.  The Executive Director and Deputy Commissioner both approved the candidate for hire. In his decision section, Executive Director Dr. Johnson noted "[t]here is evidence of good vocational and educational skills with no difficulties in either area."[17]   In addition, probationary CO          's Department of Motor Vehicles abstract indicated he had eight suspensions from 2012 to 2015.  As per DOC's response to DOI's 2015 Hiring Report, one of the added in-house automatic disqualifier was "[m]ore than five (5) suspensions on different dates" and "[m]ore than two (2) suspensions on different dates" within less than five years.[18]  Thus, according to NOE's and DOC's criteria, this candidate should not have been hired.  Probationary CO          remains employed.

g)    Probationary CO                    (June 2016 class) initially was not recommended for hire by the AIU investigator.  One of the reasons was she was not truthful on her application; she disclosed only one incarcerated associate until IFCOM results revealed calls to her telephone number by other inmates (including her child's father).  In addition, on her CRS, probationary CO          denied having ever been disciplined.  However, a DOI check with the New York City Department of Homeless Services (DHS) (her employer at the time of her background investigation) indicated she currently had an open matter in the disciplinary unit.  A review of the background file showed AIU never followed up with DHS about that pending disciplinary matter.  The CRS also noted she failed to appear for her initial appointment with the AIU investigator.  DOI investigators found Securus logged attempted calls to a telephone number listed in the probationary CO          's AIU application questionnaire booklet, and both attempted and completed Securus calls (from incarcerated inmates) to her listed cellphone number.  A review of probationary CO          's background file revealed AIU conducted an IFCOM search but failed to conduct a Securus check, and therefore did not ask her about these inmate calls and possible additional incarcerated associates.  Thus, according to NOE's and DOC's criteria, this candidate should not have been hired.  Probationary CO          remains employed.

h)    Probationary CO                    (December 2016 class) was found to be having an unduly familiar relationship with an inmate in her facility, and received 39 calls to her home telephone number from the inmate after she was hired.  A review of her background file indicated the AIU investigator found IFCOM hits to that same telephone number in 2013 and 2014.  Probationary CO          reported she did not

---

[17]          CRS, page five, dated April 28, 2016.
[18] See Appendix, at page three.

13

know the inmate placing the calls and the home telephone number wasn't issued to her until 2014. The AIU investigator accepted this response at face value. Probationary CO ███████ also had calls to her cellphone number from 2012 to 2014 from an inmate listed in her Declaration of Incarcerated Associates form and reported visiting him as well. Probationary CO ███ listed two additional incarcerated associates – her brother in Alexandria City Jail, and a friend in Augusta Correctional Center, who she reported visiting and from whom she received calls. The AIU investigator made no attempts to contact those jurisdictions to get phone calls or visitor information during the background investigation. Although this doesn't necessarily mean that probationary CO ███████ should not have been hired based on the NOE's and DOC's criteria, her extensive communication with incarcerated associates is a good example of a potential corruption hazard. She should have been proactively monitored after being hired. Probationary CO ███████ was terminated from employment on August 1, 2017.

i)     Probationary CO Torray Riles (December 2016 class) was arrested on January 21, 2018, and charged with Promoting Prison Contraband in the Second Degree, a class A misdemeanor. On that date, DOI's K-9 Unit alerted on probationary CO Riles as he entered the front gate of OBCC. When searched, he produced two medium-sized clear bags containing approximately 26 grams of marijuana he had concealed in his underwear. He also carried a clear backpack with four packs of Newport cigarettes (DOC rules prohibit COs from bringing in more than one pack at a time). A review of his background file showed probationary CO Riles was arrested in April 2016 for assault, menacing, and harassment. He had two driver's license suspensions in 2013 and 2014. Although probationary CO Riles listed no incarcerated associates, in April 2015 he received two calls to his previous cellphone number from an inmate. He reported lending his phone to a friend, and denied having any association with the inmate who made the calls. A discrepancy was noted in his CRS – the two phone calls had no duration, but they were forwarded to Correction Intelligence Bureau for further investigation. A review of the calls by DOI investigators revealed there was, in fact, duration to the calls and the conversations suggested that probationary CO Riles was the recipient of the calls, indicating he provided an intentional misstatement to AIU during his background investigation process. Thus, according to NOE's and DOC's criteria, this candidate should not have been hired. On January 22, 2018, probationary CO Riles was suspended, pending termination.

j)     Probationary CO ███████████ (December 2016 class) listed contact with her brother in her Declaration of Incarcerated Associates form. However, a review of Visitor Express showed visits as recently as 2015 by probationary CO ███ to additional inmates, who were not listed in her Declaration of Incarcerated Associates form. Several were gang-affiliated. AIU investigators did not address probationary CO ██████'s omissions. Probationary CO ██████ reported visits to her brother in upstate prisons, but the AIU investigator never reached out to DOCCS for documentation or phone calls. AIU conducted a search in Securus for the telephone

14

FILED: KINGS COUNTY CLERK 08/20/2019 02:52 PM    INDEX NO. 518946/2019
NYSEF DOC. NO. 201    Case 23-1, Document 76, 01/25/2023, 3458054, Page130 of 296    RECEIVED NYSCEF: 08/20/2019

b048

number probationary CO ███ reported belonging to her with negative findings. However, DOI conducted a CLEAR check that revealed that probationary CO ███ had an additional number that received multiple Securus calls bpm 2015 to 2016, predominantly by one gang-affiliated inmate who probationary CO ███ did not list on her Declaration of Incarcerated Associates form. The nature of the calls corroborate probationary CO ███ was the recipient of the calls. Additionally, some conversations contradicted information probationary CO ███ provided during her background investigation. For instance, during her background investigation, probationary CO ███ denied ever using or abusing controlled substances. However, during one call with an inmate, her statements asserted otherwise, which should have prompted AIU to conduct further checks. If AIU had collateral checks for a candidate's telephone numbers, they might have caught her deception and not hired her. Probationary CO ███ intentionally omitted reporting the additional telephone number during her background investigation and, according to NOE's and DOC's criteria, this candidate should not have been hired. Probationary CO ███ remains employed.

## VI.   Conclusion and Recommendations

AIU's applicant hiring process remains flawed and deficient despite DOC's statements that it would reform its hiring practices. While DOC accepted DOI's recommendations in 2015, DOC's implementation has fallen short of what is necessary to adequately reform the hiring process. The following 2015 policy and procedure recommendations remain unimplemented or incompletely implemented:

1.   DOC should have a more thorough applicant review process. DOC should adopt a system, comparable to the NYPD's Candidate Assessment Section (CAS), in which each applicant must pass through multiple levels of review, by both civilian and uniformed staff, before being approved by a panel of executives. Failure to adequately review a candidate's application should subject an AIU investigator to disciplinary review.

2.   DOC should create a written manual for AIU, describing its investigative strategies and procedures, and containing the standards to be used while conducting an investigation, the information to be collected, and how to properly document information in candidate files. The investigative manual must clearly set out the factors that constitute automatic disqualifiers, detail how to gather third-party employment verifications, and describe circumstances necessitating field visits. The manual should also have clear guidelines related to reviewing Securus calls (running inmates' calls with candidates' telephone numbers, and clearly delineating responsibility for this task). This, along with a new computerized application processing system, should help ensure that all required information is obtained for every applicant.

15

b049

3. DOC should implement standardized in-house training for AIU investigators tailored to conducting background investigations, including interviewing techniques, understanding the application process, and using social media, computer databases, and other law enforcement tools. In particular, gang identification and disqualifying factors related to gang activity must be part of the training course as this type of affiliation by a CO presents a serious threat to the safety and security of DOC facilities. The NYPD's CAS two-week training course for investigators with follow-up refresher courses provides one effective model.

4. DOC, using the NYPD's CAS system as a model, should computerize its applicant file review system. At present, all AIU files are paper based, and many DOI reviewed were incomplete. DOC should require the screening sheet and application questionnaire booklet be filled out electronically by the applicant, and the CRS be filled out electronically by the AIU investigator. Computerizing the process would force applicants to answer every question in the screening sheet and application questionnaire booklet before they could successfully submit documents to AIU for review, enhance DOC's ability to store and access information, ensure a standard process is followed for every applicant, and require AIU investigators to fill out every section prior to submitting the applicant's file for a supervisor's review. Computerization would enhance DOC's ability to store and access information. Additionally, an electronic application questionnaire similar to that used by NYPD would allow AIU to develop useful statistical information to help guide its hiring practices.

5. DOC should engage in a more rigorous review of the psychological testing presently employed. There must be more communication between AIU background investigators and AIU's psych unit when it comes to possibly conflicting or omitted information provided by the candidate at different stages of the hiring process. It should be mandated that DOC's PsyQ Personal History Report be completed by the applicant prior to the commencement of the background investigation. That way, AIU investigators and AIU psychologists will be in a better position to question applicants on any conflicting information (and possible misstatements or omissions) they might provide.

6. Decisions by supervisors, especially the Director and Deputy Commissioner that overrule the judgment of subordinates, should be explained in writing.

16

b050

7.   DOC should have a system in place to proactively monitor applicants who are hired but are considered vulnerable to corruption.

8.   AIU should focus on conducting more collateral checks. AIU too often relies on the information provided solely by the candidate.

9.   AIU investigators should have access to public record database checks, such as LexisNexis or CLEAR. This will provide the investigators with a way to conduct collateral checks related to information the candidate provides about their current and former residences and telephone numbers. These public record database checks can also provide collateral checks for information related to a candidate's criminal history outside of New York State and their social media accounts (via use of the LexisNexis "Virtual Identity Report").

10.  AIU should liaise with the NYPD to obtain paperwork related to arrest and complaint history, police contact, Domestic Incident Report history, etc. A review of the files showed AIU investigators relied on the candidate's description of certain incidents without obtaining paperwork for corroboration.

11.  When a candidate discloses associations with incarcerated inmates in other correctional institutions and jurisdictions, including NYS DOCCS, AIU investigators should contact that jail or prison to obtain relevant documentation and phone calls, if applicable.

Implicit in these recommendations is the requirement that where adverse information on a candidate is developed, DOC will act on that information, including not hiring candidates with significant red flags. To the extent this implicit requirement should be made explicit, DOI now does so.

In addition, DOI is issuing a new policy and procedure recommendation:

12.  DOC should staff AIU properly to enable investigators to thoroughly investigate and vet candidates. DOC should review and determine what the suitable workload for their AIU investigative staff should be. This review should include allocating supervisory personnel for auditing and spot monitoring, to ensure that background investigations and decisions are appropriate.

DOC reviewed a draft of this report. DOC agreed that AIU will audit and spot monitor background investigations and hiring recommendations.

17

Case 23-1, Document 76, 01/25/2023, 3458054, Page133 of 296

b051

## New York City Department of Correction's Response to the January 2015 Department of Investigation's Report on Hiring Practices

In its report, DOI recommended a series of changes to the hiring process. Specifically, DOI strongly advised the DOC to improve procedures for recruiting, screening, and hiring to ensure it hires the most qualified COs and to invest resources in AIU to ensure that it has the best trained personnel and most effective technology.

**A. DOC needs an aggressive recruitment strategy and clear disqualification standards to improve the applicant pool. DOI made the following recommendations:**

**1. DOC should re-establish its Recruitment Unit and execute a recruitment plan to attract candidates for upcoming civil service exams. In addition, DOC should resume participation in the Law Enforcement Exploring program.**

In June 2015, the DOC began executing a Recruitment Plan designed to ensure that we have sufficient quantity and quality of Officers.

Recruitment Plan
- Revamped DOC external marketing to enhance recruitment efforts:
  o Rolled out a new DOC recruitment website for uniform and non-uniform positions.
  o Created a full scale social media platform (Facebook, Instagram and Twitter) to bolster recruitment efforts.
  o Used external HR tools including DOC LinkedIn, Glassdoor to market the DOC as a quality employer.
  o Launched a full scale print media campaign with Metro Newspaper, NY Times, NY Daily News, NY Post, Newsday, Queens Courier, and other ethnic media outlets.
  o Collaborated with i-Heart Radio to increase the awareness of our November 2015 exam.
  o As a result of the Recruitment team's efforts, approximately 2,761 applicants sat for the November 2015 examination; a rate higher than the past several exams. The next exam periods are January 2016, March 2016, and May 2016. We are currently in negotiations with DCAS regarding scheduling 4 additional correction officer exams for the second half of the 2016.
  o Designed a Human Resources Journal entitled Correction Quarterly which gives potential recruits an overall snapshot of the current state of the agency. Fall issue: http://issuu.com/jointheboldest/docs/qct_cq_mag_1 Winter issue: http://issuu.com/jointheboldest/docs/cqwinter

- Hired staff to execute this initiative.

b052

- o New recruitment team consists of: 12 Uniformed staff and 5 Civilians.

- Improved Processes:
  - o Designed a candidate attrition journey to make the process clear to potential candidates.
  - o Created an exit interview process for candidates that resign from the CO title within 90 days.
  - o Identified the gaps in our current and future workforce and developed a strategic recruitment plan to address these gaps.
  - o Defined and outlined DOC's specialized units to help market DOC to potential candidates.

- Held and participated in multiple events in order to recruit potential candidates.

- The next step in the Recruitment Plan seeks to refine its process while continuing to be progressive and meeting the following objectives that aim to transform the way the agency recruits, selects, and hires staff:
  - o Establish a DOC branded Career Fair tour throughout the 5 boroughs of New York City and on Long Island in 2016.
  - o Create stronger community relations with faith-based institutions and community based organizations across the city.
  - o Launch a DOC Youth Explorers program in partner with selected Department of Education schools.
  - o Meet with DCAS to discuss post exams results.
  - o Develop a survey to monitor the status of probationary officers for retention purposes.

2. **DOC should adopt automatic disqualifying factors, including the conviction of certain crimes, with a goal to eliminate unqualified applicants as quickly and efficiently as possible.**

DOC's Applicant Investigation Unit has adopted the following automatic disqualifiers, effective January 2015:

1. Current Civil Service Law has only five (5) automatic disqualifiers for appointment. Therefore, the DOC established objective criteria for determining the character fitness of candidates by creating a group of "in-house" disqualifiers, similar to the NYPD.
2. DOC decided to empower the in-house automatic disqualifiers by utilizing the Department of Correction Commissioner's discretion to not hire under the 1 in 3 rule as stated in New York City Civil Service Law Section 61 and in Section 4.7.1 of the Rules and Regulations of the City Personnel Director. The in-house

Case 23-1, Document 76, 01/25/2023, 3458054, Page135 of 296

b053

Automatic Disqualifiers are as follows (they are in three (3) important character areas)*[1]:

A. EMPLOYMENT*
   - Dismissal from employment while a tenured member of a governmental or other public employer.

B. FELONY AND DOMESTIC VIOLENCE MISDEMEANOR CONVICTION.*
   - Any felony conviction
   - Domestic violence misdemeanor conviction

C. CRIMINAL COURT SUMMONSES TOTAL*
   - More than FIVE (5) "C" Summonses
   - Less than five (5) years
     - More than three (3) "C" Summonses
   - Less than two (2) "C" Summonses

D. DRIVING RECORD TOTAL*
   - More than seven (7) moving violations on separate occasions, other than related to employment
   - More than five (5) hazardous moving violations
   - More than five (5) suspensions on different dates
   - More than one (1) license revocation
   - Less than five (5) years:
     - More than four (4) moving violations on separate occasions, other than related to employment
     - More than three (3) hazardous moving violations
     - More than two (2) suspensions on different dates
     - Any license revocation
   - Less than two (2) years:
     - More than three (3) moving violations on separate occasions, other than related to employment
     - More than two (2) hazardous moving violations

[1] Symbol represents disqualifiers documented in New York City Police Department's In-House disqualifiers to All Applicant Division Personnel, July 19, 1995, A.P.D. Memo # 143.

Case 23-1, Document 76, 01/25/2023, 3458054, Page136 of 296

b054

       o   More than one (1) license suspension

3. **DOC should expand its list of potential disqualifying factors to include corruption risks unique to DOC including financial instability, inappropriately familiar relationships with inmates, and present affiliation with gang members.**

> Effective August 2014, the Applicant Investigation Unit's utilizes the following criminal background-check applications:
> - ✓ E-Justice
> - ✓ WebCrims
> - ✓ Family Watch Dog

A brief description of each application and its use, are as follows:

- **E-Justice:** Investigators utilize this application for integrity check of a Candidate's driver's license, any outstanding Order of Protection or status of Order of Protection. This application is also used to print out the results of fingerprints from the nationwide federal data base.   **Benefit:** This application has proven beneficial for preliminary investigation purpose and is vital to the vetting process to cultivate Candidates who fulfill the conditions of employment and are void of criminal records.

- **WebCrims:** This application is utilized by the Investigators to determine the status of a Court Case the Candidate may have reported during the Candidate-to-Investigator interview process.  WebCrims is also used to check the Court case status of a spouse or family member that reside with the Candidate.
  **Benefit:** This is important to know, especially if the Candidate failed to report this information or the individual in question has felony charges.

- **Family Watch Dog:** This application is utilized to check if the Candidate is a registered sex offender on any level.
  **Benefit:** Ensuring that the Department cultivate the best Candidate and supplying the Department with facts; to make a viable decision regarding the hiring of a Candidate.

Additionally, Investigators are provisioned with the below accounts the day of appointment.
- Email Account
- Full Internet Access
- IFCOM
- IIS w/ VINQ, VINQH, QHIN, VIST

Lastly, DOC is currently procuring a system to run credit checks on applicants.

E142

b055

4. **DOC should meet with DCAS to update the language in the Correction Officer NOE. These updates should include any new automatically disqualifying criteria developed by DOC, and be tailored, as necessary, to specific corruption vulnerabilities unique to the agency.**

In July 2015, the Recruitment Unit worked with DCAS to revise the job description portion of the notice of exam. Specifically, sections regarding "What The Job Involves", "Special Working Conditions", and a more detailed description of the physical work activities performed and environmental conditions were updated. The changes appeared on the November 2015 and January 2016 exams.

B. **DOC must make AIU's candidate screening uniform, thorough, and tailored to the unique corruption vulnerabilities at DOC. DOI makes the following recommendations:**

1. **DOC should have a more thorough applicant review process. DOC should adopt a system, comparable to the NYPD APD, in which each applicant must pass through multiple levels of review, by both civilian and uniformed staff, before being approved by a panel of executives.**

   Since DOI has issued its recommendations on DOC's applicant review process, AIU has implemented more stringent standards regarding automatic disqualifications, additional levels of review by the psychological unit, more intensive background investigations through use of additional tools such as IFCOM and credit checks, and a system of tracking the flow of applicant files. Please see responses to questions 2-7 for further explanation.

   The changes to AIU have been phased-in during the review period of the last four recruit classes.

   - October 2014 Class- 155
   - March 2015 Class- 398
   - August 2015 Class- 626
   - January 2016 Class-631

2. **AIU should create a standard detailed checklist identifying all documents that it requires applicants to submit and all AIU investigative steps necessary to complete the background investigation.**

   Please see attached Checklist created in January 2015.

3. **DOC should ensure that all case coordinators are using IFCOM as an investigative tool.**

b056

As previously mentioned, every AIU Investigator is provided access to and training on IFCOM upon their appointment to the Unit. It has become a consistently used investigative tool by AUI in conducting background investigations.

4. **DOC should implement standardized training for case coordinators in investigative and interview techniques. In particular, gang identification and disqualifying factors related to gang activity must be part of the training course as this type of affiliation by a CO presents a serious threat to the safety and security of DOC facilities.**

Effective January 2015, the following DOC in-house investigative training courses have been implemented.

### *New Investigator Training Plan*

I. **Week 1: Three (3) Full day sessions divided between immediately relevant topics and database familiarization**
   a. Day 1: Familiarization with Investigation Division
   b. Day 2: Phases and Documents of an Investigation
   c. Day 3: Documentation

II. **Week 2: Case Management and Organization (4 hrs.)**
   a. View video in advance of session: 003 *Case Management and File Organization*
   b. Why do we need standardized file organization?
   c. How should a folder be organized?
   d. Vouchering and associated processes
   e. Tracking your work

III. **Week 3: Conducting an MEO / formal interviews (4 hrs.)**
   a. View video in advance of session: 004 *ID Investigator Training Course on Interviewing*
   b. What is an MEO?
   c. Use immunity
   d. Scheduling an MEO
   e. Preparing for an MEO
   f. Conducting an MEO

IV. **Week 4: Confidential Allegations: PREA and Special Considerations for Victims of Sexual Assault (4 hrs.)**
   a. View video in advance of session: 010 *Investigating Sexual Misconduct and Abuse*
   b. What is PREA?

b057

c. What makes the callout and case different?

d. Impact on interviews

V. **Week 5: Medical Reports and ME Consults (4 hrs.)**

a. View video in advance of session: 007 Office of the Chief Medical Examiner (elective video 006 Obtaining and Analyzing Medical Evidence)

b. Requesting medical records

c. What to look for

d. Codes and acronyms

e. ME consults

VI. **Week 6: Closing a Case (4 hrs.)**

a. View video in advance of session: 002 Overview of the Disciplinary Process

b. Organize all materials and ensure everything is accounted for in final report

c. Reexamine charges – is everything still relevant?

d. Agree on charges

e. Draft MOC, PDR, Facility Referrals and Trials

VII. **Week 7: Potpourri (4 hrs.)**

a. SRG

b. Internet and Social networking

c. Evidence Analysis

d. Photographic identification procedures

e. Securpass

f. Databases

VIII. **Week 8: Final Considerations (4 hrs.)**

a. Current challenges

b. Case work workshop

c. Mentoring matchup?

Note: Some weekly sessions for <u>civilian</u> investigators may be extended to 6 hours due to the need for more extensive familiarization with DOC policy, practice, and procedure.

During the four "off" days each week, new investigators are expected to review ID policy and procedure videos and manual (in preparation for upcoming sessions), attend MEO interviews and transcribe related audio, complete facility video reviews, and shadow

FILED: KINGS COUNTY CLERK 08/28/2019 02:52 PM    INDEX NO. 518946/2019
NYSCEF DOC. NO. 281    Case 23-1, Document 76, 01/25/2023, 3458054, Page140 of 296    RECEIVED NYSCEF: 08/28/2019

b058

experienced investigators in their daily operations. Each new investigator will paired with an experienced investigator for the duration of the 7 weeks of follow up training.

5. **DOC, using the NYPD APD system as a model, should computerize its applicant file review system. At present, all AIU files are paper based, and many that DOI reviewed were incomplete.**

AIU's files remain paper- based in conjunction with an electronic tracking system which follows an applicant during the process. It tracks the documents that the applicant has submitted, when the applicant's physical and psychological appointments are scheduled, and what remains outstanding. DOC will continue to assess the use of a computerized system.

6. **DOC must engage in a more rigorous review of the psychological testing presently employed.**

AIU's Psychological Unit uses the same vendor as the NYPD's APD to purchase materials for the psychological testing of correction officer applicants. The testing not only mirrors the same types of exams administered by the NYPD APD, but are the national standard for law enforcement. In effort to enhance the applicant review process, in August 2015, the AIU Psychological Unit established a Tiered System of review. After the collecting the results of both the background investigation and written psychological exam, the results are filtered by Psychology Leadership to a reviewer with the appropriate level of skill and education. Candidates are then sorted by Tier; Tier #1 cases are completed by Examiners and/or Psychologists under supervision of Psychology Leadership. Tier #2 and Tier #3 cases are completed by Psychologists under supervision of Psychology Leadership. This method promotes ongoing training and clinical supervision while expediting candidate evaluation and capitalizing on experience-based distribution of responsibilities.

7. **Decisions by supervisors, especially the Director and Deputy Commissioner that overrule the judgment of subordinates, must be explained in writing.**

Every determination, whether an approval or disqualification made on an applicant's file is now accompanied by a written summary by either the AUI's Executive Director or Deputy Commissioner.

**C. DOC must have a system in place to proactively monitor applicants who are hired but are considered vulnerable to corruption.**

AIU proposed a monitoring system for probationary correction officers identified as 'questionable' due to information learned during the background investigation.

Case 23-1, Document 76, 01/25/2023, 3458054, Page141 of 296

b059

- o The monitoring system is triggered approximately 3 months before "questionable" correction officers' probation ends. AIU would contact DOC Human Resource Unit for a master list of probationary officers by class.
- o This Master List would be divided amongst Squad A & B of investigators based on who conducted the initial background check.
  - Some programs/background checks can be ran again to ensure candidate compliance.
- o For candidates whom declared knowing and associating with inmates (family and friends):
  - IIS (Inmate Information system)
  - Visitor Express
  - Inmate Lookup Services (ILS)
  - IFCOM (phone dump – request updated annual Personnel sheet from facility – which would show any new numbers and/or addresses)
- o Additionally, general inquiries should be conducted:
  - Unified Court system (any undisclosed new arrests)
  - Order of Protection
  - Drivers license check (suspension, unpaid tickets and etc.
- o For candidates who had a questionable background (possible gang affiliation):
  - Social media lookup (Facebook, Instagram, Snapchat and etc.)

b060



The City of New York
Department of Investigation
MARK G. PETERS
COMMISSIONER

80 MAIDEN LANE
NEW YORK, NY 10038
212-825-5900

Release 01-2015
nyc.gov/html/doi

**FOR IMMEDIATE RELEASE**
**THURSDAY, JANUARY 15, 2015**

CONTACT: NICOLE TURSO
(212) 806-5225

BETSY PISIK
(212) 825-5931

### DOI REPORT REVEALS BROKEN RECRUITMENT SYSTEM AT RIKERS ISLAND AND DEEPLY FLAWED APPLICATION PROCESS FOR NEWLY HIRED CORRECTION OFFICERS

*More than a third of new officers hired despite significant red flags*
*DOC commits to aggressive changes*

Department of Investigation (DOI) Commissioner Mark G. Peters today issued a comprehensive review of the Department of Correction's (DOC) hiring process for correction officers at Rikers Island, uncovering a deeply flawed system in which more than a third of officers were hired despite numerous corruption and safety hazards, including multiple prior arrests and convictions, prior associations with gang members, or relationships with inmates. Equally troubling, the Applicant Investigation Unit (AIU), responsible for screening potential recruits, relied on antiquated and haphazardly filed paper personnel documents and had little to no access to software necessary to perform basic background and credit checks. As a result, DOC has already replaced both its Director and Deputy Commissioner responsible for oversight of the AIU and responsible for the hiring of the applicants DOI reviewed, assigned additional staff to the screening process and committed to an aggressive set of reforms in this area.

DOI Commissioner Mark G. Peters said, "DOI's latest investigation on Rikers Island exposes a shockingly inadequate screening system, which has led to the hiring of many officers that are underqualified and unfit for duty. Applicants with a history of violence or gang affiliations should not be patrolling our jails. Positions as law enforcement officers demand better. We are pleased DOC has listened to our recommendations and is taking the necessary steps, after a decade of neglect, to strengthen its recruitment to attract candidates with only the highest talent and character."

DOC Commissioner Joseph Ponte said, "Improving staff recruitment, training and retention is a key part of my agenda of meaningful reform. My earliest actions as commissioner included providing new leadership for our staff recruiting and training operations. We have subsequently made significant changes to the Applicant Investigation Unit, including many based on recommendations from the DOI. Because at the end of the day, our performance is only as strong as the men and women who fill the posts that keep our facilities operating 24/7."

This report is another piece of DOI's ongoing investigation into criminal activity and civil disorder at Rikers Island. As part of the probe, which began in early 2014, investigators spent over 200 hours interviewing staff, conducting site visits, and reviewing over 75,000 documents related to the hiring process. For this report, DOI

# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, N.Y. 10006-1705
nyc.gov/olr

*The City of New York*

ROBERT W. LINN
*Commissioner*
RENEE CAMPION
*First Deputy Commissioner*
CLAIRE LEVITT
*Deputy Commissioner*
*Health Care Cost Management*

MAYRA E. BELL
*General Counsel*
GEORGETTE GESTELY
*Director, Employee Benefits Program*

TO:            HEADS OF CONCERNED CITY DEPARTMENTS AND AGENCIES

FROM:        ROBERT W. LINN, COMMISSIONER

SUBJECT:    EXECUTED CONTRACT: CORRECTION OFFICERS

TERM:        NOVEMBER 1, 2011 TO FEBRUARY 28, 2019

     Attached for your information and guidance is a copy of the executed contract entered into by the Commissioner of Labor Relations on behalf of the City of New York and the Correction Officer's Benevolent Association on behalf of the incumbents of positions listed in Article I of said contract.

     The contract incorporates terms of an agreement reached through collective bargaining negotiations and related procedures.

DATED:

OFFICE OF LABOR RELATIONS
REGISTRATION
OFFICIAL                    CONTRACT

NO:                          DATE:
17001                        JAN 6, 2017

# CORRECTION OFFICERS
# 2011 - 2019 AGREEMENT

## TABLE OF CONTENTS

ARTICLE I - UNION RECOGNITION AND UNIT DESIGNATION ...............................................................1

ARTICLE II - UNION SECURITY - DUES CHECKOFF ......................................................................2

ARTICLE III - HOURS AND OVERTIME..........................................................................................3

ARTICLE IV - RECALL AFTER TOUR ............................................................................................3

ARTICLE V - COMPUTATION OF BENEFITS ..................................................................................3

ARTICLE VI - SALARIES ...............................................................................................................4

ARTICLE VII - UNIFORM ALLOWANCE ........................................................................................9

ARTICLE VIII - LONGEVITY ADJUSTMENTS ...............................................................................10

ARTICLE IX - PAYMENT FOR HOLIDAY WORK ...........................................................................11

ARTICLE X - LEAVES .................................................................................................................11

ARTICLE XI - VACATIONS ..........................................................................................................12

ARTICLE XII - HEALTH AND HOSPITALIZATION BENEFITS.........................................................18

ARTICLE XIII - SECURITY BENEFITS FUND.................................................................................21

ARTICLE XIV - ANNUITY FUND ..................................................................................................22

ARTICLE XV - SENIORITY...........................................................................................................24

ARTICLE XVI - GENERAL............................................................................................................24

ARTICLE XVII - UNION ACTIVITY................................................................................................28

ARTICLE XVIII - NO DISCRIMINATION ........................................................................................29

ARTICLE XIX - BILL OF RIGHTS .................................................................................................29

ARTICLE XX - NIGHT SHIFT DIFFERENTIAL ...............................................................................29

ARTICLE XXI - GRIEVANCE AND ARBITRATION PROCEDURE .....................................................30

ARTICLE XXII - LINE-OF-DUTY DEATH BENEFIT........................................................................33

ARTICLE XXIII - DEATH BENEFIT - UNUSED LEAVE AND COMPENSATORY TIME........................33

ARTICLE XXIV – TERMINAL LEAVE LUMP SUM..........................................................................34

ARTICLE XXV - NO STRIKES.......................................................................................................34

ARTICLE XXVI - BULLETIN BOARDS ..........................................................................................34

ARTICLE XXVII - NO WAIVER......................................................................................................34

ARTICLE XXVIII - SAVINGS CLAUSE ..........................................................................................34

ARTICLE XXIX - LABOR-MANAGEMENT COMMITTEES ..............................................................35

ARTICLE XXX - FINANCIAL EMERGENCY ACT............................................................................36

17001

## CORRECTION OFFICERS
## 2011 - 2019 AGREEMENT

AGREEMENT made this _6th_ day of _January_, 2017, by and between the City of New York (hereinafter called the "City"), acting by the Commissioner of Labor Relations, and the Correction Officers Benevolent Association of the City of New York, Inc. (hereinafter called the "Union" or the "C.O.B.A."), for the period from November 1, 2011 to February 28, 2019.

## W I T N E S S E T H:

WHEREAS, the Correction Officers employed by the City have duly designated the Union as their exclusive bargaining representative for the purpose of collective bargaining with the City with respect to wages, hours and conditions of employment; and

WHEREAS, the Union and the City desire to cooperate in establishing conditions which will tend to secure standards and conditions of employment consistent with the dignity of Correction Officers, and to provide methods for fair and peaceful adjustment of disputes that may arise between the Union and the City; and

WHEREAS, as a result of collective bargaining the parties have reached an agreement which they desire to reduce to writing;

NOW, THEREFORE, it is mutually agreed as follows:

## ARTICLE I - UNION RECOGNITION AND UNIT DESIGNATION

Section 1.

The City recognizes the Union as the sole and exclusive collective bargaining representative for the unit consisting of the employees of New York City in the title of "Correction Officer."

17001

Section 2.

Except as otherwise provided herein, for purposes of this Contract, the terms "employee," "employees," "Correction Officer" or "Correction Officers" shall be interchangeable and shall relate solely to employees in the unit described in Section 1 of this Article.

## ARTICLE II - UNION SECURITY - DUES CHECKOFF

Section 1.

All employees covered by this Agreement shall be free to become and remain members of the Union in good standing.

Section 2.

The Union shall have the exclusive right to the checkoff and transmittal of dues on behalf of each employee in the unit in accord with the Mayor's Executive Order No. 98, dated May 15, 1969 entitled "Regulations Regulating the Checkoff of Union Dues" and in accord with the Mayor's Executive Order No. 107, dated December 29, 1986, entitled "Regulations Governing Procedures for Orderly Payroll Checkoff of Union Dues" and any Executive Orders which amend or supersede said Executive Orders.

Section 3.

An employee may consent in writing to the authorization of the deduction of dues from his wages and to the designation of the Union as the recipient thereof. Such consent, if given, shall be in a proper form, in accord with Section 2 of this Article II, which bears the signature of the employee.

Section 4.

The parties agree to an agency shop to the extent permitted by applicable law, as described in a supplemental agreement hereby incorporated by reference.

17001

## ARTICLE III - HOURS AND OVERTIME

Section 1.

All ordered and/or authorized overtime in excess of forty (40) hours in any week or in excess of the hours required of an employee by reason of his regular duty chart if a week's measurement is not appropriate, whether of an emergency nature or of a non-emergency nature, shall be compensated for either by cash payment or compensatory time off, at the rate of time and one-half, at the sole option of the employee. Such cash payments or compensatory time off shall be computed on the basis of fifteen (15) minute segments.

Section 2.

In order to preserve the intent and spirit of this Section on overtime compensation, there shall be no rescheduling of days off and/or tours of duty. This restriction shall apply both to the retrospective crediting of time off against hours already worked and to the anticipatory re-assignment of personnel to different days off and/or tours of duty.

Section 3.

Overtime shall be computed on a monthly basis and the Department shall make every reasonable effort to pay such overtime within six (6) weeks following the submission of the monthly report.

## ARTICLE IV - RECALL AFTER TOUR

Any Correction Officer who is recalled to duty after having completed the employee's regular tour of duty shall receive pay pursuant to the regular overtime provisions of this Agreement, that is, in cash or compensatory time off at the sole option of the Correction Officer at the rate of time and one-half for the time actually worked. The Department will issue a directive to the heads of all commands informing them that a Correction Officer who is recalled shall be put to work.

## ARTICLE V - COMPUTATION OF BENEFITS

Since the average basic forty-hour week has not been changed by this Agreement, the current standard practice for the computation of compensation for holidays, vacation days, personal leave days, annuity fund contributions and other relevant benefits, shall continue to be calculated on the basis of an eight-hour work day.

17001

## ARTICLE VI - SALARIES

### Section 1.  Salary Rates

During the term of this Agreement, the following basic amounts, which where specified include both salary rates and longevity adjustments, shall prevail for employees:

**a.**  For Correction Officers Hired prior to January 1, 2006

| Grade-Service | Effective | Effective | Effective | Effective |
|---|---|---|---|---|
| First Grade | 11/1/11 | 12/1/12 | 1/1/14 | 2/1/15 |
| 20 Years | $84,618 | $85,391 | $86,171 | $86,959 |
| 15 Years | $83,618 | $84,391 | $85,171 | $85,959 |
| 10 Years | $82,618 | $83,391 | $84,171 | $84,959 |
| 5 Years | $81,618 | $82,391 | $83,171 | $83,959 |
| Basic | $77,253 | $78,026 | $78,806 | $79,594 |
| Second Grade | $59,967 | $60,567 | $61,173 | $61,785 |
| Third Grade | $57,804 | $58,382 | $58,966 | $59,556 |
| Fourth Grade | $49,476 | $49,971 | $50,471 | $50,976 |
| Fifth Grade | $46,682 | $47,149 | $47,620 | $48,096 |
| Sixth Grade | $43,870 | $44,309 | $44,752 | $45,200 |

| Grade-Service | Effective | Effective | Effective |
|---|---|---|---|
| First Grade | 3/1/16 | 3/1/17 | 3/1/18 |
| 20 Years | $88,153 | $90,173 | $92,657 |
| 15 Years | $87,153 | $89,173 | $91,657 |
| 10 Years | $86,153 | $88,173 | $90,657 |
| 5 Years | $85,153 | $87,173 | $89,657 |
| Basic | $80,788 | $82,808 | $85,292 |
| Second Grade | $62,712 | $64,280 | $66,208 |
| Third Grade | $60,449 | $61,960 | $63,819 |
| Fourth Grade | $51,741 | $53,035 | $54,626 |
| Fifth Grade | $48,817 | $50,037 | $51,538 |
| Sixth Grade | $45,878 | $47,025 | $48,436 |

17001

**b.** For Correction Officers Hired between January 1, 2006 and October 31, 2008

| Grade-Service | Effective 11/1/11 | Effective 12/1/12 | Effective 1/1/14 | Effective 2/1/15 |
|---|---|---|---|---|
| First Grade | 11/1/11 | 12/1/12 | 1/1/14 | 2/1/15 |
| 20 Years | $84,618 | $85,391 | $86,171 | $86,959 |
| 15 Years | $83,618 | $84,391 | $85,171 | $85,959 |
| 10 Years | $82,618 | $83,391 | $84,171 | $84,959 |
| 5 Years | $81,618 | $82,391 | $83,171 | $83,959 |
| Basic | $77,253 | $78,026 | $78,806 | $79,594 |
| Second Grade | $57,175 | $57,747 | $58,324 | $58,907 |
| Third Grade | $53,803 | $54,341 | $54,884 | $55,433 |
| Fourth Grade | $49,267 | $49,760 | $50,258 | $50,761 |
| Fifth Grade | $44,080 | $44,521 | $44,966 | $45,416 |
| Sixth Grade | $42,395 | $42,819 | $43,247 | $43,679 |

| Grade-Service | Effective 3/1/16 | Effective 3/1/17 | Effective 3/1/18 |
|---|---|---|---|
| First Grade | 3/1/16 | 3/1/17 | 3/1/18 |
| 20 Years | $88,153 | $90,173 | $92,657 |
| 15 Years | $87,153 | $89,173 | $91,657 |
| 10 Years | $86,153 | $88,173 | $90,657 |
| 5 Years | $85,153 | $87,173 | $89,657 |
| Basic | $80,788 | $82,808 | $85,292 |
| Second Grade | $59,791 | $61,286 | $63,125 |
| Third Grade | $56,264 | $57,671 | $59,401 |
| Fourth Grade | $51,522 | $52,810 | $54,394 |
| Fifth Grade | $46,097 | $47,249 | $48,666 |
| Sixth Grade | $44,334 | $45,442 | $46,805 |

17001

**c.**    For Correction Officers Hired between September 1, 2008 and December 31, 2008

| Grade-Service | Effective | Effective | Effective | Effective |
|---|---|---|---|---|
| First Grade | 11/1/11 | 12/1/12 | 1/1/14 | 2/1/15 |
| 20 Years | $84,618 | $85,391 | $86,171 | $86,959 |
| 15 Years | $83,618 | $84,391 | $85,171 | $85,959 |
| 10 Years | $82,618 | $83,391 | $84,171 | $84,959 |
| 5 Years | $81,618 | $82,391 | $83,171 | $83,959 |
| Basic | $77,253 | $78,026 | $78,806 | $79,594 |
| Second Grade | $56,381 | $56,945 | $57,514 | $58,089 |
| Third Grade | $52,159 | $52,681 | $53,208 | $53,740 |
| Fourth Grade | $47,253 | $47,726 | $48,203 | $48,685 |
| Fifth Grade | $43,812 | $44,250 | $44,693 | $45,140 |
| Sixth Grade | $39,698 | $40,095 | $40,496 | $40,901 |

| Grade-Service | Effective | Effective | Effective |
|---|---|---|---|
| First Grade | 3/1/16 | 3/1/17 | 3/1/18 |
| 20 Years | $88,153 | $90,173 | $92,657 |
| 15 Years | $87,153 | $89,173 | $91,657 |
| 10 Years | $86,153 | $88,173 | $90,657 |
| 5 Years | $85,153 | $87,173 | $89,657 |
| Basic | $80,788 | $82,808 | $85,292 |
| Second Grade | $58,960 | $60,434 | $62,247 |
| Third Grade | $54,546 | $55,910 | $57,587 |
| Fourth Grade | $49,415 | $50,650 | $52,170 |
| Fifth Grade | $45,817 | $46,962 | $48,371 |
| Sixth Grade | $41,515 | $42,553 | $43,830 |

17001

**d.**    For Correction Officers Hired on or after January 1, 2009

| Grade-Service | Effective | Effective | Effective | Effective |
|---|---|---|---|---|
| First Grade | 11/1/11 | 12/1/12 | 1/1/14 | 2/1/15 |
| 20 Years | $84,618** | $85,391** | $86,171** | $86,959** |
| 15 Years | $83,618** | $84,391** | $85,171** | $85,959** |
| 10 Years | $82,618*R | $83,391*R | $84,171*R | $84,959*R |
| 5-1/2 years | $81,618* | $82,391* | $83,171* | $83,959* |
| 5 Years | $60,746* | $61,310* | $61,879* | $62,454* |
| Upon completion of 5-1/2 years of employment (Basic) | $77,253 | $78,026 | $78,806 | $79,594 |
| Upon completion of 4-1/2 years of employment | $56,381 | $56,945 | $57,514 | $58,089 |
| Upon completion of 3-1/2 years of employment | $52,159 | $52,681 | $53,208 | $53,740 |
| Upon completion of 2-1/2 years of employment | $47,253 | $47,726 | $48,203 | $48,685 |
| Upon completion of 1-1/2 years of employment | $43,812 | $44,250 | $44,693 | $45,140 |
| First 18 months of employment (Annualized) | $40,153 | $40,555 | $40,961 | $41,371 |

| Grade-Service | Effective | Effective | Effective |
|---|---|---|---|
| First Grade | 3/1/16 | 3/1/17 | 3/1/18 |
| 20 Years | $88,153** | $90,173** | $92,657** |
| 15 Years | $87,153** | $89,173** | $91,657** |
| 10 Years | $86,153*R | $88,173*R | $90,657*R |
| 5-1/2 years | $85,153* | $87,173* | $89,657* |
| 5 Years | $63,325* | $64,799* | $66,612* |
| Upon completion of 5-1/2 years of employment (Basic) | $80,788 | $82,808 | $85,292 |
| Upon completion of 4-1/2 years of employment | $58,960 | $60,434 | $62,247 |
| Upon completion of 3-1/2 years of employment | $54,546 | $55,910 | $57,587 |
| Upon completion of 2-1/2 years of employment | $49,415 | $50,650 | $52,170 |
| Upon completion of 1-1/2 years of employment | $45,817 | $46,962 | $48,371 |
| First 18 months of employment (Annualized) | $41,992 | $43,042 | $44,333 |

NOTE:    The amounts indicated in this Section by asterisks (* and **) include the longevity adjustments in Article VIII of this Agreement. The longevity adjustments in the amounts indicated herein by a single asterisk (*) shall not be deemed to be part of salary for purposes of retirement allowances unless at the time of retirement a Correction Officer paid at such rates shall have completed twenty years of service; and the longevity adjustments in the amounts indicated herein by a double asterisk (**) shall not be deemed to be part of salary for purposes of retirement allowances unless at the time of retirement a Correction Officer paid at such rates shall have completed twenty-five years of service; except that a Correction Officer who has more than twenty years, but less than twenty-five years of service at the time of retirement shall have the adjusted rates indicated by a capital letter R deemed to be part of salary for purposes of retirement allowances.

17001

In the event this provision is declared invalid under the law, the parties shall reopen negotiations to resolve the issue of the increased cost of changing the effective date of the pensionability of the above adjustments. Such negotiations will be commenced forthwith. If no agreement is reached, an impasse may be declared and subsequent mediation and the impasse proceeding, if any, shall in all respects be conducted on an expedited basis.

Section 2.

A laid off employee who is returned to service in the employee's former title or in a comparable title from a preferred list, shall receive the basic salary rate that would have been received by the employee had the employee never been laid off, up to a maximum of two (2) years of general salary increases.

Section 3.   General Wage Increase

a.      The General increases, effective as indicated, shall be:

    i.      Effective November 1, 2011, Employees shall receive a general wage increase of one percent (1%).

    ii.     Effective December 1, 2012, Employees shall receive a general wage increase of one percent (1%).

    iii.    Effective January 1, 2014, Employees shall receive a general wage increase of one percent (1%).

    iv.     Effective February 1, 2015, Employees shall receive a general wage increase of one percent (1%).

    v.      Effective March 1, 2016, Employees shall receive a general wage increase of one and a half percent (1.5%).

    vi.     Effective March 1, 2017 Employees shall receive a general wage increase of two and a half percent (2.5%).

    vii.    Effective March 1, 2018, Employees shall receive a general wage increase of three percent (3%).

b.      The increases provided for in Section 3 shall be calculated as follows:

    i.      the increases in Section 3a. (i) shall be based upon the base rates (which shall include salary or incremental schedules) in effect on October 31, 2011.

17001

    ii.    the increases in Section 3a. (ii) shall be based upon the base rates (which shall include salary or incremental schedules) in effect on November 30, 2012.

    iii.   the increases in Section 3a. (iii) shall be based upon the base rates (which shall include salary or incremental schedules) in effect on December 31, 2013.

    iv.   the increases in Section 3a. (iv) shall be based upon the base rates (which shall include salary or incremental schedules) in effect on January 31, 2015.

    v.   the increases in Section 3a. (v) shall be based upon the base rates (which shall include salary or incremental schedules) in effect on February 29, 2016.

    vi.   the increases in Section 3a. (vi) shall be based upon the base rates (which shall include salary or incremental schedules) n effect on February 28, 2017.

    vii.   the increases in Section 3a. (vii) shall be based upon the base rates (which shall include salary or incremental schedules) in effect on February 28, 2018.

c.    The general increase provided in this Section 3 shall be applied to the base rates and salary grades fixed for the applicable titles, except to the extent that the base rates and salary grades are modified by Section 3d below.

d.    The base rate and salary grades for Correction Officers hired on or after January 1, 2006 are reflected in the table of salaries set forth in Article VI, Section 1.b., c., and d.

Section 4.

Paychecks shall be delivered to commands by 3:00 p.m. on the Thursday preceding payday for distribution after 3:00 p.m. on said Thursday.

Section 5.  Salary Itemization

The Department shall make available in convenient places in each command the appropriate payroll work sheets for the purpose of enabling each employee to verify the salary components of the employee's paycheck. The parties will review further the feasibility of otherwise advising each employee of all payroll components along with the employee's paycheck.

## ARTICLE VII - UNIFORM ALLOWANCE

In fiscal year 2009-10 and 2010-11, the City shall pay to each employee a uniform

17001

allowance of $1,100.00 in accord with the existing standard procedures.

## ARTICLE VIII - LONGEVITY ADJUSTMENTS

<u>Section 1.</u>

a.      Longevity adjustments shall continue to be paid as follows:

Effective November 1, 2011, the longevity schedule shall be:

i.      Upon the completion of five years of service, a Correction Officer First Grade shall receive a longevity adjustment of $4,365

ii.     Upon completion of ten years of service, a Correction Officer First Grade shall receive a longevity adjustment of an additional $1,000

iii.    Upon completion of fifteen years of service, a Correction Officer First Grade shall receive a longevity adjustment of an additional $1,000

iv.     Upon completion of twenty years of service, a Correction Officer First Grade shall receive a longevity adjustment of an additional $1,000

b      .The adjustment after the 5th and 10th years shall not be computed as salary for pension purposes until after completing 20 years of service.

The adjustment after the 15th and 20th years shall not be computed as salary for pension purposes until after completion of 25 years of service.

In the event this provision is declared invalid under the law, the parties shall reopen negotiations to resolve the issue of the increased cost of changing the effective date of the pensionability of the above adjustments. Such negotiations will be commenced forthwith. If no agreement is reached, an impasse may be declared and subsequent mediation and the impasse proceeding, if any, shall in all respects be conducted on an expedited basis.

c.      The calculation of night shift differential payments shall be based upon the same factors, amounts and methodology as previously utilized.

d.      ITHP and pension benefit calculations shall only include the amount of the longevity payment that is pensionable.

<u>Section 2.</u>

The longevity adjustments provided in Section 1 of this Article VIII are reflected in

17001

the table of salaries set forth in Article VI, Section 1 of this Agreement.

## ARTICLE IX - PAYMENT FOR HOLIDAY WORK

Each employee shall receive eleven (11) paid holidays annually, payments for which shall be made in accord with existing procedures.

## ARTICLE X - LEAVES

Section 1.  Sick Leave

(i)     Each Correction Officer shall be entitled to leave with pay for the full period of any incapacity due to illness, injury or mental or physical defect which is service-connected pursuant to Section 9-117.1(a) of the Administrative Code.

(ii)    Each Correction Officer shall be entitled to leave with pay for the full period of any incapacity due to illness, injury or mental or physical defect, whether or not service-connected.

Section 2.  Death-in-Family Leave

In the event of a death in a Correction Officer's immediate family and upon application to and approval of the employee's commanding officer or supervisory head, a Correction Officer shall receive leave with pay not exceeding four (4) consecutive regular tours of duty. For the purposes of this Section, the phrase, "Immediate Family", shall include any of the following: (a) a spouse, (b) a natural, foster or step-parent, child, brother or sister, (c) a father-in-law or mother-in-law, or (d) any relative residing in the Correction Officer's household. The commanding officer or supervisory head granting such leave shall verify the death and relationship of the deceased. If the deceased was in the military service of the United States at the time of death, the Correction Officer requesting leave shall produce the official notice of death.

Section 3.  Military Leave

In accordance with DCAS Personnel Services Bulletin 440-11R, Military Leave not exceeding a total of thirty (30) work days in one calendar year and not exceeding thirty (30) work days in any one continuous period of such absence shall be granted with pay to COBA members to satisfy military obligations.

Section 4.  Special Excusals

Excused time accorded to other personnel employed by the City under circumstances such as excusals for the Dr. Martin Luther King, Jr. and the Senator Robert F. Kennedy

17001

funerals and the Moon Landing Observation Day shall be granted equally to employees covered by this Agreement. All compensating days off shall be subject to exigencies of the Department.

Section 5.   Leave to Attend Hearings

Individual employee grievants shall be granted leave with pay for such time as is necessary to testify at arbitration hearings.

Leave with pay shall be granted to three (3) employees who are named grievants in a group arbitration proceeding, for such time as is necessary for them to testify at their group arbitration hearings.

Leave with pay for such time as is necessary to testify at their hearings shall be granted to employees who, after final adjudication of proceedings under Section 210 paragraph 2h of the Civil Service Law, are determined not to have been in violation of Section 210.

## ARTICLE XI - VACATIONS

Section 1.

The Department shall continue to provide the following authorized annual vacations for employees hired prior to July 1, 1988:

> a.      Following the first 3 years of service (First Grade Correction Officer): twenty-seven (27) work days.
>
> b.      During the first 3 years of service (Second, Third, Fourth Grade and Probationary Correction Officer): twenty (20) work days.
>
> c.      During the calendar year in which the third anniversary of appointment occurs:

17001

| IF APPOINTMENT DATE IS: | | VACATION ALLOWANCE SHALL BE: |
|---|---|---|
| FROM | TO | |
| Jan. 1 | Feb. 14 | 27 work days |
| Feb. 15 | April 15 | 26 work days |
| Apr. 16 | June 15 | 25 work days |
| June 16 | July 15 | 24 work days |
| July 16 | Sept. 15 | 23 work days |
| Sept. 16 | Nov. 15 | 22 work days |
| Nov. 16 | Dec. 15 | 21 work days |
| Dec. 16 | Dec. 31 | 20 work days |

Section 2.

The Department shall provide the following authorized annual vacations for Correction Officers hired between July 1, 1988 through to June 30, 1993 inclusive:

     a.    Following the first 5 years of service: twenty-seven (27) work days.

     b.    During the first 5 years of service: twenty (20) work days.

     c.    During the calendar year in which the fifth anniversary of appointment occurs:

| IF APPOINTMENT DATE IS: | | VACATION ALLOWANCE SHALL BE: |
|---|---|---|
| FROM | TO | |
| Jan. 1 | Feb. 14 | 27 work days |
| Feb. 15 | April 15 | 26 work days |
| Apr. 16 | June 15 | 25 work days |
| June 16 | July 15 | 24 work days |
| July 16 | Sept. 15 | 23 work days |
| Sept. 16 | Nov. 15 | 22 work days |
| Nov. 16 | Dec. 15 | 21 work days |
| Dec. 16 | Dec. 31 | 20 work days |

Section 3.

The Department shall provide the following authorized annual vacations for Correction Officers hired after June 30, 1993:

     a.    Following the first 5 years of service: twenty-seven (27) work days.

17001

    b.     During the first 5 years of service: twelve (12) work days.

    c.     During the calendar year in which the fifth anniversary of appointment occurs:

| IF APPOINTMENT DATE IS: | | VACATION ALLOWANCE SHALL BE: |
|---|---|---|
| FROM | TO | |
| Jan. 1 | Feb. 14 | 27 work days |
| Feb. 15 | April 15 | 24 work days |
| Apr. 16 | June 15 | 22 work days |
| June 16 | July 15 | 20 work days |
| July 16 | Sept. 15 | 18 work days |
| Sept. 16 | Nov. 15 | 16 work days |
| Nov. 16 | Dec. 15 | 14 work days |
| Dec. 16 | Dec. 31 | 12 work days |

    d.     Effective July 1, 1997, the Department shall provide the following authorized annual vacations for Correction Officers hired after June 30, 1993:

    i.     Following the first 5 years of service: twenty-seven (27) work days.

    ii.     During the first 5 years of service: thirteen (13) work days.

    iii.     During the calendar year in which the fifth anniversary of appointment occurs:

| IF APPOINTMENT DATE IS: | | VACATION ALLOWANCE SHALL BE: |
|---|---|---|
| FROM | TO | |
| Jan. 1 | Feb. 14 | 27 work days |
| Feb. 15 | April 15 | 24 work days |
| Apr. 16 | June 15 | 22 work days |
| June 16 | July 15 | 20 work days |
| July 16 | Sept. 15 | 18 work days |
| Sept. 16 | Nov. 15 | 16 work days |
| Nov. 16 | Dec. 15 | 14 work days |
| Dec. 16 | Dec. 31 | 13 work days |

    e.     Effective November 1, 2002, the Department shall provide the following authorized annual vacations for Correction Officers hired after June 30, 1993 and before January 1, 2006:



17001

i. Following the first 5 years of service: twenty-seven (27) work days.

ii. During the first 5 years of service: eighteen (18) work days.

iii. During the calendar year in which the fifth anniversary of appointment occurs:

| IF APPOINTMENT DATE IS: | | VACATION ALLOWANCE SHALL BE: |
|---|---|---|
| FROM | TO | |
| Jan. 1 | Feb. 14 | 27 work days |
| Feb. 15 | April 15 | 25 work days |
| Apr. 16 | June 15 | 24 work days |
| June 16 | July 15 | 23 work days |
| July 16 | Sept. 15 | 21 work days |
| Sept. 16 | Nov. 15 | 20 work days |
| Nov. 16 | Dec. 15 | 19 work days |
| Dec. 16 | Dec. 31 | 18 work days |

f. Effective January 1, 2006, the Department shall provide the following authorized annual vacations for Correction Officers hired on or after January 1, 2006:

i. Following the first 5 years of service: twenty-seven (27) work days.

ii. During the first 5 years of service: sixteen (16) work days.

iii. During the calendar year in which the fifth anniversary of appointment occurs:

17001

|                     |           | VACATION ALLOWANCE |
| IF APPOINTMENT      |           |                    |
| DATE IS:            |           | SHALL BE:          |
|---------------------|-----------|--------------------|
| FROM                | TO        |                    |
| Jan. 1              | Feb. 14   | 27 work days       |
| Feb. 15             | April 15  | 25 work days       |
| Apr. 16             | June 15   | 23 work days       |
| June 16             | July 15   | 22 work days       |
| July 16             | Sept. 15  | 20 work days       |
| Sept. 16            | Nov. 15   | 18 work days       |
| Nov. 16             | Dec. 15   | 17 work days       |
| Dec. 16             | Dec. 31   | 16 work days       |

     g.    Effective January 1, 2009, the Department shall provide the following authorized annual vacations for Correction Officers hired after January 1, 2009:

     i.    Following the first 5 years of service: twenty-seven (27) work days.

     ii.    During the first 5 years of service: thirteen (13) work days.

     iii.    During the calendar year in which the fifth anniversary of appointment occurs:

|                     |           | VACATION ALLOWANCE |
| IF APPOINTMENT      |           |                    |
| DATE IS:            |           | SHALL BE:          |
|---------------------|-----------|--------------------|
| FROM                | TO        |                    |
| Jan. 1              | Feb. 14   | 27 work days       |
| Feb. 15             | April 15  | 24 work days       |
| Apr. 16             | June 15   | 22 work days       |
| June 16             | July 15   | 20 work days       |
| July 16             | Sept. 15  | 18 work days       |
| Sept. 16            | Nov. 15   | 16 work days       |
| Nov. 16             | Dec. 15   | 14 work days       |
| Dec. 16             | Dec. 31   | 13 work days       |

     h.    Effective January 1, 2017, the Department shall provide the following authorized annual vacations for Correction Officers:

     i.    For Correction Officers hired before January 1, 2009: 2.25 days per month (rate of 27 days per year)

     ii.    For Correction Officers hired on or after January 1, 2009:

17001

1.     During the first 5 years of service: 1.083 days per month (rate of 13 days per year (as rounded to the nearest full day))

2.     Following the first 5 years of service: 2.25 days per month (rate of 27 days per year)

## Section 4.

Vacations shall be scheduled in accordance with existing procedures except as modified by the side letter attached to this Agreement.

## Section 5.

The Department agrees to allow Correction Officers to use their accrued vacation days in the vacation year in which they are earned subject to the exigencies of the Department.

## Section 6.

Correction Officers may request in writing permission to carry over into the next vacation year a maximum of 3 weeks vacation. It is the intention of the Department of Correction to grant such requests which are reasonable. The utilization of this vacation time shall be restricted to the months of January through May and September through November. Vacations shall be scheduled to begin and/or end, connected to a pass day.

## Section 7.   Annual Leave Donation Pilot Program

a.    In order to assist Correction Officers who have exhausted all available leave and need to take a prolonged absence from duty due to the medical emergency of an immediate family member, the Department of Correction shall implement a Pilot Program entitled "Annual Leave Donation Program," which shall expire on October 31, 2018. Correction Officers who anticipate using a significant amount of leave to resolve issues caused by a major illness or medical condition of an immediate family member, may apply. The Pilot Program will be sponsored by the Department.

b.    All Correction Officers are eligible to participate as donors or recipients. Donations of accrued annual leave must be made in full day increments and will be debited from the donor's annual leave balance after review of the form and credited to the annual leave bank as full days. Only accrued annual vacation leave may be donated. Any time which is not vacation is not eligible for this program. All donations of accrued annual leave are voluntary. Donations cannot be directed to a particular Correction Officer. Donations will be included in a pool of annual leave to be dispersed by a joint

17001

Labor-Management panel. Donations into the "Annual Leave Donation Program" are not permitted in the calendar year of a Correction Officer's separation from the Department, and any such donations shall be retroactively withdrawn and returned to the individual.

c.      A Correction Officer must have donated at least one vacation day to the pool to be eligible for a disbursement during the life of the Pilot Program. A Correction Officer may donate a maximum of five vacation days per calendar year. Upon depleting all accrued personal leave, including compensatory time, a Correction Officer may receive a maximum disbursement equal to one year's vacation time that would be accrued by the Correction Officer in the same year. In cases of extreme hardship, the Labor-Management Panel may waive the required donation to the "Annual Leave Donation Program" prior to a disbursement, as well as the maximum disbursement and donation limits.

d.      All decisions concerning the implementation of the "Annual Leave Donation Program" and the eligibility of the donor/donee will be mutually agreed upon by the Labor-Management panel. All decisions must comply with IRS Revenue Ruling 90- 29. The decisions of the Labor-Management panel are final and not subject to review, appeal or any grievance procedures. The Labor-Management panel shall consist of four members, two members each from the COBA and the Department. A majority vote is necessary to receive a disbursement from the program.

e.      This "Annual Leave Donation Program" shall only be implemented in accordance with IRS Revenue Ruling 90-29 and as required by law.

## ARTICLE XII - HEALTH AND HOSPITALIZATION BENEFITS

Section 1.

The City shall continue to provide a fully paid choice of health and hospitalization insurance plans for each employee, not to exceed 100% of the full cost of HIP-HMO on a category basis. There will be an annual reopening period during the term of this Agreement for active employees to exercise their choice among medical plans.

Section 2.

Retirees shall continue to have the option of changing their previous choice of Health Plans. This option shall be:

(a)      a one time choice;
(b)      exercised only after one year of retirement; and
(c)      can be exercised at any time without regard to contract periods.

The effective date of change to a new plan shall be the first day of the month three (3) months after the month in which the application has been received by the New York City

17001

Health Insurance Program.

Effective with the reopener period for Health Insurance subsequent to July 1, 1980 and every two years thereafter, retirees shall have the option of changing their previous choice of health plans. This option shall be exercised in accordance with procedures established by the Employer. The Union will assume the responsibility of informing retirees of this option.

Section 3.

a.       Effective July 1, 1983 and thereafter, the City's cost for each employee and each retiree under age 65 coverage shall be equalized at the Community rated basic HIP/HMO plan payment rate as approved by the State Department of Insurance on a category basis of individual or family, e.g. the Blue Cross/GHI-CBP payment for family coverage shall be equal to the HIP/HMO payment for family coverage.

b.       If a replacement plan is offered to employees and retirees under age 65 which exceeds the cost of the HIP/HMO equalization provided in Section 3a, the City shall not bear the additional costs.

c.       The City (and other related Employers) shall continue to contribute on a City employee benefits program-wide basis the additional annual amount of $30 million to maintain the health insurance stabilization reserve fund which shall be used to continue equalization and protect the integrity of health insurance benefits.

The health insurance stabilization reserve fund shall be used: to provide a sufficient reserve; to maintain to the extent possible the current level of health insurance benefits provided under the Blue Cross/GHI-CBP plan; and, if sufficient funds are available, to fund new benefits.

The health insurance stabilization reserve fund shall be credited with the dividends or reduced by the losses attributable to the Blue Cross/GHI-CBP plan.

d.       Pursuant to paragraph 7 of MLC Health Benefits Agreement, notwithstanding the above, in each of the fiscal years 2001 and 2002, the City shall not make the annual $35 million contributions to the health insurance stabilization fund.

e.       In the event that there is a Citywide or program-wide health insurance package which exceeds the cost of the equalization and stabilization fund described above, the parties may negotiate reconfiguration of this package

17001

which in no event will provide for costs in excess of the total costs of this Agreement as set forth herein. However, it is understood that the COBA will not be treated any better or any worse than any other Union participating in the Citywide or Program-wide Health Program with regard to increased health insurance costs.

Section 4.

Where an employee is suspended without pay prior to disciplinary trial for disciplinary reasons for more than thirty (30) days, the employee shall receive full health and hospitalization benefit coverage during the period of the suspension following the first thirty (30) days. Where an employee is subsequently restored to full pay status, as of the date of suspension, the employee shall be restored to full health and hospitalization coverage for the first thirty (30) days of the suspension.

Section 5. Health Care Flexible Spending Account

a.    A flexible health care spending account shall be established after July 1993 pursuant to Section 125 of the IRS Code. Those employees eligible for New York City health plan coverage as defined on page 32, section 4(B) of the 1992 New York City Health Summary Program Description shall be eligible to participate in the account. Participating employees shall contribute at least $260 per year up to a maximum of $5,000 per year. Said contribution minimum and maximum levels may be modified by the MLC Health Advisory Committee based on experience of the plan. Any unfunded balance may be deducted from final salary payments due an employee.

b.    Expenses of the account shall include but not be limited to deductibles, co-insurance, co-payments, excess expenses beyond plan limits, physical exams and health related transportation costs for vision, dental, medical and prescription drug plans where the employee and dependents are covered. In no case will any of the above expenses include those non-deductible expenses defined as non-deductible in IRS Publication 502.

c.    An administrative fee of $1.00 per week for the first year shall be charged for participation in the program. An employee's participation in the account is irrevocable during a plan year. At the close of the plan year any excess balance in an employee's account will not be refunded.

Section 6 - Health Care Savings (Citywide)

The May 5, 2014 Letter Agreement regarding health savings and welfare fund contributions between the City of New York and the Municipal Labor Committee, attached as an Appendix, is deemed part of this Agreement.

17001

## ARTICLE XIII - SECURITY BENEFITS FUND

Section 1.

a.　　　Effective November 1, 2009, the City shall continue to contribute the pro-rata annual amount of $1,680 for each active employee, and $1,475 for each retiree for remittance to the Security Benefits Fund of the Correction Officers Benevolent Association of the City of New York pursuant to the terms of a supplemental agreement to be reached by the parties subject to the approval of the Corporation Counsel.  Effective December 1, 2010, there shall be an increase in the City's contribution to the active and retiree welfare funds in the prorata amount of $100.00 per annum.

b.　　　To the extent permitted by law, part of the amounts so contributed may be applied to maintain an appropriate legal services plan, pursuant to the terms of a supplemental agreement between the parties as approved by the Corporation Counsel.

c.　　　Effective November 1, 2009, employees who have been separated from service subsequent to December 31, 1970, and who were covered by the Fund of the Correction Officers' Benevolent Association at the time of such separation pursuant to a supplementary agreement between the City and the COBA shall continue to be so covered, subject to the provisions of Section 1(a), (b), (c) and (f) hereof.  Contributions shall be made only for such time as said individuals remain primary beneficiaries of the New York City Health Insurance Program and are entitled to benefits paid for by the City through such Program.

d.　　　The Union agrees to provide welfare fund benefits to domestic partners of covered employees in the same manner as those benefits are provided to spouses of married covered employees.

e.　　　Civil Legal Representation Fund

i.　　　Effective December 1, 2010, the City shall contribute $75 per annum for each active Employee to the Security Benefits Fund to maintain a civil legal representation fund pursuant to the terms of a supplemental agreement between the City and Union as approved by the Corporation Counsel.  While these funds shall be administered by the applicable Security Benefits Fund, they are to be maintained in a separate account and shall not be commingled with the other monies received by the Security Benefits Fund.  Only the $75 provided above may be used for civil legal representation.  No additional monies from the Security Benefits Fund may be used for civil legal representation.

ii.　　　Effective April 1, 2016, the City's contributions to the Civil Legal Defense Fund shall be suspended until the expiration of this Agreement, and be restored effective March 1, 2019.

1 7 0 0 1

Case 23-1, Document 76, 01/25/2023, 3458054, Page166 of 296

f.      Such payments shall be made pro-rata by the City every twenty-eight (28) days.

Section 2.

Where an employee is suspended without pay for disciplinary reasons and is subsequently restored to full pay status as of the date of the suspension, the employee shall receive full Health and Security Benefits Fund coverage for the period of the suspension.

## ARTICLE XIV - ANNUITY FUND

Section 1.

a.      Effective August 1, 2007, for Correction Officers *who have completed five years of service*, the City shall continue to contribute for each employee, on a twenty-eight (28) day cycle basis, a pro-rata daily contribution for each working day for which such employee is paid by the City which amount shall not exceed $1,041.37 per annum per employee. Contributions hereunder shall be remitted by the City each twenty-eight (28) days to a mutually agreed upon annuity fund pursuant to the terms of a supplemental agreement to be reached by the parties subject to the approval of the Corporation Counsel.

b.      Effective January 1, 2009, for Correction Officers *who have completed five years of service*, the City shall continue to contribute for each employee, on a twenty-eight (28) day cycle basis, a pro-rata daily contribution for each working day for which such employee is paid by the City which amount shall not exceed $577.37 per annum per employee. Contributions hereunder shall be remitted by the City each twenty-eight (28) days to a mutually agreed upon annuity fund pursuant to the terms of a supplemental agreement to be reached by the parties subject to the approval of the Corporation Counsel.

c.      Effective August 1, 2009, for Correction Officers *who have completed five years of service*, the City shall contribute for each employee, on a twenty-eight (28) day cycle basis, a pro-rata daily contribution for each working day for which such employee is paid by the City which amount shall not exceed $947.37.  Contributions hereunder shall be remitted by the City each twenty-eight (28) days to a mutually agreed upon annuity fund pursuant to the terms of a supplemental agreement to be reached by the parties subject to the approval of the Corporation Counsel.

d.      Effective December 1, 2010, for Correction Officers *who have completed five years of service*, the City shall contribute for each employee, on a twenty-eight (28) day cycle basis, a pro-rata daily contribution for each working day for which such employee is paid by the City which amount shall not exceed $1,411.37.  Contributions hereunder shall be remitted by the City each twenty-eight (28) days to a mutually agreed upon annuity fund pursuant to the terms of a supplemental agreement to be reached by the parties subject to the approval of the Corporation Counsel.

17001

e.     Effective August 1, 2007, the contribution to the annuity fund *during the first five years of service* shall not exceed $475.00 per annum per employee.  Thereafter, the City shall contribute for each employee, on a twenty-eight (28) day cycle basis, a pro-rata daily contribution for each working day for which such employee is paid by the City which amount shall not exceed $1,0471.00 per annum per employee.  Contributions hereunder shall be remitted by the City each twenty-eight (28) days to a mutually agreed upon annuity fund pursuant to the terms of a supplemental agreement to be reached by the parties subject to the approval of the Corporation Counsel.  Contributions hereunder shall be remitted by the City each twenty-eight (28) days to a mutually agreed upon annuity fund pursuant to the terms of a supplemental agreement to be reached by the parties subject to the approval of the Corporation Counsel.

f.     Effective January 1, 2009, the contribution to the annuity fund *during the first five years of service* shall not exceed $11.00 per annum per employee.  Thereafter, the City shall contribute for each employee, on a twenty-eight (28) day cycle basis, a pro-rata daily contribution for each working day for which such employee is paid by the City which amount shall not exceed $577.37 per annum per employee.  Contributions hereunder shall be remitted by the City each twenty-eight (28) days to a mutually agreed upon annuity fund pursuant to the terms of a supplemental agreement to be reached by the parties subject to the approval of the Corporation Counsel.  Contributions hereunder shall be remitted by the City each twenty-eight (28) days to a mutually agreed upon annuity fund pursuant to the terms of a supplemental agreement to be reached by the parties subject to the approval of the Corporation Counsel.

g.     Effective August 1, 2009, the contribution to the annuity fund *during the first five years of service* shall not exceed $381.00 per annum per employee.  Thereafter, the City shall contribute for each employee, on a twenty-eight (28) day cycle basis, a pro-rata daily contribution for each working day for which such employee is paid by the City which amount shall not exceed $947.37 per annum per employee.  Contributions hereunder shall be remitted by the City each twenty-eight (28) days to a mutually agreed upon annuity fund pursuant to the terms of a supplemental agreement to be reached by the parties subject to the approval of the Corporation Counsel.

h.     Effective December 1, 2010, the contribution to the annuity fund *during the first five years of service* shall not exceed $845.00 per annum per employee.  Thereafter, the City shall contribute for each employee, on a twenty-eight (28) day cycle basis, a pro-rata daily contribution for each working day for which such employee is paid by the City which amount shall not exceed $1411.37 per annum per employee.  Contributions hereunder shall be remitted by the City each twenty-eight (28) days to a mutually agreed upon annuity fund pursuant to the terms of a supplemental agreement to be reached by the parties subject to the approval of the Corporation Counsel.  Contributions hereunder shall be remitted by the City each twenty-eight (28) days to a mutually agreed upon annuity fund pursuant to the terms of

17001

a supplemental agreement to be reached by the parties subject to the approval of the Corporation Counsel.

Section 2.

Where an employee is suspended without pay for disciplinary reasons and is subsequently restored to full pay status as of the effective date of the suspension, the employee shall receive full annuity fund coverage for the period of the suspension.

## ARTICLE XV - SENIORITY

The Department recognizes the importance of seniority in filling vacancies within a command and shall make every effort to adhere to this policy, providing the senior applicant has the ability and qualifications to perform the work involved. While consultation on such matters is permissible, the final decision of the Department shall not be subject to the grievance procedure.

## ARTICLE XVI - GENERAL

Section 1.   Safety Helmets

The City agrees to furnish a safety helmet and equipment when required.

Section 2.   Maintenance of Facilities

All commands and other Departmental places of assignment shall have adequate heating, hot water and sanitary facilities. The Union shall give notice to the Department of any failure to maintain these conditions. If not corrected by the Department within a reasonable time, the Union may commence a grievance at Step 2 of the grievance procedure concerning that failure.

Section 3.   Semi-Private Hospital Accommodations for Line-of-Duty Injuries

The City shall prepare, submit and support legislation to provide semi-private hospital accommodations for Correction Officers injured in the line-of-duty.

Section 4.   Meal Scheduling

Employees shall not be assigned meals as a matter of practice during either the first hour and one-half or last hour and one-half of their tours. In cases of emergency this practice may be altered.

17001

Section 5.   Mutual Exchange of Tours

a.      Commanding Officers shall permit members performing similar duties to exchange tours voluntarily when there is no interference with correction service and where such exchange of tours does not result in overtime for either member.

b.      All mutuals shall be between two members and completed within a two week period. "Self-mutuals" are expressly prohibited.

Section 6.   Pilot Program for Coordination of Tours for Child/Family Care Issues

In an effort to assist Correction Officers who are experiencing child care/family issues and have a member of the department with whom they share child or family care duties, the Department shall implement a Pilot Program for twelve (12) months that will permit Correction Officers to request a change of tour within their assigned command or request transfer to a command with an opening on their desired tour, subject to the operational needs of the Department. Correction Officers requesting said accommodations must submit documentation, to be determined by DOC, detailing the reasons for the accommodation. The request will not be unreasonably denied.

Section 7.   Lump Sum Payments

Where an employee has an entitlement to accrued annual leave and/or compensatory time, and the City's fiscal condition requires employees who are terminated, laid off or who choose to retire in lieu of layoff to be removed from the payroll on or before a specific date, or where an employee reaches the mandatory retirement age, the Employer shall provide a monetary value of accumulated and unused annual leave and/or compensatory time allowances standing to the employee's credit in a lump sum. Such payments shall be in accordance with the provisions of Executive Order 30, dated June 24, 1975.

Where an employee has an entitlement to terminal leave and the City's fiscal situation requires that employees who are terminated, laid off or retired be removed from the payroll on or before a specific date, or where an employee reached the mandatory retirement age, the Employer shall provide a monetary lump sum payment for terminal leave in accordance with the provisions of Executive Order 31, dated June 24, 1975.

Section 8.   Interest Payments

Interest on wage increases shall accrue at the rate of three percent (3%) per annum from one hundred-twenty (120) days after execution of this Agreement or one hundred-twenty (120) days after the effective date of the increase, whichever is later, to the date of actual payment. Interest on longevity and step-up increments, differentials and holiday pay shall accrue at the rate of three percent (3%) per annum from one hundred-twenty (120) days after the execution of this Agreement, or one hundred-twenty

17001

(120) days following its earning, whichever is later, to the date of actual payment. Interest on overtime pay shall accrue at the rate of three percent (3%) per annum from one hundred-twenty (120) days following its earning or one hundred-twenty (120) days following the employee's submission of an overtime report, whichever is later. Interest accrued pursuant to this paragraph shall be payable only if the amount of interest due to an individual employee exceeds five dollars ($5.00).

Section 9.   Layoffs

Where layoffs are scheduled the following procedure shall be used:

1.   Notice shall be provided to the Union not less than thirty (30) days before the effective dates of such projected layoffs.

2.   Within such 30-day period designated representatives of the Employer will meet and confer with the designated representatives of the Union with the objective of considering feasible alternatives to all or part of such scheduled layoffs, including but not limited to (a) the transfer of employees to agencies with re-training, if necessary, consistent with the Civil Service Law but without regard to Civil Service title, (b) the use of Federal and State funds whenever possible to retain or re-employ employees scheduled for layoff, (c) the elimination or reduction of the amount of work contracted out to independent contractors and (d) encouragement of early retirement and the expediting of the processing of retirement applications.

When a layoff occurs, the Department will provide the Union with a list of employees who are on a preferred list with the original date of appointment utilized for the purpose of such layoff.

Section 10.   Public Transportation

The City and the C.O.B.A. will use their best efforts to effect free transportation on buses and subways for Correction Officers.

Section 11.   Personnel Folder

The Department will upon written request to the Chief of Administration by the individual employee, remove from the personnel folder, investigative reports which upon completion of the investigation are classified exonerated and/or unfounded.

Section 12.   Disciplinary Record

The past disciplinary or work record of an employee may not be revealed during a Section 75, Civil Service Law, disciplinary proceeding until a determination as to guilt or

17001

innocence of the member has been determined.

<u>Section 13.   Thirty-Day Suspension Review Committee</u>

a.      There shall be a Thirty (30) Day Suspension Review Committee to review appeals of suspensions of Correction Officers suspended for a period of greater than thirty (30) days without pay for involvement in impermissible use of force or line of duty incidents. All such suspensions will be heard by the committee on a case-by-case basis.

b.      The Suspension Review Committee shall be headed by a Chairperson designated by the Commissioner, whose duty it shall be to convene the committee.

c.      The Committee will consist of five (5) voting members:
   i.   The Chairperson
   ii.  The Chief of Department or designee;
   iii. Warden from the facility to which the suspended officer is assigned;
   iv.  Investigation Division Representative;
   v.   Union or Line Representative.

d.      The Committee shall meet on a monthly basis, or more often if necessary, to review any suspensions of greater than thirty (30) days for involvement in impermissible use of force or line of duty incidents, which have not been revoked under the existing procedures.

e.      The Committee will issue a recommendation to the Commissioner as to whether the member should be returned to regular or modified duty after serving the first thirty (30) days of the suspension.

f.      Final authority to return a suspended officer to duty will remain within the sole and exclusive discretion of the Commissioner.

<u>Section 14.   Short Sleeve Shirts</u>

      Correction Officers may wear short sleeve shirts and no ties on inside posts all year around.

<u>Section 15.   Replacement of Splashed Uniforms</u>

DOC will establish procedures to ensure that the office of the Chief of Security will maintain new uniform shirts and pants to be made available to Correction Officers who are splashed with bodily fluids. When a Correction Officer is splashed with bodily fluids, he or she will

17001

submit a form created by DOC to the office of the Chief of Security. The Officer will then be supplied with a replacement shirt and/or pants.

Section 16.    Performance Compensation

The City acknowledges that each of the uniformed forces performs an important service that reflects the diverse missions of the City's uniformed agencies. In order to reward service of an outstanding, exceptional nature, each of the uniformed agencies will establish a performance compensation program to recognize and reward such service, tailored to the unique missions of the individual uniformed agency.

The parties agree that additional compensation may be paid to employees performing outstanding, exemplary, difficult and/or unique assignments. The City will notify and discuss with each affected union of its intent to pay such additional compensation and the individuals to be compensated.

The criteria for the granting of performance-based compensation shall be based upon outstanding performance in the work assigned, and/or performance of unique and difficult work.

The performance-based compensation payments provided for in this section shall be one-time, non-recurring cash payments subject to applicable pension law. An employee can receive no more than one payment annually.

This provision shall not affect any existing productivity programs covered in any existing collective bargaining agreements. Nor shall this provision be construed to waive any obligation of the City to negotiate over future productivity programs as required by applicable law.

## ARTICLE XVII - UNION ACTIVITY

Section 1.

Time spent by Union officials and representatives in the conduct of labor relations shall be governed by the provisions of Mayor's Executive Order No. 75, as amended, dated March 22, 1973, or any other applicable Executive Order or local law, or as otherwise provided in this Agreement. No employee shall otherwise engage in Union activities during the time the employee is assigned to the employee's regular duties.

Section 2.

C.O.B.A. officers and delegates shall be recognized as representatives of the C.O.B.A. within their respective commands. For the purpose of attending the regularly scheduled monthly meeting, C.O.B.A. delegates shall be excused from duty if the meeting coincides with the delegate's scheduled tour, provided that the command has received at least seventy-two (72) hours advance notice of such request for excusal.

17001

Section 3.

The Department of Correction will issue a memorandum to all heads of institutions instructing them to discuss labor/management problems with alternate Union delegates when a regular delegate is not available, and such alternate will be released for the regularly scheduled monthly meeting when the regular delegate is unable to attend said monthly delegate meeting because of illness which requires remaining at home or hospitalization, or absence from the New York metropolitan area on leave or by assignment, or required court appearance.

## ARTICLE XVIII - NO DISCRIMINATION

In accord with applicable law, there shall be no discrimination by the City against any Correction Officer because of Union activity.

## ARTICLE XIX - BILL OF RIGHTS

The Guidelines for Interrogation of members of the Department in force at the execution date of this Agreement will not be altered during the term of this Agreement, except to reflect subsequent changes in the law or final decisions of the Supreme Court of the United States and the Court of Appeals of the State of New York regarding the procedures and conditions to be followed in the interrogation of a member of the Department. No less than two (2) weeks' written notice of such proposed alteration of the said Guidelines shall be given to the Union.

## ARTICLE XX - NIGHT SHIFT DIFFERENTIAL

a.    There shall be a 10% night shift differential which shall continue to be paid to Correction Officers assigned to rotating tours of duty for all work actually performed between the hours of 4:00 p.m. and 8:00 a.m. Effective July 1, 1978 a 10% night shift differential shall continue to be paid to all other Correction Officers for work actually performed between the hours of 4:00 p.m. and 8:00 a.m., provided that more than one (1) hour is actually worked after 4:00 p.m. and before 8:00 a.m.

b.    Where overtime compensation is to be calculated for tours in the regular duty chart, the overtime calculation shall be based on the rate paid for the tour to which the overtime is attached; for tours not in the regular duty chart, the overtime calculation shall be based on that rate paid for half or more the hours of the tour to which the overtime is attached.

c.    For all Correction Officers hired after June 30, 1993:

17001

1.    No night shift differential shall be paid to those employees during the first six months of service.

2.    Thereafter, 55% of the night shift differential as described in paragraph "a" above earned by a similarly situated Correction Officer hired prior to July 1, 1993 shall be paid until the employee reaches First Grade after five years.

## ARTICLE XXI - GRIEVANCE AND ARBITRATION PROCEDURE

Section 1.   Definition

For the purpose of this Agreement the term, "grievance" shall mean:

a.    a claimed violation, misinterpretation or inequitable application of the provisions of this Agreement;

b.    a claimed violation, misinterpretation or misapplication of the rules, regulations, or procedures of the agency affecting terms and conditions of employment, provided that, except as otherwise provided in this Section 1a, the term "grievance" shall not include disciplinary matters;

c.    a claimed violation, misinterpretation or misapplication of the Guidelines for Interrogation of Members of the Department referred to in Article XIX of this Agreement;

d.    a claimed improper holding of an open-competitive rather than a promotional examination;

e.    a claimed assignment of the grievant to duties substantially different from those stated in the employee's job title specification.

Section 2.

The grievance procedure, except for paragraph d. of Section 1 above, shall be as follows:

Step I   The employee and/or the Union shall present the grievance verbally or in the form of a memorandum to the "Head of the Facility" not later than ninety (90) days after the date on which the grievance arose. The employee may also request an appointment to discuss the grievance. The Head of the

17001

Facility shall take any steps necessary to a proper disposition of the grievance and shall reply in writing by the end of the third work day following the date of submission.

Step II An appeal from an unsatisfactory decision at Step I shall be presented in writing to the agency head or the designated representative. The appeal must be made within five (5) working days of the receipt of the Step I decision. The agency head or the designated representative, if any, shall meet with the employee and/or the Union for review of the grievance and shall issue a decision by the end of the tenth work day following the date on which the appeal was filed.

Step III An appeal from an unsatisfactory decision at Step II shall be presented by the employee and/or the Union to the Commissioner of Labor Relations, in writing, within ten (10) working days of the receipt of the Step II decision. Copies of such appeals shall be sent to the agency head. The Commissioner of Labor Relations, or designee, shall review all appeals from Step II decisions and shall answer such appeals within fifteen (15) working days.

Step IV An appeal from an unsatisfactory decision at Step III may be brought solely by the Union to the Office of Collective Bargaining for impartial arbitration within fifteen (15) working days of receipt of the Step III decision. In addition, the City shall have the right to bring directly to arbitration any dispute between the parties concerning any matter defined herein as a "grievance." The City shall commence such arbitration by submitting a written request therefor to the Office of Collective Bargaining. A copy of the notice requesting impartial arbitration shall be forwarded to the opposing party. The arbitration shall be conducted in accord with the Consolidated Rules of the Office of Collective Bargaining. The costs and fees of such arbitration shall be borne equally by the Union and the City. The decision or award of the arbitrator shall be final and binding in accord with applicable law and shall not add to, subtract from or modify any contract, rule, regulation, existing policy or order mentioned in Section 1 of this Article.

Section 3.

As a condition to the right of a Union to invoke impartial arbitration set forth in this Article, including the arbitration of a grievance involving a claimed improper holding of an open-competitive rather than a promotional examination, the employee or employees and the Union shall be required to file with the Director of the Office of Collective Bargaining a written waiver of the right, if any, of the employee or employees and the Union to submit the underlying dispute to any other administrative or judicial tribunal except for the purpose of enforcing the arbitrator's award.

17001

Section 4.

Any grievance of a general nature affecting a large group of employees and which concerns the claimed misinterpretation, inequitable application, violation or failure to comply with the provisions of this Agreement shall be filed at the option of the Union at Step III of the grievance procedure, without resort to previous steps.

Section 5.

If a decision satisfactory to the Union at any level of the grievance procedure is not implemented within a reasonable time, the Union may re-institute the original grievance at Step III of the grievance procedure; or if a satisfactory Step III decision has not been so implemented, the Union may institute a grievance concerning such failure to implement at Step IV of the grievance procedure.

Section 6.

If the City exceeds any time limit prescribed at any step in the grievance procedure, the grievant and/or the Union may invoke the next step of the procedure, except, however, that only the Union may invoke impartial arbitration under Step IV.

Section 7.

The City shall notify the Union in writing of all grievances filed by employees, all grievance hearings, and all determinations. The Union shall have the right to have a representative present at any grievance hearing and shall be given forty-eight (48) hours' notice of all grievance hearings.

Section 8.

Each of the steps in the grievance procedure, as well as time limits prescribed at each step of this grievance procedure, may be waived by mutual agreement of the parties.

Section 9.

a.      Any grievance relating to a claimed improper holding of an open-competitive rather than a promotional examination shall be presented in writing by the employee or the Union representative to the Commissioner of Labor Relations not later than thirty (30) days after the notice of intention to conduct such open-competitive examination, or copy of the appointing officer's request for such open-competitive examination, as the case may be, has been posted in accordance with Section 51 of the Civil Service Law. The grievance shall be considered and passed upon within ten (10) days after its presentation. The decision shall be in writing, copies of which shall be transmitted to both parties to the grievance upon issuance.

17001

b.     A grievance relating to the use of an open-competitive rather than a promotional examination which is unresolved by the Commissioner of Labor Relations may be brought to impartial arbitration as provided in Sections 2 and 3 above. Such a grievance shall be presented by the Union, in writing, for arbitration within fifteen (15) days of the presentation of such grievance to the Commissioner of Labor Relations, and the arbitrator shall decide such grievance within seventy-five (75) days of its presentation to him. The party requesting such arbitration shall send a copy of such request to the other party. The costs and fees of such arbitration shall be borne equally by the Union and the City.

Section 10.

The availability of the grievance or arbitration procedure shall not justify a failure to follow orders.

Section 11.

The grievance and arbitration procedures contained in this Agreement shall be the exclusive remedy for the resolution of disputes defined as "grievance" herein. This Section shall not be construed in any manner to limit the statutory rights and obligations of the City under Article XIV of the Civil Service Law.

## ARTICLE XXII - LINE-OF-DUTY DEATH BENEFIT

In the event a Correction Officer dies because of line-of-duty injury received during the actual and proper performance of Correction Officer service relating to the alleged or actual commission of an unlawful act, or directly resulting from a characteristic hazard of Correction Officer duty, through no fault of the employee's, a payment of $25,000 shall be made from funds other than those of the Retirement System in addition to any other payment which may be made as a result of such death. Such payment shall be made to the beneficiary designated under the Retirement System or, if no beneficiary is so designated to the estate of the deceased.

## ARTICLE XXIII - DEATH BENEFIT - UNUSED LEAVE AND COMPENSATORY TIME

If an employee dies while employed by the City, the employee's beneficiary designated under the Retirement System or, if no beneficiary is so designated, the deceased's estate shall receive payment in cash for the following as a death benefit:

a.  All unused accrued leave up to a maximum of 54 days' credit;

b.  All unused accrued compensatory time earned subsequent to January 1, 1971 which is

17001

verifiable by official Department records up to a maximum of two hundred (200) hours.

## ARTICLE XXIV – TERMINAL LEAVE LUMP SUM

The resolution of the Board of Estimate of the City of New York dated June 27, 1957, states the following:

> *Members of the Force shall be granted terminal leave with pay upon retirement not to exceed one month for every ten years of service, pro-rated for a fractional part thereof, provided, however, that no terminal leave shall be granted to an employee against whom departmental disciplinary charges are pending.*

Effective July 1, 2016, such Employees as described in the Resolution above and are entitled to payment shall be entitled to voluntarily choose the option of a one-time lump sum payment as their terminal leave benefit in lieu of their current terminal leave benefit prior to retirement. Such payments shall be made as soon as practicable after retirement.

## ARTICLE XXV - NO STRIKES

In accord with applicable law, neither the Union nor any employee shall induce or engage in any strikes, slowdowns, work stoppages, or mass absenteeism, or induce any mass resignation during the term of this Agreement.

## ARTICLE XXVI - BULLETIN BOARDS

The Union may post notices on bulletin boards in places and locations where notices usually are posted by the Employer for employees to read. All notices shall be on Union stationery, shall be used only to notify employees of matters pertaining to Union affairs, and shall not contain any derogatory or inflammatory statements concerning the City, the Department, or personnel employed by either entity.

## ARTICLE XXVII - NO WAIVER

Except as otherwise provided in this Agreement, the failure to enforce any provision of this Agreement shall not be deemed a waiver thereof. This Agreement is not intended and shall not be construed as a waiver of any right or benefit to which Correction Officers are entitled by law.

## ARTICLE XXVIII - SAVINGS CLAUSE

If any provision of this Agreement is found to be invalid, such invalidity shall not

17001

impair the validity and enforceability of the remaining provisions of this Agreement.

## ARTICLE XXIX - LABOR-MANAGEMENT COMMITTEES

Section 1.

The City and the Union, having recognized that cooperation between management and employees is indispensable to the accomplishment of sound and harmonious labor relations, shall jointly maintain and support a labor-management committee in each of the agencies having at least fifty (50) employees covered by this Agreement.

Section 2.

Each labor-management committee shall consider and recommend to the agency head changes in the working conditions of the employees within the agency who are covered by this Agreement. Matters subject to the grievance procedure shall not be appropriate items for consideration by the labor-management committee.

Section 3.

Each labor-management committee shall consist of six members who shall serve for the term of this Agreement. The Union shall designate three members and the agency head shall designate three members. Vacancies shall be filled by the appointing party for the balance of the term to be served. Each member may designate one (1) alternate. Each committee shall select a chairman from among its members at each meeting. The chairmanship of each committee shall alternate between the members designated by the agency head and the members designated by the Union. A quorum shall consist of a majority of the total membership of a committee. A committee shall make its recommendations to the agency head in writing.

At the request of either the Department of Correction or the C.O.B.A., a representative of the Office of Labor Relations will sit in on the Labor Management Committee.

Section 4.

The labor-management committee shall meet at the call of either the Union members or the City members at times mutually agreeable to both parties. At least one (1) week in advance of a meeting the party calling the meeting shall provide to the other party, a written agenda of matters to be discussed. Minutes shall be kept and copies supplied to all members of a committee.

17001

## ARTICLE XXX - FINANCIAL EMERGENCY ACT

The provisions of this Agreement are subject to applicable provisions of law including the New York State Financial Emergency Act for the City of New York, as amended.

17001

WHEREFORE, we have hereunto set our hands and seals this 6th day of January, 2017.

CITY OF NEW YORK

CORRECTION OFFICERS BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC.

BY: _____

ROBERT W. LINN
Commissioner of Labor Relations

BY: _____

ELIAS HUSAMUDEEN
President

APPROVED AS TO FORM:

Date submitted to the
FINANCIAL CONTROL BOARD

BY: _____

ERIC EICHENHOLZ
ACTING CORPORATION COUNSEL

UNIT: **CORRECTION OFFICERS**

TERM: **November 1, 2011 to February 28, 2019**

OFFICE OF LABOR RELATIONS
REGISTRATION

OFFICIAL                    CONTRACT

NO:                          DATE:
17001                      JAN 6, 2017



NEW YORK CITY DEPARTMENT OF CORRECTION
Martin F. Horn, Commissioner

Office of the Commissioner

33 Beaver Street, 23 d fl.
New York, NY 10004
Office 212-266-1212
Fax 212-266-1219

Norman Seabrook, President
Correction Officers' Benevolent Association
75 Broadway, Suite 810
New York, N.Y. 10004-2415

Re: COBA Agreement for the period of November 1, 2009 to October 31, 2011

Dear Mr. Seabrook:

This is to confirm our understanding that when a Correction Officer is required to report to a location other than his/her assigned location, he/she shall be allowed travel time within the tour of duty.

This shall not pertain to staff who normally have field assignments.

Very truly yours,

Martin F. Horn
Commissioner

17001



NEW YORK CITY DEPARTMENT OF CORRECTION
Martin F. Horn, Commissioner

Office of the Commissioner

33 Beaver Street, 23rd fl.
New York, NY 10004
Office 212 266 1212
Fax 212 266 1219

Norman Seabrook, President
Correction Officers' Benevolent Association
75 Broadway, Suite 810
New York, N.Y. 10004-2415

Re: COBA Agreement for the period of November 1, 2009 to October 31, 2011

Dear Mr. Seabrook:

When the Departmental Doctor determines that a Correction Officer is injured in the line of duty and is incapacitated and unable to return to work for a finite period of time, then the Department will not confine such Officer to his/her residence for that period. If the administrative determination by the Commissioner or his/her designee is different from that of the Departmental Doctor, then the change will be communicated to the Officer by telephone or in writing.

It is expressly understood that the determination by the Commissioner or his/her designee is final and not subject to the grievance procedure. This procedure does not affect any other rule or regulation of the Department.

Very truly yours,

Martin F. Horn
Commissioner

17001



THE CITY OF NEW YORK
# OFFICE OF LABOR RELATIONS
40 Rector Street, New York, NY 10006-1705
http://nyc.gov/olr

**JAMES F. HANLEY**
*Commissioner*
**MARGARET M. CONNOR**
*First Deputy Commissioner*

March 25, 2009

Norman Seabrook
President
Correction Officers' Benevolent Association
75 Broad Street
Suite 0810
New York, New York 10004-2415

Dear Mr. Seabrook:

On February 19, 2009, we informed you that an unspecified credit from the partial discontinuation of "unit management" would be available to the Correction Officers Benevolent Association.

Please be advised that we have subsequently calculated that credit to be 0.07%.

Accordingly, effective January 1, 2009, we are proposing a welfare fund increase in the amount of $35.00 per annum for active employees that would be fully funded by the 0.07% credit derived from the reduction in "unit management." This would fully expend the available credit.

If the above accords with your understanding, please execute the signature line provided below.

Very truly yours,

*James F. Hanley*
James F. Hanley

AGREED AND ACCEPTED ON BEHALF OF COBA

By: *Norman Seabrook*
Norman Seabrook
President

DOC Unit Management - Disposition of Credit (2)

*17001*

Correction Officers Benevolent Association                November 1, 2011 to February 28, 2019



THE CITY OF NEW YORK
# OFFICE OF LABOR RELATIONS
40 Rector Street, New York, NY 10006-1705
http://nyc.gov/olr

**JAMES F. HANLEY**
*Commissioner*
**MARGARET M. CONNOR**
*First Deputy Commissioner*

Norman Seabrook
President
Correction Officers' Benevolent Association
75 Broad Street, Suite 810
New York, N.Y. 10004

Re: COBA Agreement for the period of November 1, 2009 to October 31, 2011 - Change of Sick
Leave Language

Dear Mr. Seabrook:

The sole intent of the change in the sick leave language in Article X, Section 2 of the October
1, 1991 - March 31, 1995 Agreement was to acknowledge enactment of Section 9-117.1(a) of the New
York City Administrative Code which allows Correction Officers to continue to exclude line of duty
sick leave payments from gross income in accordance with Internal Revenue Code Section 104 (a)(1)
and Section 1.104 (b) of the Internal Revenue Service Regulations.

Please be assured that the 1987-90 Police Agreement varied in the same manner from the 1984-
87 Police Agreement as did the Correction Officers Agreement, and that there was no intent to nor
does it deprive any Correction Officer of any benefit nor diminish any benefit, but rather to keep and
further an existing benefit.

The sick leave provisions of Article X, Section 2 (i) and (ii) of the 2007-2009 Correction
Officer Agreement have no other purpose, nor shall they have any other use, but to continue the benefit
therein previously contained.

Very truly yours,

James F. Hanley

Correction Officers Benevolent Association

17001
November 1, 2011 to February 28, 2019



THE CITY OF NEW YORK
# OFFICE OF LABOR RELATIONS
40 Rector Street, New York, NY 10006-1705
http://nyc.gov/olr

JAMES F. HANLEY
*Commissioner*
MARGARET M. CONNOR
*First Deputy Commissioner*

Norman Seabrook
President
Correction Officers' Benevolent Association
75 Broad Street, Suite 810
New York, N.Y. 10004

Re: COBA Agreement for the period of November 1, 2009 to October 31, 2011

Dear Mr. Seabrook:

This is to confirm our mutual understanding and agreement that during the first five (5) years of service, Correction Officers hired after June 30, 1993 shall have the option to use up to three (3) compensatory time days per year as vacation days.

Very truly yours,

James F. Hanley

AGREED AND ACCEPTED ON BEHALF OF COBA

BY:

Norman Seabrook
President

17001



THE CITY OF NEW YORK

# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, NY 10006-1705

http://nyc.gov/olr

**JAMES F. HANLEY**
*Commissioner*
**MARGARET M. CONNOR**
*First Deputy Commissioner*

Norman Seabrook
President
Correction Officers' Benevolent Association
75 Broad Street, Suite 810
New York, N.Y. 10004

Re:     Re: COBA Agreement for the period of November 1, 2009 to October 31, 2011

Dear Mr. Seabrook:

This is to confirm our mutual understanding and agreement that a Labor-Management Committee will be established with the Union and the Department of Correction to resolve sick leave and Health Management Division issues.

If the above accords with your understanding, please execute the signature line provided.

Very truly yours,

*James F. Hanley*

James F. Hanley

AGREED AND ACCEPTED ON BEHALF OF COBA

BY: _____

Norman Seabrook
President

17001

Correction Officers Benevolent Association                    November 1, 2011 to February 28, 2019



THE CITY OF NEW YORK

# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, NY 10006-1705

http://nyc.gov/olr

**JAMES F. HANLEY**
*Commissioner*
**MARGARET M. CONNOR**
*First Deputy Commissioner*

Norman Seabrook
President
Correction Officers Benevolent Association
75 Broad Street, Suite 810
New York, NY 10004

Re:    COBA Agreement for the period November 1, 2009 to October 31, 2011

Dear Mr. Seabrook:

The City and the COBA recognize that, pursuant to Administrative Code Section 12-127, the City is obligated to pay for the cost of line of duty injury prescription drugs for COBA members. The parties further recognize that a significant number of COBA members have utilized the COBA Health and Welfare Fund to pay for these prescription drugs without reimbursement by the City. The COBA agrees to waive any and all claims retroactively and prospectively against the City for the reimbursement of the cost of line of duty injury prescription drugs.

If the above conforms to your understanding, please execute the signature line below.

Very truly yours,

James F. Hanley

AGREED AND ACCEPTED ON BEHALF OF COBA

BY:

Norman Seabrook
President

17001

Correction Officers Benevolent Association                    November 1, 2011 to February 28, 2019



THE CITY OF NEW YORK

# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, NY 10006-1705

http://nyc.gov/olr

**JAMES F. HANLEY**
*Commissioner*
**MARGARET M. CONNOR**
*First Deputy Commissioner*

Norman Seabrook
President
Correction Officers Benevolent Association
75 Broad Street, Suite 810
New York, NY 10004

Re:     COBA Agreement for the period November 1, 2009 to October 31, 2011

Dear Mr. Seabrook:

Effective the date of approval of the 2003-2005 COBA agreement, employees who have transferred from the uniformed service of the New York City Police Department and the New York City Fire Department shall be treated in the same manner as if they had been a member of the uniformed service continuously for the purpose of calculating increments and longevity adjustments only.

Very truly yours,

James F. Hanley

17001

Correction Officers Benevolent Association

November 1, 2011 to February 28, 2019

FILED: KINGS COUNTY CLERK 10/08/2019 02:58 PM
NYSCEF DOC. NO. 284   Case 23-1, Document 76, 01/25/2023, 3458054, Page190 of 296

INDEX NO. 518540/2019
RECEIVED NYSCEF: 10/08/2019



THE CITY OF NEW YORK
# OFFICE OF LABOR RELATIONS
40 Rector Street, New York, NY 10006-1705
http://nyc.gov/olr

**JAMES F. HANLEY**
*Commissioner*
**MARGARET M. CONNOR**
*First Deputy Commissioner*

Norman Seabrook
President
Correction Officers Benevolent Association
75 Broad Street, Suite 810
New York, NY 10004

Re:    COBA Agreement for the period November 1, 2009 to October 31, 2011

Dear Mr. Seabrook:

This is to confirm our agreement to establish a labor management committee to discuss the following items:

    a.    Rikers Island Security, Women's facilities
    b.    evaluation of probationary Correction Officers
    c.    some notice on transfers
    d.    environmental issues
    e.    access to personnel files
    f.    parking at Borough facilities
    g.    jury duty

                            Very truly yours,

                            James F. Hanley

AGREED AND ACCEPTED ON BEHALF OF COBA

BY:    Norman Seabrook
        President

17001



THE CITY OF NEW YORK

# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, NY 10006-1705

http://nyc.gov/olr

**JAMES F. HANLEY**
*Commissioner*
**MARGARET M. CONNOR**
*First Deputy Commissioner*

Norman Seabrook
President
Correction Officers Benevolent Association
75 Broad Street, Suite 810
New York, NY 10004

Re:    COBA Agreement for the period November 1, 2009 to October 31, 2011

Dear Mr. Seabrook:

This is to confirm our agreement to establish a labor management committee to discuss the impact of increased productivity. The committee will explore proposals for increased productivity by Correction Officers. Mutually agreed upon proposals may be discussed for implementation. After implementation of any agreed upon proposal, the parties may discuss application of the results of implementation.

If this accords with your understanding, please execute at the line below.

Very truly yours,

James F. Hanley

AGREED AND ACCEPTED ON BEHALF OF COBA

BY:
Norman Seabrook
President

17001

Correction Officers Benevolent Association                    November 1, 2011 to February 28, 2019



THE CITY OF NEW YORK

# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, NY 10006-1705

http://nyc.gov/olr

**JAMES F. HANLEY**
*Commissioner*
**MARGARET M. CONNOR**
*First Deputy Commissioner*

Norman Seabrook
President
Correction Officers Benevolent Association
75 Broad Street, Suite 810
New York, NY 10004

Dear Mr. Seabrook:

    Re:   COBA Agreement for the period November 1, 2009 to October 31, 2011

Dear Mr. Seabrook:

    This is to confirm our mutual understanding and agreement regarding Article XII of the above Agreement. If the stabilization fund referred to in Article XII does not have sufficient monies to maintain the then current level of health insurance benefits provided under GHI-CBP/Blue Cross plan, payroll deductions in the appropriate amounts shall be taken from employees and retirees enrolled in such plan unless agreement is reached on a program wide basis to take the needed monies from the contributions to the welfare fund provided in Article XIII of the above Agreement.

                      Very truly yours,

                      James F. Hanley

AGREED AND ACCEPTED ON BEHALF OF THE COBA

BY:

    Norman Seabrook
    President

17001



THE CITY OF NEW YORK

# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, NY 10006-1705

http://nyc.gov/olr

**JAMES F. HANLEY**
*Commissioner*
**MARGARET M. CONNOR**
*First Deputy Commissioner*

Norman Seabrook
President
Correction Officers' Benevolent Association
75 Broad Street, Suite 810
New York, NY 10004

      Re: COBA Agreement for the period of November 1, 2009 to October 31, 2011

Dear Mr. Seabrook:

      This is to confirm the mutual understanding of the parties with respect to the above captioned Agreement.

      The Department of Correction plans to expand the application of "unit management" on a phased-in basis.

      The Department reserves its rights to staff its facilities in accordance with the needs of the Agency. To this end, "unit management" shall not impede the assignment of staff, at the discretion of management, between and/or among units in a facility under unit management. The terms of the "travel time" sideletter shall continue to apply in instances where a Correction Officer is assigned to a location outside his/her parent command, except for field assignments.

      The Department of Correction will schedule vacations in the most efficient and cost-effective manner (i.e., "vacation smoothing"). Vacation picks shall be based on seniority by tour within the command to assure to the greatest extent practicable an even distribution by tour in each of the respective vacation picks, that is, no more than ten percent of the command by tour per pick.

      In the event that unit management is not implemented, or discontinued at management's discretion after implementation, the vacation scheduling modifications shall nevertheless continue to apply. In such an instance, however, the parties agree to reopen the contract on a limited basis with respect to negotiations on an alternate disposition of the savings associated with this issue.

      Nothing contained herein shall limit or diminish the Employer's or the Union's rights pursuant to §12-307(b) of the New York City Collective Bargaining Law, except as specifically provided herein. Notwithstanding this, the Union waives its right to raise any claims of any nature relating to this vacation scheduling modification including, but not limited to, a claim of practical impact relating to this scheduling modification, and the Union agrees that all matters subject to bargaining have been

17001

disposed of in this Agreement. Notwithstanding this, a claimed violation, misinterpretation, or misapplication of the vacation scheduling modification may be the subject of a grievance.

The Employer and the Union agree to convene a labor-management meeting at the request of either party to meet and confer on issues that may arise from the implementation of unit management in the various facilities. The Office of Labor Relations will send a representative at the request of either party.

The Employer and the Union understand and agree that in the event that any aspect of this agreement is contingent on the amendment of Section 9-116 of the Administrative Code for the purpose of effectuating this agreement, then the Union shall cooperate and assist the Employer in its efforts to achieve the necessary amendment, if any, subject to approval by both the City and the union of the language and other terms of the said legislation.

If any part of this Agreement is found by a Court of competent jurisdiction to be invalid, then the terms of this Agreement in its entirety will immediately terminate and be given no further effect. In such event, the parties agree to negotiate immediately over substitute savings to be achieved.

If the above accords with your understanding, please execute the signature line provided below.

Very truly yours,

James F. Hanley

AGREED AND ACCEPTED ON BEHALF OF COBA

BY.

Norman Seabrook
President

17001

Correction Officers Benevolent Association                    November 1, 2011 to February 28, 2019



THE CITY OF NEW YORK

# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, NY 10006-1705

http://nyc.gov/olr

**JAMES F. HANLEY**
*Commissioner*
**MARGARET M. CONNOR**
*First Deputy Commissioner*

Norman Seabrook
President
Correction Officers' Benevolent Association
75 Broad Street – Suite 810
New York, New York 10004

Re: COBA Agreement for the period of November 1, 2009 to October 31, 2011

Dear Mr. Seabrook:

This is to confirm our mutual understanding and agreement that a Labor-Management Committee will be established with the Union and the Department of Correction to discuss the subject of nutrition as it applies to the meals made available to Correction Officers.

Very truly yours,

*James F. Hanley*

James F. Hanley

17001

Correction Officers Benevolent Association

November 1, 2011 to February 28, 2019

THE CITY OF NEW YORK
# OFFICE OF LABOR RELATIONS
40 Rector Street, New York, NY 10006-1705
http://nyc.gov/olr

**JAMES F. HANLEY**
*Commissioner*
**MARGARET M. CONNOR**
*First Deputy Commissioner*

Norman Seabrook
President
Correction Officers' Benevolent Association
75 Broad Street – Suite 810
New York, New York 10004

Re: COBA Agreement for the period of November 1, 2009 to October 31, 2011

Dear Mr. Seabrook:

This is to confirm our mutual understanding and agreement that a Labor-Management Committee will be established with the Union and the Department of Correction to discuss ways to mitigate the initial cost impact on newly appointed Correction Officers who are required to purchase uniforms and related equipment.

Very truly yours,

James F. Hanley

1 7 0 0 1

Correction Officers Benevolent Association                    November 1, 2011 to February 28, 2019



THE CITY OF NEW YORK

# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, NY 10006-1705

http://nyc.gov/olr

**JAMES F. HANLEY**
*Commissioner*
**MARGARET M. CONNOR**
*First Deputy Commissioner*

Norman Seabrook
President
Correction Officers' Benevolent Association
75 Broad Street – Suite 810
New York, New York 10004

Re: COBA Agreement for the period of November 1, 2009 to October 31, 2011

Dear Mr. Seabrook:

Effective as soon as practicable, a member injured in the line of duty, and whose claim is found to be compensable by the Law Department, who requires medications to treat the illness or injury will have all related costs of such medications covered in the same manner then in effect immediately prior to the agreement between the City and the COBA that COBA members will utilize the COBA Health and Welfare Fund to pay for prescription drugs without reimbursement of the cost of line of duty injury prescription drugs by the City.

Upon reverting to the above procedure, the existing side letter in the contract shall be superseded. However, the COBA agrees to waive any and all claims retroactively against the City for the reimbursement.

If the above accords with your understanding, please execute the signature line provided.

Very truly yours,

*James F. Hanley*

James F. Hanley

AGREED AND ACCEPTED ON BEHALF OF COBA

BY: _____

Norman Seabrook
President

17001

Correction Officers Benevolent Association

November 1, 2011 to February 28, 2019



THE CITY OF NEW YORK

# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, NY 10006-1705

http://nyc.gov/olr

**JAMES F. HANLEY**
*Commissioner*
**MARGARET M. CONNOR**
*First Deputy Commissioner*

Norman Seabrook
President
Correction Officers' Benevolent Association
75 Broad Street – Suite 810
New York, New York 10004

Re: COBA Agreement for the period of November 1, 2009 to October 31, 2011

Dear Mr. Seabrook:

    The Department of Correction has established a category of Correction Officers designated on "special assignment."

    The designation of certain Correction Officers detailed on "special assignment" in the Department of Correction shall be in the sole discretion of the Commissioner.

    The number of employees eligible for such designation shall not exceed 4.92% of the budgeted positions in the bargaining unit.

|  "Special Assignment" |  |
| --- | --- |
| 4th Year Step | 12% (an additional 3%) |
| 3rd Year Step | 9% (an additional 3%) |
| 2nd Year Step | 6% (an additional 3%) |
| 1st Year Step | 3% |

    The affected employee's initial receipt of special assignment pay shall commence upon completion of six (6) months of satisfactory performance in the special assignment designation.

Very truly yours,

*James F. Hanley*

James F. Hanley

AGREED AND ACCEPTED ON BEHALF OF COBA

BY: *Norman Seabrook*

Norman Seabrook
President

1 7 0 0 1

Correction Officers Benevolent Association          November 1, 2011 to February 28, 2019



# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, N.Y. 10006-1705
nyc.gov/olr

**ROBERT W. LINN**
*Commissioner*
**RENEE CAMPION**
*First Deputy Commissioner*
**CLAIRE LEVITT**
*Deputy Commissioner*
*Health Care Cost Management*

**MAYRA E. BELL**
*General Counsel*
**GEORGETTE GESTELY**
*Director, Employee Benefits Program*

Elias Husamudeen
President
Correction Officers' Benevolent Association
75 Broad Street – Suite 810
New York, New York 10004

Re:    COBA Agreement for the period of November 1, 2011 to February 28, 2019

Dear Mr. Husamudeen:

This is to confirm our mutual understanding and agreement that a Labor-Management Committee will be established with the Union and the Department of Correction to discuss ways to reduce the cost of purchasing uniforms.

Very truly yours,

Robert W. Linn

AGREED AND ACCEPTED ON BEHALF OF COBA

BY:

Elias Husamudeen
President

Correction Officers Benevolent Association

17001

November 1, 2011 to February 28, 2019



# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, N.Y. 10006-1705
nyc.gov/olr

**ROBERT W. LINN**
*Commissioner*
**RENEE CAMPION**
*First Deputy Commissioner*
**CLAIRE LEVITT**
*Deputy Commissioner*
  *Health Care Cost Management*

**MAYRA E. BELL**
*General Counsel*
**GEORGETTE GESTELY**
*Director, Employee Benefits Program*

Elias Husamudeen
President
Correction Officers' Benevolent Association
75 Broad Street, Suite 810
New York, NY 10004

Re:     COBA Agreement for the period of November 1, 2011 to February 28, 2019

Dear Mr. Husamudeen:

  This letter serves to confirm the parties' mutual understanding concerning the issuance of "good guy letters" by the Department of Correction. The Department, in consultation with the New York City Law Department, will develop criteria for the Department to consider when deciding if a Correction Officer will be issued a "good guy letter" upon his or her retirement.

  If the above accords with your understanding, please countersign below.

Sincerely,

Robert W. Linn

ACCEPTED AND AGREED ON BEHALF OF COBA

BY:

Elias Husamudeen
President

*17001*

Correction Officers Benevolent Association                    November 1, 2011 to February 28, 2019



# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, N.Y. 10006-1705
nyc.gov/olr

**ROBERT W. LINN**
*Commissioner*
**RENEE CAMPION**
*First Deputy Commissioner*
**CLAIRE LEVITT**
*Deputy Commissioner*
*Health Care Cost Management*

**MAYRA E. BELL**
*General Counsel*
**GEORGETTE GESTELY**
*Director, Employee Benefits Program*

Elias Husamudeen
President
Correction Officers' Benevolent Association
75 Broad Street – Suite 810
New York, New York 10004

Re:     COBA Agreement for the period of November 1, 2011 to February 28, 2019

Dear Mr. Husamudeen:

        This is to confirm our mutual understanding and agreement regarding the Labor-Management Committee on Facilities created pursuant to the parties' 2011-2019 Memorandum of Agreement. Within six (6) months after the date it first convened, the Committee will issue a report to the Commissioner on the matters discussed by the committee, including any recommended changes or improvements to locker room or bathroom facilities. The Commissioner will issue a response within ninety (90) days of receipt of the Committee's report.

                        Very truly yours,

                        Robert W. Linn

AGREED AND ACCEPTED ON BEHALF OF COBA

BY:
        Elias Husamudeen
        President

Correction Officers Benevolent Association

*17001*

November 1, 2011 to February 28, 2019



# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, N.Y. 10006-1705
nyc.gov/olr

ROBERT W. LINN
*Commissioner*
RENEE CAMPION
*First Deputy Commissioner*
CLAIRE LEVITT
*Deputy Commissioner*
 *Health Care Cost Management*

MAYRA E. BELL
*General Counsel*
GEORGETTE GESTELY
*Director, Employee Benefits Program*

Elias Husamudeen
President
Correction Officers' Benevolent Association
75 Broad Street – Suite 810
New York, New York 10004

Re:    COBA Agreement for the period of November 1, 2011 to February 28, 2019

Dear Mr. Husamudeen:

 This is to confirm our mutual understanding and agreement that DOC will establish a Medical Practice Review Committee, which shall include a representative from the Union, to conduct fact finding and issue recommendations for improved medical practices at the Health Management Division.

 Very truly yours,

 Robert W. Linn

AGREED AND ACCEPTED ON BEHALF OF COBA

BY:

 Elias Husamudeen
 President

17001

Correction Officers Benevolent Association

November 1, 2011 to February 28, 2019



# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, N.Y. 10006-1705
nyc.gov/olr

**ROBERT W. LINN**
*Commissioner*
**RENEE CAMPION**
*First Deputy Commissioner*
**CLAIRE LEVITT**
*Deputy Commissioner*
  *Health Care Cost Management*

**MAYRA E. BELL**
*General Counsel*
**GEORGETTE GESTELY**
*Director, Employee Benefits Program*

Elias Husamudeen
President
Correction Officers' Benevolent Association
75 Broad Street – Suite 810
New York, New York 10004

Re:   COBA Agreement for the period of November 1, 2011 to February 28, 2019

Dear Mr. Husamudeen:

This is to confirm our mutual understanding and agreement that the parties will convene, at the Union's request, a Labor-Management committee which shall include representative(s) from the Mayor's Office of Labor Relations to discuss any impact on C.O.B.A. members of changes in the Department's headcount.

.

Very truly yours,

Robert W. Linn

AGREED AND ACCEPTED ON BEHALF OF COBA

BY:

Elias Husamudeen
President

17001

Correction Officers Benevolent Association                    November 1, 2011 to February 28, 2019



# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, N.Y. 10006-1705
nyc.gov/olr

**ROBERT W. LINN**
*Commissioner*
**RENEE CAMPION**
*First Deputy Commissioner*
**CLAIRE LEVITT**
*Deputy Commissioner*
*Health Care Cost Management*

**MAYRA E. BELL**
*General Counsel*
**GEORGETTE GESTELY**
*Director, Employee Benefits Program*

Elias Husamudeen
President
Correction Officers' Benevolent Association
75 Broad Street – Suite 810
New York, New York 10004

Re:  COBA Agreement for the period of November 1, 2011 to February 28, 2019

Dear Mr. Husamudeen:

This is to confirm our mutual understanding and agreement that a Labor-Management committee will be established with representatives of the Department of Correction and the C.O.B.A. to study and review the current grievance procedure with the intent of developing procedures to expedite the process.

Very truly yours,

Robert W. Linn

AGREED AND ACCEPTED ON BEHALF OF COBA

BY: 
Elias Husamudeen
President

1 7 0 0 1

Correction Officers Benevolent Association

November 1, 2011 to February 28, 2019



# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, N.Y. 10006-1705
nyc.gov/olr

**ROBERT W. LINN**
*Commissioner*
**RENEE CAMPION**
*First Deputy Commissioner*
**CLAIRE LEVITT**
*Deputy Commissioner*
  *Health Care Cost Management*

**MAYRA E. BELL**
*General Counsel*
**GEORGETTE GESTELY**
*Director, Employee Benefits Program*

Elias Husamudeen
President
Correction Officers' Benevolent Association
75 Broad Street – Suite 810
New York, New York  10004

Re:     COBA Agreement for the period of November 1, 2011 to February 28, 2019

Dear Mr. Husamudeen:

This is to confirm our mutual understanding and agreement that the Union and the Department shall establish a joint committee which shall meet on a regular basis to discuss and consider appropriate means of resolving health and safety issues.

.

Very truly yours,

Robert W. Linn

AGREED AND ACCEPTED ON BEHALF OF COBA

BY:
Elias Husamudeen
President

17001

Correction Officers Benevolent Association                                    November 1, 2011 to February 28, 2019



# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, N.Y. 10006-1705
nyc.gov/olr

ROBERT W. LINN
*Commissioner*
RENEE CAMPION
*First Deputy Commissioner*
CLAIRE LEVITT
*Deputy Commissioner*
*Health Care Cost Management*

MAYRA E. BELL
*General Counsel*
GEORGETTE GESTELY
*Director, Employee Benefits Program*

Elias Husamudeen
President
Correction Officers' Benevolent Association
75 Broad Street, Suite 810
New York, NY 10004

Re:    COBA Agreement for the period of November 1, 2011 to February 28, 2019

Dear Mr. Husamudeen:

This letter serves to confirm the parties' mutual understanding concerning the Rikers Island Central Arrest Unit.

a. In order to provide a safe environment, the Department of Correction shall, in coordination with the Bronx District Attorney's Office, create a Rikers Island Central Arrest Unit in order to more effectively pursue re-arrest for aggravated harassment and assault on Correction Officers committed by inmates while incarcerated.

b. Commanding Officers shall report, as soon as possible, to the Office of Commissioner and to the Chief of the Department that an assault upon a correction officer has been reported to him/her. The Office of the Chief of Security shall investigate and file a complete report as soon as possible to the Office of the Commissioner and to the Chief of the Department. The full report shall be signed by the correction officer to acknowledge that he/she has seen the report and he/she may append a statement to such report.

c. The Chief of Security shall notify the correction officer of its readiness to assist the correction officer. This assistance is intended solely to apply to the criminal aspect of any case arising from such assault.

d. The Department shall be responsible for collecting data on every Correction Officer assaulted and must upon request provide the Union with such information/data.

e. The provisions in Operation Order 52/89 shall apply.

17001

If the above accords with your understanding, please countersign below.

Sincerely,

Robert W. Linn

ACCEPTED AND AGREED ON BEHALF OF COBA

BY:

Elias Husamudeen
President

17001



# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, N.Y. 10006-1705
nyc.gov/olr

ROBERT W. LINN
*Commissioner*
RENEE CAMPION
*First Deputy Commissioner*
CLAIRE LEVITT
*Deputy Commissioner*
*Health Care Cost Management*

MAYRA E. BELL
*General Counsel*
GEORGETTE GESTELY
*Director, Employee Benefits Program*

Elias Husamudeen
President
Correction Officers' Benevolent Association
75 Broad Street – Suite 810
New York, New York 10004

Re:    COBA Agreement for the period of November 1, 2011 to February 28, 2019

Dear Mr. Husamudeen:

This letter serves to confirm the parties understanding regarding Correction Officer vacation accruals. Correction Officers who accrued the incorrect amount of vacation during the fifth calendar year after their appointment shall have their accruals corrected pursuant to the previously existing vacation tables in the parties' Collective Bargaining Agreement.

Effective January 1, 2017, Correction Officers shall accrue vacation time as follows:

a.    For Correction Officers hired before January 1, 2009:

2.25 days per month (rate of 27 days per year)

b.    For Correction Officers hired on or after January 1, 2009:

i.    During the first 5 years of service: 1.083 days per month (rate of 13 days per year (as rounded to the nearest full day))

ii.   Following the first five years of service: 2.25 days per month (rate of 27 days per year)

COBA Vacation Side Letter (P. 1 of 2)

1 7 0 0 1

Very truly yours,

Robert W. Linn

AGREED AND ACCEPTED ON BEHALF OF COBA

BY

Elias Husamudeen
President

17001

COBA Vacation Side Letter (P. 2 of 2)

Correction Officers Benevolent Association

November 1, 2011 to February 28, 2019



THE CITY OF NEW YORK

# OFFICE OF LABOR RELATIONS

**40 Rector Street, New York, NY 10006–1705**

http://nyc.gov/olr

**ROBERT W. LINN**
*Commissioner*

May 5, 2014

Harry Nespoli
Chair, Municipal Labor Committee
125 Barclay Street
New York, NY 10007

Dear Mr. Nespoli:

This is to confirm the parties' mutual understanding concerning the following issues:

1.    Unless otherwise agreed to by the parties, the Welfare Fund contribution will remain constant for the length of the successor unit agreements, including the $65 funded from the Stabilization Fund pursuant to the 2005 Health Benefits Agreement between the City of New York and the Municipal Labor Committee.

2.    Effective July 1, 2014, the Stabilization Fund shall convey $1 Billion to the City of New York to be used to support wage increases and other economic items for the current round of collective bargaining (for the period up to and including fiscal year 2018). Up to an additional total amount of $150 million will be available over the four year period from the Stabilization Fund for the welfare funds, the allocation of which shall be determined by the parties. Thereafter, $60 million per year will be available from the Stabilization Fund for the welfare funds, the allocation of which shall be determined by the parties.

3.    If the parties decide to engage in a centralized purchase of Prescription Drugs, and savings and efficiencies are identified therefrom, there shall not be any reduction in welfare fund contributions.

4.    There shall be a joint committee formed that will engage in a process to select an independent healthcare actuary, and any other mutually agreed upon additional outside expertise, to develop an accounting system to measure and calculate savings.

1

17001

Case 23-1, Document 76, 01/25/2023, 3458054, Page211 of 296

5.     The MLC agrees to generate cumulative healthcare savings of $3.4 billion over the course of Fiscal Years 2015 through 2018, said savings to be exclusive of the monies referenced in Paragraph 2 above and generated in the individual fiscal years as follows: (i) $400 million in Fiscal Year 2015; (ii) $700 million in Fiscal Year 2016; (iii) $1 billion in Fiscal Year 2017; (iv) $1.3 billion in Fiscal Year 2018; and (v) for every fiscal year thereafter, the savings on a citywide basis in health care costs shall continue on a recurring basis. At the conclusion of Fiscal Year 2018, the parties shall calculate the savings realized during the prior four-year period.  In the event that the MLC has generated more than $3.4 billion in cumulative healthcare savings during the four-year period, as determined by the jointly selected healthcare actuary, up to the first $365 million of such additional savings shall be credited proportionately to each union as a one-time lump sum pensionable bonus payment for its members.  Should the union desire to use these funds for other purposes, the parties shall negotiate in good faith to attempt to agree on an appropriate alternative use. Any additional savings generated for the four-year period beyond the first $365 million will be shared equally with the City and the MLC for the same purposes and subject to the same procedure as the first $365 million. Additional savings beyond $1.3 billion in FY 2018 that carry over into FY 2019 shall be subject to negotiations between the parties.

6.     The following initiatives are among those that the MLC and the City could consider in their joint efforts to meet the aforementioned annual and four-year cumulative savings figures: minimum premium, self-insurance, dependent eligibility verification audits, the capping of the HIP HMO rate, the capping of the Senior Care rate, the equalization formula, marketing plans, Medicare Advantage, and the more effective delivery of health care.

7.     Dispute Resolution

    a. In the event of any dispute under this agreement, the parties shall meet and confer in an attempt to resolve the dispute.  If the parties cannot resolve the dispute, such dispute shall be referred to Arbitrator Martin F. Scheinman for resolution.

    b. Such dispute shall be resolved within 90 days.

    c. The arbitrator shall have the authority to impose interim relief that is consistent with the parties' intent.

    d. The arbitrator shall have the authority to meet with the parties at such times as the arbitrator determines is appropriate to enforce the terms of this agreement.

    e. If the parties are unable to agree on the independent health care actuary described above, the arbitrator shall select the impartial health care actuary to be retained by the parties.

    f. The parties shall share the costs for the arbitrator and the actuary the arbitrator selects.

2

17001

If the above accords with your understanding and agreement, kindly execute the signature line provided.

Sincerely,

Robert W. Linn
Commissioner

Agreed and Accepted on behalf of the Municipal Labor Committee

BY: _____

Harry Nespoli, Chair

3

17001

Case 23-1, Document 76, 01/25/2023, 3458054, Page213 of 296

# MEMORANDUM OF AGREEMENT

MEMORANDUM OF AGREEMENT (hereinafter referred to as the "Agreement") entered into this 3rd day of December, 2015, by and between the City of New York (the "City"), and the Correction Officers' Benevolent Association (the "Union").

WHEREAS, the undersigned parties desire to enter into a collective bargaining agreement, including this Memorandum of Agreement, modifying the collective bargaining agreement that expired on October 31, 2011, to cover employees represented by the Union ("Employees") in the title of Correction Officer.

WHEREAS, the undersigned parties desire that the economic terms of the Agreement conform to the uniformed settlement pattern;

NOW, THEREFORE, it is mutually agreed as follows:

1. Duration

    The term of the agreement shall be from November 1, 2011 through February 28, 2019.

2. Continuation of Terms

    The terms of the prior collective bargaining agreements and side letters shall continue, except as modified pursuant to this Memorandum of Agreement and side letters.

3. General Wage Increases

    a. The General increases, effective as indicated, shall be:

        i.   Effective November 1, 2011, Employees shall receive a general wage increase of one percent (1%).

        ii.   Effective December 1, 2012, Employees shall receive a general wage increase of one percent (1%).

        iii.  Effective January 1, 2014, Employees shall receive a general wage increase of one percent (1%).

        iv.  Effective February 1, 2015, Employees shall receive a general wage increase of one percent (1%).

        v.   Effective March 1, 2016, Employees shall receive a general wage increase of one and a half percent (1.5%).

Case 23-1, Document 76, 01/25/2023, 3458054, Page214 of 296

vi.    Effective March 1, 2017 Employees shall receive a general wage increase of two and a half percent (2.5%).

vii.    Effective March 1, 2018, Employees shall receive a general wage increase of three percent (3%).

b.  The increases provided for in Section 3 shall be calculated as follows:

i.    the increases in Section 3a. (i) shall be based upon the base rates (which shall include salary or incremental schedules) in effect on October 31, 2011.

ii.    the increases in Section 3a. (ii) shall be based upon the base rates (which shall include salary or incremental schedules) in effect on November 30, 2012.

iii.    the increases in Section 3a. (iii) shall be based upon the base rates (which shall include salary or incremental schedules) in effect on December 31, 2013.

iv.    the increases in Section 3a. (iv) shall be based upon the base rates (which shall include salary or incremental schedules) in effect on January 31, 2015.

v.    the increases in Section 3a. (v) shall be based upon the base rates (which shall include salary or incremental schedules) in effect on February 29, 2016.

vi.    the increases in Section 3a. (vi) shall be based upon the base rates (which shall include salary or incremental schedules) n effect on February 28, 2017.

vii.    the increases in Section 3a. (vii) shall be based upon the base rates (which shall include salary or incremental schedules) in effect on February 28, 2018.

4.  Health Care Savings (Citywide)

The May 5, 2014 Letter Agreement regarding health savings and welfare fund contributions between the City of New York and the Municipal Labor Committee, will be attached as an Appendix, and is deemed part of this Agreement.

5.  Terminal Leave

The resolution of the Board of Estimate of the City of New York dated June 27, 1957, states the following:

> *Members of the Force shall be granted terminal leave with pay upon retirement not to exceed one month for every ten years of service, pro-rated for a fractional part thereof, provided, however, that no terminal leave shall be granted to an employee against whom departmental disciplinary charges are pending.*

2

Case 23-1, Document 76, 01/25/2023, 3458054, Page215 of 296

Effective July 1, 2016, the parties agree that such Employees as described in the Resolution above and are entitled to payment shall now be entitled to voluntarily choose the option of a one-time lump sum payment as their terminal leave benefit in lieu of their current terminal leave benefit prior to retirement. Such payments shall be made as soon as practicable after retirement.

In the event that a change in legislation is needed to effectuate this agreement, the parties agree to jointly support the necessary legislation to implement the terms of this Section 5.

6. Release Time

Effective July 1, 2016, four additional full-time release positions, with pay, shall be available for use by designated Union officials. The release time shall be used in a manner consistent with Mayoral Executive Order 75.

7. Suspension of Civil Legal Defense Fund Contribution

Effective April 1, 2016, the City's contributions to the Civil Legal Defense Fund shall be suspended until the expiration of this Agreement, and be restored effective March 1, 2019.

8. Thirty-Day Suspension Review Committee

   a. The Department will create a Thirty (30) Day Suspension Review Committee to review appeals of suspensions of Correction Officers suspended for a period of greater than thirty (30) days without pay for involvement in impermissible Use of Force or line of duty incidents. All such suspensions will be heard by the committee on a case-by-case basis.

   b. The Suspension Review Committee shall be headed by a Chairperson designated by the Commissioner, whose duty it shall be to convene the committee.

   c. The Committee will consist of five (5) voting members:
      i. The Chairperson
      ii. The Chief of Department or designee;
      iii. Warden from the facility to which the suspended officer is assigned;
      iv. Investigation Division Representative;
      v. Union or Line Representative.

   d. The Committee shall meet on a monthly basis, or more often if necessary, to review any suspensions of greater than thirty (30) days for involvement in impermissible Use of Force or line of duty incidents, which have not been revoked under the existing procedures.

3

e. The Committee will issue a recommendation to the Commissioner as to whether the member should be returned to regular or modified duty after serving the first thirty (30) days of the suspension.

f. Final authority to return a suspended officer to duty will remain within the sole and exclusive discretion of the Commissioner.

9. <u>Mutual Exchange of Tours</u>

a. Commanding Officers shall permit members performing similar duties to exchange tours voluntarily when there is no interference with correction service and where such exchange of tours does not result in overtime for either member.

b. All mutuals shall be between two members and completed within a two week period. "Self-mutuals" are expressly prohibited.

10. <u>Military Leave</u>

The side letter to the 2009-2011 COBA Agreement concerning military leave shall be incorporated into the parties' Collective Bargaining Agreement.

11. <u>Uniforms</u>

a. DOC will establish procedures to ensure that the office of the Chief of Security will maintain new uniform shirts and pants to be made available to Correction Officers who are splashed with bodily fluids. When a Correction Officer is splashed with bodily fluids, he or she will submit a form created by DOC to the office of the Chief of Security. The Officer will then be supplied with a replacement shirt and/or pants. Such procedure will replace the current procedure providing reimbursement for purchase of soiled uniforms.

b. DOC will meet with the Union to explore methods of reducing the cost of purchasing uniforms.

12. <u>Medical Practice Review Committee</u>

DOC agrees to establish a Medical Practice Review Committee, which shall include a representative from the Union, to conduct fact finding and issue recommendations for improved medical practices at the Health Management Division.

4

Case 23-1, Document 76, 01/25/2023, 3458054, Page217 of 296

13. Labor-Management Committee on Facilities

   a. The parties will convene, within thirty (30) days of ratification of this MOA, a Labor-Management Committee to discuss and make recommendations on issues relating to locker room and bathroom facilities, including heating, hot water, showers, telephones, and locker space.

   b. The Committee will consist of:
      i. The Mayor's Office of Labor Relations Assistant Commissioner of Workforce Engagement and Innovation;
      ii. The Chief of Department or designee;
      iii. The Deputy Commissioner of Finance or designee;
      iv. The Deputy Commissioner of Quality Assurance or designee;
      v. The Assistant Commissioner for Environmental Health;
      vi. DOC Director of Labor Relations;
      vii. Union Representative.

   c. Within six (6) months after it convenes, the Committee will issue a report to the Commissioner on the matters discussed by the committee, including any recommended changes or improvements to locker room or bathroom facilities. The Commissioner will issue a response within ninety (90) days of receipt of the Committee's report.

14. Other Labor-Management Committees

   a. The parties agree to convene, at the Union's request, a Labor-Management committee which shall include representative(s) from the Mayor's Office of Labor Relations to discuss any impact on COBA members of changes in the Department's headcount.

   b. A Labor-Management committee will be established with representatives of the Department of Correction and the COBA to study and review the current grievance procedure with the intent of developing procedures to expedite the process.

   c. The Union and the Department shall establish a joint committee which shall meet on a regular basis to discuss and consider appropriate means of resolving health and safety issues.

Case 23-1, Document 76, 01/25/2023, 3458054, Page218 of 296

15. Annual Leave Donation Program

a. The City of New York and the COBA, in order to assist Correction Officers who have exhausted all available leave and need to take a prolonged absence from duty due to the medical emergency of an immediate family member, have agreed to implement a Pilot Program entitled "Annual Leave Donation Program," which shall expire on October 31, 2018. Correction Officers who anticipate using a significant amount of leave to resolve issues caused by a major illness or medical condition of an immediate family member, may apply. The Pilot Program will be sponsored by the Department.

b. All Correction Officers are eligible to participate as donors or recipients. Donations of accrued annual leave must be made in full day increments and will be debited from the donor's annual leave balance after review of the form and credited to the annual leave bank as full days. Only accrued annual vacation leave may be donated. Any time which is not vacation is not eligible for this program. All donations of accrued annual leave are voluntary. Donations cannot be directed to a particular Correction Officer. Donations will be included in a pool of annual leave to be dispersed by a joint Labor-Management panel. Donations into the "Annual Leave Donation Program" are not permitted in the calendar year of a Correction Officer's separation from the Department, and any such donations shall be retroactively withdrawn and returned to the individual.

c. A Correction Officer must have donated at least one vacation day to the pool to be eligible for a disbursement during the life of the Pilot Program. A Correction Officer may donate a maximum of five vacation days per calendar year. Upon depleting all accrued personal leave, including compensatory time, a Correction Officer may receive a maximum disbursement equal to one year's vacation time that would be accrued by the Correction Officer in the same year. In cases of extreme hardship, the Labor-Management Panel may waive the required donation to the "Annual Leave Donation Program" prior to a disbursement, as well as the maximum disbursement and donation limits.

d. All decisions concerning the implementation of the "Annual Leave Donation Program" and the eligibility of the donor/donee will be mutually agreed upon by the Labor-Management panel. All decisions must comply with IRS Revenue Ruling 90-29. The decisions of the Labor-Management panel are final and not subject to review, appeal or any grievance procedures. The Labor-Management panel shall consist of four members, two members each from the COBA and the Department. A majority vote is necessary to receive a disbursement from the program.

e. This "Annual Leave Donation Program" shall only be implemented in accordance with IRS Revenue Ruling 90-29 and as required by law.

16. Coordination of Tours for Child/Family Care Issues

In an effort to assist Correction Officers who are experiencing child care/family issues and have a member of the department with whom they share child or family care duties, the Department shall implement a Pilot Program for twelve (12) months that will permit Correction Officers to request a change of tour within their assigned command or request transfer to a command with an opening on their desired tour, subject to the operational needs of the Department. Correction Officers requesting said accommodations must submit documentation, to be determined by DOC, detailing the reasons for the accommodation. The request will not be unreasonably denied.

Agreed to, this 30 day of December 2015.

FOR THE CITY OF NEW YORK

By: _____

ROBERT W. LINN
Commissioner of Labor Relations

FOR THE CORRECTION OFFICERS' BENEVOLENT ASSOCIATION

By: _____

NORMAN SEABROOK
President

7



THE CITY OF NEW YORK

# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, NY 10006-1705
http://nyc.gov/olr

**ROBERT W. LINN**
*Commissioner*

May 5, 2014

Harry Nespoli
Chair, Municipal Labor Committee
125 Barclay Street
New York, NY 10007

Dear Mr. Nespoli:

This is to confirm the parties' mutual understanding concerning the following issues:

1.      Unless otherwise agreed to by the parties, the Welfare Fund contribution will remain
constant for the length of the successor unit agreements, including the $65 funded from the
Stabilization Fund pursuant to the 2005 Health Benefits Agreement between the City of New
York and the Municipal Labor Committee.

2.      Effective July 1, 2014, the Stabilization Fund shall convey $1 Billion to the City of New
York to be used to support wage increases and other economic items for the current round of
collective bargaining (for the period up to and including fiscal year 2018). Up to an additional
total amount of $150 million will be available over the four year period from the Stabilization
Fund for the welfare funds, the allocation of which shall be determined by the parties. Thereafter,
$ 60 million per year will be available from the Stabilization Fund for the welfare funds, the
allocation of which shall be determined by the parties.

3.      If the parties decide to engage in a centralized purchase of Prescription Drugs, and
savings and efficiencies are identified therefrom, there shall not be any reduction in welfare fund
contributions.

4.      There shall be a joint committee formed that will engage in a process to select an
independent healthcare actuary, and any other mutually agreed upon additional outside expertise,
to develop an accounting system to measure and calculate savings.

Case 23-1, Document 76, 01/25/2023, 3458054, Page221 of 296

5.     The MLC agrees to generate cumulative healthcare savings of $3.4 billion over the course of Fiscal Years 2015 through 2018, said savings to be exclusive of the monies referenced in Paragraph 2 above and generated in the individual fiscal years as follows: (i) $400 million in Fiscal Year 2015; (ii) $700 million in Fiscal Year 2016; (iii) $1 billion in Fiscal Year 2017; (iv) $1.3 billion in Fiscal Year 2018; and (v) for every fiscal year thereafter, the savings on a citywide basis in health care costs shall continue on a recurring basis. At the conclusion of Fiscal Year 2018, the parties shall calculate the savings realized during the prior four-year period. In the event that the MLC has generated more than $3.4 billion in cumulative healthcare savings during the four-year period, as determined by the jointly selected healthcare actuary, up to the first $365 million of such additional savings shall be credited proportionately to each union as a one-time lump sum pensionable bonus payment for its members. Should the union desire to use these funds for other purposes, the parties shall negotiate in good faith to attempt to agree on an appropriate alternative use. Any additional savings generated for the four-year period beyond the first $365 million will be shared equally with the City and the MLC for the same purposes and subject to the same procedure as the first $365 million. Additional savings beyond $1.3 billion in FY 2018 that carry over into FY 2019 shall be subject to negotiations between the parties.

6.     The following initiatives are among those that the MLC and the City could consider in their joint efforts to meet the aforementioned annual and four-year cumulative savings figures: minimum premium, self-insurance, dependent eligibility verification audits, the capping of the HIP HMO rate, the capping of the Senior Care rate, the equalization formula, marketing plans, Medicare Advantage, and the more effective delivery of health care.

7.     <u>Dispute Resolution</u>

   a.  In the event of any dispute under this agreement, the parties shall meet and confer in an attempt to resolve the dispute. If the parties cannot resolve the dispute, such dispute shall be referred to Arbitrator Martin F. Scheinman for resolution.
   b.  Such dispute shall be resolved within 90 days.
   c.  The arbitrator shall have the authority to impose interim relief that is consistent with the parties' intent.
   d.  The arbitrator shall have the authority to meet with the parties at such times as the arbitrator determines is appropriate to enforce the terms of this agreement.
   e.  If the parties are unable to agree on the independent health care actuary described above, the arbitrator shall select the impartial health care actuary to be retained by the parties.
   f.  The parties shall share the costs for the arbitrator and the actuary the arbitrator selects.

2

Case 23-1, Document 76, 01/25/2023, 3458054, Page222 of 296

If the above accords with your understanding and agreement, kindly execute the signature line provided.

Sincerely,

Robert W. Linn
Commissioner

Agreed and Accepted on behalf of the Municipal Labor Committee

BY: _____
Harry Nespoli, Chair

3



# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, N.Y. 10006-1705
nyc.gov/olr

ROBERT W. LINN
*Commissioner*
RENEE CAMPION
*First Deputy Commissioner*
CLAIRE LEVITT
*Deputy Commissioner*
 *Health Care Cost Management*

MAYRA E. BELL
*General Counsel*
GEORGETTE GESTELY
*Director, Employee Benefits Program*

December 3ᵉ 2015

Norman Seabrook
President
Correction Officers' Benevolent Association
75 Broad Street, Suite 810
New York, NY 10004

### Re: 2011-2019 COBA Collective Bargaining Agreement

Dear Mr. Seabrook:

This letter serves to confirm the parties' mutual understanding concerning the Rikers Island
Central Arrest Unit.

a.  In order to provide a safe environment, the Department of Correction shall, in
    coordination with the Bronx District Attorney's Office, create a Rikers Island Central
    Arrest Unit in order to more effectively pursue re-arrest for aggravated harassment and
    assault on Correction Officers committed by inmates while incarcerated.

b.  Commanding Officers shall report, as soon as possible, to the Office of Commissioner
    and to the Chief of the Department that an assault upon a correction officer has been
    reported to him/her. The Office of the Chief of Security shall investigate and file a
    complete report as soon as possible to the Office of the Commissioner and to the Chief of
    the Department. The full report shall be signed by the correction officer to acknowledge
    that he/she has seen the report and he/she may append a statement to such report.

c.  The Chief of Security shall notify the correction officer of its readiness to assist the
    correction officer. This assistance is intended solely to apply to the criminal aspect of
    any case arising from such assault.

d. The Department shall be responsible for collecting data on every Correction Officer assaulted and must upon request provide the Union with such information/data.

e. The provisions in Operation Order 52/89 shall apply.

If the above accords with your understanding, please countersign below.

Sincerely,

Robert W. Linn

ACCEPTED AND AGREED ON BEHALF OF COBA

BY: _____

Norman Seabrook
President

2

Case 23-1, Document 76, 01/25/2023, 3458054, Page225 of 296



# OFFICE OF LABOR RELATIONS

40 Rector Street, New York, N.Y. 10006-1705

nyc.gov/olr

**ROBERT W. LINN**
*Commissioner*
**RENEE CAMPION**
*First Deputy Commissioner*
**CLAIRE LEVITT**
*Deputy Commissioner*
  *Health Care Cost Management*

**MAYRA E. BELL**
*General Counsel*
**GEORGETTE GESTELY**
*Director, Employee Benefits Program*

December 3, 2015

Norman Seabrook
President
Correction Officers' Benevolent Association
75 Broad Street, Suite 810
New York, NY 10004

**Re: 2011-2019 COBA Collective Bargaining Agreement**

Dear Mr. Seabrook:

This letter serves to confirm the parties' mutual understanding concerning the issuance of "good guy letters" by the Department of Correction. The Department, in consultation with the New York City Law Department, will develop criteria for the Department to consider when deciding if a Correction Officer will be issued a "good guy letter" upon his or her retirement.

If the above accords with your understanding, please countersign below.

Sincerely,

Robert W. Linn

ACCEPTED AND AGREED ON BEHALF OF COBA
BY:

Norman Seabrook
President



**OFFICE OF LABOR RELATIONS**

40 Rector Street, New York, N.Y. 10006-1705

nyc.gov/olr

ROBERT W. LINN
*Commissioner*
RENEE CAMPION
*First Deputy Commissioner*
CLAIRE LEVITT
*Deputy Commissioner*
  *Health Care Cost Management*

MAYRA E. BELL
*General Counsel*
GEORGETTE GESTELY
*Director, Employee Benefits Program*

December 3, 2015

Norman Seabrook
President
Correction Officers' Benevolent Association
75 Broad Street, Suite 810
New York, NY 10004

**Re: 2011-2019 COBA Collective Bargaining Agreement**

Dear Mr. Seabrook:

The parties agree to complete and unequivocal support for State legislation to provide for amendment of the disability pension benefit, as indicated in the attached draft, modified as necessary to apply to Correction Officers and subject only to technical revisions. The parties agree to jointly support a "Home Rule" message in order to enact such legislation.

The parties agree that they will not support or advocate for alternative legislation.

If the above accords with your understanding, please countersign below.

Sincerely,

Robert W. Linn

ACCEPTED AND AGREED ON BEHALF OF COBA

BY:
Norman Seabrook
President

DRAFT FOR DISCUSSION PURPOSES ONLY

AN ACT    to amend the retirement and social security law,
in relation to disability benefits for certain
members of the New York city fire department
pension fund

The People of the State of New York, represented in Senate and Assembly, do

enact as follows:

1    Section one. Subdivision 24 of section 501 of the retirement and social security

2    law, as amended by chapter 18 of the laws of 2012, is amended to read as follows:

3    24. "Wages" shall mean regular compensation earned by and paid to a member by

4    a public employer, except that for members who first join the state and local employees'

5    retirement system on or after January first, two thousand ten, overtime compensation paid in any

6    year in excess of the overtime ceiling, as defined by this subdivision, shall not be included in the

7    definition of wages. "Overtime compensation" shall mean, for purposes of this section,

8    compensation paid under any law or policy under which employees are paid at a rate greater than

9    their standard rate for additional hours worked beyond those required, including compensation

10   paid under section one hundred thirty-four of the civil service law and section ninety of the

11   general municipal law. The "overtime ceiling" shall mean fifteen thousand dollars per annum on

12   January first, two thousand ten, and shall be increased by three percent each year thereafter,

13   provided, however, that for members who first become members of the New York state and local

14   employees' retirement system on or after April first, two thousand twelve, "overtime ceiling"

15   shall mean fifteen thousand dollars per annum on April first, two thousand twelve, and shall be

16   increased each year thereafter by a percentage to be determined annually by reference to the

17   consumer price index (all urban consumers, CPI-U, U.S. city average, all items, 1982-84=100),

18   published by the United States bureau of labor statistics, for each applicable calendar year. Said

19   percentage shall equal the annual inflation as determined from the increase in the consumer price

1

Case 23-1, Document 76, 01/25/2023, 3458054, Page228 of 296

DRAFT FOR DISCUSSION PURPOSES ONLY

1    index in the one year period ending on the December thirty-first prior to the cost-of-living

2    adjustment effective on the ensuing April first. For the purpose of calculation a member's

3    primary federal social security retirement or disability benefit, wages shall, in any calendar year,

4    be limited to the portion of the member's wages which would be subject to tax under section

5    three thousand one hundred twenty-one of the internal revenue code of nineteen hundred fifty-

6    four, or any predecessor or successor provision relating thereto, if such member was employed

7    by a private employer. For members who first become members of the New York state and local

8    employees' retirement system on or after the effective date of the chapter of the laws of two

9    thousand twelve which amended this subdivision, the following items shall not be included in the

10   definition of wages: (a) wages in excess of the annual salary paid to the governor pursuant to

11   section three of article four of the state constitution, (b) lump sum payments for deferred

12   compensation, sick leave, accumulated vacation or other credits for time not worked, (c) any

13   form of termination pay, (d) any additional compensation paid in anticipation of retirement, and

14   (e) in the case of employees who receive wages from three or more employers in a twelve month

15   period, the wages paid by the third and each successive employer. For New York city enhanced

16   plan members who receive the ordinary disability benefit provided for in subdivision c-1 of

17   section five hundred six of this article or the accidental disability benefit provided for in

18   paragraph three of subdivision c of section five hundred seven of this article, the following items

19   shall not be included in the definition of wages: (a) lump sum payments for deferred

20   compensation, sick leave, accumulated vacation or other credits for time not worked, (b) any

21   form of termination pay, (c) any additional compensation paid in anticipation of retirement, and

22   (d) in the case of employees who receive wages from three or more employers in a twelve month

23   period, the wages paid by the third and each successive employer.

DRAFT FOR DISCUSSION PURPOSES ONLY

1       § 2. Section 501 of the retirement and social security law is amended by adding a

2 new subdivision 27 to read as follows:

3       27. "New York city enhanced plan member" shall mean (a) a New York city

4 police/fire revised plan member who becomes subject to the provisions of this article on or after

5 April first, two thousand sixteen and who is a member of the New York city fire department

6 pension fund, (b) a police/fire member who became subject to the provisions of this article

7 before April first, two thousand sixteen, who is a member of the New York city fire department

8 pension fund, and who makes an election, which shall be duly executed and filed with the

9 administrative head of such pension fund no later than one hundred twenty days after the

10 effective date of this subdivision and shall be irrevocable, to be subject to the provisions of this

11 article related to New York city enhanced plan members, or (c) a New York city police/fire

12 revised plan member who became subject to the provisions of this article before April first, two

13 thousand sixteen, who is a member of the New York city fire department pension fund, and who

14 makes an election, which shall be duly executed and filed with the administrative head of such

15 pension fund no later than one hundred twenty days after the effective date of this subdivision

16 and shall be irrevocable, to be subject to the provisions of this article related to New York city

17 enhanced plan members.

18       § 3. Section 506 of the retirement and social security law is amended by adding a

19 new subdivision c-1 to read as follows:

20       c-1. Notwithstanding the provisions of subdivisions a and b of this section, the

21 ordinary disability benefit for a New York city enhanced plan member shall be a pension equal

22 to the greater of (i) thirty-three and one-third percent of final average salary, or (ii) two percent

23 of final average salary times years of credited service not in excess of the maximum years of

Case 23-1, Document 76, 01/25/2023, 3458054, Page230 of 296

DRAFT FOR DISCUSSION PURPOSES ONLY

1    service for computing service retirement, such benefit in each case to be reduced by one hundred

2    percent of any workmen's compensation benefits payable.

3         § 4. Subdivisions c and e of section 507 of the retirement and social security law,

4    subdivision c as amended by chapter 18 of the laws of 2012, and subdivision e as added by

5    chapter 890 of the laws of 1976, are amended to read as follows:

6         c. 1. In the case of a member of a retirement system other than the New York state

7    and local employees' retirement system, the New York state teachers' retirement system, the New

8    York city employees' retirement system, the New York city board of education retirement system

9    or the New York city teachers' retirement system, or in the case of a member of the New York

10   city employees' retirement system who is a New York city uniformed correction/sanitation

11   revised plan member or an investigator revised plan member, the accidental disability benefit

12   hereunder shall be a pension equal to two percent of final average salary times years of credited

13   service which such member would have attained if employment had continued until such

14   member's full escalation date, not in excess of the maximum years of service creditable for the

15   normal service retirement benefit, less (i) fifty percent of the primary social security disability

16   benefit, if any, as provided in section five hundred eleven of this article, and (ii) one hundred

17   percent of any workers' compensation benefits payable. The provisions of this paragraph shall

18   not apply to New York city enhanced plan members.

19        2. In the case of a member of the New York state and local employees' retirement

20   system, the New York state teachers' retirement system, the New York city employees'

21   retirement system (other than a New York city uniformed correction/sanitation revised plan

22   member or an investigator revised plan member), the New York city board of education

23   retirement system or the New York city teachers' retirement system, the accidental disability

4

DRAFT FOR DISCUSSION PURPOSES ONLY

1   benefit hereunder shall be a pension equal to sixty percent of final average salary, less (i) fifty

2   percent of the primary social security disability benefit, if any, as provided in section five

3   hundred eleven of this article, and (ii) one hundred percent of any workers' compensation

4   benefits payable. In the event a disability retiree from any retirement system is not eligible for

5   the primary social security disability benefit and continues to be eligible for disability benefits

6   hereunder, such disability benefit shall be reduced by one-half of such retiree's primary social

7   security retirement benefit, commencing at age sixty-two, in the same manner as provided for

8   service retirement benefits under section five hundred eleven of this article.

9   3. In the case of a New York city enhanced plan member, the accidental disability

10   benefit hereunder shall be a pension equal to seventy-five percent of final average salary, less

11   one hundred percent of any workers' compensation benefits payable.

12   e. A member, except a New York city enhanced plan member, shall not be

13   eligible to apply for disability benefits under section five hundred six or this section unless such

14   member shall, at the time of application, sign a waiver prepared by the retirement system and

15   approved by the administrative head of such system pursuant to which such member agrees to

16   waive the benefits of any statutory presumption relating to the cause of disability or eligibility

17   for disability benefits, and a determination of eligibility for benefits hereunder shall be made

18   without regard to any such statutory provision.

19   § 5. Section 507 of the retirement and social security law is amended by adding a

20   new subdivision j to read as follows:

21   j. Notwithstanding any inconsistent provision of this chapter or any law, any

22   condition of impairment of health caused by diseases of the lung, resulting in disability or death

23   to a member of the New York city fire department pension fund who is a New York city

1    enhanced plan member, who successfully passed a physical examination on entry into service as

2    a firefighter, which examination failed to disclose evidence of any disease or other impairment of

3    the lung, shall be presumptive evidence that it was incurred in the performance and discharge of

4    duty, unless the contrary be proved by competent evidence.

5    § 6. Section 510 of the retirement and social security law is amended by adding a

6    new subdivision i to read as follows:

7    i. Notwithstanding any other provision of this article, the annual escalation

8    provided in this section shall not apply to the ordinary disability benefit for New York city

9    enhanced plan members provided for in subdivision c-1 of section five hundred six of this article

10    or the accidental disability benefit for New York city enhanced plan members provided for in

11    paragraph three of subdivision c of section five hundred seven of this article. Such members who

12    receive such ordinary disability benefit or accidental disability benefit shall have a cost-of-living

13    adjustment for such benefit, which shall be computed in the same manner as provided for by

14    section 13-696 of the administrative code of the city of New York.

15    § 7. Section 511 of the retirement and social security law is amended by adding a

16    new subdivision g to read as follows:

17    g. This section shall not apply to a New York city enhanced plan member who

18    receives the ordinary disability benefit provided for in subdivision c-1 of section five hundred six

19    of this article or the accidental disability benefit provided for in paragraph three of subdivision c

20    of section five hundred seven of this article.

21    § 8. Subdivision a of section 512 of the retirement and social security law, as

22    amended by chapter 18 of the laws of 2012, is amended to read as follows:

Case 23-1, Document 76, 01/25/2023, 3458054, Page233 of 296

DRAFT FOR DISCUSSION PURPOSES ONLY

1        a. A member's final average salary shall be the average wages earned by such a

2    member during any three consecutive years which provide the highest average wage; provided,

3    however, if the wages earned during any year included in the period used to determine final

4    average salary exceeds that of the average of the previous two years by more than ten percent,

5    the amount in excess of ten percent shall be excluded from the computation of final average

6    salary. Notwithstanding the preceding provisions of this subdivision to the contrary, for a

7    member who first becomes a member of the New York state and local employees' retirement

8    system on or after April first, two thousand twelve, or for a New York city police/fire revised

9    plan member, a New York city enhanced plan member who receives the ordinary disability

10    benefit provided for in subdivision c-1 of section five hundred six of this article or the accidental

11    disability benefit provided for in paragraph three of subdivision c of section five hundred seven

12    of this article, a New York city uniformed correction/sanitation revised plan member or an

13    investigator revised plan member, a member's final average salary shall be the average wages

14    earned by such a member during any five consecutive years which provide the highest average

15    wage; provided, however, if the wages earned during any year included in the period used to

16    determine final average salary exceeds that of the average of the previous four years by more

17    than ten percent, the amount in excess of ten percent shall be excluded from the computation of

18    final average salary. In determining final average salary pursuant to any provision of this

19    subdivision, where the period used to determine final average salary is the period which

20    immediately precedes the date of retirement, any month or months (not in excess of twelve)

21    which would otherwise be included in computing final average salary but during which the

22    member was on authorized leave of absence at partial pay or without pay shall be excluded from

DRAFT FOR DISCUSSION PURPOSES ONLY

1    the computation of final average salary and the month or an equal number of months

2    immediately preceding such period shall be substituted in lieu thereof.

3          § 9. Section 517 of the retirement and social security law is amended by adding

4    new subdivisions h and i to read as follows:

5          h. Notwithstanding any inconsistent provision in subdivision a of this section,

6    New York city enhanced plan members shall, as of the effective date of this subdivision,

7    contribute six percent of annual wages to the pension fund in which they have membership.

8          i. The amount of any additional contributions relating to the chapter of the laws of

9    2016 which amended this subdivision that are required to be paid by the city of New York to the

10    New York city fire department pension fund pursuant to section 13-638.2 of the administrative

11    code of the city of New York or section 13-638.3 of such code, as added by chapter 610 of the

12    laws of 1991, shall not be less than two million five hundred thousand dollars ($2,500,000) in the

13    fiscal year of the city of New York commencing July 1, 2016, four million two hundred fifty

14    thousand dollars ($4,250,000) in the fiscal year of the city of New York commencing July 1,

15    2017, five million nine hundred fifty thousand dollars ($5,950,000) in the fiscal year of the city

16    of New York commencing July 1, 2018, and seven million six hundred fifty thousand dollars

17    ($7,650,000) in the fiscal year of the city of New York commencing July 1, 2019.

18          § 10. This act shall take effect immediately.

Case 23-1, Document 76, 01/25/2023, 3458054, Page235 of 296



# New York State

# Constitution

*As revised, including amendments*
*effective January 1, 2015*

**ANDREW M. CUOMO**
*Governor*

**CESAR A. PERALES**
*Secretary of State*

This edition of the *New York State Constitution, available at: www.dos.ny.gov,* is provided as a public service by the:

**Department of State**
**Division of Administrative Rules**
**One Commerce Plaza**
**99 Washington Avenue**
**Albany, NY 12231-0001**

*Phone*:  (518) 474-6957
*Fax*:  (518) 473-9055
*E-mail*:  adminrules@dos.ny.gov

*For more information about New York State,*
*please visit: www.ny.gov*

# THE CONSTITUTION OF
# THE
# STATE OF NEW YORK

As Revised, with Amendments adopted by the
Constitutional Convention of 1938 and Approved
by Vote of the People on November 8, 1938
and
Amendments subsequently adopted by the
Legislature and Approved by Vote of the People.

As Amended and in Force Since January 1, 2015

## ARTICLE I
### BILL OF RIGHTS

§1. Rights, privileges and franchise secured; power of legislature to dispense with primary elections in certain cases.
2. Trial by jury; how waived.
3. Freedom of worship; religious liberty.
4. Habeas corpus.
5. Bail; fines; punishments; detention of witnesses.
6. Grand jury; protection of certain enumerated rights; duty of public officers to sign waiver of immunity and give testimony; penalty for refusal.
7. Compensation for taking private property; private roads; drainage of agricultural lands.
8. Freedom of speech and press; criminal prosecutions for libel.
9. Right to assemble and petition; divorce; lotteries; pool-selling and gambling; laws to prevent; pari-mutuel betting on horse races permitted; games of chance, bingo or lotto authorized under certain restrictions.
10. *Repealed*
11. Equal protection of laws; discrimination in civil rights prohibited.
12. Security against unreasonable searches, seizures and interceptions.
13. *Repealed*
14. Common law and acts of the colonial and state legislatures.
15. *Repealed*
16. Damages for injuries causing death.
17. Labor not a commodity; hours and wages in public work; right to organize and bargain collectively.
18. Workers' compensation.

## ARTICLE II
### SUFFRAGE

§1. Qualifications of voters.
2. Absentee voting.
3. Persons excluded from the right of suffrage.
4. Certain occupations and conditions not to affect residence.
5. Registration and election laws to be passed.
6. Permanent registration.
7. Manner of voting; identification of voters.
8. Bi-partisan registration and election board.
9. Presidential elections; special voting procedures authorized.

## ARTICLE III
### LEGISLATURE

§1. Legislative power.
2. Number and terms of senators and assemblymen.
3. Senate districts.
4. Readjustments and reapportionments; when federal census to control.
5. Apportionment of assemblymen; creation of assembly districts.

5-a. Definition of inhabitants.
5-b. Independent redistricting commission.
6. Compensation, allowances and traveling expenses of members.
7. Qualifications of members; prohibitions on certain civil appointments; acceptance to vacate seat.
8. Time of elections of members.
9. Powers of each house.
10. Journals; open sessions; adjournments.
11. Members not to be questioned for speeches.
12. Bills may originate in either house; may be amended by the other.
13. Enacting clause of bills; no law to be enacted except by bill.
14. Manner of passing bills; message of necessity for immediate vote.
15. Private or local bills to embrace only one subject, expressed in title.
16. Existing law not to be made applicable by reference.
17. Cases in which private or local bills shall not be passed.
18. Extraordinary sessions of the legislature; power to convene on legislative initiative.
19. Private claims not to be audited by legislature; claims barred by lapse of time.
20. Two-thirds bills.
21. Certain sections not to apply to bills recommended by certain commissioners or public agencies.
22. Tax laws to state tax and object distinctly; definition of income for income tax purposes by reference to federal laws authorized.
23. When yeas and nays necessary; three-fifths to constitute quorum.
24. Prison labor; contract system abolished.
25. Emergency governmental operations; legislature to provide for.

## ARTICLE IV
### EXECUTIVE

§1. Executive power; election and terms of governor and lieutenant-governor.
2. Qualifications of governor and lieutenant-governor.
3. Powers and duties of governor; compensation.
4. Reprieves, commutations and pardons; powers and duties of governor relating to grants of.
5. When lieutenant-governor to act as governor.
6. Duties and compensation of lieutenant-governor; succession to the governorship.
7. Action by governor on legislative bills; reconsideration after veto.
8. Departmental rules and regulations; filing; publication.

## ARTICLE V
### OFFICERS AND CIVIL DEPARTMENTS

§1. Comptroller and attorney-general; payment of state moneys without audit void.
2. Civil departments in the state government.
3. Assignment of functions.
4. Department heads.
5. *Repealed*
6. Civil service appointments and promotions; veterans' credits.
7. Membership in retirement systems; benefits not to be diminished nor impaired.

1

**FILED: KINGS COUNTY CLERK 10/08/2019 02:88 PM**

INDEX NO. 518540/2019

NYSCEF DOC. NO. 205

Case 23-1, Document 75, 01/25/2023, 3456034, Page238 of 296

The Constitution of the State of New York

RECEIVED NYSCEF: 10/08/2019

## ARTICLE VI
### JUDICIARY

§1. Unified court system; organization; process.
2. Court of appeals; organization; designations; vacancies, how filled; commission on judicial nomination.
3. Court of appeals; jurisdiction.
4. Judicial departments; appellate divisions, how constituted; governor to designate justices; temporary assignments; jurisdiction.
5. Appeals from judgment or order; new trial.
6. Judicial districts; how constituted; supreme court.
7. Supreme court; jurisdiction.
8. Appellate terms; composition; jurisdiction.
9. Court of claims; jurisdiction.
10. County courts; judges.
11. County court; jurisdiction.
12. Surrogate's courts; judges; jurisdiction.
13. Family court; organization; jurisdiction.
14. Discharge of duties of more than one judicial office by same judicial officer.
15. New York city; city-wide courts; jurisdiction.
16. District courts; jurisdiction; judges.
17. Town, village and city courts; jurisdiction; judges.
18. Trial by jury; trial without jury; claims against state.
19. Transfer of actions and proceedings.
20. Judges and justices; qualifications; eligibility for other office or service; restrictions.
21. Vacancies; how filled.
22. Commission on judicial conduct; composition; organization and procedure; review by court of appeals; discipline of judges or justices.
23. Removal of judges.
24. Court for trial of impeachments; judgment.
25. Judges and justices; compensation; retirement.
26. Temporary assignments of judges and justices.
27. Supreme court; extraordinary terms.
28. Administrative supervision of court system.
29. Expenses of courts.
30. Legislative power over jurisdiction and proceedings; delegation of power to regulate practice and procedure.
31. Inapplicability of article to certain courts.
32. Custodians of children to be of same religious persuasion.
33. Existing laws; duty of legislature to implement article.
34. Pending appeals, actions and proceedings; preservation of existing terms of office of judges and justices.
35. Certain courts abolished; transfer of judges, court personnel, and actions and proceedings to other courts.
36. Pending civil and criminal cases.
36-a. Effective date of certain amendments to articles VI and VII.
36-b. *No section*
36-c. Effective date of certain amendments to article VI, section 22.
37. Effective date of article.

## ARTICLE VII
### STATE FINANCES

§1 Estimates by departments, the legislature and the judiciary of needed appropriations; hearings.
2. Executive budget.
3. Budget bills; appearances before legislature.
4. Action on budget bills by legislature; effect thereof.
5. Restrictions on consideration of other appropriations.
6. Restrictions on content of appropriation bills.
7. Appropriation bills.
8. Gift or loan of state credit or money prohibited; exceptions for enumerated purposes.
9. Short term state debts in anticipation of taxes, revenues and proceeds of sale of authorized bonds.
10. State debts on account of invasion, insurrection, war and forest fires.
11. State debts generally; manner of contracting; referendum.
12. State debts generally; how paid; contribution to sinking funds; restrictions on use of bond proceeds.
13. Refund of state debts.
14. State debt for elimination of railroad crossings at grade; expenses; how borne; construction and reconstruction of state highways and parkways.
15. Sinking funds; how kept and invested; income therefrom and application thereof.
16. Payment of state debts; when comptroller to pay without appropriation.
17. Authorizing the legislature to establish a fund or funds for tax revenue stabilization reserves; regulating payments thereto and withdrawals therefrom.
18. Bonus on account of service of certain veterans in World War II.
19. State debt for expansion of state university.

## ARTICLE VIII
### LOCAL FINANCES

§1. Gift or loan of property or credit of local subdivisions prohibited; exceptions for enumerated purposes.
2. Restrictions on indebtedness of local subdivisions; contracting and payment of local indebtedness; exceptions.
2-a. Local indebtedness for water supply, sewage and drainage facilities and purposes; allocations and exclusions of indebtedness.
3. Restrictions on creation and indebtedness of certain corporations.
4. Limitations on local indebtedness.
5. Ascertainment of debt-incurring power of counties, cities, towns and villages; certain indebtedness to be excluded.
6. Debt-incurring power of Buffalo, Rochester and Syracuse; certain additional indebtedness to be excluded.
7. Debt-incurring power of New York city; certain additional indebtedness to be excluded.
7-a. Debt-incurring power of New York city; certain indebtedness for railroads and transit purposes to be excluded.
8. Indebtedness not to be invalidated by operation of this article.
9. When debt-incurring power of certain counties shall cease.
10. Limitations on amount to be raised by real estate taxes for local purposes; exceptions.
10-a. Application and use of revenues: certain public improvements.
11. Taxes for certain capital expenditures to be excluded from tax limitation.
12. Powers of local governments to be restricted; further limitations on contracting local indebtedness authorized.

## ARTICLE IX
### LOCAL GOVERNMENTS

§1. Bill of rights for local governments.
2. Powers and duties of legislature; home rule powers of local governments; statute of local governments.
3. Existing laws to remain applicable; construction; definitions.

## ARTICLE X
### CORPORATIONS

§1. Corporations; formation of.
2. Dues of corporations.
3. Savings bank charters; savings and loan association charters; special charters not to be granted.
4. Corporations; definition; right to sue and be sued.
5. Public corporations; restrictions on creation and powers; accounts; obligations of.
6. Liability of state for payment of bonds of public corporation to construct state thruways; use of state canal lands and properties.

2

Case 23-1, Document 75, 01/25/2023, 3456064, Page239 of 296

The Constitution of the State of New York

7. Liability of state for obligations of the port of New York authority for railroad commuter cars; limitations.
8. Liability of state on bonds of a public corporation to finance new industrial or manufacturing plants in depressed areas.

## ARTICLE XI
### EDUCATION

§1. Common schools.
2. Regents of the University.
3. Use of public property or money in aid of denominational schools prohibited; transportation of children authorized.

## ARTICLE XII
### DEFENSE

§1. Defense; militia.

## ARTICLE XIII
### PUBLIC OFFICERS

§1. Oath of office; no other test for public office.
2. Duration of term of office.
3. Vacancies in office; how filled; boards of education.
4. Political year and legislative term.
5. Removal from office for misconduct.
6. When office to be deemed vacant; legislature may declare.
7. Compensation of officers.
8. Election and term of city and certain county officers.
9-12. *No sections 9-12*
13. Law enforcement and other officers.
14. Employees of, and contractors for, the state and local governments; wages, hours and other provisions to be regulated by legislature.

## ARTICLE XIV
### CONSERVATION

§1. Forest preserve to be forever kept wild; authorized uses and exceptions.
2. Reservoirs.
3. Forest and wild life conservation; use or disposition of certain lands authorized.
4. Protection of natural resources; development of agricultural lands.
5. Violations of article; how restrained.

## ARTICLE XV
### CANALS

§1. Disposition of canals and canal properties prohibited.
2. Prohibition inapplicable to lands and properties no longer useful; disposition authorized.
3. Contracts for work and materials; special revenue fund.
4. Lease or transfer to federal government of barge canal system authorized.

## ARTICLE XVI
### TAXATION

§1. Power of taxation; exemptions from taxation.
2. Assessments for taxation purposes.
3. Situs of intangible personal property; taxation of.
4. Certain corporations not to be discriminated against.
5. Compensation of public officers and employees subject to taxation.
6. Public improvements or services; contract of indebtedness; creation of public corporations.

## ARTICLE XVII
### SOCIAL WELFARE

§1. Public relief and care.
2. State board of social welfare; powers and duties.
3. Public health.
4. Care and treatment of persons suffering from mental disorder or defect; visitation of institutions for.
5. Institutions for detention of criminals; probation; parole; state commission of correction.
6. Visitation and inspection.
7. Loans for hospital construction.

## ARTICLE XVIII
### HOUSING

§1. Housing and nursing home accommodations for persons of low income; slum clearance.
2. *Idem;* powers of legislature in aid of.
3. Article VII to apply to state debts under this article, with certain exceptions; amortization of state debts; capital and periodic subsidies.
4. Powers of cities, towns and villages to contract indebtedness in aid of low rent housing and slum clearance projects; restrictions thereon.
5. Liability for certain loans made by the state to certain public corporations.
6. Loans and subsidies; restrictions on and preference in occupancy of projects.
7. Liability arising from guarantees to be deemed indebtedness; method of computing.
8. Excess condemnation.
9. Acquisition of property for purposes of article.
10. Power of legislature; construction of article.

## ARTICLE XIX
### AMENDMENTS TO CONSTITUTION

§1. Amendments to constitution; how proposed, voted upon and ratified; failure of attorney-general to render opinion not to affect validity.
2. Future constitutional conventions; how called; election of delegates; compensation; quorum; submission of amendments; officers; employees; rules; vacancies.
3. Amendments simultaneously submitted by convention and legislature.

## ARTICLE XX
### WHEN TO TAKE EFFECT

§1. Time of taking effect.

Case 23-1, Document 75, 01/25/2023, 3456054, Page240 of 296

# THE CONSTITUTION

[1][Preamble] WE THE PEOPLE of the State of New York, grateful to Almighty God for our Freedom, in order to secure its blessings, DO ESTABLISH THIS CONSTITUTION.

## ARTICLE I
BILL OF RIGHTS

[Rights, privileges and franchise secured; power of legislature to dispense with primary elections in certain cases]

Section 1.   No member of this state shall be disfranchised[2], or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land, or the judgment of his or her peers, except that the legislature may provide that there shall be no primary election held to nominate candidates for public office or to elect persons to party positions for any political party or parties in any unit of representation of the state from which such candidates or persons are nominated or elected whenever there is no contest or contests for such nominations or election as may be prescribed by general law. (Amended by vote of the people November 3, 1959; November 6, 2001.)[3]

[Trial by jury; how waived]

§2.   Trial by jury in all cases in which it has heretofore been guaranteed by constitutional provision shall remain inviolate forever; but a jury trial may be waived by the parties in all civil cases in the manner to be prescribed by law. The legislature may provide, however, by law, that a verdict may be rendered by not less than five-sixths of the jury in any civil case. A jury trial may be waived by the defendant in all criminal cases, except those in which the crime charged may be punishable by death, by a written instrument signed by the defendant in person in open court before and with the approval of a judge or justice of a court having jurisdiction to try the offense. The legislature may enact laws, not inconsistent herewith, governing the form, content, manner and time of presentation of the instrument effectuating such waiver. (Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

[Freedom of worship; religious liberty]

§3.   The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all humankind; and no person shall be rendered incompetent to be a witness on account of his or her opinions on matters of religious belief; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this state. (Amended by vote of the people November 6, 2001.)

[Habeas corpus]

§4.   The privilege of a writ or order of habeas corpus shall not be suspended, unless, in case of rebellion or invasion, the public safety requires it. (Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

[Bail; fines; punishments; detention of witnesses]

§5.   Excessive bail shall not be required nor excessive fines imposed, nor shall cruel and unusual punishments be inflicted, nor shall witnesses be unreasonably detained.

[Grand jury; protection of certain enumerated rights; duty of public officers to sign waiver of immunity and give testimony; penalty for refusal]

§6.   No person shall be held to answer for a capital or otherwise infamous crime (except in cases of impeachment, and in cases of militia when in actual service, and the land, air and naval forces in time of war, or which this state may keep with the consent of congress in time of peace, and in cases of petit larceny under the regulation of the legislature), unless on indictment of a grand jury, except that a person held for the action of a grand jury upon a charge for such an offense, other than one punishable by death or life imprisonment, with the consent of the district attorney, may waive indictment by a grand jury and consent to be prosecuted on an information filed by the district attorney; such waiver shall be evidenced by written instrument signed by the defendant in open court in the presence of his or her counsel. In any trial in any court whatever the party accused shall be allowed to appear and defend in person and with counsel as in civil actions and shall be informed of the nature and cause of the accusation and be confronted with the witnesses against him or her. No person shall be subject to be twice put in jeopardy for the same offense; nor shall he or she be compelled in any criminal case to be a witness against himself or herself, providing, that any public officer who, upon being called before a grand jury to testify concerning the conduct of his or her present office or of any public office held by him or her within five years prior to such grand jury call to testify, or the performance of his or her official duties in any such present or prior offices, refuses to sign a waiver of immunity against subsequent criminal prosecution, or to answer any relevant question concerning such matters before such grand jury, shall by virtue of such refusal, be disqualified from holding any other public office or public employment for a period of five years from the date of such refusal to sign a waiver of immunity against subsequent prosecution, or to answer any relevant question concerning such matters before such grand jury, and shall be removed from his or her present office by the appropriate authority or shall forfeit his or her present office at the suit of the attorney-general.

The power of grand juries to inquire into the wilful misconduct in office of public officers, and to find indictments or to direct the filing of informations in connection with such inquiries, shall never be suspended or impaired by law. No person shall be deprived of life, liberty or property without due process of law. (Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 8, 1949; November 3, 1959; November 6, 1973; November 6, 2001.)

[Compensation for taking private property; private roads; drainage of agricultural lands]

§7. (a) Private property shall not be taken for public use without just compensation.

(c) Private roads may be opened in the manner to be prescribed by law; but in every case the necessity of the road and the amount of all damage to be sustained by the opening thereof shall be first determined by a jury of freeholders, and such amount, together with the expenses of the proceedings, shall be paid by the person to be benefitted.

(d) The use of property for the drainage of swamp or agricultural lands is declared to be a public use, and general laws may be passed permitting the owners or occupants of swamp or agricultural lands to construct and maintain for the drainage thereof, necessary drains, ditches and dykes upon the lands of others, under proper restrictions, on making just compensation, and such compensation together with the cost of such drainage may be assessed, wholly or partly, against any property benefitted thereby; but no special laws shall be enacted for such purposes. (Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938. Subdivision (e) repealed by vote of the people November 5, 1963. Subdivision (b) repealed by vote of the people November 3, 1964.)

[Freedom of speech and press; criminal prosecutions for libel]

§8.   Every citizen may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions or indictments for libels, the truth may be given in

---

[1]  Section headings [enclosed in brackets], annotations and footnotes throughout this document are not in the official text.

[2]  As so in original.

[3]  Except where otherwise indicated, each section hereafter was re-enacted without change by the Constitutional Convention of 1938 and re-adopted by vote of the people November 8, 1938.

4

Case 23-1, Document 76, 01/25/2023, 3456064, Page241 of 296

**The Constitution of the State of New York**

evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact. (Amended by vote of the people November 6, 2001.)

**[Right to assemble and petition; divorce; lotteries; pool-selling and gambling; laws to prevent; pari-mutual betting on horse races permitted; games of chance, bingo or lotto authorized under certain restrictions]**
§9.  1.  No law shall be passed abridging the rights of the people peaceably to assemble and to petition the government, or any department thereof; nor shall any divorce be granted otherwise than by due judicial proceedings; except as hereinafter provided, no lottery or the sale of lottery tickets, pool-selling, book-making, or any other kind of gambling, except lotteries operated by the state and the sale of lottery tickets in connection therewith as may be authorized and prescribed by the legislature, the net proceeds of which shall be applied exclusively to or in aid or support of education in this state as the legislature may prescribe, except pari-mutual betting on horse races as may be prescribed by the legislature and from which the state shall derive a reasonable revenue for the support of government, and except casino gambling at no more than seven facilities as authorized and prescribed by the legislature shall hereafter be authorized or allowed within this state; and the legislature shall pass appropriate laws to prevent offenses against any of the provisions of this section. (Amendment approved by vote of the people November 5, 2013.)
  2.  Notwithstanding the foregoing provisions of this section, any city, town or village within the state may by an approving vote of the majority of the qualified electors in such municipality voting on a proposition therefor submitted at a general or special election authorize, subject to state legislative supervision and control, the conduct of one or both of the following categories of games of chance commonly known as: (a) bingo or lotto, in which prizes are awarded on the basis of designated numbers or symbols on a card conforming to numbers or symbols selected at random; (b) games in which prizes are awarded on the basis of a winning number or numbers, color or colors, or symbol or symbols determined by chance from among those previously selected or played, whether determined as the result of the spinning of a wheel, a drawing or otherwise by chance. If authorized, such games shall be subject to the following restrictions, among others which may be prescribed by the legislature: (1) only bona fide religious, charitable or non-profit organizations of veterans, volunteer firefighter and similar non-profit organizations shall be permitted to conduct such games; (2) the entire net proceeds of any game shall be exclusively devoted to the lawful purposes of such organizations; (3) no person except a bona fide member of any such organization shall participate in the management or operation of such game; and (4) no person shall receive any remuneration for participating in the management or operation of any such game. Unless otherwise provided by law, no single prize shall exceed two hundred fifty dollars, nor shall any series of prizes on one occasion aggregate more than one thousand dollars. The legislature shall pass appropriate laws to effectuate the purposes of this subdivision, ensure that such games are rigidly regulated to prevent commercialized gambling, prevent participation by criminal and other undesirable elements and the diversion of funds from the purposes authorized hereunder and establish a method by which a municipality which has authorized such games may rescind or revoke such authorization. Unless permitted by the legislature, no municipality shall have the power to pass local laws or ordinances relating to such games. Nothing in this section shall prevent the legislature from passing laws more restrictive than any of the provisions of this section. (Amendment approved by vote of the people November 7, 1939; further amended by vote of the people November 5, 1957; November 8, 1966; November 4, 1975; November 6, 1984; November 6, 2001.)

**Section 10 which dealt with ownership of lands, yellowtail tenures and escheat was repealed by amendment approved by vote of the people November 6, 1962**

**[Equal protection of laws; discrimination in civil rights prohibited]**
§11.  No person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed or religion, be subjected to any discrimination in his or her civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 6, 2001.)

**[Security against unreasonable searches, seizures and interceptions]**
§12.  The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
  The right of the people to be secure against unreasonable interception of telephone and telegraph communications shall not be violated, and ex parte orders or warrants shall issue only upon oath or affirmation that there is reasonable ground to believe that evidence of crime may be thus obtained, and identifying the particular means of communication, and particularly describing the person or persons whose communications are to be intercepted and the purpose thereof. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**Section 13 which dealt with purchase of lands of Indians was repealed by amendment approved by vote of the people November 6, 1962**

**[Common law and acts of the colonial and state legislatures]**
§14.  Such parts of the common law, and of the acts of the legislature of the colony of New York, as together did form the law of the said colony, on the nineteenth day of April, one thousand seven hundred seventy-five, and the resolutions of the congress of the said colony, and of the convention of the State of New York, in force on the twentieth day of April, one thousand seven hundred seventy-seven, which have not since expired, or been repealed or altered; and such acts of the legislature of this state as are now in force, shall be and continue the law of this state, subject to such alterations as the legislature shall make concerning the same. But all such parts of the common law, and such of the said acts, or parts thereof, as are repugnant to this constitution, are hereby abrogated. (Formerly §16. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**Section 15 which dealt with certain grants of lands and of charters made by the king of Great Britain and the state and obligations and contracts not to be impaired was repealed by amendment approved by vote of the people November 6, 1962**

**[Damages for injuries causing death]**
§16.  The right of action now existing to recover damages for injuries resulting in death, shall never be abrogated; and the amount recoverable shall not be subject to any statutory limitation. (Formerly §18. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Labor not a commodity; hours and wages in public work; right to organize and bargain collectively]**
§17.  Labor of human beings is not a commodity nor an article of commerce and shall never be so considered or construed.
  No laborer, worker or mechanic, in the employ of a contractor or sub-contractor engaged in the performance of any public work, shall be permitted to work more than eight hours in any day or more than five days in any week, except in cases of extraordinary emergency; nor shall he or she be paid less than the rate of wages prevailing in the same trade or occupation in the locality within the state where such public work is to be situated, erected or used.

Case 23-1, Document 75, 01/25/2023, 3456834, Page242 of 296

Employees shall have the right to organize and to bargain collectively through representatives of their own choosing. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 6, 2001.)

**[Workers' compensation]**
§18. Nothing contained in this constitution shall be construed to limit the power of the legislature to enact laws for the protection of the lives, health, or safety of employees; or for the payment, either by employers, or by employers and employees or otherwise, either directly or through a state or other system of insurance or otherwise, of compensation for injuries to employees or for death of employees resulting from such injuries without regard to fault as a cause thereof, except where the injury is occasioned by the wilful intention of the injured employee to bring about the injury or death of himself or herself or of another, or where the injury results solely from the intoxication of the injured employee while on duty; or for the adjustment, determination and settlement, with or without trial by jury, of issues which may arise under such legislation; or to provide that the right of such compensation, and the remedy therefor shall be exclusive of all other rights and remedies for injuries to employees or for death resulting from such injuries; or to provide that the amount of such compensation for death shall not exceed a fixed or determinable sum; provided that all moneys paid by an employer to his or her employees or their legal representatives, by reason of the enactment of any of the laws herein authorized, shall be held to be a proper charge in the cost of operating the business of the employer. (Formerly §19. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 6, 2001.)

## ARTICLE II
### SUFFRAGE

**[Qualifications of voters]**
Section 1. Every citizen shall be entitled to vote at every election for all officers elected by the people and upon all questions submitted to the vote of the people provided that such citizen is eighteen years of age or over and shall have been a resident of this state, and of the county, city, or village for thirty days next preceding an election. (Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 2, 1943; November 6, 1945; November 6, 1961; November 8, 1966; November 7, 1995.)

**[Absentee voting]**
§2. The legislature may, by general law, provide a manner in which, and the time and place at which, qualified voters who, on the occurrence of any election, may be absent from the county of their residence or, if residents of the city of New York, from the city, and qualified voters who, on the occurrence of any election, may be unable to appear personally at the polling place because of illness or physical disability, may vote and for the return and canvass of their votes. (Formerly §1-a. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 4, 1947; November 8, 1955; November 5, 1963.)

**[Persons excluded from the right of suffrage]**
§3. No person who shall receive, accept, or offer to receive, or pay, offer or promise to pay, contribute, offer or promise to contribute to another, to be paid or used, any money or other valuable thing as a compensation or reward for the giving or withholding a vote at an election, or who shall make any promise to influence the giving or withholding any such vote, or who shall make or become directly or indirectly interested in any bet or wager depending upon the result of any election, shall vote at such election; and upon challenge for such cause, the person so challenged, before the officers authorized for that purpose shall receive his or her vote, shall swear or affirm before such officers that he or she has not received or offered, does not expect to receive, has not paid, offered or promised to pay, contributed, offered or promised to contribute to another, to be paid or used, any money

or other valuable thing as a compensation or reward for the giving or withholding a vote at such election, and has not made any promise to influence the giving or withholding of any such vote, nor made or become directly or indirectly interested in any bet or wager depending upon the result of such election. The legislature may enact laws excluding from the right of suffrage all persons convicted of bribery or of any infamous crime. (Formerly §2. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 6, 2001.)

**[Certain occupations and conditions not to affect residence]**
§4. For the purpose of voting, no person shall be deemed to have gained or lost a residence, by reason of his or her presence or absence, while employed in the service of the United States; nor while engaged in the navigation of the waters of this state, or of the United States, or of the high seas; nor while a student of any seminary of learning; nor while kept at any almshouse, or other asylum, or institution wholly or partly supported at public expense or by charity; nor while confined in any public prison. (Formerly §3. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 6, 2001.)

**[Registration and election laws to be passed]**
§5. Laws shall be made for ascertaining, by proper proofs, the citizens who shall be entitled to the right of suffrage hereby established, and for the registration of voters; which registration shall be completed at least ten days before each election. Such registration shall not be required for town and village elections except by express provision of law. (Formerly §4. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 6, 1951; further amended by vote of the people November 8, 1955; November 8, 1966; November 7, 1995.)

**[Permanent registration]**
§6. The legislature may provide by law for a system or systems of registration whereby upon personal application a voter may be regis- tered and his or her registration continued so long as he or she shall remain qualified to vote from an address within the jurisdiction of the board with which such voter is registered. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 7, 1995; November 6, 2001.)

**[Manner of voting; identification of voters]**
§7. All elections by the citizens, except for such town officers as may by law be directed to be otherwise chosen, shall be by ballot, or by such other method as may be prescribed by law, provided that secrecy in voting be preserved. The legislature shall provide for identification of voters through their signatures in all cases where personal registration is required and shall also provide for the signatures, at the time of voting, of all persons voting in person by ballot or voting machine, whether or not they have registered in person, save only in cases of illiteracy or physical disability. (Formerly §5. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Bi-partisan registration and election boards]**
§8. All laws creating, regulating or affecting boards or officers charged with the duty of qualifying voters, or of distributing ballots to voters, or of receiving, recording or counting votes at elections, shall secure equal representation of the two political parties which, at the general election next preceding that for which such boards or officers are to serve, cast the highest and the next highest number of votes. All such boards and officers shall be appointed or elected in such manner, and upon the nomination of such representatives of said parties respectively, as the legislature may direct. Existing laws on this subject shall continue until the legislature shall otherwise provide. This section shall not apply to town, or village elections. (Formerly §6. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 7, 1995.)

6

Case 23-1, Document 75, 01/25/2023, 3456064, Page243 of 296

**[Presidential elections; special voting procedures authorized]**

§9. Notwithstanding the residence requirements imposed by section one of this article, the legislature may, by general law, provide special procedures whereby every person who shall have moved from another state to this state or from one county, city or village within this state to another county, city or village within this state and who shall have been an inhabitant of this state in any event for ninety days next preceding an election at which electors are to be chosen for the office of president and vice president of the United States shall be entitled to vote in this state solely for such electors, provided such person is otherwise qualified to vote in this state and is not able to qualify to vote for such electors in any other state. The legislature may also, by general law, prescribe special procedures whereby every person who is registered and would be qualified to vote in this state but for his or her removal from this state to another state within one year next preceding such election shall be entitled to vote in this state solely for such electors, provided such person is not able to qualify to vote for such electors in any other state. (New. Added by vote of the people November 5, 1963; amended by vote of the people November 6, 2001.)

### ARTICLE III
LEGISLATURE

**[Legislative power]**

Section 1. The legislative power of this state shall be vested in the senate and assembly.

**[Number and terms of senators and assemblymen]**

§2. The senate shall consist of fifty members[4], except as hereinafter provided. The senators elected in the year one thousand eight hundred and ninety-five shall hold their offices for three years, and their successors shall be chosen for two years. The assembly shall consist of one hundred and fifty members. The assembly members elected in the year one thousand nine hundred and thirty-eight, and their successors, shall be chosen for two years. (Amended by vote of the people November 2, 1937; November 6, 2001.)

**[Senate districts]**

§3. The senate districts[5], described in section three of article three of this constitution as adopted by the people on November sixth, eighteen hundred ninety-four are hereby continued for all of the purposes of future reapportionments of senate districts pursuant to section four of this article. (Formerly §3. Repealed and replaced by new §3 amended by vote of the people November 6, 1962.)

**[Readjustments and reapportionments; when federal census to control]**

§4. (a) Except as herein otherwise provided, the federal census taken in the year nineteen hundred thirty and each federal census taken decennially thereafter shall be controlling as to the number of inhabitants in the state or any part thereof for the purposes of the apportionment of members of assembly and readjustment or alteration of senate and assembly districts next occurring, in so far as such census and the tabulation thereof purport to give the information necessary therefor. The legislature, by law, shall provide for the making and tabulation by state authorities of an enumeration of the inhabitants of the entire state to be used for such purposes, instead of a federal census, if the taking of a federal census in any tenth year from the year nineteen hundred thirty be omitted or if the federal census fails to show the number of aliens or Indians not taxed. If a federal census, though giving the requisite information as to the state at large, fails to give the information as to any civil or territorial divisions which is required to be known for such purposes, the legislature, by law, shall provide for such an enumeration of the inhabitants of such parts of the state only as may be necessary, which shall supersede in part the federal census and be used in connection therewith for such purposes. The legislature, by law, may provide in its discretion for an enumeration by state authorities of the inhabitants of the state, to be used

for such purposes, in place of a federal census, when the return of a decennial federal census is delayed so that it is not available at the beginning of the regular session of the legislature in the second year after the year nineteen hundred thirty or after any tenth year therefrom, or if an apportionment of members of assembly and readjustment or alteration of senate districts is not made at or before such a session. At the regular session in the year nineteen hundred thirty-two, and at the first regular session after the year nineteen hundred forty and after each tenth year therefrom the senate districts shall be readjusted or altered, but if, in any decade, counting from and including that which begins with the year nineteen hundred thirty-one, such a readjustment or alteration is not made at the time above prescribed, it shall be made at a subsequent session occurring not later than the sixth year of such decade, meaning not later than nineteen hundred thirty-six, nineteen hundred forty-six, nineteen hundred fifty-six, and so on; provided, however, that if such districts shall have been readjusted or altered by law in either of the years nineteen hundred thirty or nineteen hundred thirty-one, they shall remain unaltered until the first regular session after the year nineteen hundred forty. No town, except a town having more than a full ratio of apportionment, and no block in a city inclosed by streets or public ways, shall be divided in the formation of senate districts. In the reapportionment of senate districts, no district shall contain a greater excess in population over an adjoining district in the same county, than the population of a town or block therein adjoining such district. Counties, towns or blocks which, from their location, may be included in either of two districts, shall be so placed as to make said districts most nearly equal in number of inhabitants, excluding aliens.

No county shall have four or more senators unless it shall have a full ratio for each senator. No county shall have more than one-third of all the senators; and no two counties or the territory thereof as now organized, which are adjoining counties, or which are separated only by public waters, shall have more than one-half of all the senators.

(b) The independent redistricting commission established pursuant to section five-b of this article shall prepare a redistricting plan to establish senate, assembly, and congressional districts every ten years commencing in two thousand twenty-one, and shall submit to the legislature such plan and the implementing legislation therefor on or before January first or as soon as practicable thereafter but no later than January fifteenth in the year ending in two beginning in two thousand twenty-two. The redistricting plans for the assembly and the senate shall be contained in and voted upon by the legislature in a single bill, and the congressional district plan may be included in the same bill if the legislature chooses to do so. The implementing legislation shall be voted upon, without amendment, by the senate or the assembly and if approved by the first house voting upon it, such legislation shall be delivered to the other house immediately to be voted upon without amendment. If approved by both houses, such legislation shall be presented to the governor for action.

If either house shall fail to approve the legislation implementing the first redistricting plan, or the governor shall veto such legislation and the legislature shall fail to override such veto, each house or the governor if he or she vetoes it, shall notify the commission that such legislation has been disapproved. Within fifteen days of such notification and in no case later than February twenty-eighth, the redistricting commission shall prepare and submit to the legislature a second redistricting plan and the necessary implementing legislation for such plan. Such legislation shall be voted upon, without amendment, by the senate or the assembly and, if approved by the first house voting upon it, such legislation shall be delivered to the other house immediately to be voted upon without amendment. If approved by both houses, such legislation shall be presented to the governor for action.

If either house shall fail to approve the legislation implementing the second redistricting plan, or the governor shall veto such legislation and the legislature shall fail to override such veto, each house shall introduce such implementing legislation with any amendments each house of the legislature deems necessary. All such amendments shall comply with the provisions of this article. If approved by both houses, such legislation shall be presented to the governor for action.

All votes by the senate or assembly on any redistricting plan legislation pursuant to this article shall be conducted in accordance with the following rules:

---

[4] State Law §123 sets forth current number of senators.
[5] State Law §124 currently sets forth 63 senate districts.

Case 23-1, Document 75, 01/25/2023, 3456054, Page244 of 296

The Constitution of the State of New York

(1) In the event that the speaker of the assembly and the temporary president of the senate are members of two different political parties, approval of legislation submitted by the independent redistricting commission pursuant to subdivision (f) of section five-b of this article shall require the vote in support of its passage by at least a majority of the members elected to each house.

(2) In the event that the speaker of the assembly and the temporary president of the senate are members of two different political parties, approval of legislation submitted by the independent redistricting commission pursuant to subdivision (g) of section five-b of this article shall require the vote in support of its passage by at least sixty percent of the members elected to each house.

(3) In the event that the speaker of the assembly and the temporary president of the senate are members of the same political party, approval of legislation submitted by the independent redistricting commission pursuant to subdivision (f) or (g) of section five-b of this article shall require the vote in support of its passage by at least two-thirds of the members elected to each house.

(c) Subject to the requirements of the federal constitution and statutes and in compliance with state constitutional requirements, the following principles shall be used in the creation of state senate and state assembly districts and congressional districts:

(1) When drawing district lines, the commission shall consider whether such lines would result in the denial or abridgement of racial or language minority voting rights, and districts shall not be drawn to have the purpose of, nor shall they result in, the denial or abridgement of such rights. Districts shall be drawn so that, based on the totality of the circumstances, racial or minority language groups do not have less opportunity to participate in the political process than other members of the electorate and to elect representatives of their choice.

(2) To the extent practicable, districts shall contain as nearly as may be an equal number of inhabitants. For each district that deviates from this requirement, the commission shall provide a specific public explanation as to why such deviation exists.

(3) Each district shall consist of contiguous territory.

(4) Each district shall be as compact in form as practicable.

(5) Districts shall not be drawn to discourage competition or for the purpose of favoring or disfavoring incumbents or other particular candidates or political parties. The commission shall consider the maintenance of cores of existing districts, of pre-existing political subdivisions, including counties, cities, and towns, and of communities of interest.

(6) In drawing senate districts, towns or blocks which, from their location may be included in either of two districts, shall be so placed as to make said districts most nearly equal in number of inhabitants. The requirements that senate districts not divide counties or towns, as well as the 'block-on-border' and 'town-on-border' rules, shall remain in effect.

During the preparation of the redistricting plan, the independent redistricting commission shall conduct not less than one public hearing on proposals for the redistricting of congressional and state legislative districts in each of the following (i) cities: Albany, Buffalo, Syracuse, Rochester, and White Plains; and (ii) counties: Bronx, Kings, New York, Queens, Richmond, Nassau, and Suffolk. Notice of all such hearings shall be widely published using the best available means and media a reasonable time before every hearing. At least thirty days prior to the first public hearing and in any event no later than September fifteenth of the year ending in one or as soon as practicable thereafter, the independent redistricting commission shall make widely available to the public, in print form and using the best available technology, its draft redistricting plans, relevant data, and related information. Such plans, data, and information shall be in a form that allows and facilitates their use by the public to review, analyze, and comment upon such plans and to develop alternative redistricting plans for presentation to the commission at the public hearings. The independent redistricting commission shall report the findings of all such hearings to the legislature upon submission of a redistricting plan.

(d) The ratio for apportioning senators shall always be obtained by dividing the number of inhabitants, excluding aliens, by fifty, and the senate shall always be composed of fifty members, except that if any county having three or more senators at the time of any apportionment shall be

entitled on such ratio to an additional senator or senators, such additional senator or senators shall be given to such county in addition to the fifty senators, and the whole number of senators shall be increased to that extent.

The senate districts, including the present ones, as existing immediately before the enactment of a law readjusting or altering the senate districts, shall continue to be the senate districts of the state until the expirations of the terms of the senators then in office, except for the purpose of an election of senators for full terms beginning at such expirations, and for the formation of assembly districts.

(e) The process for redistricting congressional and state legislative districts established by this section and sections five and five-b of this article shall govern redistricting in this state except to the extent that a court is required to order the adoption of, or changes to, a redistricting plan as a remedy for a violation of law.

A reapportionment plan and the districts contained in such plan shall be in force until the effective date of a plan based upon the subsequent federal decennial census taken in a year ending in zero unless modified pursuant to court order. (Amended by vote of the people November 6, 1945; further amended by vote of the people November 4, 2014.)

**[Apportionment of assemblymen; creation of assembly districts]**
§5. The members of the assembly shall be chosen by single districts and shall be apportioned pursuant to this section and sections four and five-b of this article at each regular session at which the senate districts are readjusted or altered, and by the same law, among the several counties of the state, as nearly as may be according to the number of their respective inhabitants, excluding aliens. Every county heretofore established and separately organized, except the county of Hamilton, shall always be entitled to one member of assembly, and no county shall hereafter be erected unless its population shall entitle it to a member. The county of Hamilton shall elect with the county of Fulton, until the population of the county of Hamilton shall, according to the ratio, entitle it to a member. But the legislature may abolish the said county of Hamilton and annex the territory thereof to some other county or counties.

The quotient obtained by dividing the whole number of inhabitants of the state, excluding aliens, by the number of members of assembly, shall be the ratio for apportionment, which shall be made as follows: One member of assembly shall be apportioned to every county, including Fulton and Hamilton as one county, containing less than the ratio and one-half over. Two members shall be apportioned to every other county. The remaining members of assembly shall be apportioned to the counties having more than two ratios according to the number of inhabitants, excluding aliens. Members apportioned on remainders shall be apportioned to the counties having the highest remainders in the order thereof respectively. No county shall have more members of assembly than a county having a greater number of inhabitants, excluding aliens.

The assembly districts[6], including the present ones, as existing immediately before the enactment of a law making an apportionment of members of assembly among the counties, shall continue to be the assembly districts of the state until the expiration of the terms of members then in office, except for the purpose of an election of members of assembly for full terms beginning at such expirations.

In any county entitled to more than one member, the board of supervisors, and in any city embracing an entire county and having no board of supervisors, the common council, or if there be none, the body exercising the powers of a common council, shall assemble at such times as the legislature making an apportionment shall prescribe, and divide such counties into assembly districts as nearly equal in number of inhabitants, excluding aliens, as may be, of convenient and contiguous territory in as compact form as practicable, each of which shall be wholly within a senate district formed under the same apportionment, equal to the number of members of assembly to which such county shall be entitled, and shall cause to be filed in the office of the secretary of state and of the clerk of such county, a description of such districts, specifying the number of each district and of the inhabitants thereof, excluding aliens, according to the census or enumeration used as the population basis for the formation of such districts; and such apportionment

---

8

6 State Law §121 sets forth 150 assembly districts.

Case 23-1, Document 75, 01/25/2023, 3456064, Page245 of 296

and districts shall remain unaltered until after the next reapportionment of members of assembly, except that the board of supervisors of any county containing a town having more than a ratio of apportionment and one-half over may alter the assembly districts in a senate district containing such town at any time on or before March first, nineteen hundred forty-six. In counties having more than one senate district, the same number of assembly districts shall be put in each senate district, unless the assembly districts cannot be evenly divided among the senate districts of any county, in which case one more assembly district shall be put in the senate district in such county having the largest, or one less assembly district shall be put in the senate district in such county having the smallest number of inhabitants, excluding aliens, as the case may require. Nothing in this section shall prevent the division, at any time, of counties and towns and the erection of new towns by the legislature.

An apportionment by the legislature, or other body, shall be subject to review by the supreme court, at the suit of any citizen, under such reasonable regulations as the legislature may prescribe; and any court before which a cause may be pending involving an apportionment, shall give precedence thereto over all other causes and proceedings, and if said court be not in session it shall convene promptly for the disposition of the same. The court shall render its decision within sixty days after a petition is filed. In any judicial proceeding relating to redistricting of congressional or state legislative districts, any law establishing congressional or state legislative districts found to violate the provisions of this article shall be invalid in whole or in part. In the event that a court finds such a violation, the legislature shall have a full and reasonable opportunity to correct the law's legal infirmities. (Amended by vote of the people November 6, 1945; further amended by vote of the people November 4, 2014.)

**[Definition of inhabitants]**
§5-a. For the purpose of apportioning senate and assembly districts pursuant to the foregoing provisions of this article, the term "inhabitants, excluding aliens" shall mean the whole number of persons. (New. Added by vote of the people November 4, 1969.)

**[Independent redistricting commission]**
§5-b. (a) On or before February first of each year ending with a zero and at any other time a court orders that congressional or state legislative districts be amended, an independent redistricting commission shall be established to determine the district lines for congressional and state legislative offices. The independent redistricting commission shall be composed of ten members, appointed as follows:

(1) two members shall be appointed by the temporary president of the senate;

(2) two members shall be appointed by the speaker of the assembly;

(3) two members shall be appointed by the minority leader of the senate;

(4) two members shall be appointed by the minority leader of the assembly;

(5) two members shall be appointed by the eight members appointed pursuant to paragraphs (1) through (4) of this subdivision by a vote of not less than five members in favor of such appointment, and these two members shall not have been enrolled in the preceding five years in either of the two political parties that contain the largest or second largest number of enrolled voters within the state;

(6) one member shall be designated chair of the commission by a majority of the members appointed pursuant to paragraphs (1) through (5) of this subdivision to convene and preside over each meeting of the commission.

(b) The members of the independent redistricting commission shall be registered voters in this state. No member shall within the last three years:

(1) be or have been a member of the New York state legislature or United States Congress or a statewide elected official;

(2) be or have been a state officer or employee or legislative employee as defined in section seventy-three of the public officers law;

(3) be or have been a registered lobbyist in New York state;

(4) be or have been a political party chairman, as defined in paragraph (k) of subdivision one of section seventy-three of the public officers law;

(5) be the spouse of a statewide elected official or of any member of the United States Congress, or of the state legislature.

(c) To the extent practicable, the members of the independent redistricting commission shall reflect the diversity of the residents of this state with regard to race, ethnicity, gender, language, and geographic residence and to the extent practicable the appointing authorities shall consult with organizations devoted to protecting the voting rights of minority and other voters concerning potential appointees to the commission.

(d) Vacancies in the membership of the commission shall be filled within thirty days in the manner provided for in the original appointments.

(e) The legislature shall provide by law for the compensation of the members of the independent redistricting commission, including compensation for actual and necessary expenses incurred in the performance of their duties.

(f) A minimum of five members of the independent redistricting commission shall constitute a quorum for the transaction of any business or the exercise of any power of such commission prior to the appointment of the two commission members appointed pursuant to paragraph (5) of subdivision (a) of this section, and a minimum of seven members shall constitute a quorum after such members have been appointed, and no exercise of any power of the independent redistricting commission shall occur without the affirmative vote of at least a majority of the members, provided that, in order to approve any redistricting plan and implementing legislation, the following rules shall apply:

(1) In the event that the speaker of the assembly and the temporary president of the senate are members of the same political party, approval of a redistricting plan and implementing legislation by the commission for submission to the legislature shall require the vote in support of its approval by at least seven members including at least one member appointed by each of the legislative leaders.

(2) In the event that the speaker of the assembly and the temporary president of the senate are members of two different political parties, approval of a redistricting plan by the commission for submission to the legislature shall require the vote in support of its approval by at least seven members including at least one member appointed by the speaker of the assembly and one member appointed by the temporary president of the senate.

(g) In the event that the commission is unable to obtain seven votes to approve a redistricting plan on or before January first in the year ending in two or as soon as practicable thereafter, the commission shall submit to the legislature that redistricting plan and implementing legislation that garnered the highest number of votes in support of its approval by the commission with a record of the votes taken. In the event that more than one plan received the same number of votes for approval, and such number was higher than that for any other plan, then the commission shall submit all plans that obtained such number of votes. The legislature shall consider and vote upon such implementing legislation in accordance with the voting rules set forth in subdivision (b) of section four of this article.

(h) (1) The independent redistricting commission shall appoint two co-executive directors by a majority vote of the commission in accordance with the following procedure:

(i) In the event that the speaker of the assembly and the temporary president of the senate are members of two different political parties, the co-executive directors shall be approved by a majority of the commission that includes at least one appointee by the speaker of the assembly and at least one appointee by the temporary president of the senate.

(ii) In the event that the speaker of the assembly and the temporary president of the senate are members of the same political party, the co-executive directors shall be approved by a majority of the commission that includes at least one appointee by each of the legislative leaders.

(2) One of the co-executive directors shall be enrolled in the political party with the highest number of enrolled members in the state and one shall be enrolled in the political party with the second highest number of enrolled

9

members in the state. The co-executive directors shall appoint such staff as are necessary to perform the commission's duties, except that the commission shall review a staffing plan prepared and provided by the co-executive directors which shall contain a list of the various positions and the duties, qualifications, and salaries associated with each position.

(3) In the event that the commission is unable to appoint one or both of the co-executive directors within forty-five days of the establishment of a quorum of seven commissioners, the following procedure shall be followed:

(i) In the event that the speaker of the assembly and the temporary president of the senate are members of two different political parties, within ten days the speaker's appointee on the commission shall appoint one co-executive director, and the temporary president's appointees on the commission shall appoint the other co-executive director. Also within ten days the minority leader of the assembly shall select a co-deputy executive director, and the minority leader of the senate shall select the other co-deputy executive director.

(ii) In the event that the speaker of the assembly and the temporary president of the senate are members of the same political party, within ten days the speaker's and temporary president's appointees on the commission shall together appoint one co-executive director, and the two minority leaders' appointees on the commission shall together appoint the other co-executive director.

(4) In the event of a vacancy in the offices of co-executive director or co-deputy executive director, the position shall be filled within ten days of its occurrence by the same appointing authority or authorities that appointed his or her predecessor.

(i) The state budget shall include necessary appropriations for the expenses of the independent redistricting commission, provide for compensation and reimbursement of expenses for the members and staff of the commission, assign to the commission any additional duties that the legislature may deem necessary to the performance of the duties stipulated in this article, and require other agencies and officials of the state of New York and its political subdivisions to provide such information and assistance as the commission may require to perform its duties. (New. Added by vote of the people November 4, 2014.)

**[Compensation, allowances and traveling expenses of members]**

§6. Each member of the legislature shall receive for his or her services a like annual salary, to be fixed by law. He or she shall also be reimbursed for his or her actual traveling expenses in going to and returning from the place in which the legislature meets, not more than once each week while the legislature is in session. Senators, when the senate alone is convened in extraordinary session, or when serving as members of the court for the trial of impeachments, and such members of the assembly, not exceeding nine in number, as shall be appointed managers of an impeachment, shall receive an additional per diem allowance, to be fixed by law. Any member, while serving as an officer of his or her house or in any other special capacity therein or directly connected therewith not hereinbefore in this section specified, may also be paid and receive, in addition, any allowance which may be fixed by law for the particular and additional services appertaining to or entailed by such office or special capacity. Neither the salary of any member nor any other allowance so fixed may be increased or diminished during, and with respect to, the term for which he or she shall have been elected, nor shall he or she be paid or receive any other extra compensation. The provisions of this section and laws enacted in compliance therewith shall govern and be exclusively controlling, according to their terms. Members shall continue to receive such salary and additional allowance as heretofore fixed and provided in this section, until changed by law pursuant to this section. (Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 4, 1947; November 3, 1964; November 6, 2001.)

**[Qualifications of members; prohibitions on certain civil appointments; acceptance to vacate seat]**

§7. No person shall serve as a member of the legislature unless he or she is a citizen of the United States and has been a resident of the state of New York for five years, and, except as hereinafter otherwise prescribed, of the assembly or senate district for the twelve months immediately preceding his or her election; if elected a senator or member of assembly at the first election next ensuing after a readjustment or alteration of the senate or assembly districts becomes effective, a person, to be eligible to serve as such, must have been a resident of the county in which the senate or assembly district is contained for the twelve months immediately preceding his or her election. No member of the legislature shall, during the time for which he or she was elected, receive any civil appointment from the governor, the governor and the senate, the legislature or from any city government, to an office which shall have been created, or the emoluments whereof shall have been increased during such time. If a member of the legislature be elected to congress, or appointed to any office, civil or military, under the government of the United States, the state of New York, or under any city government except as a member of the national guard or naval militia of the state, or of the reserve forces of the United States, his or her acceptance thereof shall vacate his or her seat in the legislature, providing, however, that a member of the legislature may be appointed commissioner of deeds or to any office in which he or she shall receive no compensation. (New. Derived in part from former §§7 and 8. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 2, 1943.)

**[Time of elections of members]**

§8. The elections of senators and members of assembly, pursuant to the provisions of this constitution, shall be held on the Tuesday succeeding the first Monday of November, unless otherwise directed by the legislature. (Formerly §9. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Powers of each house]**

§9. A majority of each house shall constitute a quorum to do business. Each house shall determine the rules of its own proceedings, and be the judge of the elections, returns and qualifications of its own members; shall choose its own officers; and the senate shall choose a temporary president and the assembly shall choose a speaker. (Formerly §10. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938. Amended by vote of the people November 5, 1963.)

**[Journals; open sessions; adjournments]**

§10. Each house of the legislature shall keep a journal of its proceedings, and publish the same, except such parts as may require secrecy. The doors of each house shall be kept open, except when the public welfare shall require secrecy. Neither house shall, without the consent of the other, adjourn for more than two days. (Formerly §11. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Members not to be questioned for speeches]**

§11. For any speech or debate in either house of the legislature, the members shall not be questioned in any other place. (Formerly §12. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Bills may originate in either house; may be amended by the other]**

§12. Any bill may originate in either house of the legislature, and all bills passed by one house may be amended by the other. (Formerly §13. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Enacting clause of bills; no law to be enacted except by bill]**

§13. The enacting clause of all bills shall be "The People of the State of New York, represented in Senate and Assembly, do enact as follows," and no law shall be enacted except by bill. (Formerly §14. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

10

**FILED: KINGS COUNTY CLERK 10/08/2019 02:88 PM**
INDEX NO. 518540/2019
NYSCEF DOC. NO. 205
Case 23-1, Document 75, 01/25/2023, 3456064, Page247 of 296
The Constitution of the State of New York
RECEIVED NYSCEF: 10/08/2019

**[Manner of passing bills; message of necessity for immediate vote]**

§14. No bill shall be passed or become a law unless it shall have been printed and upon the desks of the members, in its final form, at least three calendar legislative days prior to its final passage, unless the governor, or the acting governor, shall have certified, under his or her hand and the seal of the state, the facts which in his or her opinion necessitate an immediate vote thereon, in which case it must nevertheless be upon the desks of the members in final form, not necessarily printed, before its final passage; nor shall any bill be passed or become a law, except by the assent of a majority of the members elected to each branch of the legislature; and upon the last reading of a bill, no amendment thereof shall be allowed, and the question upon its final passage shall be taken immediately thereafter, and the ayes and nays entered on the journal.

For purposes of this section, a bill shall be deemed to be printed and upon the desks of the members if: it is set forth in a legible electronic format by electronic means, and it is available for review in such format at the desks of the members. For purposes of this section "electronic means" means any method of transmission of information between computers or other machines designed for the purpose of sending and receiving such transmissions and which: allows the recipient to reproduce the information transmitted in a tangible medium of expression; and does not permit additions, deletions or other changes to be made without leaving an adequate record thereof. (Formerly §15. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people: November 6, 2001; November 4, 2014.)

**[Private or local bills to embrace only one subject, expressed in title]**

§15. No private or local bill, which may be passed by the legislature, shall embrace more than one subject, and that shall be expressed in the title. (Formerly §16. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Existing law not to be made applicable by reference]**

§16. No act shall be passed which shall provide that any existing law, or any part thereof, shall be made or deemed a part of said act, or which shall enact that any existing law, or part thereof, shall be applicable, except by inserting it in such act. (Formerly §17. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Cases in which private or local bills shall not be passed]**

§17. The legislature shall not pass a private or local bill in any of the following cases:

Changing the names of persons.

Laying out, opening, altering, working or discontinuing roads, highways or alleys, or for draining swamps or other low lands. Locating or changing county seats.

Providing for changes of venue in civil or criminal cases.

Incorporating villages.

Providing for election of members of boards of supervisors.

Selecting, drawing, summoning or empaneling grand or petit jurors.

Regulating the rate of interest on money.

The opening and conducting of elections or designating places of voting.

Creating, increasing or decreasing fees, percentages or allowances of public officers, during the term for which said officers are elected or appointed.

Granting to any corporation, association or individual the right to lay down railroad tracks.

Granting to any private corporation, association or individual any exclusive privilege, immunity or franchise whatever.

Granting to any person, association, firm or corporation, an exemption from taxation on real or personal property.

Providing for the building of bridges, except over the waters forming a part of the boundaries of the state, by other than a municipal or other public corporation or a public agency of the state. (Formerly §18. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 3, 1964.)

**[Extraordinary sessions of the legislature; power to convene on legislative initiative]**

§18. The members of the legislature shall be empowered, upon the presentation to the temporary president of the senate and the speaker of the assembly of a petition signed by two-thirds of the members elected to each house of the legislature, to convene the legislature on extraordinary occasions to act upon the subjects enumerated in such petition. (New. Added by vote of the people November 4, 1975.)

**[Private claims not to be audited by legislature; claims barred by lapse of time]**

§19. The legislature shall neither audit nor allow any private claim or account against the state, but may appropriate money to pay such claims as shall have been audited and allowed according to law.

No claim against the state shall be audited, allowed or paid which, as between citizens of the state, would be barred by lapse of time. But if the claimant shall be under legal disability, the claim may be presented within two years after such disability is removed. (Derived in part from former §6 of Art. 7. Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 3, 1964.)

**[Two-thirds bills]**

§20. The assent of two-thirds of the members elected to each branch of the legislature shall be requisite to every bill appropriating the public moneys or property for local or private purposes.

**[Certain sections not to apply to bills recommended by certain commissioners or public agencies]**

§21. Sections 15, 16 and 17 of this article shall not apply to any bill, or the amendments to any bill, which shall be recommended to the legislature by commissioners or any public agency appointed or directed pursuant to law to prepare revisions, consolidations or compilations of statutes. But a bill amending an existing law shall not be excepted from the provisions of sections 15, 16 and 17 of this article unless such amending bill shall itself be recommended to the legislature by such commissioners or public agency. (Formerly §23. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Tax laws to state tax and object distinctly; definition of income for income tax purposes by reference to federal laws authorized]**

§22. Every law which imposes, continues or revives a tax shall distinctly state the tax and the object to which it is to be applied, and it shall not be sufficient to refer to any other law to fix such tax or object.

Notwithstanding the foregoing or any other provision of this constitution, the legislature, in any law imposing a tax or taxes on, in respect to or measured by income, may define the income on, in respect to or by which such tax or taxes are imposed or measured, by reference to any provision of the laws of the United States as the same may be or become effective at any time or from time to time, and may prescribe exceptions or modifications to any such provision. (Formerly §24. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 3, 1959.)

**[When yeas and nays necessary; three-fifths to constitute quorum]**

§23. On the final passage, in either house of the legislature, of any act which imposes, continues or revives a tax, or creates a debt or charge, or makes, continues or revives any appropriation of public or trust money or property, or releases, discharges or commutes any claim or demand of the state, the question shall be taken by yeas and nays, which shall be duly entered upon the journals, and three-fifths of all the members elected to either house shall, in all such cases, be necessary to constitute a quorum therein. (Formerly §25. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Prison labor; contract system abolished]**

§24. The legislature shall, by law, provide for the occupation and employment of prisoners sentenced to the several state prisons,

Case 23-1, Document 75, 01/25/2023, 3456654, Page248 of 296

penitentiaries, jails and reformatories in the state; and no person in any such prison, penitentiary, jail or reformatory, shall be required or allowed to work, while under sentence thereto, at any trade, industry or occupation, wherein or whereby his or her work, or the product or profit of his or her work, shall be farmed out, contracted, given or sold to any person, firm, association or corporation, provided that the legislature may provide by law that such prisoners may voluntarily perform work for nonprofit organizations. As used in this section, the term "nonprofit organization" means an organization operated exclusively for religious, charitable, or educational purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual. This section shall not be construed to prevent the legislature from providing that convicts may work for, and that the products of their labor may be disposed of to, the state or any political division thereof, or for or to any public institution owned or managed and controlled by the state, or any political division thereof. (Formerly §29. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 6, 2001; November 3, 2009.)

**[Emergency governmental operations; legislature to provide for]**
§25. Notwithstanding any other provision of this constitution, the legislature, in order to insure continuity of state and local governmental operations in periods of emergency caused by enemy attack or by disasters (natural or otherwise), shall have the power and the immediate duty (1) to provide for prompt and temporary succession to the powers and duties of public offices, of whatever nature and whether filled by election or appointment, the incumbents of which may become unavailable for carrying on the powers and duties of such offices, and (2) to adopt such other measures as may be necessary and proper for insuring the continuity of governmental operations.

Nothing in this article shall be construed to limit in any way the power of the state to deal with emergencies arising from any cause. (New. Added by vote of the people November 5, 1963.)

### ARTICLE IV
#### EXECUTIVE

**[Executive power; election and terms of governor and lieutenant-governor]**
Section 1. The executive power shall be vested in the governor, who shall hold office for four years; the lieutenant-governor shall be chosen at the same time, and for the same term. The governor and lieutenant-governor shall be chosen at the general election held in the year nineteen hundred thirty-eight, and each fourth year thereafter. They shall be chosen jointly, by the casting by each voter of a single vote applicable to both offices, and the legislature by law shall provide for making such choice in such manner. The respective persons having the highest number of votes cast jointly for them for governor and lieutenant-governor respectively shall be elected. (Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 3, 1953; November 6, 2001.)

**[Qualifications of governor and lieutenant-governor]**
§2. No person shall be eligible to the office of governor or lieutenant-governor, except a citizen of the United States, of the age of not less than thirty years, and who shall have been five years next preceding the election a resident of this state. (Amended by vote of the people November 6, 2001.)

**[Powers and duties of governor; compensation]**
§3. The governor shall be commander-in-chief of the military and naval forces of the state. The governor shall have power to convene the legislature, or the senate only, on extraordinary occasions. At extraordinary sessions convened pursuant to the provisions of this section no subject shall be acted upon, except such as the governor may recommend for consideration. The governor shall communicate by message to the legislature at every session the condition of the state, and recommend such matters to it as he or she shall judge expedient. The governor shall expedite all such measures as may be resolved

upon by the legislature, and shall take care that the laws are faithfully executed. The governor shall receive for his or her services an annual salary to be fixed by joint resolution of the senate and assembly, and there shall be provided for his or her use a suitable and furnished executive residence. (Formerly §4. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 3, 1953; November 5, 1963; November 6, 2001.)

**[Reprieves, commutations and pardons; powers and duties of governor relating to grants of]**
§4. The governor shall have the power to grant reprieves, commutations and pardons after conviction, for all offenses except treason and cases of impeachment, upon such conditions and with such restrictions and limitations, as he or she may think proper, subject to such regulations as may be provided by law relative to the manner of applying for pardons. Upon conviction for treason, the governor shall have power to suspend the execution of the sentence, until the case shall be reported to the legislature at its next meeting, when the legislature shall either pardon, or commute the sentence, direct the execution of the sentence, or grant a further reprieve. The governor shall annually communicate to the legislature each case of reprieve, commutation or pardon granted, stating the name of the convict, the crime of which the convict was convicted, the sentence and its date, and the date of the commutation, pardon or reprieve. (Formerly §5. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 6, 2001.)

**[When lieutenant-governor to act as governor]**
§5. In case of the removal of the governor from office or of his or her death or resignation, the lieutenant-governor shall become governor for the remainder of the term.

In case the governor-elect shall decline to serve or shall die, the lieutenant-governor-elect shall become governor for the full term.

In case the governor is impeached, is absent from the state or is otherwise unable to discharge the powers and duties of the office of governor, the lieutenant-governor shall act as governor until the inability shall cease or until the term of the governor shall expire.

In case of the failure of the governor-elect to take the oath of office at the commencement of his or her term, the lieutenant-governor-elect shall act as governor until the governor shall take the oath. (Formerly §6. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 8, 1949; November 5, 1963; November 6, 2001.)

**[Duties and compensation of lieutenant-governor; succession to the governorship]**
§6. The lieutenant-governor shall possess the same qualifications of eligibility for office as the governor. The lieutenant-governor shall be the president of the senate but shall have only a casting vote therein.
The lieutenant-governor shall receive for his or her services an annual salary to be fixed by joint resolution of the senate and assembly.

In case of vacancy in the offices of both governor and lieutenant-governor, a governor and lieutenant-governor shall be elected for the remainder of the term at the next general election happening not less than three months after both offices shall have become vacant. No election of a lieutenant-governor shall be had in any event except at the time of electing a governor.

In case of vacancy in the offices of both governor and lieutenant-governor or if both of them shall be impeached, absent from the state or otherwise unable to discharge the powers and duties of the office of governor, the temporary president of the senate shall act as governor until the inability shall cease or until a governor shall be elected.

In case of vacancy in the office of lieutenant-governor alone, or if the lieutenant-governor shall be impeached, absent from the state or otherwise unable to discharge the duties of office, the temporary president of the senate shall perform all the duties of lieutenant-governor during such vacancy or inability.

12

Case 23-1, Document 76, 01/25/2023, 3456064, Page249 of 296

If, when the duty of acting as governor devolves upon the temporary president of the senate, there be a vacancy in such office or the temporary president of the senate shall be absent from the state or otherwise unable to discharge the duties of governor, the speaker of the assembly shall act as governor during such vacancy or inability.

The legislature may provide for the devolution of the duty of acting as governor in any case not provided for in this article. (Formerly §§7 and 8. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 6, 1945; November 3, 1953; November 5, 1963; November 6, 2001.)

**[Action by governor on legislative bills; reconsideration after veto]**
§7. Every bill which shall have passed the senate and assembly shall, before it becomes a law, be presented to the governor; if the governor approve, he or she shall sign it; but if not, he or she shall return it with his or her objections to the house in which it shall have originated, which shall enter the objections at large on the journal, and proceed to reconsider it. If after such reconsideration, two-thirds of the members elected to that house shall agree to pass the bill, it shall be sent together with the objections, to the other house, by which it shall likewise be reconsidered; and if approved by two-thirds of the members elected to that house, it shall become a law notwithstanding the objections of the governor. In all such cases the votes in both houses shall be determined by yeas and nays, and the names of the members voting shall be entered by yeas and nays, and the names of the members voting shall be entered on the journal of each house respectively. If any bill shall not be returned by the governor within ten days (Sundays excepted) after it shall have been presented to him or her, the same shall be a law in like manner as if he or she had signed it, unless the legislature shall, by their adjournment, prevent its return, in which case it shall not become a law without the approval of the governor. No bill shall become a law after the final adjournment of the legislature, unless approved by the governor within thirty days after such adjournment. If any bill presented to the governor contain several items of appropriation of money, the governor may object to one or more of such items while approving of the other portion of the bill. In such case the governor shall append to the bill, at the time of signing it, a statement of the items to which he or she objects; and the appropriation so objected to shall not take effect. If the legislature be in session, he or she shall transmit to the house in which the bill originated a copy of such statement, and the items objected to shall be separately reconsidered. If on reconsideration one or more of such items be approved by two-thirds of the members elected to each house, the same shall be part of the law, notwithstanding the objections of the governor. All the provisions of this section, in relation to bills not approved by the governor, shall apply in cases in which he or she shall withhold approval from any item or items contained in a bill appropriating money. (Formerly §9. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 6, 2001.)

**[Departmental rules and regulations; filing; publication]**
§8. No rule or regulation made by any state department, board, bureau, officer, authority or commission, except such as relates to the organization or internal management of a state department, board, bureau, authority or commission shall be effective until it is filed in the office of the department of state. The legislature shall provide for the speedy publication of such rules and regulations, by appropriate laws. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**ARTICLE V**
OFFICERS AND CIVIL DEPARTMENTS

**[Comptroller and attorney-general; payment of state moneys without audit void]**
Section 1. The comptroller and attorney-general shall be chosen at the same general election as the governor and hold office for the same term, and shall possess the qualifications provided in section 2 of article IV. The legislature shall provide for filling vacancies in the office of comptroller and of

attorney-general. No election of a comptroller or an attorney-general shall be had except at the time of electing a governor. The comptroller shall be required: (1) To audit all vouchers before payment and all official accounts; (2) to audit the accrual and collection of all revenues and receipts; and (3) to prescribe such methods of accounting as are necessary for the performance of the foregoing duties. The payment of any money of the state, or of any money under its control, or the refund of any money paid to the state, except upon audit by the comptroller, shall be void, and may be restrained upon the suit of any taxpayer with the consent of the supreme court in appellate division on notice to the attorney-general. In such respect the legislature shall define the powers and duties and may also assign to him or her: (1) supervision of the accounts of any political subdivision of the state; and (2) powers and duties pertaining to or connected with the assessment and taxation of real estate, including determination of ratios which the assessed valuation of taxable real property bears to the full valuation thereof, but not including any of those powers and duties reserved to officers of a county, city, town or village by virtue of sections seven and eight of article nine of this constitution. The legislature shall assign to him or her no administrative duties, excepting such as may be incidental to the performance of these functions, any other provision of this constitution to the contrary notwithstanding. (Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 3, 1953; November 8, 1955; November 6, 2001.)

**[Civil departments in the state government]**
§2. There shall be not more than twenty civil departments in the state government, including those referred to in this constitution. The legislature may by law change the names of the departments referred to in this constitution. (Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 2, 1943; November 3, 1959; November 7, 1961.)

**[Assignment of functions]**
§3. Subject to the limitations contained in this constitution, the legislature may from time to time assign by law new powers and functions to departments, officers, boards, commissions or executive offices of the governor, and increase, modify or diminish their powers and functions. Nothing contained in this article shall prevent the legislature from creating temporary commissions for special purposes or executive offices of the governor and from reducing the number of departments as provided for in this article, by consolidation or otherwise. (Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 7, 1961.)

**[Department heads]**
§4. The head of the department of audit and control shall be the comptroller and of the department of law, the attorney-general. The head of the department of education shall be The Regents of the University of the State of New York, who shall appoint and at pleasure remove a commissioner of education to be the chief administrative officer of the department. The head of the department of agriculture and markets shall be appointed in a manner to be prescribed by law. Except as otherwise provided in this constitution, the heads of all other departments and the members of all boards and commissions, excepting temporary commissions for special purposes, shall be appointed by the governor by and with the advice and consent of the senate and may be removed by the governor, in a manner to be prescribed by law. (Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 7, 1961.)

**Section 5 which abolished certain offices was repealed by amendment approved by vote of the people November 6, 1962**

**[Civil service appointments and promotions; veterans' credits]**
§6. Appointments and promotions in the civil service of the state and all of the civil divisions thereof, including cities and villages, shall be made according to merit and fitness to be ascertained, as far as practicable, by examination which, as far as practicable, shall be competitive; provided,

13

Case 23-1, Document 75, 01/25/2023, 3456034, Page250 of 296

however, that any member of the armed forces of the United States who served therein in time of war, and who, at the time of such member's appointment or promotion, is a citizen or an alien lawfully admitted for permanent residence in the United States and a resident of this state and is honorably discharged or released under honorable circumstances from such service, shall be entitled to receive five points additional credit in a competitive examination for original appointment and two and one-half points additional credit in an examination for promotion or, if such member was disabled in the actual performance of duty in any war and his or her disability is certified by the United States department of veterans affairs to be in existence at the time of application for appointment or promotion, he or she shall be entitled to receive ten points additional credit in a competitive examination for original appointment and five points additional credit in an examination for promotion. Such additional credit shall be added to the final earned rating of such member after he or she has qualified in an examination and shall be granted only at the time of establishment of an eligible list. No such member shall receive the additional credit granted by this section after he or she has received one appointment, either original entrance or promotion, from an eligible list on which he or she was allowed the additional credit granted by this section, except where a member has been appointed or promoted from an eligible list on which he or she was allowed additional credit for military service and subsequent to such appointment he or she is disabled as provided in this section, such member shall be entitled to ten points additional credit less the number of points of additional credit allowed for the prior appointment. (Formerly §6. Repealed and new section approved by vote of the people November 8, 1949; further amended by vote of the people November 3, 1964; November 3, 1987; November 4, 1997; November 6, 2001; November 4, 2008; November 5, 2013.)

**[Membership in retirement systems; benefits not to be diminished nor impaired]**

§7. After July first, nineteen hundred forty, membership in any pension or retirement system of the state or of a civil division thereof shall be a contractual relationship, the benefits of which shall not be diminished or impaired. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

## ARTICLE VI[7]
### JUDICIARY

**[Unified court system; organization; process]**

Section 1. a. There shall be a unified court system for the state. The state-wide courts shall consist of the court of appeals, the supreme court including the appellate divisions thereof, the court of claims, the county court, the surrogate's court and the family court, as hereinafter provided. The legislature shall establish in and for the city of New York, as part of the unified court system for the state, a single, city-wide court of civil jurisdiction and a single, city-wide court of criminal jurisdiction, as hereinafter provided, and may upon the request of the mayor and the local legislative body of the city of New York, merge the two courts into one city-wide court of both civil and criminal jurisdiction. The unified court system for the state shall also include the district, town, city and village courts outside the city of New York, as hereinafter provided.

b. The court of appeals, the supreme court including the appellate divisions thereof, the court of claims, the county court, the surrogate's court, the family court, the courts or court of civil and criminal jurisdiction of the city of New York, and such other courts as the legislature may determine shall be courts of record.

c. All processes, warrants and other mandates of the court of appeals, the supreme court including the appellate divisions thereof, the court of claims, the county court, the surrogate's court and the family court may be served and executed in any part of the state. All processes, warrants and other mandates of the courts or court of civil and criminal jurisdiction of the city of New York may, subject to such limitation as may be prescribed by the

legislature, be served and executed in any part of the state. The legislature may provide that processes, warrants and other mandates of the district court may be served and executed in any part of the state and that processes, warrants and other mandates of town, village and city courts outside the city of New York may be served and executed in any part of the county in which such courts are located or in any part of any adjoining county.

**[Court of appeals; organization; designations; vacancies, how filled; commission on judicial nomination]**

§2. a. The court of appeals is continued. It shall consist of the chief judge and the six elected associate judges now in office, who shall hold their offices until the expiration of their respective terms, and their successors, and such justices of the supreme court as may be designated for service in said court as hereinafter provided. The official terms of the chief judge and the six associate judges shall be fourteen years.

Five members of the court shall constitute a quorum, and the concurrence of four shall be necessary to a decision; but no more than seven judges shall sit in any case. In case of the temporary absence or inability to act of any judge of the court of appeals, the court may designate any justice of the supreme court to serve as associate judge of the court during such absence or inability to act. The court shall have power to appoint and to remove its clerk. The powers and jurisdiction of the court shall not be suspended for want of appointment when the number of judges is sufficient to constitute a quorum.

b. Whenever and as often as the court of appeals shall certify to the governor that the court is unable, by reason of the accumulation of causes pending therein, to hear and dispose of the same with reasonable speed, the governor shall designate such number of justices of the supreme court as may be so certified to be necessary, but not more than four, to serve as associate judges of the court of appeals. The justices so designated shall be relieved, while so serving, from their duties as justices of the supreme court, and shall serve as associate judges of the court of appeals until the court shall certify that the need for the services of any such justices no longer exists, whereupon they shall return to the supreme court. The governor may fill vacancies among such designated judges. No such justices shall serve as associate judge of the court of appeals except while holding the office of justice of the supreme court. The designation of a justice of the supreme court as an associate judge of the court of appeals shall not be deemed to affect his or her existing office any longer than until the expiration of his or her designation as such associate judge, nor to create a vacancy.

c. There shall be a commission on judicial nomination to evaluate the qualifications of candidates for appointment to the court of appeals and to prepare a written report and recommend to the governor those persons who by their character, temperament, professional aptitude and experience are well qualified to hold such judicial office. The legislature shall provide by law for the organization and procedure of the judicial nominating commission.

d. (l) The commission on judicial nomination shall consist of twelve members of whom four shall be appointed by the governor, four by the chief judge of the court of appeals, and one each by the speaker of the assembly, the temporary president of the senate, the minority leader of the senate, and the minority leader of the assembly. Of the four members appointed by the governor, no more than two shall be enrolled in the same political party, two shall be members of the bar of the state, and two shall not be members of the bar of the state. Of the four members appointed by the chief judge of the court of appeals, no more than two shall be enrolled in the same political party, two shall be members of the bar of the state, and two shall not be members of the bar of the state. No member of the commission shall hold or have held any judicial office or hold any elected public office for which he or she receives compensation during his or her period of service, except that the governor and the chief judge may each appoint no more than one former judge or justice of the unified court system to such commission. No member of the commission shall hold any office in any political party. No member of the judicial nominating commission shall be eligible for appointment to judicial office in any court of the state during the member's period of service or within one year thereafter.

(2) The members first appointed by the governor shall have respectively one, two, three and four year terms as the governor shall designate. The

---

[7] New article adopted by vote of the people November 7, 1961; repealed and replaced former article adopted November 3, 1925, as amended.

Case 23-1, Document 75, 01/25/2023, 3456064, Page251 of 296

members first appointed by the chief judge of the court of appeals shall have respectively one, two, three and four year terms as the chief judge shall designate. The member first appointed by the temporary president of the senate shall have a one-year term. The member first appointed by the minority leader of the senate shall have a two-year term. The member first appointed by the speaker of the assembly shall have a four-year term. The member first appointed by the minority leader of the assembly shall have a three-year term. Each subsequent appointment shall be for a term of four years.

(3) The commission shall designate one of their number to serve as chairperson.

(4) The commission shall consider the qualifications of candidates for appointment to the offices of judge and chief judge of the court of appeals and, whenever a vacancy in those offices occurs, shall prepare a written report and recommend to the governor persons who are well qualified for those judicial offices.

e. The governor shall appoint, with the advice and consent of the senate, from among those recommended by the judicial nominating commission, a person to fill the office of chief judge or associate judge, as the case may be, whenever a vacancy occurs in the court of appeals; provided, however, that no person may be appointed a judge of the court of appeals unless such person is a resident of the state and has been admitted to the practice of law in this state for at least ten years. The governor shall transmit to the senate the written report of the commission on judicial nomination relating to the nominee.

f. When a vacancy occurs in the office of chief judge or associate judge of the court of appeals and the senate is not in session to give its advice and consent to an appointment to fill the vacancy, the governor shall fill the vacancy by interim appointment upon the recommendation of a commission on judicial nomination as provided in this section. An interim appointment shall continue until the senate shall pass upon the governor's selection. If the senate confirms an appointment, the judge shall serve a term as provided in subdivision a of this section commencing from the date of his or her interim appointment. If the senate rejects an appointment, a vacancy in the office shall occur sixty days after such rejection. If an interim appointment to the court of appeals be made from among the justices of the supreme court or the appellate divisions thereof, that appointment shall not affect the justice's existing office, nor create a vacancy in the supreme court, or the appellate division thereof, unless such appointment is confirmed by the senate and the appointee shall assume such office. If an interim appointment of chief judge of the court of appeals be made from among the associate judges, an interim appointment of associate judge shall be made in like manner; in such case, the appointment as chief judge shall not affect the existing office of associate judge, unless such appointment as chief judge is confirmed by the senate and the appointee shall assume such office.

g. The provisions of subdivisions c, d, e and f of this section shall not apply to temporary designations or assignments of judges or justices. (Subdivision a amended, subdivision c repealed and new subdivisions c through g added by vote of the people November 8, 1977; further amended by vote of the people November 6, 2001.)

**[Court of appeals; jurisdiction]**
§3. a. The jurisdiction of the court of appeals shall be limited to the review of questions of law except where the judgment is of death, or where the appellate division, on reversing or modifying a final or interlocutory judgment in an action or a final or interlocutory order in a special proceeding, finds new facts and a final judgment or a final order pursuant thereto is entered; but the right to appeal shall not depend upon the amount involved.

b. Appeals to the court of appeals may be taken in the classes of cases hereafter enumerated in this section;

In criminal cases, directly from a court of original jurisdiction where the judgment is of death, and in other criminal cases from an appellate division or otherwise as the legislature may from time to time provide.

In civil cases and proceedings as follows:

(1) As of right, from a judgment or order entered upon the decision of an appellate division of the supreme court which finally determines an action or special proceeding wherein is directly involved the construction of the

constitution of the state or of the United States, or where one or more of the justices of the appellate division dissents from the decision of the court, or where the judgment or order is one of reversal or modification.

(2) As of right, from a judgment or order of a court of record of original jurisdiction which finally determines an action or special proceeding where the only question involved on the appeal is the validity of a statutory provision of the state or of the United States under the constitution of the state or of the United States; and on any such appeal only the constitutional question shall be considered and determined by the court.

(3) As of right, from an order of the appellate division granting a new trial in an action or a new hearing in a special proceeding where the appellant stipulates that, upon affirmance, judgment absolute or final order shall be rendered against him or her.

(4) From a determination of the appellate division of the supreme court in any department, other than a judgment or order which finally determines an action or special proceeding, where the appellate division allows the same and certifies that one or more questions of law have arisen which, in its opinion, ought to be reviewed by the court of appeals, but in such case the appeal shall bring up for review only the question or questions so certified; and the court of appeals shall certify to the appellate division its determination upon such question or questions.

(5) From an order of the appellate division of the supreme court in any department, in a proceeding instituted by or against one or more public officers or a board, commission or other body of public officers or a court or tribunal, other than an order which finally determines such proceeding, where the court of appeals shall allow the same upon the ground that, in its opinion, a question of law is involved which ought to be reviewed by it, and without regard to the availability of appeal by stipulation for final order absolute.

(6) From a judgment or order entered upon the decision of an appellate division of the supreme court which finally determines an action or special proceeding but which is not appealable under paragraph (1) of this subdivision where the appellate division or the court of appeals shall certify that in its opinion a question of law is involved which ought to be reviewed by the court of appeals. Such an appeal may be allowed upon application (a) to the appellate division, and in case of refusal, to the court of appeals, or (b) directly to the court of appeals. Such an appeal shall be allowed when required in the interest of substantial justice.

(7) No appeal shall be taken to the court of appeals from a judgment or order entered upon the decision of an appellate division of the supreme court in any civil case or proceeding where the appeal to the appellate division was from a judgment or order entered in an appeal from another court, including an appellate or special term of the supreme court, unless the construction of the constitution of the state or of the United States is directly involved therein, or unless the appellate division of the supreme court shall certify that in its opinion a question of law is involved which ought to be reviewed by the court of appeals.

(8) The legislature may abolish an appeal to the court of appeals as of right in any or all of the cases or classes of cases specified in paragraph (1) of this subdivision wherein no question involving the construction of the constitution of the state or of the United States is directly involved, provided, however, that appeals in any such case or class of cases shall thereupon be governed by paragraph (6) of this subdivision.

(9) The court of appeals shall adopt and from time to time may amend a rule to permit the court to answer questions of New York law certified to it by the Supreme Court of the United States, a court of appeals of the United States or an appellate court of last resort of another state, which may be determinative of the cause then pending in the certifying court and which in the opinion of the certifying court are not controlled by precedent in the decisions of the courts of New York. (Paragraph (9) added by vote of the people November 5, 1985; further amended by vote of the people November 6, 2001.)

**[Judicial departments; appellate divisions, how constituted; governor to designate justices; temporary assignments; jurisdiction]**
§4. a. The state shall be divided into four judicial departments. The first department shall consist of the counties within the first judicial district of the state. The second department shall consist of the counties within the second, ninth, tenth and eleventh judicial districts of the state. The third

department shall consist of the counties within the third, fourth and sixth judicial districts of the state. The fourth department shall consist of the counties within the fifth, seventh and eighth judicial districts of the state. Each department shall be bounded by the lines of judicial districts. Once every ten years the legislature may alter the boundaries of the judicial departments, but without changing the number thereof.

b.  The appellate divisions of the supreme court are continued, and shall consist of seven justices of the supreme court in each of the first and second departments, and five justices in each of the other departments. In each appellate division, four justices shall constitute a quorum, and the concurrence of three shall be necessary to a decision. No more than five justices shall sit in any case.

c.  The governor shall designate the presiding justice of each appellate division, who shall act as such during his or her term of office and shall be a resident of the department. The other justices of the appellate divisions shall be designated by the governor, from all the justices elected to the supreme court, for terms of five years or the unexpired portions of their respective terms of office, if less than five years.

d.  The justices heretofore designated shall continue to sit in the appellate divisions until the terms of their respective designations shall expire. From time to time as the terms of the designations expire, or vacancies occur, the governor shall make new designations. The governor may also, on request of any appellate division, make temporary designations in case of the absence or inability to act of any justice in such appellate division, for service only during such absence or inability to act.

e.  In case any appellate division shall certify to the governor that one or more additional justices are needed for the speedy disposition of the business before it, the governor may designate an additional justice or additional justices; but when the need for such additional justice or justices shall no longer exist, the appellate division so certify to the governor, and thereupon service under such designation or designations shall cease.

f.  A majority of the justices designated to sit in any appellate division shall at all times be residents of the department.

g.  Whenever the appellate division in any department shall be unable to dispose of its business within a reasonable time, a majority of the presiding justices of the several departments, at a meeting called by the presiding justice of the department in arrears, may transfer any pending appeals from such department to any other department for hearing and determination.

h.  A justice of the appellate division of the supreme court in any department may be temporarily designated by the presiding justice of his or her department to the appellate division in another judicial department upon agreement by the presiding justices of the appellate division of the departments concerned.

i.  In the event that the disqualification, absence or inability to act of justices in any appellate division prevents there being a quorum of justices qualified to hear an appeal, the justices qualified to hear the appeal may transfer it to the appellate division in another department for hearing and determination. In the event that the justices in any appellate division qualified to hear an appeal are equally divided, said justices may transfer the appeal to the appellate division in another department for hearing and determination. Each appellate division shall have power to appoint and remove its clerk.

j.  No justice of the appellate division shall, within the department to which he or she may be designated to perform the duties of an appellate justice, exercise any of the powers of a justice of the supreme court, other than those of a justice out of court, and those pertaining to the appellate division, except that the justice may decide causes or proceedings theretofore submitted, or hear and decide motions submitted by consent of counsel, but any such justice, when not actually engaged in performing the duties of such appellate justice in the department to which he or she is designated, may hold any term of the supreme court and exercise any of the powers of a justice of the supreme court in any judicial district in any other department of the state.

k.  The appellate divisions of the supreme court shall have all the jurisdiction possessed by them on the effective date of this article and such additional jurisdiction as may be prescribed by law, provided, however, that the right to appeal to the appellate divisions from a judgment or order

which does not finally determine an action or special proceeding may be limited or conditioned by law. (Subdivision e amended by vote of the people November 8, 1977; further amended by vote of the people November 6, 2001.)

**[Appeals from judgment or order; new trial]**

§5.  a.  Upon an appeal from a judgment or an order, any appellate court to which the appeal is taken which is authorized to review such judgment or order may reverse or affirm, wholly or in part, or may modify the judgment or order appealed from, and each interlocutory judgment or intermediate or other order which it is authorized to review, and as to any or all of the parties. It shall thereupon render judgment of affirmance, judgment of reversal and final judgment upon the right of any or all of the parties, or judgment of modification thereon according to law, except where it may be necessary or proper to grant a new trial or hearing, when it may grant a new trial or hearing.

b.  If any appeal is taken to an appellate court which is not authorized to review such judgment or order, the court shall transfer the appeal to an appellate court which is authorized to review such judgment or order.

**[Judicial districts; how constituted; supreme court][8]**

§6.  a.  The state shall be divided into eleven judicial districts. The first judicial district shall consist of the counties of Bronx and New York. The second judicial district shall consist of the counties of Kings and Richmond. The third judicial district shall consist of the counties of Albany, Columbia, Greene, Rensselaer, Schoharie, Sullivan, and Ulster. The fourth judicial district shall consist of the counties of Clinton, Essex, Franklin, Fulton, Hamilton, Montgomery, St. Lawrence, Saratoga, Schenectady, Warren and Washington. The fifth judicial district shall consist of the counties of Herkimer, Jefferson, Lewis, Oneida, Onondaga, and Oswego. The sixth judicial district shall consist of the counties of Broome, Chemung, Chenango, Cortland, Delaware, Madison, Otsego, Schuyler, Tioga and Tompkins. The seventh judicial district shall consist of the counties of Cayuga, Livingston, Monroe, Ontario, Seneca, Steuben, Wayne and Yates. The eighth judicial district shall consist of the counties of Allegany, Cattaraugus, Chautauqua, Erie, Genesee, Niagara, Orleans and Wyoming. The ninth judicial district shall consist of the counties of Dutchess, Orange, Putnam, Rockland and Westchester. The tenth judicial district shall consist of the counties of Nassau and Suffolk. The eleventh judicial district shall consist of the county of Queens.

b.  Once every ten years the legislature may increase or decrease the number of judicial districts or alter the composition of judicial districts and thereupon re-apportion the justices to be thereafter elected in the judicial districts so altered. Each judicial district shall be bounded by county lines.

c.  The justices of the supreme court shall be chosen by the electors of the judicial district in which they are to serve. The terms of justices of the supreme court shall be fourteen years from and including the first day of January next after their election.

d.  The supreme court is continued. It shall consist of the number of justices of the supreme court including the justices designated to the appellate divisions of the supreme court, judges of the county court of the counties of Bronx, Kings, Queens and Richmond and judges of the court of general sessions of the county of New York authorized by law on the thirty-first day of August next after the approval and ratification of this amendment by the people, all of whom shall be justices of the supreme court for the remainder of their terms. The legislature may increase the number of justices of the supreme court in any judicial district, except that the number in any district shall not be increased to exceed one justice for fifty thousand, or fraction over thirty thousand, of the population thereof as shown by the last federal census or state enumeration. The legislature may decrease the number of justices of the supreme court in any judicial district, except that the number in any district shall not be less than the number of justices of the supreme court authorized by law on the effective date of this article.

e.  The clerks of the several counties shall be clerks of the supreme court, with such powers and duties as shall be prescribed by law.

---

[8] Judiciary Law §140 currently sets forth 13 judicial districts.

16

Case 23-1, Document 75, 01/25/2023, 3456064, Page253 of 296

**[Supreme court; jurisdiction]**

§7. a. The supreme court shall have general original jurisdiction in law and equity and the appellate jurisdiction herein provided. In the city of New York, it shall have exclusive jurisdiction over crimes prosecuted by indictment, provided, however, that the legislature may grant to the city-wide court of criminal jurisdiction of the city of New York jurisdiction over misdemeanors prosecuted by indictment and to the family court in the city of New York jurisdiction over crimes and offenses by or against minors or between spouses or between parent and child or between members of the same family or household.

b. If the legislature shall create new classes of actions and proceedings, the supreme court shall have jurisdiction over such classes of actions and proceedings, but the legislature may provide that another court or other courts shall also have jurisdiction and that actions and proceedings of such classes may be originated in such other court or courts. (Subdivision b repealed and subdivision c relettered b by vote of the people November 8, 1977.)

**[Appellate terms; composition; jurisdiction]**

§8. a. The appellate division of the supreme court in each judicial department may establish an appellate term in and for such department or in and for a judicial district or districts or in and for a county or counties within such department. Such an appellate term shall be composed of not less than three nor more than five justices of the supreme court who shall be designated from time to time by the chief administrator of the courts with the approval of the presiding justice of the appropriate appellate division, and who shall be residents of the department or of the judicial district or districts as the case may be and the chief administrator of the courts shall designate the place or places where such appellate terms shall be held.

b. Any such appellate term may be discontinued and re-established as the appellate division of the supreme court in each department shall determine from time to time and any designation to service therein may be revoked by the chief administrator of the courts with the approval of the presiding justice of the appropriate appellate division.

c. In each appellate term no more than three justices assigned thereto shall sit in any action or proceeding. Two of such justices shall constitute a quorum and the concurrence of two shall be necessary to a decision.

d. If so directed by the appellate division of the supreme court establishing an appellate term, an appellate term shall have jurisdiction to hear and determine appeals now or hereafter authorized by law to be taken to the supreme court or to the appellate division other than appeals from the supreme court, a surrogate's court, the family court or appeals in criminal cases prosecuted by indictment or by information as provided in section six of article one.

e. As may be provided by law, an appellate term shall have jurisdiction to hear and determine appeals from the district court or a town, village or city court outside the city of New York. (Subdivisions a, b and d amended by vote of the people November 8, 1977.)

**[Court of claims; jurisdiction]**

§9. The court of claims is continued. It shall consist of the eight judges now authorized by law, but the legislature may increase such number and may reduce such number to six or seven. The judges shall be appointed by the governor by and with the advice and consent of the senate and their terms of office shall be nine years. The court shall have jurisdiction to hear and determine claims against the state or by the state against the claimant or between conflicting claimants as the legislature may provide.

**[County courts; judges]**

§10. a. The county court is continued in each county outside the city of New York. There shall be at least one judge of the county court in each county and such number of additional judges in each county as may be provided by law. The judges shall be residents of the county and shall be chosen by the electors of the county.

b. The terms of the judges of the county court shall be ten years from and including the first day of January next after their election.

**[County court; jurisdiction]**

§11. a. The county court shall have jurisdiction over the following classes of actions and proceedings which shall be originated in such county court in the manner provided by law, except that actions and proceedings within the jurisdiction of the district court or a town, village or city court outside the city of New York may, as provided by law, be originated therein: actions and proceedings for the recovery of money, actions and proceedings for the recovery of chattels and actions and proceedings for the foreclosure of mechanics liens and liens on personal property where the amount sought to be recovered or the value of the property does not exceed twenty-five thousand dollars exclusive of interest and costs; over all crimes and other violations of law; over summary proceedings to recover possession of real property and to remove tenants therefrom; and over such other actions and proceedings, not within the exclusive jurisdiction of the supreme court, as may be provided by law.

b. The county court shall exercise such equity jurisdiction as may be provided by law and its jurisdiction to enter judgment upon a counterclaim for the recovery of money only shall be unlimited.

c. The county court shall have jurisdiction to hear and determine all appeals arising in the county in the following actions and proceedings: as of right, from a judgment or order of the district court or a town, village or city court which finally determines an action or proceeding and, as may be provided by law, from a judgment or order of any such court which does not finally determine an action or proceeding. The legislature may provide, in accordance with the provisions of section eight of this article, that any or all of such appeals be taken to an appellate term of the supreme court instead of the county court.

d. The provisions of this section shall in no way limit or impair the jurisdiction of the supreme court as set forth in section seven of this article. (Subdivision b repealed and subdivisions c, d and e relettered b, c and d by vote of the people November 8, 1977; subdivision a amended by vote of the people November 8, 1983.)

**[Surrogate's courts; judges; jurisdiction]**

§12. a. The surrogate's court is continued in each county in the state. There shall be at least one judge of the surrogate's court in each county and such number of additional judges of the surrogate's court as may be provided by law.

b. The judges of the surrogate's court shall be residents of the county and shall be chosen by the electors of the county.

c. The terms of the judges of the surrogate's court in the city of New York shall be fourteen years, and in other counties ten years, from and including the first day of January next after their election.

d. The surrogate's court shall have jurisdiction over all actions and proceedings relating to the affairs of decedents, probate of wills, administration of estates and actions and proceedings arising thereunder or pertaining thereto, guardianship of the property of minors, and such other actions and proceedings, not within the exclusive jurisdiction of the supreme court, as may be provided by law.

e. The surrogate's court shall exercise such equity jurisdiction as may be provided by law.

f. The provisions of this section shall in no way limit or impair the jurisdiction of the supreme court as set forth in section seven of this article.

**[Family court; organization; jurisdiction]**

§13. a. The family court of the state of New York is hereby established. It shall consist of at least one judge in each county outside the city of New York and such number of additional judges for such counties as may be provided by law. Within the city of New York it shall consist of such number of judges as may be provided by law. The judges of the family court within the city of New York shall be residents of such city and shall be appointed by the mayor of the city of New York for terms of ten years. The judges of the family court outside the city of New York, shall be chosen by the electors of the counties wherein they reside for terms of ten years.

b. The family court shall have jurisdiction over the following classes of actions and proceedings which shall be originated in such family court in the manner provided by law: (1) the protection, treatment, correction and commitment of those minors who are in need of the exercise of the authority

17

Case 23-1, Document 7b, 01/25/2023, 3456054, Page254 of 296

The Constitution of the State of New York

of the court because of circumstances of neglect, delinquency or dependency, as the legislature may determine; (2) the custody of minors except for custody incidental to actions and proceedings for marital separation, divorce, annulment of marriage and dissolution of marriage; (3) the adoption of persons; (4) the support of dependents except for support incidental to actions and proceedings in this state for marital separation, divorce, annulment of marriage or dissolution of marriage; (5) the establishment of paternity; (6) proceedings for conciliation of spouses; and (7) as may be provided by law: the guardianship of the person of minors and, in conformity with the provisions of section seven of this article, crimes and offenses by or against minors or between spouses or between parent and child or between members of the same family or household. Nothing in this section shall be construed to abridge the authority or jurisdiction of courts to appoint guardians in cases originating in those courts.

c. The family court shall also have jurisdiction to determine, with the same powers possessed by the supreme court, the following matters when referred to the family court from the supreme court: habeas corpus proceedings for the determination of the custody of minors; and in actions and proceedings for marital separation, divorce, annulment of marriage and dissolution of marriage, applications to fix temporary or permanent support and custody, or applications to enforce judgments and orders of support and of custody, or applications to modify judgments and orders of support and of custody which may be granted only upon the showing to the family court that there has been a subsequent change of circumstances and that modification is required.

d. The provisions of this section shall in no way limit or impair the jurisdiction of the supreme court as set forth in section seven of this article. (Amended by vote of the people November 6, 1973.)

**[Discharge of duties of more than one judicial office by same judicial officer]**
§14. The legislature may at any time provide that outside the city of New York the same person may act and discharge the duties of county judge and surrogate or of judge of the family court and surrogate, or of county judge and judge of the family court, or of all three positions in any county.

**[New York city; city-wide courts; jurisdiction]**
§15. a. The legislature shall by law establish a single court of city-wide civil jurisdiction and a single court of city-wide criminal jurisdiction in and for the city of New York and the legislature may, upon the request of the mayor and the local legislative body of the city of New York, merge the two courts into one city-wide court of both civil and criminal jurisdiction. The said city-wide courts shall consist of such number of judges as may be provided by law. The judges of the court of city-wide civil jurisdiction shall be residents of such city and shall be chosen for terms of ten years by the electors of the counties included within the city of New York from districts within such counties established by law. The judges of the court of city-wide criminal jurisdiction shall be residents of such city and shall be appointed for terms of ten years by the mayor of the city of New York.

b. The court of city-wide civil jurisdiction of the city of New York shall have jurisdiction over the following classes of actions and proceedings which shall be originated in such court in the manner provided by law: actions and proceedings for the recovery of money, actions and proceedings for the recovery of chattels and actions and proceedings for the foreclosure of mechanics liens and liens on personal property where the amount sought to be recovered or the value of the property does not exceed twenty-five thousand dollars exclusive of interest and costs, or such smaller amount as may be fixed by law; over summary proceedings to recover possession of real property and to remove tenants therefrom and over such other actions and proceedings, not within the exclusive jurisdiction of the supreme court, as may be provided by law. The court of city-wide civil jurisdiction shall further exercise such equity jurisdiction as may be provided by law and its jurisdiction to enter judgment upon a counterclaim for the recovery of money only shall be unlimited.

c. The court of city-wide criminal jurisdiction of the city of New York shall have jurisdiction over crimes and other violations of law, other than those prosecuted by indictment, provided, however, that the legislature may grant to said court jurisdiction over misdemeanors prosecuted by indictment;

and over such other actions and proceedings, not within the exclusive jurisdiction of the supreme court, as may be provided by law.

d. The provisions of this section shall in no way limit or impair the jurisdiction of the supreme court as set forth in section seven of this article. (Subdivision b amended by vote of the people November 8, 1983; further amended by vote of the people November 7, 1995.)

**[District courts; jurisdiction; judges]**
§16. a. The district court of Nassau county may be continued under existing law and the legislature may, at the request of the board of supervisors or other elective governing body of any county outside the city of New York, establish the district court for the entire area of such county or for a portion of such county consisting of one or more cities, or one or more towns which are contiguous, or of a combination of such cities and such towns provided at least one of such cities is contiguous to one of such towns.

b. No law establishing the district court for an entire county shall become effective unless approved at a general election on the question of the approval of such law by a majority of the votes cast thereon by the electors within the area of any cities in the county considered as one unit and by a majority of the votes cast thereon by the electors within the area outside of cities in the county considered as one unit.

c. No law establishing the district court for a portion of a county shall become effective unless approved at a general election on the question of the approval of such law by a majority of the votes cast thereon by the electors within the area of any cities included in such portion of the county considered as one unit and by a majority of the votes cast thereon by the electors within the area outside of cities included in such portion of the county considered as one unit.

d. The district court shall have such jurisdiction as may be provided by law, but not in any respect greater than the jurisdiction of the courts for the city of New York as provided in section fifteen of this article, provided, however, that in actions and proceedings for the recovery of money, actions and proceedings for the recovery of chattels and actions and proceedings for the foreclosure of mechanics liens and liens on personal property, the amount sought to be recovered or the value of the property shall not exceed fifteen thousand dollars exclusive of interest and costs.

e. The legislature may create districts of the district court which shall consist of an entire county or of an area less than a county.

f. There shall be at least one judge of the district court for each district and such number of additional judges in each district as may be provided by law.

g. The judges of the district court shall be apportioned among the districts as may be provided by law, and to the extent practicable, in accordance with the population and the volume of judicial business.

h. The judges shall be residents of the district and shall be chosen by the electors of the district. Their terms shall be six years from and including the first day of January next after their election.

i. The legislature may regulate and discontinue the district court in any county or portion thereof. (Subdivision d amended by vote of the people November 8, 1983.)

**[Town, village and city courts; jurisdiction; judges]**
§17. a. Courts for towns, villages and cities outside the city of New York are continued and shall have the jurisdiction prescribed by the legislature but not in any respect greater than the jurisdiction of the district court as provided in section sixteen of this article.

b. The legislature may regulate such courts, establish uniform jurisdiction, practice and procedure for city courts outside the city of New York and may discontinue any village or city court outside the city of New York existing on the effective date of this article. The legislature may discontinue any town court existing on the effective date of this article only with the approval of a majority of the total votes cast at a general election on the question of a proposed discontinuance of the court in each such town affected thereby.

c. The legislature may abolish the legislative functions on town boards of justices of the peace and provide that town councilmen be elected in their stead.

18

**FILED: KINGS COUNTY CLERK 10/15/2019 02:58 PM**

INDEX NO. 518540/2019

NYSCEF DOC. NO. 286

RECEIVED NYSCEF: 10/15/2019

Case 23-1, Document 75, 01/25/2023, 3456054, Page255 of 296

The Constitution of the State of New York

d.  The number of the judges of each of such town, village and city courts and the classification and duties of the judges shall be prescribed by the legislature. The terms, method of selection and method of filling vacancies for the judges of such courts shall be prescribed by the legislature, provided, however, that the justices of town courts shall be chosen by the electors of the town for terms of four years from and including the first day of January next after their election.

**[Trial by jury; trial without jury; claims against state]**

§18. a.  Trial by jury is guaranteed as provided in article one of this constitution. The legislature may provide that in any court of original jurisdiction a jury shall be composed of six or of twelve persons and may authorize any court which shall have jurisdiction over crimes and other violations of law, other than crimes prosecuted by indictment, to try such matters without a jury, provided, however, that crimes prosecuted by indictment shall be tried by a jury composed of twelve persons, unless a jury trial has been waived as provided in section two of article one of this constitution.

b.  The legislature may provide for the manner of trial of actions and proceedings involving claims against the state.

**[Transfer of actions and proceedings]**

§19. a.  The supreme court may transfer any action or proceeding, except one over which it shall have exclusive jurisdiction which does not depend upon the monetary amount sought, to any other court having jurisdiction of the subject matter within the judicial department provided that such other court has jurisdiction over the classes of persons named as parties. As may be provided by law, the supreme court may transfer to itself any action or proceeding originated or pending in another court within the judicial department other than the court of claims upon a finding that such a transfer will promote the administration of justice.

b.  The county court shall transfer to the supreme court or surrogate's court or family court any action or proceeding which has not been transferred to it from the supreme court or surrogate's court or family court and over which the county court has no jurisdiction. The county court may transfer any action or proceeding, except a criminal action or proceeding involving a felony prosecuted by indictment or an action or proceeding required by this article to be dealt with in the surrogate's court or family court, to any court, other than the supreme court, having jurisdiction of the subject matter within the county provided that such other court has jurisdiction over the classes of persons named as parties.

c.  As may be provided by law, the supreme court or the county court may transfer to the county court any action or proceeding originated or pending in the district court or a town, village or city court outside the city of New York upon a finding that such a transfer will promote the administration of justice.

d.  The surrogate's court shall transfer to the supreme court or the county court or the family court or the courts for the city of New York established pursuant to section fifteen of this article any action or proceeding which has not been transferred to it from any of said courts and over which the surrogate's court has no jurisdiction.

e.  The family court shall transfer to the supreme court or the surrogate's court or the county court or the courts for the city of New York established pursuant to section fifteen of this article any action or proceeding which has not been transferred to it from any of said courts and over which the family court has no jurisdiction.

f.  The courts for the city of New York established pursuant to section fifteen of this article shall transfer to the supreme court or the surrogate's court or the family court any action or proceeding which has not been transferred to them from any of said courts and over which the said courts for the city of New York have no jurisdiction.

g.  As may be provided by law, the supreme court shall transfer any action or proceeding to any other court having jurisdiction of the subject matter in any other judicial district or county provided that such other court has jurisdiction over the classes of persons named as parties.

h.  As may be provided by law, the county court, the surrogate's court, the family court and the courts for the city of New York established pursuant to section fifteen of this article may transfer any action or

proceeding, other than one which has previously been transferred to it, to any other court, except the supreme court, having jurisdiction of the subject matter in any other judicial district or county provided that such other court has jurisdiction over the classes of persons named as parties.

i.  As may be provided by law, the district court of a town, village or city court outside the city of New York may transfer any action or proceeding, other than one which has previously been transferred to it, to any court, other than the county court or the surrogate's court or the family court or the supreme court, having jurisdiction of the subject matter in the same or an adjoining county provided that such other court has jurisdiction over the classes of persons named as parties.

j.  Each court shall exercise jurisdiction over any action or proceeding transferred to it pursuant to this section.

k.  The legislature may provide that the verdict or judgment in actions and proceedings so transferred shall not be subject to the limitation of monetary jurisdiction of the court to which the actions and proceedings are transferred if that limitation be lower than that of the court in which the actions and proceedings were originated.

**[Judges and justices; qualifications; eligibility for other office or service; restrictions]**

§20. a.  No person, other than one who holds such office at the effective date of this article, may assume the office of judge of the court of appeals, justice of the supreme court, or judge of the court of claims unless he or she has been admitted to practice law in this state at least ten years. No person, other than one who holds such office at the effective date of this article, may assume the office of judge of the county court, surrogate's court, family court, a court for the city of New York established pursuant to section fifteen of this article, district court or city court outside the city of New York unless he or she has been admitted to practice law in this state at least five years or such greater number of years as the legislature may determine.

b.  A judge of the court of appeals, justice of the supreme court, judge of the court of claims, judge of a county court, judge of the surrogate's court, judge of the family court or judge of a court for the city of New York established pursuant to section fifteen of this article who is elected or appointed after the effective date of this article may not:

(1)  hold any other public office or trust except an office in relation to the administration of the courts, member of a constitutional convention or member of the armed forces of the United States or of the state of New York in which latter event the legislature may enact such legislation as it deems appropriate to provide for a temporary judge or justice to serve during the period of the absence of such judge or justice in the armed forces;

(2)  be eligible to be a candidate for any public office other than judicial office or member of a constitutional convention, unless he or she resigns from judicial office; in the event a judge or justice does not so resign from judicial office within ten days after his or her acceptance of the nomination of such other office, his or her judicial office shall become vacant and the vacancy shall be filled in the manner provided in this article;

(3)  hold any office or assume the duties or exercise the powers of any office of any political organization or be a member of any governing or executive agency thereof;

(4)  engage in the practice of law, act as an arbitrator, referee or compensated mediator in any action or proceeding or matter or engage in the conduct of any other profession or business which interferes with the performance of his or her judicial duties.

Judges and justices of the courts specified in this subdivision shall also be subject to such rules of conduct as may be promulgated by the chief administrator of the courts with the approval of the court of appeals.

c.  Qualifications for and restrictions upon the judges of district, town, village or city courts outside the city of New York, other than such qualifications and restrictions specifically set forth in subdivision a of this section, shall be prescribed by the legislature, provided, however, that the legislature shall require a course of training and education to be completed by justices of town and village courts selected after the effective date of this article who have not been admitted to practice law in this state. Judges of such courts shall also be subject to such rules of conduct not inconsistent with laws as may be promulgated by the chief administrator of the courts

with the approval of the court of appeals. (Amended by vote of the people November 8, 1977; November 6, 2001.)

**[Vacancies; how filled]**

§21. a. When a vacancy shall occur, otherwise than by expiration of term, in the office of justice of the supreme court, of judge of the county court, of judge of the surrogate's court or judge of the family court outside the city of New York, it shall be filled for a full term at the next general election held not less than three months after such vacancy occurs and until the vacancy shall be so filled, the governor by and with the advice and consent of the senate, if the senate shall be in session, or, if the senate not be in session, the governor may fill such vacancy by an appointment which shall continue until and including the last day of December next after the election at which the vacancy shall be filled.

b. When a vacancy shall occur, otherwise than by expiration of term, in the office of judge of the court of claims, it shall be filled for the unexpired term in the same manner as an original appointment.

c. When a vacancy shall occur, otherwise than by expiration of term, in the office of judge elected to the city-wide court of civil jurisdiction of the city of New York, it shall be filled for a full term at the next general election held not less than three months after such vacancy occurs and, until the vacancy shall be so filled, the mayor of the city of New York may fill such vacancy by an appointment which shall continue until and including the last day of December next after the election at which the vacancy shall be filled. When a vacancy shall occur, otherwise than by expiration of term on the last day of December of any year, in the office of judge appointed to the family court within the city of New York or the city-wide court of criminal jurisdiction of the city of New York, the mayor of the city of New York shall fill such vacancy by an appointment for the unexpired term.

d. When a vacancy shall occur, otherwise than by expiration of term, in the office of judge of the district court, it shall be filled for a full term at the next general election held not less than three months after such vacancy occurs and, until the vacancy shall be so filled, the board of supervisors or the supervisor or supervisors of the affected district if such district consists of a portion of a county or, in counties with an elected county executive officer, such county executive officer may, subject to confirmation by the board of supervisors or the supervisor or supervisors of such district, fill such vacancy by an appointment which shall continue until and including the last day of December next after the election at which the vacancy shall be filled.

**[Commission on judicial conduct; composition; organization and procedure; review by court of appeals; discipline of judges or justices]**

§22. a. There shall be a commission on judicial conduct. The commission on judicial conduct shall receive, initiate, investigate and hear complaints with respect to the conduct, qualifications, fitness to perform or performance of official duties of any judge or justice of the unified court system, in the manner provided by law; and, in accordance with subdivision d of this section, may determine that a judge or justice be admonished, censured or removed from office for cause, including, but not limited to, misconduct in office, persistent failure to perform his or her duties, habitual intemperance, and conduct, on or off the bench, prejudicial to the administration of justice, or that a judge or justice be retired for mental or physical disability preventing the proper performance of his or her judicial duties. The commission shall transmit an[9] such determination to the chief judge of the court of appeals who shall cause written notice of such determination to be given to the judge or justice involved. Such judge or justice may either accept the commission's determination or make written request to the chief judge, within thirty days after receipt of such notice, for a review of such determination by the court of appeals.

b. (l) The commission on judicial conduct shall consist of eleven members, of whom four shall be appointed by the governor, one by the temporary president of the senate, one by the minority leader of the senate, one by the speaker of the assembly, one by the minority leader of the assembly and three by the chief judge of the court of appeals. Of the

members appointed by the governor one person shall be a member of the bar of the state but not a judge or justice, two shall not be members of the bar, justices or judges or retired justices or judges of the unified court system, and one shall be a judge or justice of the unified court system. Of the members appointed by the chief judge one person shall be a justice of the appellate division of the supreme court and two shall be judges or justices of a court or courts other than the court of appeals or appellate divisions. None of the persons to be appointed by the legislative leaders shall be justices or judges or retired justices or judges.

(2) The persons first appointed by the governor shall have respectively one, two, three, and four-year terms as the governor shall designate. The persons first appointed by the chief judge of the court of appeals shall have respectively two, three, and four-year terms as the governor shall designate. The person first appointed by the temporary president of the senate shall have a one-year term. The person first appointed by the minority leader of the senate shall have a two-year term. The person first appointed by the speaker of the assembly shall have a four-year term. The person first appointed by the minority leader of the assembly shall have a three-year term. Each member of the commission shall be appointed thereafter for a term of four years. Commission membership of a judge or justice appointed by the governor or the chief judge shall terminate if such member ceases to hold the judicial position which qualified him or her for such appointment. Membership shall also terminate if a member attains a position which would have rendered him or her ineligible for appointment at the time of appointment. A vacancy shall be filled by the appointing officer for the remainder of the term.

c. The organization and procedure of the commission on judicial conduct shall be as provided by law. The commission on judicial conduct may establish its own rules and procedures not inconsistent with law. Unless the legislature shall provide otherwise, the commission shall be empowered to designate one of its members or any other person as a referee to hear and report concerning any matter before the commission.

d. In reviewing a determination of the commission on judicial conduct, the court of appeals may admonish, censure, remove or retire, for the reasons set forth in subdivision a of this section, any judge of the unified court system. In reviewing a determination of the commission on judicial conduct, the court of appeals shall review the commission's findings of fact and conclusions of law on the record of the proceedings upon which the commission's determination was based. The court of appeals may impose a less or more severe sanction prescribed by this section than the one determined by the commission, or impose no sanction.

e. The court of appeals may suspend a judge or justice from exercising the powers of his or her office while there is pending a determination by the commission on judicial conduct for his or her removal or retirement, or while the judge or justice is charged in this state with a felony by an indictment or an information filed pursuant to section six of article one. The suspension shall continue upon conviction and, if the conviction becomes final, the judge or justice shall be removed from office. The suspension shall be terminated upon reversal of the conviction and dismissal of the accusatory instrument. Nothing in this subdivision shall prevent the commission on judicial conduct from determining that a judge or justice be admonished, censured, removed, or retired pursuant to subdivision a of this section.

f. Upon the recommendation of the commission on judicial conduct or on its own motion, the court of appeals may suspend a judge or justice from office when he or she is charged with a crime punishable as a felony under the laws of this state, or any other crime which involves moral turpitude. The suspension shall continue upon conviction and, if the conviction becomes final, the judge or justice shall be removed from office. The suspension shall be terminated upon reversal of the conviction and dismissal of the accusatory instrument. Nothing in this subdivision shall prevent the commission on judicial conduct from determining that a judge or justice be admonished, censured, removed, or retired pursuant to subdivision a of this section.

g. A judge or justice who is suspended from office by the court of appeals shall receive his or her judicial salary during such period of suspension, unless the court directs otherwise. If the court has so directed

---

[9] As so in original ("an should be "any").

Case 23-1, Document 75, 01/25/2023, 3456064, Page257 of 296

and such suspension is thereafter terminated, the court may direct that the judge or justice shall be paid his or her salary for such period of suspension.

h.   A judge or justice retired by the court of appeals shall be considered to have retired voluntarily. A judge or justice removed by the court of appeals shall be ineligible to hold other judicial office.

i.   Notwithstanding any other provision of this section, the legislature may provide by law for review of determinations of the commission on judicial conduct with respect to justices of town and village courts by an appellate division of the supreme court. In such event, all references in this section to the court of appeals and the chief judge thereof shall be deemed references to an appellate division and the presiding justice thereof, respectively.

j.   If a court on the judiciary shall have been convened before the effective date of this section and the proceeding shall not be concluded by that date, the court on the judiciary shall have continuing jurisdiction beyond the effective date of this section to conclude the proceeding. All matters pending before the former commission on judicial conduct on the effective date of this section shall be disposed of in such manner as shall be provided by law. (Former §22 repealed and new §22 added by November 6, 2001.)

**[Removal of judges]**

§23.   a.  Judges of the court of appeals and justices of the supreme court may be removed by concurrent resolution of both houses of the legislature, if two-thirds of all the members elected to each house concur therein.

b.   Judges of the court of claims, the county court, the surrogate's court, the family court, the courts for the city of New York established pursuant to section fifteen of this article, the district court and such other courts as the legislature may determine may be removed by the senate, on the recommendation of the governor, if two-thirds of all the members elected to the senate concur therein.

c.   No judge or justice shall be removed by virtue of this section except for cause, which shall be entered on the journals, nor unless he or she shall have been served with a statement of the cause alleged, and shall have had an opportunity to be heard. On the question of removal, the yeas and nays shall be entered on the journal. (Amended by vote of the people November 6, 2001.)

**[Court for trial of impeachments; judgment]**

§24.   The assembly shall have the power of impeachment by a vote of a majority of all the members elected thereto. The court for the trial of impeachments shall be composed of the president of the senate, the senators, or the major part of them, and the judges of the court of appeals, or the major part of them. On the trial of an impeachment against the governor or lieutenant-governor, neither the lieutenant-governor nor the temporary president of the senate shall act as a member of the court. No judicial officer shall exercise his or her office after articles of impeachment against him or her shall have been preferred to the senate, until he or she shall have been acquitted. Before the trial of an impeachment, the members of the court shall take an oath or affirmation truly and impartially to try the impeachment according to the evidence, and no person shall be convicted without the concurrence of two-thirds of the members present. Judgment in cases of impeachment shall not extend further than to removal from office, or removal from office and disqualification to hold and enjoy any public office of honor, trust, or profit under this state; but the party impeached shall be liable to indictment and punishment according to law. (Amended by vote of the people November 6, 2001.)

**[Judges and justices; compensation; retirement]**

§25.   a.  The compensation of a judge of the court of appeals, a justice of the supreme court, a judge of the court of claims, a judge of the county court, a judge of the surrogate's court, a judge of the family court, a judge of a court for the city of New York established pursuant to section fifteen of this article, a judge of the district court or of a retired judge or justice shall be established by law and shall not be diminished during the term of office for which he or she was elected or appointed. Any judge or justice of a court abolished  by  section thirty-five of this article, who pursuant to that section becomes a judge or justice of a court established or continued by this article, shall receive without interruption or diminution for the remainder of the term

for which he or she was elected or appointed to the abolished court the compensation he or she had been receiving upon the effective date of this article together with any additional compensation that may be prescribed by law.

b.   Each judge of the court of appeals, justice of the supreme court, judge of the court of claims, judge of the county court, judge of the surrogate's court, judge of the family court, judge of a court for the city of New York established pursuant to section fifteen of this article and judge of the district court shall retire on the last day of December in the year in which he or she reaches the age of seventy. Each such former thereafter perform the duties of a justice of the supreme court, with power to hear and determine actions and proceedings, provided, however, that it shall be certificated in the manner provided by law that the services of such judge or justice are necessary to expedite the business of the court and that he or she is mentally and physically able and competent to perform the full duties of such office. Any such certification shall be valid for a term of two years and may be extended as provided by law for additional terms of two years. A retired judge or justice shall serve no longer than until the last day of December in the year in which he or she reaches the age of seventy-six. A retired judge or justice shall be subject to assignment by the appellate division of the supreme court of the judicial department of his or her residence. Any retired justice of the supreme court who had been designated to and served as a justice of any appellate division immediately preceding his or her reaching the age of seventy shall be eligible for designation by the governor as a temporary or additional justice of the appellate division. A retired judge or justice shall not be counted in determining the number of justices in a judicial district for purposes of subdivision d of section six of this article.

c.   The provisions of this section shall also be applicable to any judge or justice who has not reached the age of seventy-six and to whom it would otherwise have been applicable but for the fact that he or she reached the age of seventy and retired before the effective date of this article. (Subdivision b amended by vote of the people November 8, 1966; further amended by vote of the people November 6, 2001.)

**[Temporary assignments of judges and justices]**

§26.  a.  A justice of the supreme court may perform the duties of office or hold court in any county and may be temporarily assigned to the supreme court in any judicial district or to the court of claims. A justice of the supreme court in the city of New York may be temporarily assigned to the family court in the city of New York or to the surrogate's court in any county within the city of New York when required to dispose of the business of such court.

b.   A judge of the court of claims may perform the duties of office or hold court in any county and may be temporarily assigned to the supreme court in any judicial district.

c.   A judge of the county court may perform the duties of office or hold court in any county and may be temporarily assigned to the supreme court in the judicial department of his or her residence or to the county court or the family court in any county or to the surrogate's court in any county outside the city of New York or to a court for the city of New York established pursuant to section fifteen of this article.

d.   A judge of the surrogate's court in any county within the city of New York may perform the duties of office or hold court in any county and may be temporarily assigned to the supreme court in the judicial department of his or her residence.

e.   A judge of the surrogate's court in any county outside the city of New York may perform the duties of office or hold court in any county and may be temporarily assigned to the supreme court in the judicial department of his or her residence or to the county court or the family court in any county or to a court for the city of New York established pursuant to section fifteen of this article.

f.   A judge of the family court may perform the duties of office or hold court in any county and may be temporarily assigned to the supreme court in the judicial department of his or her residence or to the county court or the family court in any county or to the surrogate's court in any county outside the city of New York or to a court for the city of New York established pursuant to section fifteen of this article.

g.   A judge of a court for the city of New York established pursuant to section fifteen of this article may perform the duties of office or hold court in

21

Case 23-1, Document 75, 01/25/2023, 3456054, Page258 of 296

any county and may be temporarily assigned to the supreme court in the judicial department of his or her residence or to the county court or the family court in any county or to the other court for the city of New York established pursuant to section fifteen of this article.

h. A judge of the district court in any county may perform the duties of office or hold court in any county and may be temporarily assigned to the county court in the judicial department of his or her residence or to a court for the city of New York established pursuant to section fifteen of this article or to the district court in any county.

i. Temporary assignments of all the foregoing judges or justices listed in this section, and of judges of the city courts pursuant to paragraph two of subdivision j of this section, shall be made by the chief administrator of the courts in accordance with standards and administrative policies established pursuant to section twenty-eight of this article.

j. (1) The legislature may provide for temporary assignments within the county of residence or any adjoining county, of judges of town, village or city courts outside the city of New York.

(2) In addition to any temporary assignments to which a judge of a city court may be subject pursuant to paragraph one of this subdivision, such judge also may be temporarily assigned by the chief administrator of the courts to the county court, the family court or the district court within his or her county of residence or any adjoining county provided he or she is not permitted to practice law.

k. While temporarily assigned pursuant to the provisions of this section, any judge or justice shall have the powers, duties and jurisdiction of a judge or justice of the court to which assigned. After the expiration of any temporary assignment, as provided in this section, the judge or justice assigned shall have all the powers, duties and jurisdiction of a judge or justice of the court to which he or she was assigned with respect to matters pending before him or her during the term of such temporary assignment. (Subdivision i amended by vote of the people November 8, 1977; subdivision f amended by vote of the people November 8, 1983; further amended by vote of the people November 6, 2001.)

**[Supreme court; extraordinary terms]**
§27. The governor may, when in his or her opinion the public interest requires, appoint extraordinary terms of the supreme court. The governor shall designate the time and place of holding the term and the justice who shall hold the term. The governor may terminate the assignment of the justice and may name another justice in his or her place to hold the term. (Amended by vote of the people November 6, 2001.)

**[Administrative supervision of court system]**
§28. a. The chief judge of the court of appeals shall be the chief judge of the state of New York and shall be the chief judicial officer of the unified court system. There shall be an administrative board of the courts which shall consist of the chief judge of the court of appeals as chairperson and the presiding justice of the appellate division of the supreme court of each judicial department. The chief judge shall, with the advice and consent of the administrative board of the courts, appoint a chief administrator of the courts who shall serve at the pleasure of the chief judge.

b. The chief administrator, on behalf of the chief judge, shall supervise the administration and operation of the unified court system. In the exercise of such responsibility, the chief administrator of the courts shall have such powers and duties as may be delegated to him or her by the chief judge and such additional powers and duties as may be provided by law.

c. The chief judge, after consultation with the administrative board, shall establish standards and administrative policies for general application throughout the state, which shall be submitted by the chief judge to the court of appeals, together with the recommendations, if any, of the administrative board. Such standards and administrative policies shall be promulgated after approval by the court of appeals. (Formerly §28. Repealed and new §28 added by vote of the people November 8, 1977; amended by vote of the people November 6, 2001.)

**[Expenses of courts]**
§29. a. The legislature shall provide for the allocation of the cost of operating and maintaining the court of appeals, the appellate division of the

supreme court in each judicial department, the supreme court, the court of claims, the county court, the surrogate's court, the family court, the courts for the city of New York established pursuant to section fifteen of this article and the district court, among the state, the counties, the city of New York and other political subdivisions.

b. The legislature shall provide for the submission of the itemized estimates of the annual financial needs of the courts referred to in subdivision a of this section to the chief administrator of the courts to be forwarded to the appropriating bodies with recommendations and comment.

c. Insofar as the expense of the courts is borne by the state or paid by the state in the first instance, the final determination of the itemized estimates of the annual financial needs of the courts shall be made by the legislature and the governor in accordance with articles four and seven of this constitution.

d. Insofar as the expense of the courts is not paid by the state in the first instance and is borne by counties, the city of New York or other political subdivisions, the final determination of the itemized estimates of the annual financial needs of the courts shall be made by the appropriate governing bodies of such counties, the city of New York or other political subdivisions. (Subdivision b amended by vote of the people November 8, 1977.)

**[Legislative power over jurisdiction and proceedings; delegation of power to regulate practice and procedure]**
§30. The legislature shall have the same power to alter and regulate the jurisdiction and proceedings in law and in equity that it has heretofore exercised. The legislature may, on such terms as it shall provide and subject to subsequent modification, delegate, in whole or in part, to a court, including the appellate division of the supreme court, or to the chief administrator of the courts, any power possessed by the legislature to regulate practice and procedure in the courts. The chief administrator of the courts shall exercise any such power delegated to him or her with the advice and consent of the administrative board of the courts. Nothing herein contained shall prevent the adoption of regulations by individual courts consistent with the general practice and procedure as provided by statute or general rules. (Amended by vote of the people November 8, 1977.)

**[Inapplicability of article to certain courts]**
§31. This article does not apply to the peacemakers courts or other Indian courts, the existence and operation of which shall continue as may be provided by law.

**[Custodians of children to be of same religious persuasion]**
§32. When any court having jurisdiction over a child shall commit it or remand it to an institution or agency or place it in the custody of any person by parole, placing out, adoption or guardianship, the child shall be committed or remanded or placed, when practicable, in an institution or agency governed by persons, or in the custody of a person, of the same religious persuasion as the child.

**[Existing laws; duty of legislature to implement article]**
§33. Existing provisions of law not inconsistent with this article shall continue in force until repealed, amended, modified or superseded in accordance with the provisions of this article. The legislature shall enact appropriate laws to carry into effect the purposes and provisions of this article, and may, for the purpose of implementing, supplementing or clarifying any of its provisions, enact any laws, not inconsistent with the provisions of this article, necessary or desirable in promoting the objectives of this article.

**[Pending appeals, actions and proceedings; preservation of existing terms of office of judges and justices]**
§34. a. The court of appeals, the appellate division of the supreme court, the supreme court, the court of claims, the county court in counties outside the city of New York, the surrogate's court and the district court of Nassau county shall hear and determine all appeals, actions and proceedings pending therein on the effective date of this article except that the appellate division of the supreme court in the first and second judicial departments or the appellate term in such departments, if so directed by the appropriate appellate division of the supreme court, shall hear and determine all appeals

Case 23-1, Document 75, 01/25/2023, 3456064, Page259 of 296

pending in the appellate terms of the supreme court in the first and second judicial departments and in the court of special sessions of the city of New York and except that the county court or an appellate term shall, as may be provided by law, hear and determine all appeals pending in the county court or the supreme court other than an appellate term. Further appeal from a decision of the county court, the appellate term or the appellate division of the supreme court, rendered on or after the effective date of this article, shall be governed by the provisions of this article.

b. The justices of the supreme court in office on the effective date of this article shall hold their offices as justices of the supreme court until the expiration of their respective terms.

c. The judges of the court of claims in office on the effective date of this article shall hold their offices as judges of the court of claims until the expiration of their respective terms.

d. The surrogates, and county judges outside the city of New York, including the special county judges of the counties of Erie and Suffolk, in office on the effective date of this article shall hold office as judges of the surrogate's court or county judge, respectively, of such counties until the expiration of their respective terms.

e. The judges of the district court of Nassau county in office on the effective date of this article shall hold their offices until the expiration of their respective terms.

f. Judges of courts for towns, villages and cities outside the city of New York in office on the effective date of this article shall hold their offices until the expiration of their respective terms.

**[Certain courts abolished; transfer of judges, court personnel, and actions and proceedings to other courts]**

§35. a. The children's courts, the court of general sessions of the county of New York, the county courts of the counties of Bronx, Kings, Queens and Richmond, the city court of the city of New York, the domestic relations court of the city of New York, the municipal court of the city of New York, the court of special sessions of the city of New York and the city magistrates' courts of the city of New York are abolished from and after the effective date of this article and thereupon the seals, records, papers and documents of or belonging to such courts shall, unless otherwise provided by law, be deposited in the offices of the clerks of the several counties in which these courts now exist.

b. The judges of the county court of the counties of Bronx, Kings, Queens and Richmond and the judges of the court of general sessions of the county of New York in office on the effective date of this article appointed, be justices of the supreme court in and for the judicial district which includes the county in which they resided on that date. The salaries of such justices shall be the same as the salaries of the other justices of the supreme court residing in the same judicial district and shall be paid in the same manner. All actions and proceedings pending in the county court of the counties of Bronx, Kings, Queens and Richmond and in the court of general sessions of the county of New York on the effective date of this article shall be transferred to the supreme court in the county in which the action or proceedings was pending, or otherwise as may be provided by law.

c. The legislature shall provide by law that the justices of the city court of the city of New York and the justices of the municipal court of the city of New York in office on the date such courts are abolished shall, for the remainder of the term for which each was elected or appointed, be judges of the city-wide court of civil jurisdiction of the city of New York established pursuant to section fifteen of this article and for such district as the legislature may determine.

d. The legislature shall provide by law that the justices of the court of special sessions and the magistrates of the city magistrates' courts of the city of New York in office on the date such courts are abolished shall, for the remainder of the term for which each was appointed, be judges of the city-wide court of criminal jurisdiction of the city of New York established pursuant to section fifteen provided, however, that each term shall expire on the last day of the year in which it would have expired except for the provisions of this article.

e. All actions and proceedings pending in the city court of the city of New York and the municipal court in the city of New York on the date such courts are abolished shall be transferred to the city-wide court of civil jurisdiction of the city of New York established pursuant to section fifteen of this article or as otherwise provided by law.

f. All actions and proceedings pending in the court of special sessions of the city of New York and the city magistrates' courts of the city of New York on the date such courts are abolished shall be transferred to the city-wide court of criminal jurisdiction of the city of New York established pursuant to section fifteen of this article or as otherwise provided by law.

g. The special county judges of the counties of Broome, Chautauqua, Jefferson, Oneida and Rockland and the judges of the children's courts in all counties outside the city of New York in office on the effective date of this article shall, for the remainder of the terms for which they were elected or appointed, be judges of the family court in and for the county in which they hold office. Except as otherwise provided in this section, the office of special county judge and the office of special surrogate is abolished from and after the effective date of this article and the terms of the persons holding such offices shall terminate on that date.

h. All actions and proceedings pending in the children's courts in counties outside the city of New York on the effective date of this article shall be transferred to the family court in the respective counties.

i. The justices of the domestic relations court of the city of New York in office on the effective date of this article shall, for the remainder of the terms for which they were appointed, be judges of the family court within the city of New York.

j. All actions and proceedings pending in the domestic relations court of the city of New York on the effective date of this article shall be transferred to the family court in the city of New York.

k. The office of official referee is abolished, provided, however, that official referees in office on the effective date of this article shall, for the remainder of the terms for which they were appointed or certified, be official referees of the court in which appointed or certified or the successor court, as the case may be. At the expiration of the term of any official referee, his or her office shall be abolished and thereupon such former official referee shall be subject to the relevant provisions of section twenty-five of this article.

l. As may be provided by law, the non-judicial personnel of the courts affected by this article in office on the effective date of this article shall, to the extent practicable, be continued without diminution of salaries and with the same status and rights in the courts established or continued by this article; and especially skilled, experienced and trained personnel shall, to the extent practicable, be assigned to like functions in the courts which exercise the jurisdiction formerly exercised by the courts in which they were employed. In the event that the adoption of this article shall require or make possible a reduction in the number of non-judicial personnel, or in the number of certain categories of such personnel, such reduction shall be made, to the extent practicable, by provision that the death, resignation, removal or retirement of an employee shall not create a vacancy until the reduced number of personnel has been reached.

m. In the event that a judgment or order was entered before the effective date of this article and a right of appeal existed and notice of appeal therefrom is filed after the effective date of this article, such appeal shall be taken from the supreme court, the county courts, the surrogate's courts, the children's courts, the court of general sessions of the county of New York and the domestic relations court of the city of New York to the appellate division of the supreme court in the judicial department in which such court was located; from the court of claims to the appellate division of the supreme court in the third judicial department, except for those claims which arose in the fourth judicial department, in which case the appeal shall be to the appellate division of the supreme court in the fourth judicial department; from the city court of the city of New York, the municipal court of the city of New York, the court of special sessions of the city of New York and the city magistrates' courts of the city of New York to the appellate division of the supreme court in the judicial department in which such court was located, provided, however, that such appellate division of the supreme court may transfer any such appeal to an appellate term, if such appellate term be established; and from the district court, town, village and city courts outside the city of New York to the county court in the county in which such court was located, provided, however, that the legislature may require the transfer of any such appeal to an appellate term, if such appellate term be

23

Case 23-1, Document 75, 01/25/2023, 3456054, Page260 of 296

established. Further appeal from a decision of a county court or an appellate term or the appellate division of the supreme court shall be governed by the provisions of this article. However, if in any action or proceeding decided prior to the effective date of this article, a party had a right of direct appeal from a court of original jurisdiction to the court of appeals, such appeal may be taken directly to the court of appeals.

n. In the event that an appeal was decided before the effective date of this article and a further appeal could be taken as of right and notice of appeal therefrom is filed after the effective date of this article, such appeal may be taken from the appellate division of the supreme court to the court of appeals and from any other court to the appellate division of the supreme court. Further appeal from a decision of the appellate division of the supreme court shall be governed by the provisions of this article. If a further appeal could not be taken as of right, such appeal shall be governed by the provisions of this article. (Amended by vote of the people November 6, 2001.)

**[Pending civil and criminal cases]**
§36. No civil or criminal appeal, action or proceeding pending before any court or any judge or justice on the effective date of this article shall abate but such appeal, action or proceeding so pending shall be continued in the courts as provided in this article and, for the purposes for the disposition of such actions or proceedings only, the jurisdiction of any court to which any such action or proceeding is transferred by this article shall be coextensive with the jurisdiction of the former court from which the action or proceeding was transferred. Except to the extent inconsistent with the provisions of this article, subsequent proceedings in such appeal, action or proceeding shall be conducted in accordance with the laws in force on the effective date of this article until superseded in the manner authorized by law.

**[Effective date of certain amendments to articles VI and VII]**
§36-a. The amendments to the provisions of sections two, four, seven, eight, eleven, twenty, twenty-two, twenty-six, twenty-eight, twenty-nine and thirty of article six and to the provisions of section one of article seven, as first proposed by a concurrent resolution passed by the legislature in the year nineteen hundred seventy-six and entitled "Concurrent Resolution of the Senate and Assembly proposing amendments to articles six and seven of the constitution, in relation to the manner of selecting judges of the court of appeals, creation of a commission on judicial conduct and administration of the unified court system, providing for the effectiveness of such amendments and the repeal of subdivision c of section two, subdivision b of section seven, subdivision b of section eleven, section twenty-two and section twenty-eight of article six thereof relating thereto", shall become a part of the constitution on the first day of January next after the approval and ratification of the amendments proposed by such concurrent resolution by the people but the provisions thereof shall not become operative and the repeal of subdivision c of section two, section twenty-two and section twenty-eight shall not become effective until the first day of April next thereafter which date shall be deemed the effective date of such amendments and the chief judge and the associate judges of the court of appeals in office on such effective date shall hold their offices until the expiration of their respective terms. Upon a vacancy in the office of any such judge, such vacancy shall be filled in the manner provided in section two of article six. (New. Added by vote of the people November 8, 1977.)

**No section 36-b**

**[Effective date of certain amendments to article VI, section 22]**
§36-c. The amendments to the provisions of section twenty-two of article six as first proposed by a concurrent resolution passed by the legislature in the year nineteen hundred seventy-four and entitled "Concurrent Resolution of the Senate and Assembly proposing an amendment to section twenty-two of article six and adding section thirty-six-c to such article of the constitution, in relation to the powers of and reconstituting the court on the judiciary and creating a commission on judicial conduct", shall become a part of the constitution on the first day of January next after the approval and ratification of the amendments proposed by such concurrent resolution by the people but the provisions thereof shall not become operative until the first day of September next thereafter which date shall be deemed the effective date

of such amendments. (New. Added by vote of the people November 4, 1975.)

**[Effective date of article]**
§37. This article shall become a part of the constitution on the first day of January next after the approval and ratification of this amendment by the people but its provisions shall not become operative until the first day of September next thereafter which date shall be deemed the effective date of this article.

**ARTICLE VII**
STATE FINANCES

**[Estimates by departments, the legislature and the judiciary of needed appropriations; hearings]**
Section 1. For the preparation of the budget, the head of each department of state government, except the legislature and judiciary, shall furnish the governor such estimates and information in such form and at such times as the governor may require, copies of which shall forthwith be furnished to the appropriate committees of the legislature. The governor shall hold hearings thereon at which the governor may require the attendance of heads of departments and their subordinates. Designated representatives of such committees shall be entitled to attend the hearings thereon and to make inquiry concerning any part thereof.

Itemized estimates of the financial needs of the legislature, certified by the presiding officer of each house, and of the judiciary, approved by the court of appeals and certified by the chief judge of the court of appeals, shall be transmitted to the governor not later than the first day of December in each year for inclusion in the budget without revision but with such recommendations as the governor may deem proper. Copies of the itemized estimates of the financial needs of the judiciary also shall forthwith be transmitted to the appropriate committees of the legislature. (Amended by vote of the people November 8, 1977; November 6, 2001.)

**[Executive budget]**
§2. Annually, on or before the first day of February in each year following the year fixed by the constitution for the election of governor and lieutenant governor, and on or before the second Tuesday following the first day of the annual meeting of the legislature, in all other years, the governor shall submit to the legislature a budget containing a complete plan of expenditures proposed to be made before the close of the ensuing fiscal year and all moneys and revenues estimated to be available therefor, together with an explanation of the basis of such estimates and recommendations as to proposed legislation, if any, which the governor may deem necessary to provide moneys and revenues sufficient to meet such proposed expenditures. It shall also contain such other recommendations and information as the governor may deem proper and such additional information as may be required by law. (New. Derived in part from former §2 of Art. 4-a. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 2, 1965; November 6, 2001.)

**[Budget bills; appearances before legislature]**
§3. At the time of submitting the budget to the legislature the governor shall submit a bill or bills containing all the proposed appropriations and reappropriations included in the budget and the proposed legislation, if any, recommended therein.

The governor may at any time within thirty days thereafter and, with the consent of the legislature, at any time before the adjournment thereof, amend or supplement the budget and submit amendments to any bills submitted by him or her or submit supplemental bills.

The governor and the heads of departments shall have the right, and it shall be the duty of the heads of departments when requested by either house of the legislature or an appropriate committee thereof, to appear and be heard in respect to the budget during the consideration thereof, and to answer inquiries relevant thereto. The procedure for such appearances and inquiries shall be provided by law. (New. Derived in part from former §§2 and 3 of

Case 23-1, Document 75, 01/25/2023, 3456064, Page261 of 296

Art. 4-a. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 6, 2001.)

**[Action on budget bills by legislature; effect thereof]**

§4. The legislature may not alter an appropriation bill submitted by the governor except to strike out or reduce items therein, but it may add thereto items of appropriation provided that such additions are stated separately and distinctly from the original items of the bill and refer each to a single object or purpose. None of the restrictions of this section, however, shall apply to appropriations for the legislature or judiciary.

Such an appropriation bill shall when passed by both houses be a law immediately without further action by the governor, except that appropriations for the legislature and judiciary and separate items added to the governor's bills by the legislature shall be subject to approval of the governor as provided in section 7 of article IV. (New. Derived in part from former §3 of Art. 4-a. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 6, 2001.)

**[Restrictions on consideration of other appropriations]**

§5. Neither house of the legislature shall consider any other bill making an appropriation until all the appropriation bills submitted by the governor shall have been finally acted on by both houses, except on message from the governor certifying to the necessity of the immediate passage of such a bill. (New. Derived in part from former §4 of Art. 4-a. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Restrictions on content of appropriation bills]**

§6. Except for appropriations contained in the bills submitted by the governor and in a supplemental appropriation bill for the support of government, no appropriations shall be made except by separate bills each for a single object or purpose. All such bills and such supplemental appropriation bill shall be subject to the governor's approval as provided in section 7 of article IV.

No provision shall be embraced in any appropriation bill submitted by the governor or in such supplemental appropriation bill unless it relates specifically to some particular appropriation in the bill, and any such provision shall be limited in its operation to such appropriation. (New. Derived in part from former §22 of Art. 3 and former §4 of Art. 4-a. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Appropriation bills]**

§7. No money shall ever be paid out of the state treasury or any of its funds, or any of the funds under its management, except in pursuance of an appropriation by law; nor unless such payment be made within two years next after the passage of such appropriation act; and every such law making a new appropriation or continuing or reviving an appropriation, shall distinctly specify the sum appropriated, and the object or purpose to which it is to be applied; and it shall not be sufficient for such law to refer to any other law to fix such sum. (New. Derived in part from former §21 of Art. 3. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Gift or loan of state credit or money prohibited; exceptions for enumerated purposes]**

§8. 1. The money of the state shall not be given or loaned to or in aid of any private corporation or association, or private undertaking; nor shall the credit of the state be given or loaned to or in aid of any individual, or public or private corporation or association, or private undertaking, but the foregoing provisions shall not apply to any fund or property now held or which may hereafter be held by the state for educational, mental health or mental retardation purposes.

2. Subject to the limitations on indebtedness and taxation, nothing in this constitution contained shall prevent the legislature from providing for the aid, care and support of the needy directly or through subdivisions of the state; or for the protection by insurance or otherwise, against the hazards of unemployment, sickness and old age; or for the education and support of the blind, the deaf, the dumb, the physically handicapped, the mentally ill, the emotionally disturbed, the mentally retarded or juvenile delinquents as it may deem proper; or for health and welfare services for all children, either directly or through subdivisions of the state, including school districts; or for the aid, care and support of neglected and dependent children and of the needy sick, through agencies and institutions authorized by the state board of social welfare or other state department having the power of inspection thereof, by payments made on a per capita basis directly or through the subdivisions of the state; or for the increase in the amount of pensions of any member of a retirement system of the state, or of a subdivision of the state; or for an increase in the amount of pension benefits of any widow or widower of a retired member of a retirement system of the state or of a subdivision of the state to whom payable as beneficiary under an optional settlement in connection with the pension of such member. The enumeration of legislative powers in this paragraph shall not be taken to diminish any power of the legislature hitherto existing.

3. Nothing in this constitution contained shall prevent the legislature from authorizing the loan of the money of the state to a public corporation to be organized for the purpose of making loans to non-profit corporations or for the purpose of guaranteeing loans made by banking organizations, as that term shall be defined by the legislature, to finance the construction of new industrial or manufacturing plants, the construction of new buildings to be used for research and development, the construction of other eligible business facilities, and for the purchase of machinery and equipment related to such new industrial or manufacturing plants, research and development buildings, and other eligible business facilities in this state or the acquisition, rehabilitation or improvement of former or existing industrial or manufacturing plants, buildings to be used for research and development, other eligible business facilities, and machinery and equipment in this state, including the acquisition of real property therefor, and the use of such money by such public corporation for such purposes, to improve employment opportunities in any area of the state, provided, however, that any such plants, buildings or facilities or machinery and equipment therefor shall not be (i) primarily used in making retail sales of goods or services to customers who personally visit such facilities to obtain such goods or services or (ii) used primarily as a hotel, apartment house or other place of business which furnishes dwelling space or accommodations to either residents or transients, and provided further that any loan by such public corporation shall not exceed sixty per centum of the cost of any such project and the repayment of which shall be secured by a mortgage thereon which shall not be a junior encumbrance thereon by more than fifty per centum of such cost or by a security interest if personalty, and that the amount of any guarantee of a loan made by a banking organization shall not exceed eighty per centum of the cost of any such project. (Formerly §1. Derived in part from former §9 of Art. 8. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 6, 1951; November 7, 1961; November 8, 1966; November 6, 1973; November 8, 1977; November 5, 1985; November 6, 2001.)

**[Short term state debts in anticipation of taxes, revenues and proceeds of sale of authorized bonds]**

§9. The state may contract debts in anticipation of the receipt of taxes and revenues, direct or indirect, for the purposes and within the amounts of appropriations theretofore made. Notes or other obligations for the moneys so borrowed shall be issued as may be provided by law, and shall with the interest thereon be paid from such taxes and revenues within one year from the date of issue.

The state may also contract debts in anticipation of the receipt of the proceeds of the sale of bonds theretofore authorized, for the purpose and within the amounts of the bonds so authorized. Notes or obligations for the money so borrowed shall be issued as may be provided by law, and shall with the interest thereon be paid from the proceeds of the sale of such bonds within two years from the date of issue, except as to bonds issued or to be issued for any of the purposes authorized by article eighteen of this constitution, in which event the notes or obligations shall with the interest thereon be paid from the proceeds of the sale of such bonds within five years from the date of issue. (Formerly §2. Renumbered and amended by Constitutional

Case 23-1, Document 75, 01/25/2023, 3456054, Page262 of 296

Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 4, 1958; November 7, 1995.)

**[State debts on account of invasion, insurrection, war and forest fires]**

§10.  In addition to the above limited power to contract debts, the state may contract debts to repel invasion, suppress insurrection, or defend the state in war, or to suppress forest fires; but the money arising from the contracting of such debts shall be applied for the purpose for which it was raised, or to repay such debts, and to no other purpose whatever. (Formerly §3. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[State debts generally; manner of contracting; referendum]**

§11.  Except the debts or refunding debts specified in sections 9, 10 and 13 of this article, no debt shall be hereafter contracted by or in behalf of the state, unless such debt shall be authorized by law, for some single work or purpose, to be distinctly specified therein. No such law shall take effect until it shall, at a general election, have been submitted to the people, and have received a majority of all the votes cast for and against it at such election nor shall it be submitted to be voted on within three months after its passage nor at any general election when any other law or any bill shall be submitted to be voted for or against.

The legislature may, at any time after the approval of such law by the people, if no debt shall have been contracted in pursuance thereof, repeal the same; and may at any time, by law, forbid the contracting of any further debt or liability under such law. (Formerly §4. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 2, 1993.)

**[State debts generally; how paid; contribution to sinking funds; restrictions on use of bond proceeds]**

§12.  Except the debts or refunding debts specified in sections 9, 10 and 13 of this article, all debts contracted by the state and each portion of any such debt from time to time so contracted shall be subject to the following rules:

1.  The principal of each debt or any portion thereof shall either be paid in equal annual installments or in installments that result in substantially level or declining debt service payments such as shall be authorized by law, or, in the alternative, contributions of principal in the amount that would otherwise be required to be paid annually shall be made to a sinking fund.

2.  When some portions of the same debt are payable annually while other portions require contributions to a sinking fund, the entire debt shall be structured so that the combined amount of annual installments of principal paid and/or annual contributions of principal made in each year shall be equal to the amount that would be required to be paid if the entire debt were payable in annual installments.

3.  When interest on state obligations is not paid at least annually, there shall also be contributed to a sinking fund at least annually, the amount necessary to bring the balance thereof, including income earned on contributions, to the accreted value of the obligations to be paid therefrom on the date such contribution is made, less the sum of all required future contributions of principal, in the case of sinking fund obligations, or payments of principal, in the case of serial obligations. Notwithstanding the foregoing, nothing contained in this subdivision shall be deemed to require contributions for interest to sinking funds if total debt service due on the debt or portion thereof in the year such interest is due will be substantially the same as the total debt service due on such debt or portion thereof in each other year or if the total amount of debt service due in each subsequent year on such debt or portion thereof shall be less than the total debt service due in each prior year.

4.  The first annual installment on such debt shall be paid, or the first annual contribution shall be made to a sinking fund, not more than one year, and the last installment shall be paid, or contribution made not more than forty years, after such debt or portion thereof shall have been contracted, provided, however, that in contracting any such debt the privilege of paying all or any part of such debt prior to the date on which the same shall be due may be reserved to the state in such manner as may be provided by law.

5.  No such debt shall be contracted for a period longer than that of the probable life of the work or purpose for which the debt is to be contracted, or in the alternative, the weighted average period of probable life of the works or purposes for which such indebtedness is to be contracted. The probable lives of such works or purposes shall be determined by general laws, which determination shall be conclusive.

6.  The money arising from any loan creating such debt or liability shall be applied only to the work or purpose specified in the act authorizing such debt or liability, or for the payment of such debt or liability, including any notes or obligations issued in anticipation of the sale of bonds evidencing such debt or liability.

7.  Any sinking funds created pursuant to this section shall be maintained and managed by the state comptroller or an agent or trustee designated by the state comptroller, and amounts in sinking funds created pursuant to this section, and earnings thereon, shall be used solely for the purpose of retiring the obligations secured thereby except that amounts in excess of the required balance on any contribution date and amounts remaining in such funds after all of the obligations secured thereby have been retired shall be deposited in the general fund.

8.  No appropriation shall be required for disbursement of money, or income earned thereon, from any sinking fund created pursuant to this section for the purpose of paying principal of and interest on the obligations for which such fund was created, except that interest shall be paid from any such fund only if, and to the extent that, it is not payable annually and contributions on account of such interest were made thereto.

9.  The provisions of section 15 of this article shall not apply to sinking funds created pursuant to this section.

10.  When state obligations are sold at a discount, the debt incurred for purposes of determining the amount of debt issued or outstanding pursuant to a voter approved bond referendum or other limitation on the amount of debt that may be issued or outstanding for a work or purpose shall be deemed to include only the amount of money actually received by the state notwithstanding the face amount of such obligations. (Derived in part from former §4. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people, November 2, 1993.)

**[Refund of state debts]**

§13.  The legislature may provide means and authority whereby any state debt or debts, or any portion or combination thereof, may be refunded in accordance with the following provisions:

1.  State debts may be refunded at any time after they are incurred provided that the state will achieve a debt service savings on a present value basis as a result of the refunding transaction, and further provided that no maturity date shall be called for redemption unless the privilege to pay prior to the maturity date was reserved to the state. The legislature may provide for the method of computation of present value for such purpose.

2.  In no event shall refunding obligations be issued in an amount exceeding that necessary to provide sufficient funds to accomplish the refunding of the obligations to be refunded including paying all costs and expenses related to the refunding transaction and, in no event, shall the proceeds of refunding obligations be applied to any purpose other than accomplishing the refunding of the debt to be refunded and paying costs and expenses related to the refunding.

3.  Proceeds of refunding obligations shall be deposited in escrow funds which shall be maintained and managed by the state comptroller or by an agent or trustee designated by the state comptroller and no legislative appropriation shall be required for disbursement of money, or income earned thereon, from such escrow funds for the purposes enumerated in this section.

4.  Refunding obligations may be refunded pursuant to this section.

5.  Refunding obligations shall either be paid in annual installments or annual contributions shall be made to a sinking fund in amounts sufficient to retire the refunding obligations at their maturity. No annual installments or contributions of principal need be made with respect to all or any portion of an issue of refunding obligations in years when debt service on such refunding obligations or portion thereof is paid or contributed

26

Case 23-1, Document 75, 01/25/2023, 3456054, Page263 of 296

entirely from an escrow fund created pursuant to subdivision 3 of this section or in years when no installments or contributions would have been due on the obligations to be refunded. So long as any of the refunding obligations remain outstanding, installments or contributions shall be made in any years that installments or contributions would have been due on the obligations to be refunded.

6. In no event shall the last annual installment or contribution on any portion of refunding debt, including refunding obligations issued to refund other refunding obligations, be made after the termination of the period of probable life of the projects financed with the proceeds of the relevant portion of the debt to be refunded, or any debt previously refunded with the refunding obligations to be refunded, determined as of the date of issuance of the original obligations pursuant to section 12 of this article to finance such projects, or forty years from such date, if earlier; provided, however, that in lieu of the foregoing, an entire refunding issue or portion thereof may be structured to mature over the remaining weighted average useful life of all projects financed with the obligations being refunded.

7. Subject to the provisions of subdivision 5 of this section, each annual installment or contribution of principal of refunding obligations shall be equal to the amount that would be required by subdivision 1 of section 12 of this article if such installments or contributions were required to be made from the year that the next installment or contribution would have been due on the obligations to be refunded, if they had not been refunded, until the final maturity of the refunding obligations but excluding any year in which no installment or contribution would have been due on the obligations to be refunded or, in the alternative, the total payments of principal and interest on the refunding bonds shall be less in each year to their final maturity than the total payments of principal and interest on the bonds to be refunded in each such year.

8. The provisions of subdivision 3 and subdivisions 7 through 9 of section 12 of this article shall apply to sinking funds created pursuant to this section for the payment at maturity of refunding obligations. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 2, 1993.)

**[State debt for elimination of railroad crossings at grade; expenses; how borne; construction and reconstruction of state highways and parkways]**
§14. The legislature may authorize by law the creation of a debt or debts of the state, not exceeding in the aggregate three hundred million dollars, to provide moneys for the elimination, under state supervision, of railroad crossings at grade within the state, and for incidental improvements connected therewith as authorized by this section. The provisions of this article, not inconsistent with this section, relating to the issuance of bonds for a debt or debts of the state and the maturity and payment thereof, shall apply to a state debt or debts created pursuant to this section; except that the law authorizing the contracting of such debt or debts shall take effect without submission to the people pursuant to section 11 of this article. The aggregate amount of a state debt or debts which may be created pursuant to this section shall not exceed the difference between the amount of the debt or debts heretofore created or authorized by law, under the provisions of section 14 of article VII of the constitution in force on July first, nineteen hundred thirty-eight, and the sum of three hundred million dollars.

The expense of any grade crossing elimination the construction work for which was not commenced before January first, nineteen hundred thirty-nine, including incidental improvements connected therewith as authorized by this section, whether or not an order for such elimination shall theretofore have been made, shall be paid by the state in the first instance, but the state shall be entitled to recover from the railroad company or companies, by way of reimbursement (1) the entire amount of the railroad improvements not an essential part of elimination, and (2) the amount of the net benefit to the company or companies from the elimination exclusive of such railroad improvements, the amount of such net benefit to be adjudicated after the completion of the work in the manner to be prescribed by law, and in no event to exceed fifteen per centum of the expense of the elimination, exclusive of all incidental improvements. The reimbursement by the railroad companies shall be payable at such times, in such manner and with interest at such rate as the legislature may prescribe.

The expense of any grade crossing elimination the construction work for which was commenced before January first, nineteen hundred thirty-nine, shall be borne by the state, railroad companies, and the municipality or municipalities in the proportions formerly prescribed by section 14 of article VII of the constitution in force on July first, nineteen hundred thirty-eight, and the law or laws enacted pursuant to its provisions, applicable to such elimination, and subject to the provisions of such former section and law or laws, including advances in aid of any railroad company or municipality, although such elimination shall not be completed until after January first, nineteen hundred thirty-nine.

A grade crossing elimination the construction work for which shall be commenced after January first, nineteen hundred thirty-nine, shall include incidental improvements rendered necessary or desirable because of such elimination, and reasonably included in the engineering plans therefor. Out of the balance of all moneys authorized to be expended under section 14 of article VII of the constitution in force on July first, nineteen hundred thirty-eight, and remaining unexpended and unobligated on such date, fifty million dollars shall be deemed segregated for grade crossing eliminations and incidental improvements in the city of New York and shall be available only for such purposes until such eliminations and improvements are completed and paid for.

Notwithstanding any of the foregoing provisions of this section the legislature is hereby authorized to appropriate, out of the proceeds of bonds now or hereafter sold to provide moneys for the elimination of railroad crossings at grade and incidental improvements pursuant to this section, sums not exceeding in the aggregate sixty million dollars for the construction and reconstruction of state highways and parkways. (Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 4, 1941.)

**[Sinking funds; how kept and invested; income therefrom and application thereof]**
§15. The sinking funds provided for the payment of interest and the extinguishment of the principal of the debts of the state heretofore contracted shall be continued; they shall be separately kept and safely invested, and neither of them shall be appropriated or used in any manner other than for such payment and extinguishment as hereinafter provided. The comptroller shall each year appraise the securities held for investment in each of such funds at their fair market value not exceeding par. The comptroller shall then determine and certify to the legislature the amount of each of such funds and the amounts which, if thereafter annually contributed to each such fund, would, with the fund and with the accumulations thereon and upon the contributions thereto, computed at the rate of three per centum per annum, produce at the date of maturity the amount of the debt to retire which such fund was created, and the legislature shall thereupon appropriate as the contribution to each such fund for such year at least the amount thus certified.

If the income of any such fund in any year is more than a sum which, if annually added to such fund would, with the fund and its accumulations as aforesaid, retire the debt at maturity, the excess income may be applied to the interest on the debt for which the fund was created.

After any sinking fund shall equal in amount the debt for which it was created no further contribution shall be made thereto except to make good any losses ascertained at the annual appraisals above mentioned, and the income thereof shall be applied to the payment of the interest on such debt. Any excess in such income not required for the payment of interest may be applied to the general fund of the state. (Formerly §5. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 6, 2001.)

**[Payment of state debts; when comptroller to pay without appropriation]**
§16. The legislature shall annually provide by appropriation for the payment of the interest upon and installments of principal of all debts or refunding debts created on behalf of the state except those contracted under section 9 of this article, as the same shall fall due, and for the contribution to all of the sinking funds created by law, of the amounts annually to be

Case 23-1, Document 75, 01/25/2023, 3456054, Page264 of 296

The Constitution of the State of New York

contributed under the provisions of section 12, 13 or 15 of this article. If at any time the legislature shall fail to make any such appropriation, the comptroller shall set apart from the first revenues thereafter received, applicable to the general fund of the state, a sum sufficient to pay such interest, installments of principal, or contributions to such sinking fund, as the case may be, and shall so apply the moneys thus set apart. The comptroller may be required to set aside and apply such revenues as aforesaid, at the suit of any holder of such bonds.

Notwithstanding the foregoing provisions of this section, the comptroller may covenant with the purchasers of any state obligations that they shall have no further rights against the state for payment of such obligations or any interest thereon after an amount or amounts determined in accordance with the provisions of such covenant is deposited in a described fund or with a named or described agency or trustee. In such case, this section shall have no further application with respect to payment of such obligations or any interest thereon after the comptroller has complied with the prescribed conditions of such covenant. (Formerly §11. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 2, 1993.)

**[Authorizing the legislature to establish a fund or funds for tax revenue stabilization reserves; regulating payments thereto and withdrawals therefrom]**
§17. The legislature may establish a fund or funds to aid in the stabilization of the tax revenues of the state available for expenditure or distribution. Any law creating such a fund shall specify the tax or taxes to which such fund relates, and shall prescribe the method of determining the amount of revenue from any such tax or taxes which shall constitute a norm of each fiscal year. Such part as shall be prescribed by law of any revenue derived from such tax or taxes during a fiscal year in excess of such norm shall be paid into such fund. No moneys shall at any time be withdrawn from such fund unless the revenue derived from such tax or taxes during a fiscal year shall fall below the norm for such year; in which event such amount as may be prescribed by law, but in no event an amount exceeding the difference between such revenue and such norm, shall be paid from such fund into the general fund.

No law changing the method of determining a norm or prescribing the amount to be paid into such a fund or to be paid from such a fund into the general fund may become effective until three years from the date of its enactment. (Added by amendment approved by vote of the people November 2, 1943.)

**[Bonus on account of service of certain veterans in World War II]**
§18. The legislature may authorize by law the creation of a debt or debts of the state to provide for the payment of a bonus to each male and female member of the armed forces of the United States, still in the armed forces, or separated or discharged under honorable conditions, for service while on active duty with the armed forces at any time during the period from December seventh, nineteen hundred forty-one to and including September second, nineteen hundred forty-five, who was a resident of this state for a period of at least six months immediately prior to his or her enlistment, induction or call to active duty. The law authorizing the creation of the debt shall provide for payment of such bonus to the next of kin of each male and female member of the armed forces who, having been a resident of this state for a period of six months immediately prior to his or her enlistment, induction or call to active duty, died while on active duty at any time during the period from December seventh, nineteen hundred forty-one to and including September second, nineteen hundred forty-five; or who died while on active duty subsequent to September second, nineteen hundred forty-five, or after his or her separation or discharge under honorable conditions, prior to receiving payment of such bonus. An apportionment of the moneys on the basis of the periods and places of service of such members of the armed forces shall be provided by general laws. The aggregate of the debts authorized by this section shall not exceed four hundred million dollars. The provisions of this article, not inconsistent with this section, relating to the issuance of bonds for a debt or debts of the state and the maturity and payment thereof, shall apply to a debt or debts created

pursuant to this section; except that the law authorizing the contracting of such debt or debts shall take effect without submission to the people pursuant to section eleven of this article.

Proceeds of bonds issued pursuant to law, as authorized by this section as in force prior to January first, nineteen hundred fifty shall be available and may be expended for the payment of such bonus to persons qualified therefor as now provided by this section. (Added by amendment approved by vote of the people November 4, 1947; further amended by vote of the people November 8, 1949.)

**[State debt for expansion of state university]**
§19. The legislature may authorize by law the creation of a debt or debts of the state, not exceeding in the aggregate two hundred fifty million dollars, to provide moneys for the construction, reconstruction, rehabilitation, improvement and equipment of facilities for the expansion and development of the program of higher education provided and to be provided at institutions now or hereafter comprised within the state university, for acquisition of real property therefor, and for payment of the state's share of the capital costs of locally sponsored institutions of higher education approved and regulated by the state university trustees. The provisions of this article, not inconsistent with this section, relating to the issuance of bonds for a debt or debts of the state and the maturity and payment thereof, shall apply to a state debt or debts created pursuant to this section; except that the law authorizing the contracting of such debt or debts shall take effect without submission to the people pursuant to section eleven of this article. (New. Added by vote of the people November 5, 1957.)

## ARTICLE VIII
LOCAL FINANCES

**[Gift or loan of property or credit of local subdivisions prohibited; exceptions for enumerated purposes]**
Section 1. No county, city, town, village or school district shall give or loan any money or property to or in aid of any individual, or private corporation or association, or private undertaking, or become directly or indirectly the owner of stock in, or bonds of, any private corporation or association; nor shall any county, city, town, village or school district give or loan its credit to or in aid of any individual, or public or private corporation or association, or private undertaking, except that two or more such units may join together pursuant to law in providing any municipal facility, service, activity or undertaking which each of such units has the power to provide separately. Each such unit may be authorized by the legislature to contract joint or several indebtedness, pledge its or their faith and credit for the payment of such indebtedness for such joint undertaking and levy real estate or other authorized taxes or impose charges therefor subject to the provisions of this constitution otherwise restricting the power of such units to contract indebtedness or to levy taxes on real estate. The legislature shall have power to provide by law for the manner and the proportion in which indebtedness arising out of such joint undertakings shall be incurred by such units and shall have power to provide a method by which such indebtedness shall be determined, allocated and apportioned among such units and such indebtedness treated for purposes of exclusion from applicable constitutional limitations, provided that in no event shall more than the total amount of indebtedness incurred for such joint undertaking be included in ascertaining the power of all such participating units to incur indebtedness. Such law may provide that such determination, allocation and apportionment shall be conclusive if made or approved by the comptroller. This provision shall not prevent a county from contracting indebtedness for the purpose of advancing to a town or school district, pursuant to law, the amount of unpaid taxes returned to it.

Subject to the limitations on indebtedness and taxation applying to any county, city, town or village nothing in this constitution contained shall prevent a county, city or town from making such provision for the aid, care and support of the needy as may be authorized by law, nor prevent any such county, city or town from providing for the care, support, maintenance and secular education of inmates of orphan asylums, homes for dependent children or correctional institutions and of children placed in family homes

28

FILED: KINGS COUNTY CLERK 10/16/2019 02:56 PM INDEX NO. 518540/2019
NYSCEF DOC. NO. 205      Case 23-1, Document 76, 07/25/2023, 3456064, Page265 of 296      RECEIVED NYSCEF: 10/16/2019

The Constitution of the State of New York

by authorized agencies, whether under public or private control, or from providing health and welfare services for all children, nor shall anything in this constitution contained prevent a county, city, town or village from increasing the pension benefits payable to retired members of a police department or fire department or to widows, dependent children or dependent parents of members or retired members of a police department or fire department; or prevent the city of New York from increasing the pension benefits payable to widows, dependent children or dependent parents of members or retired members of the relief and pension fund of the department of street cleaning of the city of New York. Payments by counties, cities or towns to charitable, eleemosynary, correctional and reformatory institutions and agencies, wholly or partly under private control, for care, support and maintenance, may be authorized, but shall not be required, by the legislature. No such payments shall be made for any person cared for by any such institution or agency, nor for a child placed in a family home, who is not received and retained therein pursuant to rules established by the state board of social welfare or other state department having the power of inspection thereof. (Formerly §10. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 3, 1959; November 5, 1963; November 2, 1965.)

**[Restrictions on indebtedness of local subdivisions; contracting and payment of local indebtedness; exceptions]**

§2. No county, city, town, village or school district shall contract any indebtedness except for county, city, town, village or school district purposes, respectively. No indebtedness shall be contracted for longer than the period of probable usefulness of the object or purpose for which such indebtedness is to be contracted, or, in the alternative, the weighted average period of probable usefulness of the several objects or purposes for which such indebtedness is to be contracted, to be determined by the governing body of the county, city, town, village or school district contracting such indebtedness pursuant to general or special laws of the state legislature, which determination shall be conclusive, and in no event for longer than forty years. Indebtedness or any portion thereof may be refunded within either such period of probable usefulness, or average period of probable usefulness, as may be determined by such governing body computed from the date such indebtedness was contracted.

No indebtedness shall be contracted by any county, city, town, village or school district unless such county, city, town, village or school district shall have pledged its faith and credit for the payment of the principal thereof and the interest thereon. Except for indebtedness contracted in anticipation of the collection of taxes actually levied and uncollected or to be levied for the year when such indebtedness is contracted and indebtedness contracted to be paid in one of the two fiscal years immediately succeeding the fiscal year in which such indebtedness was contracted, all such indebtedness and each portion thereof from time to time contracted, including any refunding thereof, shall be paid in annual installments, the first of which, except in the case of refunding of indebtedness heretofore contracted, shall be paid not more than two years after such indebtedness or portion thereof shall have been contracted, and no installment, except in the case of refunding of indebtedness heretofore contracted, shall be more than fifty per centum in excess of the smallest prior installment, unless the governing body of the county, city, town, village or school district contracting such indebtedness provides for substantially level or declining debt service payments as may be authorized by law.

Notwithstanding the foregoing provisions, indebtedness contracted by the city of New York and each portion of any such indebtedness from time to time so contracted for the supply of water, including the acquisition of land in connection with such purpose, may be financed either by serial bonds with a maximum maturity of fifty years, in which case such indebtedness shall be paid in annual installments as hereinbefore provided, or by sinking fund bonds with a maximum maturity of fifty years, which shall be redeemed through annual contributions to sinking funds established and maintained for the purpose of amortizing the indebtedness for which such bonds are issued. Notwithstanding the foregoing provisions, indebtedness hereafter contracted by the city of New York and each portion of any such indebtedness from time to time so contracted for (a) the acquisition,

construction or equipment of rapid transit railroads, or (b) the construction of docks, including the acquisition of land in connection with any of such purposes, may be financed either by serial bonds with a maximum maturity of forty years, in which case such indebtedness shall be paid in annual installments as hereinbefore provided, or by sinking fund bonds with a maximum maturity of forty years, which shall be redeemed through annual contributions to sinking funds established and maintained for the purpose of amortizing the indebtedness for which such bonds are issued.

Notwithstanding the foregoing provisions, but subject to such requirements as the legislature shall impose by general or special law, indebtedness contracted by any county, city, town, village or school district and each portion thereof from time to time contracted for any object or purpose for which indebtedness may be contracted may also be financed by sinking fund bonds with a maximum maturity of fifty years, which shall be redeemed through annual contributions to sinking funds established by such county, city, town, village or school district, provided, however, that each such annual contribution shall be at least equal to the amount required, if any, to enable the sinking fund to redeem, on the date of the contribution, the same amount of such indebtedness as would have been paid and then be payable if such indebtedness had been financed entirely by the issuance of serial bonds, except, if an issue of sinking fund bonds is combined for sale with an issue of serial bonds, for the same object or purpose, then the amount of each annual sinking fund contribution shall be at least equal to the amount required, if any, to enable the sinking fund to redeem, on the date of each such annual contribution, (i) the amount which would be required to be paid annually if such indebtedness had been issued entirely as serial bonds, less (ii) the amount of indebtedness, if any, to be paid during such year on the portion of such indebtedness actually issued as serial bonds. Sinking funds established on or after January first, nineteen hundred eighty-six pursuant to the preceding sentence shall be maintained and managed by the state comptroller pursuant to such requirements and procedures as the legislature shall prescribe, including provisions for reimbursement by the issuer of bonds payable from such sinking funds for the expenses related to such maintenance and management.

Provisions shall be made annually by appropriation by every county, city, town, village and school district for the payment of interest on all indebtedness and for the amounts required for (a) the amortization and redemption of term bonds, sinking fund bonds and serial bonds, (b) the redemption of certificates or other evidence of indebtedness (except those issued in anticipation of the collection of taxes or other revenues, or renewals thereof, and which are described in paragraph A of section five of this article and those issued in anticipation of the receipt of the proceeds of the sale of bonds theretofore authorized) contracted to be paid in such year out of the tax levy or other revenues applicable to a reduction thereof, and (c) the redemption of certificates or other evidence of indebtedness issued in anticipation of the collection of taxes or other revenues, or renewals thereof, which are not retired within five years after their date of original issue. If at any time the respective appropriating authorities shall fail to make such appropriations, a sufficient sum shall be set apart from the first revenues thereafter received and shall be applied to such purposes. The fiscal officer of any county, city, town, village or school district may be required to set apart and apply such revenues as aforesaid at the suit of any holder of obligations issued for any such indebtedness.

Notwithstanding the foregoing, all interest need not be paid annually on an issue of indebtedness provided that either (a) substantially level or declining debt service payments (including all payments of interest) shall be made over the life of such issue of indebtedness, or (b) there shall annually be contributed to a sinking fund created pursuant to this section, the amount necessary to bring the balance thereof, including income earned on contributions, to the accreted value of the obligations to be paid therefrom on the date such contribution is made, less the sum of all required future contributions of principal, in the case of sinking fund obligations, or payments of principal, in the case of serial obligations. When obligations are sold by a county, city, town, village or school district at a discount, the debt incurred for the purposes of any debt limitation contained in this constitution, shall be deemed to include only the amount of money actually received by the county, city, town, village or school district, irrespective of the face amount

Case 23-1, Document 75, 01/25/2023, 3456054, Page266 of 296

of the obligations. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 8, 1949; November 3, 1953; November 5, 1985; November 2, 1993.)

**[Local indebtedness for water supply, sewage and drainage facilities and purposes; allocations and exclusions of indebtedness]**

§2-a. Notwithstanding the provisions of section one of this article, the legislature by general or special law and subject to such conditions as it shall impose:

A. May authorize any county, city, town or village or any county or town on behalf of an improvement district to contract indebtedness to provide a supply of water, in excess of its own needs, for sale to any other public corporation or improvement district;

B. May authorize two or more public corporations and improvement districts to provide for a common supply of water and may authorize any such corporation, or any county or town on behalf of an improvement district, to contract joint indebtedness for such purpose or to contract indebtedness for specific proportions of the cost;

C. May authorize any county, city, town or village or any county or town on behalf of an improvement district to contract indebtedness to provide facilities, in excess of its own needs, for the conveyance, treatment and disposal of sewage from any other public corporation or improvement district;

D. May authorize two or more public corporations and improvement districts to provide for the common conveyance, treatment and disposal of sewage and may authorize any such corporation, or any county or town on behalf of an improvement district, to contract joint indebtedness for such purpose or to contract indebtedness for specific proportions of the cost;

E. May authorize any county, city, town or village or any county or town on behalf of an improvement district to contract indebtedness to provide facilities, in excess of its own needs, for drainage purposes from any other public corporation or improvement district.

F. May authorize two or more public corporations and improvement districts to provide for a common drainage system and may authorize any such corporation, or any county or town on behalf of an improvement district, to contract joint indebtedness for such purpose or to contract indebtedness for specific proportions of the cost.

Indebtedness contracted by a county, city, town or village pursuant to this section shall be for a county, city, town or village purpose, respectively. In ascertaining the power of a county, city, town or village to contract indebtedness, any indebtedness contracted pursuant to paragraphs A and B of this section shall be excluded.

The legislature shall provide the method by which a fair proportion of joint indebtedness contracted pursuant to paragraphs D and F of this section shall be allocated to any county, city, town or village.

The legislature by general law in terms and in effect applying alike to all counties, to all cities, to all towns and/or to all villages also may provide that all or any part of indebtedness contracted or proposed to be contracted by any county, city, town or village pursuant to paragraphs D and F of this section for a revenue producing public improvement or service may be excluded periodically in ascertaining the power of such county, city, town or village to contract indebtedness. The amount of any such exclusion shall have a reasonable relation to the extent to which such public improvement or service shall have yielded or is expected to yield revenues sufficient to provide for the payment of the interest on and amortization of or payment of indebtedness contracted or proposed to be contracted for such public improvement or service, after deducting all costs of operation, maintenance and repairs thereof. The legislature shall provide the method by which a fair proportion of joint indebtedness proposed to be contracted pursuant to paragraphs D and F of this section shall be allocated to any county, city, town or village for the purpose of determining the amount of any such exclusion. The provisions of paragraph C of section five and section ten-a of this article shall not apply to indebtedness contracted pursuant to paragraphs D and F of this section.

The legislature may provide that any allocation of indebtedness, or determination of the amount of any exclusion of indebtedness, made pursuant to this section shall be conclusive if made or approved by the state

comptroller. (Section added by vote of the people November 3, 1953. Paragraphs C-F added, next unnumbered paragraph amended, and three concluding unnumbered paragraphs added by amendment approved by vote of the people November 8, 1955.)

**[Restrictions on creation and indebtedness of certain corporations]**

§3. No municipal or other corporation (other than a county, city, town, village, school district or fire district, or a river improvement, river regulating, or drainage district, established by or under the supervision of the department of conservation) possessing the power (a) to contract indebtedness and (b) to levy taxes or benefit assessments upon real estate or to require the levy of such taxes or assessments, shall hereafter be established or created, but nothing herein shall prevent the creation of improvement districts in counties and towns, provided that the county or town or towns in which such districts are located shall pledge its or their faith and credit for the payment of the principal of and interest on all indebtedness to be contracted for the purposes of such districts, and in ascertaining the power of any such county or town to contract indebtedness, such indebtedness shall be included, unless such indebtedness would, under the provisions of this article, be excluded in ascertaining the power of a county or town to contract indebtedness. No such corporation now existing shall hereafter contract any indebtedness without the consent, granted in such manner as may be prescribed by general law, of the city or village within which, or of the town within any unincorporated area of which any real estate may be subject to such taxes or assessments. If the real estate subject to such taxes or assessments is wholly within a city, village or the unincorporated area of a town, in ascertaining the power of such city, village or town to contract indebtedness, there shall be included any indebtedness hereafter contracted by such corporation, unless such indebtedness would, under the provisions of this article, be excluded if contracted by such city, village or town. If only part of the real estate subject to such taxes or assessments is within a city, village or the unincorporated area of a town, in ascertaining the power of such city, village or town to contract indebtedness, there shall be included the proportion, determined as prescribed by general law, of any indebtedness hereafter contracted by such corporation, unless such indebtedness would, under the provisions of this article, be excluded if contracted by such city, village or town. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Limitations on local indebtedness]**

§4. Except as otherwise provided in this constitution, no county, city, town, village or school district described in this section shall be allowed to contract indebtedness for any purpose or in any manner which, including existing indebtedness, shall exceed an amount equal to the following percentages of the average full valuation of taxable real estate of such county, city, town, village or school district:

(a) the county of Nassau, for county purposes, ten per centum;

(b) any county, other than the county of Nassau, for county purposes, seven per centum;

(c) the city of New York, for city purposes, ten per centum;

(d) any city, other than the city of New York, having one hundred twenty-five thousand or more inhabitants according to the latest federal census, for city purposes, nine per centum;

(e) any city having less than one hundred twenty-five thousand inhabitants according to the latest federal census, for city purposes, excluding education purposes, seven per centum;

(f) any town, for town purposes, seven per centum;

(g) any village for village purposes, seven per centum; and

(h) any school district which is coterminous with, or partly within, or wholly within, a city having less than one hundred twenty-five thousand inhabitants according to the latest federal census, for education purposes, five per centum; provided, however, that such limitation may be increased in relation to indebtedness for specified objects or purposes with (1) the approving vote of sixty per centum or more of the duly qualified voters of such school district voting on a proposition therefor submitted at a general or special election, (2) the consent of The Regents of the University of the State of New York and (3) the consent of the state comptroller. The legislature shall prescribe by law the qualifications for voting at any such election.

30

Case 23-1, Document 75, 01/25/2023, 3456064, Page267 of 296

Except as otherwise provided in this constitution, any indebtedness contracted in excess of the respective limitations prescribed in this section shall be void.

In ascertaining the power of any city having less than one hundred twenty-five thousand inhabitants according to the latest federal census to contract indebtedness, indebtedness heretofore contracted by such city for education purposes shall be excluded. Such indebtedness so excluded shall be included in ascertaining the power of a school district which is coterminous with, or partly within, or wholly within, such city to contract indebtedness. The legislature shall prescribe by law the manner by which the amount of such indebtedness shall be determined and allocated among such school districts. Such law may provide that such determinations and allocations shall be conclusive if made or approved by the state comptroller.

In ascertaining the power of a school district described in this section to contract indebtedness, certificates or other evidences of indebtedness described in paragraph A of section five of this article shall be excluded.

The average full valuation of taxable real estate of any such county, city, town, village or school district shall be determined in the manner prescribed in section ten of this article.

Nothing contained in this section shall be deemed to restrict the powers granted to the legislature by other provisions of this constitution to further restrict the powers of any county, city, town, village or school district to contract indebtedness. (New. Approved by vote of the people November 6, 1951. Substituted for §4, derived in part from former §10, renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

### [Ascertainment of debt-incurring power of counties, cities, towns and villages; certain indebtedness to be excluded]

§5. In ascertaining the power of a county, city, town or village to contract indebtedness, there shall be excluded:

A. Certificates or other evidences of indebtedness (except serial bonds of an issue having a maximum maturity of more than two years) issued for purposes other than the financing of capital improvements and contracted to be redeemed in one of the two fiscal years immediately succeeding the year of their issue, and certificates or other evidences of indebtedness issued in any fiscal year in anticipation of (a) the collection of taxes on real estate for amounts theretofore actually levied and uncollected or to be levied in such year and payable out of such taxes, (b) moneys receivable from the state which have theretofore been apportioned by the state or which are to be so apportioned within one year after their issue and (c) the collection of any other taxes due and payable or to become due and payable within one year or of other revenues to be received within one year after their issue; excepting any such certificates or other evidences of indebtedness or renewals thereof which are not retired within five years after their date of original issue.

B. Indebtedness heretofore or hereafter contracted to provide for the supply of water.

C. Indebtedness heretofore or hereafter contracted by any county, city, town or village for a public improvement or part thereof, or service, owned or rendered by such county, city, town or village, annually proportionately to the extent that the same shall have yielded to such county, city, town or village net revenue; provided, however, that such net revenue shall be twenty-five per centum or more of the amount required in such year for the payment of the interest on, amortization of, or payment of, such indebtedness. Such exclusion shall be granted only if the revenues of such public improvement or part thereof, or service, are applied to and actually used for payment of all costs of operation, maintenance and repairs, and payment of the amounts required in such year for interest on and amortization of or redemption of such indebtedness, or such revenues are deposited in a special fund to be used solely for such payments. Any revenues remaining after such payments are made may be used for any lawful purpose of such county, city, town or village, respectively.

Net revenue shall be determined by deducting from gross revenues of the preceding year all costs of operation, maintenance and repairs for such year, or the legislature may provide that net revenue shall be determined by deducting from the average of the gross revenues of not to exceed five of the preceding years during which the public improvement or part thereof, or

service, has been in operation, the average of all costs of operation, maintenance and repairs for the same years.

A proportionate exclusion of indebtedness contracted or proposed to be contracted also may be granted for the period from the date when such indebtedness is first contracted or to be contracted for such public improvement or part thereof, or service, through the first year of operation of such public improvement or part thereof, or service. Such exclusion shall be computed in the manner provided in this section on the basis of estimated net revenue which shall be determined by deducting from the gross revenues estimated to be received during the first year of operation of such public improvement or part thereof, or service, all estimated costs of operation, maintenance and repairs for such year. The amount of any such proportionate exclusion shall not exceed seventy-five per centum of the amount which would be excluded if the computation were made on the basis of net revenue instead of estimated net revenue.

Except as otherwise provided herein, the legislature shall prescribe the method by which and the terms and conditions under which the proportionate amount of any such indebtedness to be so excluded shall be determined and no proportionate amount of such indebtedness shall be excluded except in accordance with such determination. The legislature may provide that the state comptroller shall make such determination or it may confer appropriate jurisdiction on the appellate division of the supreme court in the judicial departments in which such counties, cities, towns or villages are located for the purpose of determining the proportionate amount of any such indebtedness to be so excluded.

The provisions of this paragraph C shall not affect or impair any existing exclusions of indebtedness, or the power to exclude indebtedness, granted by any other provision of this constitution.

D. Serial bonds, issued by any county, city, town or village which now maintains a pension or retirement system or fund which is not on an actuarial reserve basis with current payments to the reserve adequate to provide for all current accruing liabilities. Such bonds shall not exceed in the aggregate an amount sufficient to provide for the payment of the liabilities of such system or fund, accrued on the date of issuing such bonds, both on account of pensioners on the pension roll on that date and prospective pensions to dependents of such pensioners and on account of prior service of active members of such system or fund on that date. Such bonds or the proceeds thereof shall be deposited in such system or fund. Each such pension or retirement system or fund thereafter shall be maintained on an actuarial reserve basis with current payments to the reserve adequate to provide for all current accruing liabilities.

E. Indebtedness contracted on or after January first, nineteen hundred sixty-two and prior to January first, two thousand twenty-four, for the construction or reconstruction of facilities for the conveyance, treatment and disposal of sewage. The legislature shall prescribe the method by which and the terms and conditions under which the amount of any such indebtedness to be excluded shall be determined, and no such indebtedness shall be excluded except in accordance with such determination. (Derived in part from former §10. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; paragraph C further amended by vote of the people November 8, 1949, and November 6, 1951; paragraph A amended by vote of the people November 3, 1953; paragraph E added by vote of the people November 5, 1963 and amended November 6, 1973; further amended by vote of the people November 8, 1983; November 2, 1994; November 4, 2003, November 5, 2013.)

### [Debt-incurring power of Buffalo, Rochester and Syracuse; certain additional indebtedness to be excluded]

§6. In ascertaining the power of the cities of Buffalo, Rochester and Syracuse to contract indebtedness, in addition to the indebtedness excluded by section 5 of this article, there shall be excluded:

Indebtedness not exceeding in the aggregate the sum of ten million dollars, heretofore or hereafter contracted by the city of Buffalo or the city of Rochester and indebtedness not exceeding in the aggregate the sum of five million dollars heretofore or hereafter contracted by the city of Syracuse for so much of the cost and expense of any public improvement as may be required by the ordinance or other local law therein assessing the same to be

Case 23-1, Document 75, 01/25/2023, 3456654, Page268 of 296

raised by assessment upon local property or territory. (Derived in part from former §10. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Debt-incurring power of New York city; certain additional indebtedness to be excluded]**

§7. In ascertaining the power of the city of New York to contract indebtedness, in addition to the indebtedness excluded by section 5 of this article, there shall be excluded:

A. Indebtedness contracted prior to the first day of January, nineteen hundred ten, for dock purposes proportionately to the extent to which the current net revenues received by the city therefrom shall meet the interest on and the annual requirements for the amortization of such indebtedness. The legislature shall prescribe the method by which and the terms and conditions under which the amount of any such indebtedness to be so excluded shall be determined, and no such indebtedness shall be excluded except in accordance with such determination. The legislature may confer appropriate jurisdiction on the appellate division of the supreme court in the first judicial department for the purpose of determining the amount of any such indebtedness to be so excluded.

B. The aggregate of indebtedness initially contracted from time to time after January first, nineteen hundred twenty-eight, for the construction or equipment, or both, of new rapid transit railroads, not exceeding the sum of three hundred million dollars. Any indebtedness thereafter contracted in excess of such sum for such purposes shall not be so excluded, but this provision shall not be construed to prevent the refunding of any of the indebtedness excluded hereunder.

C. The aggregate of indebtedness initially contracted from time to time after January first, nineteen hundred fifty, for the construction, reconstruction and equipment of city hospitals, not exceeding the sum of one hundred fifty million dollars. Any indebtedness thereafter contracted in excess of such sum for such purposes, other than indebtedness contracted to refund indebtedness excluded pursuant to this paragraph, shall not be so excluded.

D. The aggregate of indebtedness initially contracted from time to time after January first, nineteen hundred fifty-two, for the construction and equipment of new rapid transit railroads, including extensions of and interconnections with and between existing rapid transit railroads or portions thereof, and reconstruction and equipment of existing rapid transit railroads, not exceeding the sum of five hundred million dollars. Any indebtedness thereafter contracted in excess of such sum for such purposes, other than indebtedness contracted to refund indebtedness excluded pursuant to this paragraph, shall not be so excluded.

E. Indebtedness contracted for school purposes, evidenced by bonds, to the extent to which state aid for common schools, not exceeding two million five hundred thousand dollars, shall meet the interest and the annual requirements for the amortization and payment of part or all of one or more issues of such bonds. Such exclusion shall be effective only during a fiscal year of the city in which its expense budget provides for the payment of such debt service from such state aid. The legislature shall prescribe by law the manner by which the amount of any such exclusion shall be determined and such indebtedness shall not be excluded hereunder except in accordance with the determination so prescribed. Such law may provide that any such determination shall be conclusive if made or approved by the state comptroller. (Derived in part from former §10. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938. Paragraph D added by amendment approved by vote of the people November 8, 1949; paragraphs E and F added by vote of the people November 6, 1951. Former paragraph A deleted; subsequent paragraphs re-lettered A to E by amendment approved by vote of the people November 3, 1953.)

**[Debt-incurring power of New York city; certain indebtedness for railroads and transit purposes to be excluded]**

§7-a. In ascertaining the power of the city of New York to contract indebtedness, in addition to the indebtedness excluded under any other section of this constitution, there shall be excluded:

A. The aggregate of indebtedness initially contracted from time to time by the city for the acquisition of railroads and facilities or properties used in connection therewith or rights therein or securities of corporations owning such railroads, facilities or rights, not exceeding the sum of three hundred fifteen million dollars. Provision for the amortization of such indebtedness shall be made either by the establishment and maintenance of a sinking fund therefor or by annual payment of part thereof, or by both such methods. Any indebtedness thereafter contracted in excess of such sum for such purposes shall not be so excluded, but this provision shall not be construed to prevent the refunding of any such indebtedness.

Notwithstanding any other provision of the constitution, the city is hereby authorized to contract indebtedness for such purposes and to deliver its obligations evidencing such indebtedness to the corporations owning the railroads, facilities, properties or rights acquired, to the holders of securities of such owning corporations, to the holders of securities of corporations holding the securities of such owning corporations, or to the holders of securities to which such acquired railroads, facilities, properties or rights are now subject.

B. Indebtedness contracted by the city for transit purposes, and not otherwise excluded, proportionately to the extent to which the current net revenue received by the city from all railroads and facilities and properties used in connection therewith and rights therein owned by the city and securities of corporations owning such railroads, facilities, properties or rights, owned by the city, shall meet the interest and the annual requirements for the amortization and payment of such non-excluded indebtedness.

In determining whether indebtedness for transit purposes may be excluded under this paragraph of this section, there shall first be deducted from the current net revenue received by the city from such railroads and facilities and properties used in connection therewith and rights therein and securities owned by the city: (a) an amount equal to the interest and amortization requirements on indebtedness for rapid transit purposes heretofore excluded by order of the appellate division, which exclusion shall not be terminated by or under any provision of this section; (b) an amount equal to the interest on indebtedness contracted pursuant to this section and of the annual requirements for amortization on any sinking fund bonds and for redemption of any serial bonds evidencing such indebtedness; (c) an amount equal to the sum of all taxes and bridge tolls accruing to the city in the fiscal year of the city preceding the acquisition of the railroads or facilities or properties or rights therein or securities acquired by the city hereunder, from such railroads, facilities and properties; and (d) the amount of net operating revenue derived by the city from the independent subway system during such fiscal year. The legislature shall prescribe the method by which and the terms and conditions under which the amount of any indebtedness to be excluded hereunder shall be determined, and no indebtedness shall be excluded except in accordance with the determination so prescribed. The legislature may confer appropriate jurisdiction on the appellate division of the supreme court in the first judicial department for the purpose of determining the amount of any debt to be so excluded. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Indebtedness not to be invalidated by operation of this article]**

§8. No indebtedness of a county, city, town, village or school district valid at the time of its inception shall thereafter become invalid by reason of the operation of any of the provisions of this article. (Derived in part from former §10. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[When debt-incurring power of certain counties shall cease]**

§9. Whenever the boundaries of any city are the same as those of a county, or when any city includes within its boundaries more than one county, the power of any county wholly included within such city to contract indebtedness shall cease, but the indebtedness of such county shall not, for the purposes of this article, be included as a part of the city indebtedness. (Derived in part from former §10. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

Case 23-1, Document 75, 01/25/2023, 3456064, Page269 of 296

The Constitution of the State of New York

**[Limitations on amount to be raised by real estate taxes for local purposes; exceptions]**

§10. Hereafter, in any county, city, village or school district described in this section, the amount to be raised by tax on real estate in any fiscal year, in addition to providing for the interest on and the principal of all indebtedness, shall not exceed an amount equal to the following percentages of the average full valuation of taxable real estate of such county, city, village or school district, less the amount to be raised by tax on real estate in such year for the payment of the interest on and redemption of certificates or other evidence of indebtedness described in paragraphs A and D of section five of this article, or renewals thereof:

(a) any county, for county purposes, one and one-half per centum; provided, however, that the legislature may prescribe a method by which such limitation may be increased to not to exceed two per centum;

(b) any city of one hundred twenty-five thousand or more inhabitants according to the latest federal census, for city purposes, two per centum;

(c) any city having less than one hundred twenty-five thousand inhabitants according to the latest federal census, for city purposes, two per centum;

(d) any village, for village purposes, two per centum;

(e) Notwithstanding the provisions of sub-paragraphs (a) and (b) of this section, the city of New York and the counties therein, for city and county purposes, a combined total of two and one-half per centum.

The average full valuation of taxable real estate of such county, city, village or school district shall be determined by taking the assessed valuations of taxable real estate on the last completed assessment rolls and the four preceding rolls of such county, city, village or school district, and applying thereto the ratio which such assessed valuation on each of such rolls bears to the full valuation, as determined by the state tax commission or by such other state officer or agency as the legislature shall by law direct. The legislature shall prescribe the manner by which such ratio shall be determined by the state tax commission or by such other state officer or agency.

Nothing contained in this section shall be deemed to restrict the powers granted to the legislature by other provisions of this constitution to further restrict the powers of any county, city, town, village or school district to levy taxes on real estate. (Derived in part from former §10. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 8, 1949; November 3, 1953; subparagraph (f) added by separate amendment approved by vote of the people November 3, 1953. Former subparagraph (e) repealed and former subparagraph (f) relettered (e) by amendment approved by vote of the people November 5, 1985.)

**[Application and use of revenues: certain public improvements]**

§10-a. For the purpose of determining the amount of taxes which may be raised on real estate pursuant to section ten of this article, the revenues received in each fiscal year by any county, city or village from a public improvement or part thereof, or service, owned or rendered by such county, city or village for which bonds or capital notes are issued after January first, nineteen hundred fifty, shall be applied first to the payment of all costs of operation, maintenance and repairs thereof, and then to the payment of the amounts required in such fiscal year to pay the interest on and the amortization of, or payment of, indebtedness contracted for such public improvement or part thereof, or service. The provisions of this section shall not prohibit the use of excess revenues for any lawful county, city or village purpose. The provisions of this section shall not be applicable to a public improvement or part thereof constructed to provide for the supply of water. (New section added by amendment approved by vote of the people November 8, 1949. Amended by vote of the people November 3, 1953.)

**[Taxes for certain capital expenditures to be excluded from tax limitation]**

§11. (a) Whenever the city of New York is required by law to pay for all or any part of the cost of capital improvements by direct budgetary appropriation in any fiscal year or by the issuance of certificates or other evidence of indebtedness (except serial bonds of an issue having a maximum maturity of more than two years) to be redeemed in one of the two immediately succeeding fiscal years, taxes required for such appropriation or for the redemption of such certificates or other evidence of indebtedness may be excluded in whole or in part by such city from the tax limitation prescribed by section ten of this article, in which event the total amount so required for such appropriation and for the redemption of such certificates or other evidence of indebtedness shall be deemed to be indebtedness to the same extent and in the same manner as if such amount had been financed through indebtedness payable in equal annual installments over the period of the probable usefulness of such capital improvement, as determined by law. The fiscal officer of such city shall determine the amount to be deemed indebtedness pursuant to this section, and the legislature, in its discretion, may provide that such determination, if approved by the state comptroller, shall be conclusive. Any amounts determined to be deemed indebtedness of any county, city, other than the city of New York, village or school district in accordance with the provisions of this section as in force and effect prior to January first, nineteen hundred fifty-two, shall not be deemed to be indebtedness on and after such date.

(b) Whenever any county, city, other than the city of New York, village or school district which is coterminous with, or partly within, or wholly within, a city having less than one hundred twenty-five thousand inhabitants according to the latest federal census provides by direct budgetary appropriation for any fiscal year for the payment in such fiscal year or in any future fiscal year or years of all or any part of the cost of an object or purpose for which a period of probable usefulness has been determined by law, the taxes required for such appropriation shall be excluded from the tax limitation prescribed by section ten of this article unless the legislature otherwise provides. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 8, 1949, and by vote of the people November 6, 1951.)

**[Powers of local governments to be restricted; further limitations on contracting local indebtedness authorized]**

§12. It shall be the duty of the legislature, subject to the provisions of this constitution, to restrict the power of taxation, assessment, borrowing money, contracting indebtedness, and loaning the credit of counties, cities, towns and villages, so as to prevent abuses in taxation and assessments and in contracting of indebtedness by them. Nothing in this article shall be construed to prevent the legislature from further restricting the powers herein specified of any county, city, town, village or school district to contract indebtedness or to levy taxes on real estate. The legislature shall not, however, restrict the power to levy taxes on real estate for the payment of interest on or principal of indebtedness theretofore contracted. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938. Amended by vote of the people November 5, 1963.)

## ARTICLE IX[10]
### LOCAL GOVERNMENTS

**Bill of rights for local governments.**

Section 1. Effective local self-government and intergovernmental cooperation are purposes of the people of the state. In furtherance thereof, local governments shall have the following rights, powers, privileges and immunities in addition to those granted by other provisions of this constitution:

(a) Every local government, except a county wholly included within a city, shall have a legislative body elective by the people thereof. Every local government shall have power to adopt local laws as provided by this article.

(b) All officers of every local government whose election or appointment is not provided for by this constitution shall be elected by the people of the local government, or of some division thereof, or appointed by such officers of the local government as may be provided by law.

---

[10] New article adopted by amendment approved by vote of the people November 5, 1963. Former Article IX repealed, except for sections 5, 6 and 8 which were relettered subdivisions (a), (b) and (c) respectively of new section 13 of Article XIII.

33

Case 23-1, Document 75, 01/25/2023, 3456054, Page270 of 296

(c)  Local governments shall have power to agree, as authorized by act of the legislature, with the federal government, a state or one or more other governments within or without the state, to provide cooperatively, jointly or by contract any facility, service, activity or undertaking which each participating local government has the power to provide separately. Each such local government shall have power to apportion its share of the cost thereof upon such portion of its area as may be authorized by act of the legislature.

(d)  No local government or any part of the territory thereof shall be annexed to another until the people, if any, of the territory proposed to be annexed shall have consented thereto by majority vote on a referendum and until the governing board of each local government, the area of which is affected, shall have consented thereto upon the basis of a determination that the annexation is in the over-all public interest. The consent of the governing board of a county shall be required only where a boundary of the county is affected. On or before July first, nineteen hundred sixty-four, the legislature shall provide, where such consent of a governing board is not granted, for adjudication and determination, on the law and the facts, in a proceeding initiated in the supreme court, of the issue of whether the annexation is in the over-all public interest.

(e)  Local governments shall have power to take by eminent domain private property within their boundaries for public use together with excess land or property but no more than is sufficient to provide for appropriate disposition or use of land or property which abuts on that necessary for such public use, and to sell or lease that not devoted to such use. The legislature may authorize and regulate the exercise of the power of eminent domain and excess condemnation by a local government outside its boundaries.

(f)  No local government shall be prohibited by the legislature (1) from making a fair return on the value of the property used and useful in its operation of a gas, electric or water public utility service, over and above costs of operation and maintenance and necessary and proper reserves, in addition to an amount equivalent to taxes which such service, if privately owned, would pay to such local government, or (2) from using such profits for payment of refunds to consumers or for any other lawful purpose.

(g)  A local government shall have power to apportion its cost of a governmental service or function upon any portion of its area, as authorized by act of the legislature.

(h) (1)  Counties, other than those wholly included within a city, shall be empowered by general law, or by special law enacted upon county request pursuant to section two of this article, to adopt, amend or repeal alternative forms of county government provided by the legislature or to prepare, adopt, amend or repeal alternative forms of their own. Any such form of government or any amendment thereof, by act of the legislature or by local law, may transfer one or more functions or duties of the county or of the cities, towns, villages, districts or other units of government wholly contained in such county to each other or when authorized by the legislature to the state, or may abolish one or more offices, departments, agencies or units of government provided, however, that no such form or amendment, except as provided in paragraph (2) of this subdivision, shall become effective unless approved on a referendum by a majority of the votes cast therein in the area of the county outside of cities, and in the cities of the county, if any, considered as one unit. Where an alternative form of county government or any amendment thereof, by act of the legislature or by local law, provides for the transfer of any function or duty to or from any village or the abolition of any office, department, agency or unit of government of a village wholly contained in such county, such form or amendment shall not become effective unless it shall also be approved on the referendum by a majority of the votes cast therein in all the villages so affected considered as one unit.

(2)  After the adoption of an alternative form of county government by a county, any amendment thereof by act of the legislature or by local law which abolishes or creates an elective county office, changes the voting or veto power of or the method of removing an elective county officer during his or her term of office, abolishes, curtails or transfers to another county officer or agency any power of an elective county officer or changes the form or composition of the county legislative body shall be subject to a permissive referendum as provided by the legislature. (Amended by vote of the people November 6, 2001.)

**Powers and duties of legislature; home rule powers of local governments; statute of local governments.**

§2.  (a)  The legislature shall provide for the creation and organization of local governments in such manner as shall secure to them the rights, powers, privileges and immunities granted to them by this constitution.

(b)  Subject to the bill of rights of local governments and other applicable provisions of this constitution, the legislature:

(1)  Shall enact, and may from time to time amend, a statute of local governments granting to local governments powers including but not limited to those of local legislation and administration in addition to the powers vested in them by this article. A power granted in such statute may be repealed, diminished, impaired or suspended only by enactment of a statute by the legislature with the approval of the governor at its regular session in one calendar year and the re-enactment and approval of such statute in the following calendar year.

(2)  Shall have the power to act in relation to the property, affairs or government of any local government only by general law, or by special law only (a) on request of two-thirds of the total membership of its legislative body or on request of its chief executive officer concurred in by a majority of such membership, or (b) except in the case of the city of New York, on certificate of necessity from the governor reciting facts which in the judgment of the governor constitute an emergency requiring enactment of such law and, in such latter case, with the concurrence of two-thirds of the members elected to each house of the legislature.

(3)  Shall have the power to confer on local governments powers not relating to their property, affairs or government including but not limited to those of local legislation and administration, in addition to those otherwise granted by or pursuant to this article, and to withdraw or restrict such additional powers.

(c)  In addition to powers granted in the statute of local governments or any other law, (i) every local government shall have power to adopt and amend local laws not inconsistent with the provisions of this constitution or any general law relating to its property, affairs or government and, (ii) every local government shall have power to adopt and amend local laws not inconsistent with the provisions of this constitution or any general law relating to the following subjects, whether or not they relate to the property, affairs or government of such local government, except to the extent that the legislature shall restrict the adoption of such a local law relating to other than the property, affairs or government of such local government:

(1)  The powers, duties, qualifications, number, mode of selection and removal, terms of office, compensation, hours of work, protection, welfare and safety of its officers and employees, except that cities and towns shall not have such power with respect to members of the legislative body of the county in their capacities as county officers.

(2)  In the case of a city, town or village, the membership and composition of its legislative body.

(3)  The transaction of its business.

(4)  The incurring of its obligations, except that local laws relating to financing by the issuance of evidences of indebtedness by such local government shall be consistent with laws enacted by the legislature.

(5)  The presentation, ascertainment and discharge of claims against it.

(6)  The acquisition, care, management and use of its highways, roads, streets, avenues and property.

(7)  The acquisition of its transit facilities and the ownership and operation thereof.

(8)  The levy, collection and administration of local taxes authorized by the legislature and of assessments for local improvements, consistent with laws enacted by the legislature.

(9)  The wages or salaries, the hours of work or labor, and the protection, welfare and safety of persons employed by any contractor or sub-contractor performing work, labor or services for it.

(10)  The government, protection, order, conduct, safety, health and well-being of persons or property therein.

(d)  Except in the case of a transfer of functions under an alternative form of county government, a local government shall not have power to adopt local laws which impair the powers of any other local government.

Case 23-1, Document 75, 01/25/2023, 3456064, Page271 of 296

(e) The rights and powers of local governments specified in this section insofar as applicable to any county within the city of New York shall be vested in such city. (Amended by vote of the people November 6, 2001.)

**Existing laws to remain applicable; construction; definitions.**
§3. (a) Except as expressly provided, nothing in this article shall restrict or impair any power of the legislature in relation to:

(1) The maintenance, support or administration of the public school system, as required or provided by article XI of this constitution, or any retirement system pertaining to such public school system,

(2) The courts as required or provided by article VI of this constitution, and

(3) Matters other than the property, affairs or government of a local government.

(b) The provisions of this article shall not affect any existing valid provisions of acts of the legislature or of local legislation and such provisions shall continue in force until repealed, amended, modified or superseded in accordance with the provisions of this constitution.

(c) Rights, powers, privileges and immunities granted to local governments by this article shall be liberally construed.

(d) Whenever used in this article the following terms shall mean or include:

(1) "General law." A law which in terms and in effect applies alike to all counties, all counties other than those wholly included within a city, all cities, all towns or all villages.

(2) "Local government." A county, city, town or village.

(3) "People." Persons entitled to vote as provided in section one of article two of this constitution.

(4) "Special law." A law which in terms and in effect applies to one or more, but not all, counties, counties other than those wholly included within a city, cities, towns or villages.

## ARTICLE X
### CORPORATIONS

**[Corporations; formation of]**
Section 1.  Corporations may be formed under general law; but shall not be created by special act, except for municipal purposes, and in cases where, in the judgment of the legislature, the objects of the corporation cannot be attained under general laws. All general laws and special acts passed pursuant to this section may be altered from time to time or repealed. (Formerly §1 of Art. 8. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Dues of corporations]**
§2.  Dues from corporations shall be secured by such individual liability of the corporators and other means as may be prescribed by law. (Formerly §2 of Art. 8. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Savings bank charters; savings and loan association charters; special charters not to be granted]**
§3.  The legislature shall, by general law, conform all charters of savings banks, savings and loan associations, or institutions for savings, to a uniformity of powers, rights and liabilities, and all charters hereafter granted for such corporations shall be made to conform to such general law, and to such amendments as may be made thereto. The legislature shall have no power to pass any act granting any special charter for banking purposes; but corporations or associations may be formed for such purposes under general laws. (Formerly §4 of Art. 8. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 8, 1983.)

**[Corporations; definition; right to sue and be sued]**
§4.  The term corporations as used in this section, and in sections 1, 2 and 3 of this article shall be construed to include all associations and joint-stock companies having any of the powers or privileges of corporations not possessed by individuals or partnerships. And all corporations shall have the right to sue and shall be subject to be sued in all courts in like cases as natural persons. (Formerly §3 of Art. 8. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Public corporations; restrictions on creation and powers; accounts; obligations of]**
§5.  No public corporation (other than a county, city, town, village, school district or fire district or an improvement district established in a town or towns) possessing both the power to contract indebtedness and the power to collect rentals, charges, rates or fees for the services or facilities furnished or supplied by it shall hereafter be created except by special act of the legislature.

No such public corporation (other than a county or city) shall hereafter be given both the power to contract indebtedness and the power, within any city, to collect rentals, charges, rates or fees from the owners of real estate, or the occupants of real estate (other than the occupants of premises owned or controlled by such corporation or by the state or any civil division thereof), for services or facilities furnished or supplied in connection with such real estate, if such services or facilities are of a character or nature then or formerly furnished or supplied by the city, unless the electors of the city shall approve the granting to such corporation of such powers by a majority vote at a general or special election in such city; but this paragraph shall not apply to a corporation created pursuant to an interstate compact.

The accounts of every such public corporation heretofore or hereafter created shall be subject to the supervision of the state comptroller, or, if the member or members of such public corporation are appointed by the mayor of a city, to the supervision of the comptroller of such city; provided, however, that this provision shall not apply to such a public corporation created pursuant to agreement or compact with another state or with a foreign power, except with the consent of the parties to such agreement or compact.

Neither the state nor any political subdivision thereof shall at any time be liable for the payment of any obligations issued by such a public corporation heretofore or hereafter created, nor may the legislature accept, authorize acceptance of or impose such liability upon the state or any political subdivision thereof; but the state or a political subdivision thereof may, if authorized by the legislature, acquire the properties of any such corporation and pay the indebtedness thereof. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Liability of state for payment of bonds of public corporation to construct state thruways; use of state canal lands and properties]**
§6.  Notwithstanding any provision of this or any other article of this constitution, the legislature may by law, which shall take effect without submission to the people:

(a) make or authorize making the state liable for the payment of the principal of and interest on bonds of a public corporation created to construct state thruways, in a principal amount not to exceed five hundred million dollars, maturing in not to exceed forty years after their respective dates, and for the payment of the principal of and interest on notes of such corporation issued in anticipation of such bonds, which notes and any renewals thereof shall mature within five years after the respective dates of such notes; and

(b) authorize the use of any state canal lands and properties by such a public corporation for so long as the law may provide. To the extent payment is not otherwise made or provided for, the provisions of section sixteen of article seven shall apply to the liability of the state incurred pursuant to this section, but the powers conferred by this section shall not be subject to the limitations of this or any other article. (New. Added by vote of the people November 6, 1951.)

**[Liability of state for obligations of the port of New York authority for railroad commuter cars; limitations]**
§7.  Notwithstanding any provision of this or any other article of this constitution, the legislature may by law, which shall take effect without submission to the people, make or authorize making the state liable for the payment of the principal of and interest on obligations of the port of New

Case 23-1, Document 75, 01/25/2023, 3456634, Page272 of 296
The Constitution of the State of New York

York authority issued pursuant to legislation heretofore or hereafter enacted, to purchase or refinance the purchase of, or to repay advances from this state made for the purpose of purchasing, railroad passenger cars, including self-propelled cars, and locomotives and other rolling stock used in passenger transportation, for the purpose of leasing such cars to any railroad transporting passengers between municipalities in the portion of the port of New York district within the state, the majority of the trackage of which within the port of New York district utilized for the transportation of passengers shall be in the state; provided, however, that the total amount of obligations with respect to which the state may be made liable shall not exceed one hundred million dollars at any time, and that all of such obligations shall be due not later than thirty-five years after the effective date of this section.

To the extent payment is not otherwise made or provided for, the provisions of section sixteen of article seven shall apply to the liability of the state incurred pursuant to this section, but the powers conferred by this section shall not be subject to the limitations of this or any other article. (New. Added by vote of the people November 7, 1961.)

**[Liability of state on bonds of a public corporation to finance new industrial or manufacturing plants in depressed areas]**
§8. Notwithstanding any provision of this or any other article of this constitution, the legislature may by law, which shall take effect without submission to the people, make or authorize making the state liable for the payment of the principal of and interest on bonds of a public corporation to be created pursuant to and for the purposes specified in the last paragraph of section eight of article seven of this constitution, maturing in not to exceed thirty years after their respective dates, and for the principal of and interest on notes of such corporation issued in anticipation of such bonds, which notes and any renewals thereof shall mature within seven years after the respective dates of such notes, provided that the aggregate principal amount of such bonds with respect to which the state shall be so liable shall not at any one time exceed nine hundred million dollars, excluding bonds issued to refund outstanding bonds. (New. Added by vote of the people November 7, 1961. Formerly duplicate §7 added by vote of the people November 7, 1961; renumbered and amended by vote of the people November 4, 1969; further amended by vote of the people November 3, 1981; November 5, 1985; November 5, 1991.)

## ARTICLE XI
EDUCATION

**[Common schools]**
Section 1. The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated. (Formerly §1 of Art. 9. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Regents of the University]**
§2. The corporation created in the year one thousand seven hundred eighty-four, under the name of The Regents of the University of the State of New York, is hereby continued under the name of The University of the State of New York. It shall be governed and its corporate powers, which may be increased, modified or diminished by the legislature, shall be exercised by not less than nine regents. (Formerly §2 of Art. 9. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Use of public property or money in aid of denominational schools prohibited; transportation of children authorized]**
§3. Neither the state nor any subdivision thereof, shall use its property or credit or any public money, or authorize or permit either to be used, directly or indirectly, in aid or maintenance, other than for examination or inspection, of any school or institution of learning wholly or in part under the control or direction of any religious denomination, or in which any denominational tenet or doctrine is taught, but the legislature may provide for the transportation of children to and from any school or institution of learning. (Formerly §4 of Art. 9. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.

Formerly §4, renumbered §3 without change by amendment approved by vote of the people November 6, 1962; former § 4 repealed by same amendment.)

## ARTICLE XII[11]
DEFENSE

**[Defense; militia]**
Section 1. The defense and protection of the state and of the United States is an obligation of all persons within the state. The legislature shall provide for the discharge of this obligation and for the maintenance and regulation of an organized militia.

## ARTICLE XIII
PUBLIC OFFICERS

**[Oath of office; no other test for public office]**
Section 1. Members of the legislature, and all officers, executive and judicial, except such inferior officers as shall be by law exempted, shall, before they enter on the duties of their respective offices, take and subscribe the following oath or affirmation: "I do solemnly swear  (or affirm) that I will support the constitution of the United States, and the constitution of the State of New York, and that I will faithfully discharge the duties of the office of ......, according to the best of  my ability;" and no other oath, declaration or test shall be required as a qualification for any office of public trust, except that any committee of a political party may, by rule, provide for equal representation of the sexes on any such committee, and a state convention of a political party, at which candidates for public office are nominated, may, by rule, provide for equal representation of the sexes on any committee of such party. (Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Duration of term of office]**
§2. When the duration of any office is not provided by this constitution it may be declared by law, and if not so declared, such office shall be held during the pleasure of the authority making the appointment. (Formerly §3 of Art. 10. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938. Formerly §6, renumbered §2 without change by amendment approved by vote of the people November 6, 1962; former §2 repealed by same amendment.)

**[Vacancies in office; how filled; boards of education]**
§3. The legislature shall provide for filling vacancies in office, and in case of elective officers, no person appointed to fill a vacancy shall hold his or her office by virtue of such appointment longer than the commencement of the political year next succeeding the first annual election after the happening of the vacancy; provided, however, that nothing contained in this article shall prohibit the filling of vacancies on boards of education, including boards of education of community districts in the city school district of the city of New York, by appointment until  the next regular school district election, whether or not such appointment shall extend beyond the thirty-first day of December in any year. (Formerly §5 of Art. 10. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938. Formerly §8, renumbered §3 without change by amendment approved by vote of the people November 6, 1962; former §3 repealed by same amendment. Amended by vote of the people November 8, 1977; November 6, 2001.)

**[Political year and legislative term]**
§4. The political year and legislative term shall begin on the first day of January; and the legislature shall, every year, assemble on the first Wednesday after the first Monday in January. (Formerly §6 of Art. 10. Renumbered  and amended by Constitutional Convention of 1938 and

---

[11]  New article adopted by vote of the people November 6, 1962; repealing and replacing former article adopted November 8, 1938.

36

FILED: KINGS COUNTY CLERK 10/05/2019 02:58 PM
INDEX NO. 518540/2019
NYSCEF DOC. NO. 285
RECEIVED NYSCEF: 10/05/2019
Case 23-1, Document 75, 01/25/2023, 3456064, Page273 of 296
The Constitution of the State of New York

approved by vote of the people November 8, 1938. Formerly §9, renumbered §4 without change by amendment approved by vote of the people November 6, 1962; former §4 repealed by same amendment.)

**[Removal from office for misconduct]**
§5. Provision shall be made by law for the removal for misconduct or malversation in office of all officers, except judicial, whose powers and duties are not local or legislative and who shall be elected at general elections, and also for supplying vacancies created by such removal. (Formerly §7 of Art. 10. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938. Formerly §10, renumbered §5 without change by amendment approved by vote of the people November 6, 1962; former §5 repealed by same amendment.)

**[When office to be deemed vacant; legislature may declare]**
§6. The legislature may declare the cases in which any office shall be deemed vacant when no provision is made for that purpose in this constitution. (Formerly §8 of Art. 10. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938. Formerly §11, renumbered §6 without change by amendment approved by vote of the people November 6, 1962; former §6 repealed by same amendment.)

**[Compensation of officers]**
§7. Each of the state officers named in this constitution shall, during his or her continuance in office, receive a compensation, to be fixed by law, which shall not be increased or diminished during the term for which he or she shall have been elected or appointed; nor shall he or she receive to his or her use any fees or perquisites of office or other compensation. (Formerly §9 of Art. 10. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938. Formerly §12, renumbered 7 without change by amendment approved by vote of the people November 6, 1962; former §7 repealed by same amendment; further amended as §12 by vote of the people November 5, 1963; further amended by vote of the people November 6, 2001.)

**[Election and term of city and certain county officers]**
§8. All elections of city officers, including supervisors, elected in any city or part of a city, and of county officers elected in any county wholly included in a city, except to fill vacancies, shall be held on the Tuesday succeeding the first Monday in November in an odd-numbered year, and the term of every such officer shall expire at the end of an odd-numbered year. This section shall not apply to elections of any judicial officer. (New. Added by amendment approved by vote of the people November 2, 1965.)

**No sections 9, 10, 11.**

**No section 12** *(see section 7).*

**[Law enforcement and other officers]**
§13. (a) Except in counties in the city of New York and except as authorized in section one of article nine of this constitution, registers in counties having registers shall be chosen by the electors of the respective counties once in every three years and whenever the occurring of vacancies shall require; the sheriff and the clerk of each county shall be chosen by the electors once in every three or four years as the legislature shall direct. Sheriffs shall hold no other office. They may be required by law to renew their security, from time to time; and in default of giving such new security, their offices shall be deemed vacant. The governor may remove any elective sheriff, county clerk, district attorney or register within the term for which he or she shall have been elected; but before so doing the governor shall give to such officer a copy of the charges against him or her and an opportunity of being heard in his or her defense. In each county a district attorney shall be chosen by the electors once in every three or four years as the legislature shall direct. The clerk of each county in the city of New York shall be appointed, and be subject to removal, by the appellate division of the supreme court in the judicial department in which the county is located. In addition to his or her powers and duties as clerk of the supreme court, he or

she shall have power to select, draw, summon and empanel grand and petit jurors in the manner and under the conditions now or hereafter prescribed by law, and shall have such other powers and duties as shall be prescribed by the city from time to time by local law.

(b) Any district attorney who shall fail faithfully to prosecute a person charged with the violation in his or her county of any provision of this article which may come to his or her knowledge, shall be removed from office by the governor, after due notice and an opportunity of being heard in his or her defense. The expenses which shall be incurred by any county, in investigating and prosecuting any charge of bribery or attempting to bribe any person holding office under the laws of this state, within such county, or of receiving bribes by any such person in said county, shall be a charge against the state, and their payment by the state shall be provided for by law.

(c) The city of New York is hereby vested with power from time to time to abolish by local law, as defined by the legislature, the office of any county officer within the city other than judges, clerks of counties and district attorneys, and to assign any or all functions of such officers to city officers, courts or clerks of counties, and to prescribe the powers, duties, qualifications, number, mode of selection and removal, terms of office and compensation of the persons holding such offices and the employees therein, and to assign to city officers any powers or duties of clerks of counties not assigned by this constitution. The legislature shall not pass any law affecting any such matters in relation to such offices within the city of New York except on message from the governor declaring that an emergency exists and the concurrent action of two-thirds of the members of each house, except that existing laws regarding each such office shall continue in force, and may be amended or repealed by the legislature as heretofore, until the power herein granted to the city has been exercised with respect to that office. The provisions of article nine shall not prevent the legislature from passing general or special laws prescribing or affecting powers and duties of such city officers or such courts or clerks to whom or which functions of such county officers shall have been so assigned, in so far as such powers or duties embrace subjects not relating to property, affairs or government of such city. (Added by vote of the people November 5, 1963. Subdivisions (a), (b) and (c), formerly §§5, 6 and 8 of Art. 9. Subdivision (a) amended by vote of the people November 7, 1972; subdivision (a) further amended by vote of the people November 6, 1984; November 7, 1989; further amended by vote of the people November 6, 2001.)

**[Employees of, and contractors for, the state and local governments; wages, hours and other provisions to be regulated by legislature]**
§14. The legislature may regulate and fix the wages or salaries and the hours of work or labor, and make provisions for the protection, welfare and safety, of persons employed by the state or by any county, city, town, village or other civil division of the state, or by any contractor or subcontractor performing work, labor or services for the state or for any county, city, town, village or other civil division thereof. (New. Added by amendment approved by vote of the people November 5, 1963.)

## ARTICLE XIV
### CONSERVATION

**[Forest preserve to be forever kept wild; authorized uses and exceptions]**
Section 1. The lands of the state, now owned or hereafter acquired, constituting the forest preserve as now fixed by law, shall be forever kept as wild forest lands. They shall not be leased, sold or exchanged, or be taken by any corporation, public or private, nor shall the timber thereon be sold, removed or destroyed. Nothing herein contained shall prevent the state from constructing, completing and maintaining any highway heretofore specifically authorized by constitutional amendment, nor from constructing and maintaining to federal standards federal aid interstate highway route five hundred two from a point in the vicinity of the city of Glens Falls, thence northerly to the vicinity of the villages of Lake George and Warrensburg, the hamlets of South Horicon and Pottersville and thence northerly in a generally straight line on the west side of Schroon Lake to the vicinity of the hamlet of

Case 23-1, Document 78, 01/25/2023, 3456054, Page274 of 296

Schroon, then continuing northerly to the vicinity of Schroon Falls, Schroon River and North Hudson, and to the east of Makomis Mountain, east of the hamlet of New Russia, east of the village of Elizabethtown and continuing northerly in the vicinity of the hamlet of Towers Forge, and east of Poke-O-Moonshine Mountain and continuing northerly to the vicinity of the village of Keeseville and the city of Plattsburgh, all of the aforesaid taking not to exceed a total of three hundred acres of state forest preserve land, nor from constructing and maintaining not more than twenty-five miles of ski trails thirty to two hundred feet wide, together with appurtenances thereto, provided that no more than five miles of such trails shall be in excess of one hundred twenty feet wide, on the north, east and northwest slopes of Whiteface Mountain in Essex county, nor from constructing and maintaining not more than twenty-five miles of ski trails thirty to two hundred feet wide, together with appurtenances thereto, provided that no more than two miles of such trails shall be in excess of one hundred twenty feet wide, on the slopes of Belleayre Mountain in Ulster and Delaware counties and not more than forty miles of ski trails thirty to two hundred feet wide, together with appurtenances thereto, provided that no more than eight miles of such trails shall be in excess of one hundred twenty feet wide, on the slopes of Gore and Pete Gay mountains in Warren county, nor from relocating, reconstructing and maintaining a total of not more than fifty miles of existing state highways for the purpose of eliminating the hazards of dangerous curves and grades, provided a total of no more than four hundred acres of forest preserve land shall be used for such purpose and that no single relocated portion of any highway shall exceed one mile in length. Notwithstanding the foregoing provisions, the state may convey to the village of Saranac Lake ten acres of forest preserve land adjacent to the boundaries of such village for public use in providing for refuse disposal and in exchange therefore the village of Saranac Lake shall convey to the state thirty acres of certain true forest land owned by such village on Roaring Brook in the northern half of Lot 113, Township 11, Richards Survey. Notwithstanding the foregoing provisions, the state may convey to the town of Arietta twenty-eight acres of forest preserve land within such town for public use in providing for the extension of the runway and landing strip of the Piseco airport and in exchange therefor the town of Arietta shall convey to the state thirty acres of certain land owned by such town in the town of Arietta. Notwithstanding the foregoing provisions and subject to legislative approval of the tracts to be exchanged prior to the actual transfer of title, the state, in order to consolidate its land holdings for better management, may convey to International Paper Company approximately eight thousand five hundred acres of forest preserve land located in townships two and three of Totten and Crossfield Purchase and township nine of the Moose River Tract, Hamilton county, and in exchange therefore International Paper Company shall convey to the state for incorporation into the forest preserve approximately the same number of acres of land located within such townships and such County on condition that the legislature shall determine that the lands to be received by the state are at least equal in value to the lands to be conveyed by the state. Notwithstanding the foregoing provisions and subject to legislative approval of the tracts to be exchanged prior to the actual transfer of title and the conditions herein set forth, the state, in order to facilitate the preservation of historic buildings listed on the national register of historic places by rejoining an historic grouping of buildings under unitary ownership and stewardship, may convey to Sagamore Institute, Inc., a not-for-profit educational organization, approximately ten acres of land and buildings thereon adjoining the real property of the Sagamore Institute, Inc. and located on Sagamore Road, near Racquette Lake Village, in the Town of Long Lake, county of Hamilton, and in exchange therefor; Sagamore Institute, Inc. shall convey to the state for incorporation into the forest preserve approximately two hundred acres of wild forest land located within the Adirondack Park on condition that the legislature shall determine that the lands to be received by the state are at least equal in value to the lands and buildings to be conveyed by the state and that the natural and historic character of the lands and buildings conveyed by the state will be secured by appropriate covenants and restrictions and that the lands and buildings conveyed by the state will reasonably be available for public visits according to agreement between Sagamore Institute, Inc. and the state. Notwithstanding the foregoing provisions the state may convey to the town of Arietta fifty acres of forest preserve land within such town for public use in providing for the extension

of the runway and landing strip of the Piseco airport and providing for the maintenance of a clear zone around such runway, and in exchange therefor, the town of Arietta shall convey to the state fifty-three acres of true forest land located in lot 2 township 2 Totten and Crossfield's Purchase in the town of Lake Pleasant.

Notwithstanding the foregoing provisions and subject to legislative approval prior to actual transfer of title, the state may convey to the town of Keene, Essex county, for public use as a cemetery owned by such town, approximately twelve acres of forest preserve land within such town and, in exchange therefor, the town of Keene shall convey to the state for incorporation into the forest preserve approximately one hundred forty-four acres of land, together with an easement over land owned by such town including the riverbed adjacent to the land to be conveyed to the state that will restrict further development of such land, on condition that the legislature shall determine that the property to be received by the state is at least equal in value to the land to be conveyed by the state.

Notwithstanding the foregoing provisions and subject to legislative approval prior to actual transfer of title, because there is no viable alternative to using forest preserve lands for the siting of drinking water wells and necessary appurtenances and because such wells are necessary to meet drinking water quality standards, the state may convey to the town of Long Lake, Hamilton county, one acre of forest preserve land within such town for public use as the site of such drinking water wells and necessary appurtenances for the municipal water supply for the hamlet of Raquette Lake. In exchange therefor, the town of Long Lake shall convey to the state at least twelve acres of land located in Hamilton county for incorporation into the forest preserve that the legislature shall determine is at least equal in value to the land to be conveyed by the state. The Raquette Lake surface reservoir shall be abandoned as a drinking water supply source.

Notwithstanding the foregoing provisions and subject to legislative approval prior to actual transfer of title, the state may convey to National Grid up to six acres adjoining State Route 56 in St. Lawrence County where it passes through Forest Preserve in Township 5, Lots 1, 2, 5 and 6 that is necessary and appropriate for National Grid to construct a new 46kV power line and in exchange therefore National Grid shall convey to the state for incorporation into the forest preserve at least 10 acres of forest land owned by National Grid in St. Lawrence county, on condition that the legislature shall determine that the property to be received by the state is at least equal in value to the land conveyed by the state.

Notwithstanding the foregoing provisions, the legislature may authorize the settlement, according to terms determined by the legislature, of title disputes in township forty, Totten and Crossfield purchase in the town of Long Lake, Hamilton county, to resolve longstanding and competing claims of title between the state and private parties in said township, provided that prior to, and as a condition of such settlement, land purchased without the use of state-appropriated funds, and suitable for incorporation in the forest preserve within the Adirondack park, shall be conveyed to the state on the condition that the legislature shall determine that the property to be conveyed to the state shall provide a net benefit to the forest preserve as compared to the township forty lands subject to such settlement.

Notwithstanding the foregoing provisions, the state may authorize NYCO Minerals, Inc. to engage in mineral sampling operations, solely at its expense, to determine the quantity and quality of wollastonite on approximately 200 acres of forest preserve land contained in lot 8, Stowers survey, town of Lewis, Essex county provided that NYCO Minerals, Inc. shall provide the data and information derived from such drilling to the state for appraisal purposes. Subject to legislative approval of the tracts to be exchanged prior to the actual transfer of the title, the state may subsequently convey said lot 8 to NYCO Minerals, Inc., and, in exchange therefor, NYCO Minerals, Inc. shall convey to the state for incorporation into the forest preserve not less than the same number of acres of land, on condition that the legislature shall determine that the lands to be received by the state are equal to or greater than the value of the land to be conveyed by the state and on condition that the assessed value of the land to be conveyed to the state shall total not less than one million dollars. When NYCO Minerals, Inc. terminates all mining operations on such lot 8 it shall remediate the site and convey title to such lot back to the state of New York for inclusion in the forest preserve. In the event that lot 8 is not conveyed to NYCO Minerals,

38

Case 23-1, Document 75, 01/25/2023, 3456054, Page275 of 296

Inc. pursuant to this paragraph, NYCO Minerals, Inc. nevertheless shall convey to the state for incorporation into the forest preserve not less than the same number of acres of land that is disturbed by any mineral sampling operations conducted on said lot 8 pursuant to this paragraph on condition that the legislature shall determine that the lands to be received by the state are equal to or greater than the value of the lands disturbed by the mineral sampling operations. (Formerly §7 of Art. 7. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 4, 1941; November 4, 1947; November 5, 1957; November 3, 1959; November 5, 1963; November 2, 1965; November 6, 1979; November 8, 1983; November 3, 1987; November 5, 1991; November 7, 1995; November 6, 2007; November 3, 2009; November 5, 2013.)

**[Reservoirs]**
§2. The legislature may by general laws provide for the use of not exceeding three per centum of such lands for the construction and maintenance of reservoirs for municipal water supply, and for the canals of the state. Such reservoirs shall be constructed, owned and controlled by the state, but such work shall not be undertaken until after the boundaries and high flow lines thereof shall have been accurately surveyed and fixed, and after public notice, hearing and determination that such lands are required for such public use. The expense of any such improvements shall be apportioned on the public and private property and municipalities benefited to the extent of the benefits received. Any such reservoir shall always be operated by the state and the legislature shall provide for a charge upon the property and municipalities benefited for a reasonable return to the state upon the value of the rights and property of the state used and the services of the state rendered, which shall be fixed for terms of not exceeding ten years and be readjustable at the end of any term. Unsanitary conditions shall not be created or continued by any such public works. (Derived in part from former §7 of Art. 7. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 3, 1953.)

**[Forest and wild life conservation; use or disposition of certain lands authorized]**
§3. 1. Forest and wild life conservation are hereby declared to be policies of the state. For the purpose of carrying out such policies the legislature may appropriate moneys for the acquisition by the state of land, outside of the Adirondack and Catskill parks as now fixed by law, for the practice of forest or wild life conservation. The prohibitions of section 1 of this article shall not apply to any lands heretofore or hereafter acquired or dedicated for such purposes within the forest preserve counties but outside of the Adirondack and Catskill parks as now fixed by law, except that such lands shall not be leased, sold or exchanged, or be taken by any corporation, public or private.

2. As to any other lands of the state, now owned or hereafter acquired, constituting the forest preserve referred to in section one of this article, but outside of the Adirondack and Catskill parks as now fixed by law, and consisting in any case of not more than one hundred contiguous acres entirely separated from any other portion of the forest preserve, the legislature may by appropriate legislation, notwithstanding the provisions of section one of this article, authorize: (a) the dedication thereof for the practice of forest or wild life conservation; or (b) the use thereof for public recreational or other state purposes or the sale, exchange or other disposition thereof; provided, however, that all moneys derived from the sale or other disposition of any of such lands shall be paid into a special fund of the treasury and be expended only for the acquisition of additional lands for such forest preserve within either such Adirondack or Catskill park. (Formerly §16 of Art. 7. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 5, 1957; November 6, 1973.)

**[Protection of natural resources; development of agricultural lands]**
§4. The policy of the state shall be to conserve and protect its natural resources and scenic beauty and encourage the development and improvement of its agricultural lands for the production of food and other agricultural products. The legislature, in implementing this policy, shall include adequate provision for the abatement of air and water pollution and of excessive and unnecessary noise, the protection of agricultural lands, wetlands and shorelines, and the development and regulation of water resources. The legislature shall further provide for the acquisition of lands and waters, including improvements thereon and any interest therein, outside the forest preserve counties, and the dedication of properties so acquired or now owned, which because of their natural beauty, wilderness character, or geological, ecological or historical significance, shall be preserved and administered for the use and enjoyment of the people. Properties so dedicated shall constitute the state nature and historical preserve and they shall not be taken or otherwise disposed of except by law enacted by two successive regular sessions of the legislature. (New. Added by vote of the people November 4, 1969.)

**[Violations of article; how restrained]**
§5. A violation of any of the provisions of this article may be restrained at the suit of the people or, with the consent of the supreme court in appellate division, on notice to the attorney-general at the suit of any citizen. (New. Derived from former §7 of Art. 7. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938. Renumbered §5 by vote of the people November 4, 1969.)

## ARTICLE XV
CANALS

**[Disposition of canals and canal properties prohibited]**
Section 1. The legislature shall not sell, abandon or otherwise dispose of the now existing or future improved barge canal, the divisions of which are the Erie canal, the Oswego canal, the Champlain canal, and the Cayuga and Seneca canals, or of the terminals constructed as part of the barge canal system; nor shall it sell, abandon or otherwise dispose of any portion of the canal system existing prior to the barge canal improvement which portion forms a part of, or functions as a part of, the present barge canal system; but such canals and terminals shall remain the property of the state and under its management and control forever. This prohibition shall not prevent the legislature, by appropriate laws, from authorizing the granting of revocable permits or leases for periods of time as authorized by the legislature for the occupancy or use of such lands or structures. (Formerly §8 of Art. 7. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; November 5, 1991.)

**[Prohibition inapplicable to lands and properties no longer useful; disposition authorized]**
§2. The prohibition of sale, abandonment or other disposition contained in section 1 of this article shall not apply to barge canal lands, barge canal terminals or barge canal terminal lands which have or may become no longer necessary or useful for canal or terminal purposes; nor to any canal lands and appertaining structures constituting the canal system prior to the barge canal improvement which have or may become no longer necessary or useful in conjunction with the now existing barge canal. The legislature may by appropriate legislation authorize the sale, exchange, abandonment or other disposition of any barge canal lands, barge canal terminals, barge canal terminal lands or other canal lands and appertaining structures which have or may become no longer necessary or useful as a part of the barge canal system, as an aid to navigation thereon, or for barge canal terminal purposes. (Formerly duplicate §8 of Art. 7. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; November 5, 1991.)

**[Contracts for work and materials; special revenue fund]**
§3. All boats navigating the canals and the owners and masters thereof, shall be subject to such laws and regulations as have been or may hereafter be enacted concerning the navigation of the canals. The legislature shall annually make provision for the expenses of the superintendence and repairs of the canals, and may provide for the improvement of the canals in such manner as shall be provided by law notwithstanding the creation of a special revenue fund as provided in this section. All contracts for work or materials

Case 23-1, Document 75, 01/25/2023, 3456054, Page276 of 296

on any canal shall be made with the persons who shall offer to do or provide the same at the lowest responsible price, with adequate security for their performance as provided by law.

All funds that may be derived from any sale or other disposition of any barge canal lands, barge canal terminals, barge canal terminal lands or other canal lands and appertaining structures and any other funds collected for the use of the canals or canal lands shall be paid into a special revenue fund of the treasury. Such funds shall only be expended for the maintenance, construction, reconstruction, development or promotion of the canal, canal lands, or lands adjacent to the canal as provided by law. (Formerly §9 of Art. 7. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; November 5, 1991.)

**[Lease or transfer to federal government of barge canal system authorized]**

§4. Notwithstanding the prohibition of sale, abandonment or other disposition contained in section one of this article, the legislature may authorize by law the lease or transfer to the federal government of the barge canal, consisting of the Erie, Oswego, Champlain, Cayuga and Seneca divisions and the barge canal terminals and facilities for purposes of operation, improvement and inclusion in the national system of inland waterways. Such lease or transfer to the federal government for the purposes specified herein may be made upon such terms and conditions as the legislature may determine with or without compensation to the state. Nothing contained herein shall prevent the legislature from providing annual appropriations for the state's share, if any, of the cost of operation, maintenance and improvement of the barge canal, the divisions thereof, terminals and facilities in the event of the transfer of the barge canal in whole to the federal government whether by lease or transfer.

The legislature, in determining the state's share of the annual cost of operation, maintenance and improvement of the barge canal, the several divisions, terminals and facilities, shall give consideration and evaluate the benefits derived from the barge canal for purposes of flood control, conservation and utilization of water resources. (Added by vote of the people November 3, 1959.)

## ARTICLE XVI[12]
### TAXATION

**[Power of taxation; exemptions from taxation]**

Section 1. The power of taxation shall never be surrendered, suspended or contracted away, except as to securities issued for public purposes pursuant to law. Any laws which delegate the taxing power shall specify the types of taxes which may be imposed thereunder and provide for their review.

Exemptions from taxation may be granted only by general laws. Exemptions may be altered or repealed except those exempting real or personal property used exclusively for religious, educational or charitable purposes as defined by law and owned by any corporation or association organized or conducted exclusively for one or more of such purposes and not operating for profit.

**[Assessments for taxation purposes]**

§2. The legislature shall provide for the supervision, review and equalization of assessments for purposes of taxation. Assessments shall in no case exceed full value.

Nothing in this constitution shall be deemed to prevent the legislature from providing for the assessment, levy and collection of village taxes by the taxing authorities of those subdivisions of the state in which the lands comprising the respective villages are located, nor from providing that the respective counties of the state may loan or advance to any village located in whole or in part within such county the amount of any tax which shall have been levied for village purposes upon any lands located within such county and remaining unpaid.

**[Situs of intangible personal property; taxation of]**

§3. Moneys, credits, securities and other intangible personal property within the state not employed in carrying on any business therein by the owner shall be deemed to be located at the domicile of the owner for purposes of taxation, and, if held in trust, shall not be deemed to be located in this state for purposes of taxation because of the trustee being domiciled in this state, provided that if no other state has jurisdiction to subject such property held in trust to death taxation, it may be deemed property having a taxable situs within this state for purposes of death taxation. Intangible personal property shall not be taxed ad valorem nor shall any excise tax be levied solely because of the ownership or possession thereof, except that the income therefrom may be taken into consideration in computing any excise tax measured by income generally. Undistributed profits shall not be taxed.

**[Certain corporations not to be discriminated against]**

§4. Where the state has power to tax corporations incorporated under the laws of the United States there shall be no discrimination in the rates and method of taxation between such corporations and other corporations exercising substantially similar functions and engaged in substantially similar business within the state.

**[Compensation of public officers and employees subject to taxation]**

§5. All salaries, wages and other compensation, except pensions, paid to officers and employees of the state and its subdivisions and agencies shall be subject to taxation. (Amended by vote of the people November 6, 2001.)

**[Public improvements or services; contract of indebtedness; creation of public corporations]**

§6. Notwithstanding any provision of this or any other article of this constitution to the contrary, the legislature may by law authorize a county, city, town or village, or combination thereof acting together, to undertake the development of public improvements or services, including the acquisition of land, for the purpose of redevelopment of economically unproductive, blighted or deteriorated areas and, in furtherance thereof, to contract indebtedness. Any such indebtedness shall be contracted by any such county, city, town or village, or combination thereof acting together, without the pledge of its faith and credit, or the faith and credit of the state, for the payment of the principal thereof and the interest thereon, and such indebtedness may be paid without restriction as to the amount or relative amount of annual installments. The amount of any indebtedness contracted under this section may be excluded in ascertaining the power of such county, city, town or village to contract indebtedness within the provisions of this constitution relating thereto. Any county, city, town or village contracting indebtedness pursuant to this section for redevelopment of an economically unproductive, blighted or deteriorated area shall pledge to the payment thereof that portion of the taxes raised by it on real estate in such area which, in any year, is attributed to the increase in value of taxable real estate resulting from such redevelopment. The legislature may further authorize any county, city, town or village, or combination thereof acting together, to carry out the powers and duties conferred by this section by means of a public corporation created therefor. (New. Added by vote of the people November 8, 1983; amended by vote of the people November 6, 2001.)

## ARTICLE XVII
### SOCIAL WELFARE

**[Public relief and care]**

Section 1. The aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[State board of social welfare; powers and duties]**

§2. The state board of social welfare shall be continued. It shall visit and inspect, or cause to be visited and inspected by members of its staff, all public and private institutions, whether state, county, municipal, incorporated or

---

[12] New article adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.

not incorporated, which are in receipt of public funds and which are of a charitable, eleemosynary, correctional or reformatory character, including all reformatories for juveniles and institutions or agencies exercising custody of dependent, neglected or delinquent children, but excepting state institutions for the education and support of the blind, the deaf and the dumb, and excepting also such institutions as are hereinafter made subject to the visitation and inspection of the department of mental hygiene or the state commission of correction. As to institutions, whether incorporated or not incorporated, having inmates, but not in receipt of public funds, which are of a charitable, eleemosynary, correctional or reformatory character, and agencies, whether incorporated or not incorporated, not in receipt of public funds, which exercise custody of dependent, neglected or delinquent children, the state board of social welfare shall make inspections, or cause inspections to be made by members of its staff, but solely as to matters directly affecting the health, safety, treatment and training of their inmates, or of the children under their custody. Subject to the control of the legislature and pursuant to the procedure prescribed by general law, the state board of social welfare may make rules and regulations, not inconsistent with this constitution, with respect to all of the functions, powers and duties with which the department and the state board of social welfare are herein or shall be charged. (New. Derived in part from former §11 of Art. 8. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Public health]**
§3.  The protection and promotion of the health of the inhabitants of the state are matters of public concern and provision therefor shall be made by the state and by such of its subdivisions and in such manner, and by such means as the legislature shall from time to time determine. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Care and treatment of persons suffering from mental disorder or defect; visitation of institutions for]**
§4.  The care and treatment of persons suffering from mental disorder or defect and the protection of the mental health of the inhabitants of the state may be provided by state and local authorities and in such manner as the legislature may from time to time determine. The head of the department of mental hygiene shall visit and inspect, or cause to be visited and inspected by members of his or her staff, all institutions either public or private used for the care and treatment of persons suffering from mental disorder or defect. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 6, 2001.)

**[Institutions for detention of criminals; probation; parole; state commission of correction]**
§5.  The legislature may provide for the maintenance and support of institutions for the detention of persons charged with or convicted of crime and for systems of probation and parole of persons convicted of crime. There shall be a state commission of correction, which shall visit and inspect or cause to be visited and inspected by members of its staff, all institutions used for the detention of sane adults charged with or convicted of crime. (New. Derived in part from former §11 of Art. 8. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938. Amended by vote of the people November 6, 1973.)

**[Visitation and inspection]**
§6.  Visitation and inspection as herein authorized, shall not be exclusive of other visitation and inspection now or hereafter authorized by law. (New. Derived from former §13 of Art. 8. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Loans for hospital construction]**
§7.  Notwithstanding any other provision of this constitution, the legislature may authorize the state, a municipality or a public corporation acting as an instrumentality of the state or municipality to lend its money or credit to or in aid of any corporation or association, regulated by law as to its charges,

profits, dividends, and disposition of its property or franchises, for the purpose of providing such hospital or other facilities for the prevention, diagnosis or treatment of human disease, pain, injury, disability, deformity or physical condition, and for facilities incidental or appurtenant thereto as may be prescribed by law. (New. Added by vote of the people November 4, 1969.)

## ARTICLE XVIII[13]
### HOUSING

**[Housing and nursing home accommodations for persons of low income; slum clearance]**
Section 1.  Subject to the provisions of this article, the legislature may provide in such manner, by such means and upon such terms and conditions as it may prescribe for low rent housing and nursing home accommodations for persons of low income as defined by law, or for the clearance, replanning, reconstruction and rehabilitation of substandard and insanitary areas, or for both such purposes, and for recreational and other facilities incidental or appurtenant thereto. (Amended by vote of the people November 2, 1965.)

**[*Idem*; powers of legislature in aid of]**
§2.  For and in aid of such purposes, notwithstanding any provision in any other article of this constitution, but subject to the limitations contained in this article, the legislature may: make or contract to make or authorize to be made or contracted capital or periodic subsidies by the state to any city, town, village, or public corporation, payable only with moneys appropriated therefor from the general fund of the state; authorize any city, town or village to make or contract to make such subsidies to any public corporation, payable only with moneys locally appropriated therefor from the general or other fund available for current expenses of such municipality; authorize the contracting of indebtedness for the purpose of providing moneys out of which it may make or contract to make or authorize to be made or contracted loans by the state to any city, town, village or public corporation; authorize any city, town or village to make or contract to make loans to any public corporation; authorize any city, town or village to guarantee the principal of and interest on, or only the interest on, indebtedness contracted by a public corporation; authorize and provide for loans by the state and authorize loans by any city, town or village to or in aid of corporations regulated by law as to rents, profits, dividends and disposition of their property or franchises and engaged in providing housing facilities or nursing home accommodations; authorize any city, town or village to make loans to the owners of existing multiple dwellings for the rehabilitation and improvement thereof for occupancy by persons of low income as defined by law; grant or authorize tax exemptions in whole or in part, except that no such exemption may be granted or authorized for a period of more than sixty years; authorize cooperation with and the acceptance of aid from the United States; grant the power of eminent domain to any city, town or village, to any public corporation and to any corporation regulated by law as to rents, profits, dividends and disposition of its property or franchises and engaged in providing housing facilities.

As used in this article, the term "public corporation" shall mean any corporate governmental agency (except a county or municipal corporation) organized pursuant to law to accomplish any or all of the purposes specified in this article. (Amended by vote of the people November 2, 1965.)

**[Article VII to apply to state debts under this article, with certain exceptions; amortization of state debts; capital and periodic subsidies]**
§3.  The provisions of article VII, not inconsistent with this article, relating to debts of the state shall apply to all debts contracted by the state for the purpose of providing moneys out of which to make loans pursuant to this article, except (a) that any law or laws authorizing the contracting of such debt, not exceeding in the aggregate three hundred million dollars, shall take

---

[13] Entire article new. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.

Case 23-1, Document 75, 01/25/2023, 3456054, Page278 of 296

The Constitution of the State of New York

effect without submission to the people, and the contracting of a greater amount of debt may not be authorized prior to January first, nineteen hundred forty-two; (b) that any such debt and each portion thereof, except as hereinafter provided, shall be paid in equal annual installments, the first of which shall be payable not more than three years, and the last of which shall be payable not more than fifty years, after such debt or portion thereof shall have been contracted; and (c) that any law authorizing the contracting of such debt may be submitted to the people at a general election, whether or not any other law or bill shall be submitted to be voted for or against at such election.

Debts contracted by the state for the purpose of providing money out of which to make loans to or in aid of corporations regulated by law as to rents, profits, dividends and disposition of their property or franchises and engaged in providing housing facilities pursuant to this article may be paid in such manner that the total annual charges required for the payment of principal and interest are approximately equal and constant for the entire period in which any of the bonds issued therefor are outstanding.

Any law authorizing the making of contracts for capital or periodic subsidies to be paid with moneys currently appropriated from the general fund of the state shall take effect without submission to the people, and the amount to be paid under such contracts shall not be included in ascertaining the amount of indebtedness which may be contracted by the state under this article; provided, however, (a) that such periodic subsidies shall not be paid for a period longer than the life of the projects assisted thereby, but in any event for not more than sixty years; (b) that no contracts for periodic subsidies shall be entered into in any one year requiring payments aggregating more than one million dollars in any one year; and (c) that there shall not be outstanding at any one time contracts for periodic subsidies requiring payments exceeding an aggregate of thirty-four million dollars in any one year, unless a law authorizing contracts in excess of such amounts shall have been submitted to and approved by the people at a general election; and any such law may be submitted to the people at a general election, whether or not any other law or bill shall be submitted to be voted for or against at such election. (Amended by vote of the people November 8, 1955; further amended by vote of the people November 5, 1957.)

**[Powers of cities, towns and villages to contract indebtedness in aid of low rent housing and slum clearance projects; restrictions thereon]**

§4. To effectuate any of the purposes of this article, the legislature may authorize any city, town or village to contract indebtedness to an amount which shall not exceed two per centum of the average assessed valuation of the real estate of such city, town or village subject to taxation, as determined by the last completed assessment roll and the four preceding assessment rolls of such city, town or village, for city, town or village taxes prior to the contracting of such indebtedness. In ascertaining the power of a city, or village having a population of five thousand or more as determined by the last federal census, to contract indebtedness pursuant to this article there may be excluded any such indebtedness if the project or projects aided by guarantees representing such indebtedness or by loans for which such indebtedness was contracted shall have yielded during the preceding year net revenue to be determined annually by deducting from the gross revenues, including periodic subsidies therefor, received from such project or projects, all costs of operation, maintenance, repairs and replacements, and the interest on such indebtedness and the amounts required in such year for the payment of such indebtedness; provided that in the case of guarantees such interest and such amounts shall have been paid, and in the case of loans an amount equal to such interest and such amounts shall have been paid to such city or village. The legislature shall prescribe the method by which the amount of any such indebtedness to be excluded shall be determined, and no such indebtedness shall be excluded except in accordance with such determination. The legislature may confer appropriate jurisdiction on the appellate division of the supreme court in the judicial departments in which such cities or villages are located for the purpose of determining the amount of any such indebtedness to be so excluded.

The liability of a city, town or village on account of any contract for capital or periodic subsidies to be paid subsequent to the then current year shall, for the purpose of ascertaining the power of such city, town or village to contract indebtedness, be deemed indebtedness in the amount of the

commuted value of the total of such capital or periodic subsidies remaining unpaid, calculated on the basis of an annual interest rate of four per centum. Such periodic subsidies shall not be contracted for a period longer than the life of the projects assisted thereby, and in no event for more than sixty years. Indebtedness contracted pursuant to this article shall be excluded in ascertaining the power of a city or such village otherwise to create indebtedness under any other section of this constitution. Notwithstanding the foregoing the legislature shall not authorize any city or village having a population of five thousand or more to contract indebtedness hereunder in excess of the limitations prescribed by any other article of this constitution unless at the same time it shall by law require such city or village to levy annually a tax or taxes other than an ad valorem tax on real estate to an extent sufficient to provide for the payment of the principal of and interest on any such indebtedness. Nothing herein contained, however, shall be construed to prevent such city or village from pledging its faith and credit for the payment of such principal and interest nor shall any such law prevent recourse to an ad valorem tax on real estate to the extent that revenue derived from such other tax or taxes in any year, together with revenues from the project or projects aided by the proceeds of such indebtedness, shall become insufficient to provide fully for payment of such principal and interest in that year. (Amended by vote of the people November 8, 1949.)

**[Liability for certain loans made by the state to certain public corporations]**

§5. Any city, town or village shall be liable for the repayment of any loans and interest thereon made by the state to any public corporation, acting as an instrumentality of such city, town or village. Such liability of a city, town or village shall be excluded in ascertaining the power of such city, town or village to become indebted pursuant to the provisions of this article, except that in the event of a default in payment under the terms of any such loan, the unpaid balance thereof shall be included in ascertaining the power of such city, town or village to become so indebted. No subsidy, in addition to any capital or periodic subsidy originally contracted for in aid of any project or projects authorized under this article, shall be paid by the state to a city, town, village or public corporation, acting as an instrumentality thereof, for the purpose of enabling such city, town, village or corporation to remedy an actual default or avoid an impending default in the payment of principal or interest on a loan which has been theretofore made by the state to such city, town, village or corporation pursuant to this article. (Amended by vote of the people November 5, 1957.)

**[Loans and subsidies; restrictions on and preference in occupancy of projects]**

§6. No loan, or subsidy shall be made by the state to aid any project unless such project is in conformity with a plan or undertaking for the clearance, replanning and reconstruction or rehabilitation of a substandard and unsanitary area or areas and for recreational and other facilities incidental or appurtenant thereto. The legislature may provide additional conditions to the making of such loans or subsidies consistent with the purposes of this article. The occupancy of any such project shall be restricted to persons of low income as defined by law and preference shall be given to persons who live or shall have lived in such area or areas.

**[Liability arising from guarantees to be deemed indebtedness; method of computing]**

§7. The liability arising from any guarantee of the principal of and interest on indebtedness contracted by a public corporation shall be deemed indebtedness in the amount of the face value of the principal thereof remaining unpaid. The liability arising from any guarantee of only the interest on indebtedness contracted by a public corporation shall be deemed indebtedness in the amount of the commuted value of the total interest guaranteed and remaining unpaid, calculated on the basis of an annual interest rate of four per centum.

**[Excess condemnation]**

§8. Any agency of the state, or any city, town, village, or public corporation, which is empowered by law to take private property by eminent domain for any of the public purposes specified in section one of this article, may be

empowered by the legislature to take property necessary for any such purpose but in excess of that required for public use shall such purpose shall have been accomplished; and to improve and utilize such excess, wholly or partly for any other public purpose, or to lease or sell such excess with restrictions to preserve and protect such improvement or improvements.

**[Acquisition of property for purposes of article]**
§9. Subject to any limitation imposed by the legislature, the state, or any city, town, village or public corporation, may acquire by purchase, gift, eminent domain or otherwise, such property as it may deem ultimately necessary or proper to effectuate the purposes of this article, or any of them, although temporarily not required for such purposes.

**[Power of legislature; construction of article]**
§10. The legislature is empowered to make all laws which it shall deem necessary and proper for carrying into execution the foregoing powers. This article shall be construed as extending powers which otherwise might be limited by other articles of this constitution and shall not be construed as imposing additional limitations; but nothing in this article contained shall be deemed to authorize or empower the state, or any city, town, village or public corporation to engage in any private business or enterprise other than the building and operation of low rent dwelling houses for persons of low income as defined by law, or the loaning of money to owners of existing multiple dwellings as herein provided.

### ARTICLE XIX
AMENDMENTS TO CONSTITUTION

**[Amendments to constitution; how proposed, voted upon and ratified; failure of attorney-general to render opinion not to affect validity]**
Section 1. Any amendment or amendments to this constitution may be proposed in the senate and assembly whereupon such amendment or amendments shall be referred to the attorney-general whose duty it shall be within twenty days thereafter to render an opinion in writing to the senate and assembly as to the effect of such amendment or amendments upon other provisions of the constitution. Upon receiving such opinion, if the amendment or amendments as proposed or as amended shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment or amendments shall be entered on their journals, and the ayes and noes taken thereon, and referred to the next regular legislative session convening after the succeeding general election of members of the assembly, and shall be published for three months previous to the time of making such choice; and if in such legislative session, such proposed amendment or amendments shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the legislature to submit each proposed amendment or amendments to the people for approval in such manner and at such times as the legislature shall prescribe; and if the people shall approve and ratify such amendment or amendments by a majority of the electors voting thereon, such amendment or amendments shall become a part of the constitution on the first day of January next after such approval. Neither the failure of the attorney-general to render an opinion concerning such a proposed amendment nor his or her failure to do so timely shall affect the validity of such proposed amendment or legislative action thereon. (Formerly §1 of Art. 14. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 4, 1941; November 6, 2001.)

**[Future constitutional conventions; how called; election of delegates; compensation; quorum; submission of amendments; officers; employees; rules; vacancies]**
§2. At the general election to be held in the year nineteen hundred fifty-seven, and every twentieth year thereafter, and also at such times as the legislature may by law provide, the question "Shall there be a convention to revise the constitution and amend the same?" shall be submitted to and decided by the electors of the state; and in case a majority of the electors voting thereon shall decide in favor of a convention for such purpose, the electors of every senate district of the state, as then organized, shall elect three delegates at the next ensuing general election, and the electors of the state voting at the same election shall elect fifteen delegates-at-large. The delegates so elected shall convene at the capitol on the first Tuesday of April next ensuing after their election, and shall continue their session until the business of such convention shall have been completed. Every delegate shall receive for his or her services the same compensation as shall then be annually payable to the members of the assembly and be reimbursed for actual traveling expenses, while the convention is in session, to the extent that a member of the assembly would then be entitled thereto in the case of a session of the legislature. A majority of the convention shall constitute a quorum for the transaction of business, and no amendment to the constitution shall be submitted for approval to the electors as hereinafter provided, unless by the assent of a majority of all the delegates elected to the convention, the ayes and noes being entered on the journal to be kept. The convention shall have the power to appoint such officers, employees and assistants as it may deem necessary, and fix their compensation and to provide for the printing of its documents, journal, proceedings and other expenses of said convention. The convention shall determine the rules of its own proceedings, choose its own officers, and be the judge of the election, returns and qualifications of its members. In case of a vacancy, by death, resignation or other cause, of any district delegate elected to the convention, such vacancy shall be filled by a vote of the remaining delegates representing the district in which such vacancy occurs. If such vacancy occurs in the office of a delegate-at-large, such vacancy shall be filled by a vote of the remaining delegates-at-large. Any proposed constitution or constitutional amendment which shall have been adopted by such convention, shall be submitted to a vote of the electors of the state at the time and in the manner provided by such convention, at an election which shall be held not less than six weeks after the adjournment of such convention. Upon the approval of such constitution or constitutional amendments, in the manner provided in the last preceding section, such constitution or constitutional amendment, shall go into effect on the first day of January next after such approval. (Formerly §2 of Art. 14. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 6, 2001.)

**[Amendments simultaneously submitted by convention and legislature]**
§3. Any amendment proposed by a constitutional convention relating to the same subject as an amendment proposed by the legislature, coincidently submitted to the people for approval shall, if approved, be deemed to supersede the amendment so proposed by the legislature. (Formerly §3 of Art. 14. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

### ARTICLE XX
WHEN TO TAKE EFFECT

**[Time of taking effect]**
Section 1. This constitution shall be in force from and including the first day of January, one thousand nine hundred thirty-eight, except as herein otherwise provided. (Formerly §1 of Art. 15. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)



★ ★ ★

*DONE in Convention at the Capitol in the city of Albany, the twenty-fifth day of August, in the year one thousand nine hundred thirty-eight, and of the Independence of the United States of America the one hundred and sixty-third.*
*IN WITNESS WHEREOF, we have hereunto subscribed our names.*

FREDERICK E. CRANE,
*President and Delegate-at-Large*

U.H. Boyden, *Secretary*

**Do you have to file?** Refer to the Form 1040 Instructions to determine if you are required to file a tax return. Even if you do not have to file a tax return, you may be eligible for a refund if box 2 shows an amount or if you are eligible for any credit.

**Earned income credit (EIC).**
You may be able to take the EIC for 2014 if your adjusted gross income (AGI) is less than a certain amount. The amount of the credit is based on income and family size. Workers without children could qualify for a smaller credit. You and any qualifying children must have valid social security numbers (SSNs). You cannot take the EIC if your investment income is more than the specified amount for 2014 or if income is earned for services provided while you were an inmate at a penal institution. For 2014 income limits and more information, see your tax preparer, contact the IRS, or visit our website at IRS.gov/eitc. Also see Pub. 596, Earned Income Credit. **Any EIC that is more than your tax liability is refunded to you, but only if you file a tax return.**

**Corrections.** If your name, SSN, or address is incorrect, correct Copies B, C, and 2 and ask your employer to correct your employment record. Be sure to ask the employer to file Form W-2c, Corrected Wage and Tax Statement, with the Social Security Administration (SSA) to correct any name, SSN, or money amount error reported to the SSA on Form W-2. Be sure to get your copies of Form W-2c from your employer for all corrections made so you may file them with your tax return. If your name and SSN are correct but are not the same as shown on your social security card, you should ask for a new card that displays your correct name at any SSA office or by calling 1-800-772-1213. You also may visit the SSA at www.socialsecurity.gov.

**Cost of employer-sponsored health coverage (if such cost is provided by the employer).** The reporting in box 12, using code DD, of the cost of employer-sponsored health coverage is for your information only. **The amount reported with code DD is not taxable.**

**Credit for excess taxes.** If you had more than one

employer in 2014 and more than $7,254.00 in social security and/or Tier 1 railroad retirement (RRTA) taxes were withheld, you may be able to claim a credit for the excess against your federal income tax. If you had more than one railroad employer and more than $3,828 in Tier 2 RRTA tax was withheld, you also may be able to claim a credit.

See your Form 1040 or Form 1040A instructions and Pub. 505, Tax Withholding and Estimated Tax.

**Instructions for Employee**

**Box 1.** Enter this amount on the Wages line of your tax return.

**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.

**Box 5.** You may be required to report this amount on Form 8959, Additional Medicare Tax. See Form 1040 instructions to determine if you are required to complete Form 8959.

**Box 6.** This amount includes the 1.45% Medicare Tax withheld on all Medicare wages and tips shown in Box 5, as well as the 0.9% Additional Medicare Tax on any of those Medicare wages and tips above $200,000.

**Box 10.** This amount is the total dependent care benefits your employer paid to you or incurred on your behalf (including amounts from a section 125 (cafeteria) plan). Any amount over $5000 also is included in Box 1. Complete form 2441, Child and Dependent Care Expenses, to compute any taxable and nontaxable amounts.

**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E) and designated Roth contributions (codes AA, BB, and EE) under all plans are generally limited to a total of $17,500 ($12,000 if you only have SIMPLE plans; $20,500 for section 403(b) plans if you qualify for the 15-year rule explained in Pub. 571). Deferrals under code G are limited to $17,500.

However, if you were at least age 50 in 2014, your employer may have allowed an additional deferral of up to $5,500 ($2,500 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective deferrals. For code G, the total of all elective deferrals may be higher

for the last 3 years before you reach retirement age. Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the "Wages, Salaries, Tips, etc." line instructions for Form 1040.

**Note.** If a year follows codes D, E, G, AA, BB or EE, you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.

**D)** Elective deferrals to a Section 401(k) cash or deferred arrangement. Also includes deferrals under a SIMPLE retirement account that is part of a section 401(k) arrangement.

**E)** Elective deferrals under a section 403(b) salary reduction agreement.

**G)** Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan.

**AA)** Designated Roth contributions to a section 401(k) plan.

**BB)** Designated Roth contributions under a section 403(b) plan.

**DD)** Cost of employer-sponsored health coverage. The amount reported with code DD is not taxable.

**EE)** Designated Roth contributions under a governmental section 457(b) plan. The amount does not apply to contributions under a tax-exempt organization section 457(b) plan.

**Box 13.** If the "Retirement Plan" box is checked, special limits may apply to the amount of traditional IRA contributions you may deduct. See Pub.590, Individual Retirement Arrangements (IRAs).

**Note.** Keep Copy C of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help protect your social security benefits, keep Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year.

DEPT. OF THE TREASURY - IRS OMB NO. 1545-0008 · **THIS INFORMATION IS BEING PROVIDED TO THE INTERNAL REVENUE SERVICE**

| W-2 WAGE & TAX STATEMENT | A) EMPLOYEE'S SOCIAL SECURITY NO. 9 | | DUPLICATE 02/20/2018 72 0001 | |
|---|---|---|---|---|
| B) EMPLOYER IDENTIFICATION NUMBER | | 1 WAGES & OTHER COMPENSATION 86,738.16 | 2 FEDERAL INCOME TAX WITHHELD 14,848.30 | |
| C) EMPLOYER'S NAME, ADDRESS AND ZIP CODE CITY OF NEW YORK 450 WEST 33RD STREET, 4TH FL. NEW YORK, NY 10001 | | 3 SOCIAL SECURITY WAGES 89,935.17 | 4 SOCIAL SECURITY TAX WITHHELD 5,575.98 | |
| | | 5 MEDICARE WAGES 89,935.17 | 6 MEDICARE TAX WITHHELD 1,304.06 | |
| D) CONTROL NUMBER | | | 10 DEPENDENT CARE BENEFITS | |

| E) EMPLOYEE'S NAME, ADDRESS AND ZIP CODE | 11 NONQUALIFIED PLANS | 12 SEE INSTRUCTIONS FOR BOX 12 | |
|---|---|---|---|
| | | CODE | AMOUNT |
| VICKY WARE 80 PATTON AVENUE WYANDANCH NY 11798 | | 12A DD | 7,685.50 |
| | | 12B | |
| | 13 X RETIREMENT PLAN | 12C | |
| | | 12D | |
| | | 12E | |
| | | 12F | |

| **2014** TAX YEAR | **COPY C** | **EMPLOYEE'S COPY** |
|---|---|---|

| 15 NAME OF STATE NEW YORK | 16 STATE WAGES, ETC 86,738.16 | 17 STATE INCOME TAX WITHHELD 4,896.46 | 14 OTHER IRC 414H 3,197.01 |
|---|---|---|---|
| 20A LOCALITY NAME NYC | 18A LOCAL WAGES, ETC | 19A LOCAL INCOME TAX WITHHELD | IRC 125 345.33 |
| 20B LOCALITY NAME | 18B LOCAL WAGES, ETC | 19B LOCAL INCOME TAX WITHHELD | FRINGE 619.96 |

DEPT. OF THE TREASURY - IRS OMB NO. 1545-0008 · **THIS INFORMATION IS BEING PROVIDED TO THE INTERNAL REVENUE SERVICE**

| W-2 WAGE & TAX STATEMENT | A) EMPLOYEE'S SOCIAL SECURITY NO. | | DUPLICATE 02/20/2018 72 0001 | |
|---|---|---|---|---|
| B) EMPLOYER IDENTIFICATION NUMBER | | 1 WAGES & OTHER COMPENSATION 86,738.16 | 2 FEDERAL INCOME TAX WITHHELD 14,848.30 | |
| C) EMPLOYER'S NAME, ADDRESS AND ZIP CODE CITY OF NEW YORK 450 WEST 33RD STREET, 4TH FL. NEW YORK, NY 10001 | | 3 SOCIAL SECURITY WAGES 89,935.17 | 4 SOCIAL SECURITY TAX WITHHELD 5,575.98 | |
| | | 5 MEDICARE WAGES 89,935.17 | 6 MEDICARE TAX WITHHELD 1,304.06 | |
| D) CONTROL NUMBER | | | 10 DEPENDENT CARE BENEFITS | |

| E) EMPLOYEE'S NAME, ADDRESS AND ZIP CODE | 11 NONQUALIFIED PLANS | 12 SEE INSTRUCTIONS FOR BOX 12 | |
|---|---|---|---|
| | | CODE | AMOUNT |
| VICKY WARE 80 PATTON AVENUE WYANDANCH NY 11798 | | 12A DD | 7,685.50 |
| | | 12B | |
| | 13 X RETIREMENT PLAN | 12C | |
| | | 12D | |
| | | 12E | |
| | | 12F | |

| **2014** TAX YEAR | **COPY B** | **TO BE FILED WITH EMPLOYEE'S FEDERAL TAX RETURN** |
|---|---|---|

| 15 NAME OF STATE NEW YORK | 16 STATE WAGES, ETC 86,738.16 | 17 STATE INCOME TAX WITHHELD 4,896.46 | 14 OTHER IRC 414H 3,197.01 |
|---|---|---|---|
| 20A LOCALITY NAME NYC | 18A LOCAL WAGES, ETC | 19A LOCAL INCOME TAX WITHHELD | IRC 125 345.33 |
| 20B LOCALITY NAME | 18B LOCAL WAGES, ETC | 19B LOCAL INCOME TAX WITHHELD | FRINGE 619.96 |

DEPT. OF THE TREASURY - IRS OMB NO. 1545-0008

| W-2 WAGE & TAX STATEMENT | A) EMPLOYEE'S SOCIAL SECURITY NO. | | DUPLICATE 02/20/2018 72 0001 | |
|---|---|---|---|---|
| B) EMPLOYER IDENTIFICATION NUMBER | | 1 WAGES & OTHER COMPENSATION 86,738.16 | 2 FEDERAL INCOME TAX WITHHELD 14,848.30 | |
| C) EMPLOYER'S NAME, ADDRESS AND ZIP CODE CITY OF NEW YORK 450 WEST 33RD STREET, 4TH FL. NEW YORK, NY 10001 | | 3 SOCIAL SECURITY WAGES 89,935.17 | 4 SOCIAL SECURITY TAX WITHHELD 5,575.98 | |
| | | 5 MEDICARE WAGES 89,935.17 | 6 MEDICARE TAX WITHHELD 1,304.06 | |
| D) CONTROL NUMBER | | | 10 DEPENDENT CARE BENEFITS | |

| E) EMPLOYEE'S NAME, ADDRESS AND ZIP CODE | 11 NONQUALIFIED PLANS | 12 SEE INSTRUCTIONS FOR BOX 12 | |
|---|---|---|---|
| | | CODE | AMOUNT |
| VICKY WARE 80 PATTON AVENUE WYANDANCH NY 11798 | | 12A DD | 7,685.50 |
| | | 12B | |
| | 13 X RETIREMENT PLAN | 12C | |
| | | 12D | |
| | | 12E | |
| | | 12F | |

| **2014** TAX YEAR | **COPY 2** STATE, CITY | **TO BE FILED WITH EMPLOYEE'S OR LOCAL TAX RETURN** |
|---|---|---|

| 15 NAME OF STATE NEW YORK | 16 STATE WAGES, ETC 86,738.16 | 17 STATE INCOME TAX WITHHELD 4,896.46 | 14 OTHER IRC 414H 3,197.01 |
|---|---|---|---|
| 20A LOCALITY NAME NYC | 18A LOCAL WAGES, ETC | 19A LOCAL INCOME TAX WITHHELD | IRC 125 345.33 |
| 20B LOCALITY NAME | 18B LOCAL WAGES, ETC | 19B LOCAL INCOME TAX WITHHELD | FRINGE 619.96 |

## COPY C — EMPLOYEE'S COPY

**DEPT. OF THE TREASURY · IRS OMB NO. 1545-0008**
**THIS INFORMATION IS BEING PROVIDED TO THE INTERNAL REVENUE SERVICE**

### Instructions (left column text)

**Do you have to file?** Refer to the Form 1040 Instructions to determine if you are required to file a tax return. Even if you do not have to file a tax return, you may be eligible for a refund if box 2 shown as amount or if you are eligible for any credit.

**Earned income credit (EIC).**
You may be able to take the EIC for 2015 if your adjusted gross income (AGI) is less than a certain amount. The amount of the credit is based on income and family size. Workers without children could qualify for a smaller credit. You and any qualifying children must have valid social security numbers (SSNs). You cannot take the EIC if your investment income is more than the specified amount for 2015 or if income is earned for services provided while you were an inmate at a penal institution. For 2015 income limits and other information, see Pub. 596, Earned Income Credit. **Any EIC that is more than your tax liability is refunded to you, but only if you file a tax return.**

**Corrections.** If your name, SSN, or address is incorrect, correct Copies B, C, and 2 and ask your employer to correct your employment record. Be sure to ask the employer to file Form W-2c, Corrected Wage and Tax Statement, with the Social Security Administration (SSA) to correct any name, SSN, or money amount error reported to the SSA on Form W-2. Be sure to get your copies of Form W-2c from your employer for all corrections made so you may file them with your tax return. If your name and SSN are correct but are not the same as shown on your social security card, you should ask for a new card that displays your correct name at any SSA office or by calling 1-800-772-1213. You also may visit the SSA at www.socialsecurity.gov.

**Cost of employer-sponsored health coverage (if such cost is provided by the employer).** The reporting in box 12, using code DD, of the cost of employer-sponsored health coverage is for your information only. **The amount reported with code DD is not taxable.**

**Credit for excess taxes.** If you had more than one

employer in 2015 and more than $7,347.00 in social security and/or Tier 1 railroad retirement (RRTA) taxes were withheld, you may be able to claim a credit for the excess against your federal income tax. If you had more than one railroad employer and more than $4,321.80 in Tier 2 RRTA tax was withheld, you also may be able to claim a credit. See your Form or 1040A instructions and Pub. 505, Tax Withholding and Estimated Tax.

**Instructions for Employee**

**Box 1.** Enter this amount on the Wages line of your tax return.

**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.

**Box 5.** You may be required to report this amount on Form 8959, Additional Medicare Tax. See Form 1040 instructions to determine if you are required to complete Form 8959.

**Box 6.** This amount includes the 1.45% Medicare Tax withheld on all Medicare wages and tips shown in Box 5, as well as the 0.9% Additional Medicare Tax on any of those Medicare wages and tips above $200,000.

**Box 10.** This amount includes the total dependent care benefits your employer paid to you or incurred on your behalf (including amounts from a section 125 (cafeteria) plan). Any amount over $5000 also is included in Box 1. Complete form 2441, Child and Dependent Care Expenses, to compute any taxable and nontaxable amounts.

**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E) and designated Roth contributions (codes AA, BB, and EE) under all plans are generally limited to a total of $18,000 ($12,500 if you only have SIMPLE plans; $21,000 for section 403(b) plans if you qualify for the 15-year rule explained in Pub. 571). Deferrals under code G are limited to $18,000.

However, if you were at least age 50 in 2015, your employer may have allowed an additional deferral of up to $6,000 ($3,000 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective deferrals. For code G, the limit on elective deferrals may be higher

for the last 3 years before you reach retirement age. Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the "Wages, Salaries, Tips, etc." line instructions for Form 1040.

**Note.** If a year follows code D, E, G, AA, BB or EE, you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.

**D)** Elective deferrals to a Section 401(k) cash or deferred arrangement. Also includes deferrals under a SIMPLE retirement account that is part of a section 401(k) arrangement.

**E)** Elective deferrals under a section 403(b) salary reduction agreement.

**G)** Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan.

**AA)** Designated Roth contributions to a section 401(k) plan.

**BB)** Designated Roth contributions under a section 403(b) plan.

**DD)** Cost of employer-sponsored health coverage. The amount reported with code DD is not taxable.

**EE)** Designated Roth contributions under a governmental section 457(b) plan. The amount does not apply to contributions under a tax-exempt organization section 457(b) plan.

**Box 13.** If the "Retirement Plan" box is checked, special limits may apply to the amount of traditional IRA contributions you may deduct. See Pub.590, Individual Retirement Arrangements (IRAs).

**Note.** Keep Copy C of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help protect your social security benefits, keep Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year.

---

### W-2 WAGE & TAX STATEMENT — COPY C

A) EMPLOYEE'S SOCIAL SECURITY NO.
DUPLICATE 02/20/2018 72 0001

| Box | Description | Amount |
|---|---|---|
| B) EMPLOYER IDENTIFICATION NUMBER | 1 WAGES & OTHER COMPENSATION | 93,784.46 |
| | 2 FEDERAL INCOME TAX WITHHELD | 16,664.87 |
| C) EMPLOYER'S NAME, ADDRESS AND ZIP CODE | 3 SOCIAL SECURITY WAGES | 97,269.63 |
| CITY OF NEW YORK | 4 SOCIAL SECURITY TAX WITHHELD | 6,030.72 |
| 450 WEST 33RD STREET, 4TH FL. | 5 MEDICARE WAGES | 97,269.63 |
| NEW YORK, NY 10001 | 6 MEDICARE TAX WITHHELD | 1,410.41 |
| D) CONTROL NUMBER | 10 DEPENDENT CARE BENEFITS | |

E) EMPLOYEE'S NAME, ADDRESS AND ZIP CODE

VICKY WARE
80 PATTON AVENUE
WYANDANCH NY 11798

11 NONQUALIFIED PLANS

12 SEE INSTRUCTIONS FOR BOX 12

| CODE | AMOUNT |
|---|---|
| 12A DD | 8,436.44 |
| 12B | |
| 12C | |
| 12D | |
| 12E | |
| 12F | |

13 RETIREMENT PLAN [X]

**2015 TAX YEAR** — **COPY C** — **EMPLOYEE'S COPY**

| 15 NAME OF STATE | 16 STATE WAGES, ETC | 17 STATE INCOME TAX WITHHELD | 14 OTHER | |
|---|---|---|---|---|
| NEW YORK | 93,784.46 | 5,427.49 | IRC 414H | 3,485.17 |
| 20A LOCALITY NAME NYC | 18A LOCAL WAGES, ETC | 19A LOCAL INCOME TAX WITHHELD | IRC 125 | 372.56 |
| 20B LOCALITY NAME | 18B LOCAL WAGES, ETC | 19B LOCAL INCOME TAX WITHHELD | | |

---

**DEPT. OF THE TREASURY · IRS OMB NO. 1545-0008**
**THIS INFORMATION IS BEING PROVIDED TO THE INTERNAL REVENUE SERVICE**

### W-2 WAGE & TAX STATEMENT — COPY B

A) EMPLOYEE'S SOCIAL SECURITY NO.
DUPLICATE 02/20/2018 72 0001

| Box | Description | Amount |
|---|---|---|
| B) EMPLOYER IDENTIFICATION NUMBER | 1 WAGES & OTHER COMPENSATION | 93,784.46 |
| | 2 FEDERAL INCOME TAX WITHHELD | 16,664.87 |
| C) EMPLOYER'S NAME, ADDRESS AND ZIP CODE | 3 SOCIAL SECURITY WAGES | 97,269.63 |
| CITY OF NEW YORK | 4 SOCIAL SECURITY TAX WITHHELD | 6,030.72 |
| 450 WEST 33RD STREET, 4TH FL. | 5 MEDICARE WAGES | 97,269.63 |
| NEW YORK, NY 10001 | 6 MEDICARE TAX WITHHELD | 1,410.41 |
| D) CONTROL NUMBER | 10 DEPENDENT CARE BENEFITS | |

E) EMPLOYEE'S NAME, ADDRESS AND ZIP CODE

VICKY WARE
80 PATTON AVENUE
WYANDANCH NY 11798

11 NONQUALIFIED PLANS

12 SEE INSTRUCTIONS FOR BOX 12

| CODE | AMOUNT |
|---|---|
| 12A DD | 8,436.44 |
| 12B | |
| 12C | |
| 12D | |
| 12E | |
| 12F | |

13 RETIREMENT PLAN [X]

**2015 TAX YEAR** — **COPY B** — **TO BE FILED WITH EMPLOYEE'S FEDERAL TAX RETURN**

| 15 NAME OF STATE | 16 STATE WAGES, ETC | 17 STATE INCOME TAX WITHHELD | 14 OTHER | |
|---|---|---|---|---|
| NEW YORK | 93,784.46 | 5,427.49 | IRC 414H | 3,485.17 |
| 20A LOCALITY NAME NYC | 18A LOCAL WAGES, ETC | 19A LOCAL INCOME TAX WITHHELD | IRC 125 | 372.56 |
| 20B LOCALITY NAME | 18B LOCAL WAGES, ETC | 19B LOCAL INCOME TAX WITHHELD | | |

---

**DEPT. OF THE TREASURY · IRS OMB NO. 1545-0008**
**THIS INFORMATION IS BEING PROVIDED TO THE INTERNAL REVENUE SERVICE**

### W-2 WAGE & TAX STATEMENT — COPY 2

A) EMPLOYEE'S SOCIAL SECURITY NO.
DUPLICATE 02/20/2018 72 0001

| Box | Description | Amount |
|---|---|---|
| B) EMPLOYER IDENTIFICATION NUMBER | 1 WAGES & OTHER COMPENSATION | 93,784.46 |
| | 2 FEDERAL INCOME TAX WITHHELD | 16,664.87 |
| C) EMPLOYER'S NAME, ADDRESS AND ZIP CODE | 3 SOCIAL SECURITY WAGES | 97,269.63 |
| CITY OF NEW YORK | 4 SOCIAL SECURITY TAX WITHHELD | 6,030.72 |
| 450 WEST 33RD STREET, 4TH FL. | 5 MEDICARE WAGES | 97,269.63 |
| NEW YORK, NY 10001 | 6 MEDICARE TAX WITHHELD | 1,410.41 |
| D) CONTROL NUMBER | 10 DEPENDENT CARE BENEFITS | |

E) EMPLOYEE'S NAME, ADDRESS AND ZIP CODE

VICKY WARE
80 PATTON AVENUE
WYANDANCH NY 11798

11 NONQUALIFIED PLANS

12 SEE INSTRUCTIONS FOR BOX 12

| CODE | AMOUNT |
|---|---|
| 12A DD | 8,436.44 |
| 12B | |
| 12C | |
| 12D | |
| 12E | |
| 12F | |

13 RETIREMENT PLAN [X]

**2015 TAX YEAR** — **COPY 2** — **TO BE FILED WITH EMPLOYEE'S STATE, CITY OR LOCAL TAX RETURN**

| 15 NAME OF STATE | 16 STATE WAGES, ETC | 17 STATE INCOME TAX WITHHELD | 14 OTHER | |
|---|---|---|---|---|
| NEW YORK | 93,784.46 | 5,427.49 | IRC 414H | 3,485.17 |
| 20A LOCALITY NAME NYC | 18A LOCAL WAGES, ETC | 19A LOCAL INCOME TAX WITHHELD | IRC 125 | 372.56 |
| 20B LOCALITY NAME | 18B LOCAL WAGES, ETC | 19B LOCAL INCOME TAX WITHHELD | | |

DEPT. OF THE TREASURY - IRS OMB NO. 1545-0008

**THIS INFORMATION IS BEING PROVIDED TO THE INTERNAL REVENUE SERVICE**

## Copy C (top right)

**W-2 WAGE & TAX STATEMENT**
A) EMPLOYEE'S SOCIAL SECURITY NO.
DUPLICATE*02/20/2018*72*0001

| B) EMPLOYER IDENTIFICATION NUMBER | 1 WAGES & OTHER COMPENSATION 96,343.21 | 2 FEDERAL INCOME TAX WITHHELD 17,114.54 |
|---|---|---|
| C) EMPLOYER'S NAME, ADDRESS AND ZIP CODE **CITY OF NEW YORK 450 WEST 33RD STREET, 4TH FL. NEW YORK, NY 10001** | 3 SOCIAL SECURITY WAGES 99,900.86 | 4 SOCIAL SECURITY TAX WITHHELD 6,193.85 |
| | 5 MEDICARE WAGES 99,900.86 | 6 MEDICARE TAX WITHHELD 1,448.56 |
| D) CONTROL NUMBER | | 10 DEPENDENT CARE BENEFITS |

E) EMPLOYEE'S NAME, ADDRESS AND ZIP CODE

11 NONQUALIFIED PLANS

12 SEE INSTRUCTIONS FOR BOX 12

| CODE | AMOUNT |
|---|---|
| 12A DD | 8,579.51 |
| 12B | |

**VICKY WARE
80 PATTON AVENUE
WYANDANCH NY 11798**

13 [X] RETIREMENT PLAN

| 12C | |
| 12D | |
| 12E | |
| 12F | |

**2016 TAX YEAR** — **COPY C** — **EMPLOYEE'S COPY**

| 15 NAME OF STATE NEW YORK | 16 STATE WAGES, ETC 96,343.21 | 17 STATE INCOME TAX WITHHELD 5,622.12 | 14 OTHER IRC 414H 3,557.65 |
|---|---|---|---|
| 20A LOCALITY NAME NYC | 18A LOCAL WAGES, ETC | 19A LOCAL INCOME TAX WITHHELD | IRC 125 367.31 |
| 20B LOCALITY NAME | 18B LOCAL WAGES, ETC | 19B LOCAL INCOME TAX WITHHELD | FRINGE 619.96 |

---

DEPT. OF THE TREASURY - IRS OMB NO. 1545-0008

**THIS INFORMATION IS BEING PROVIDED TO THE INTERNAL REVENUE SERVICE**

**W-2 WAGE & TAX STATEMENT**
A) EMPLOYEE'S SOCIAL SECURITY NO.
DUPLICATE*02/20/2018*72*0001

| B) EMPLOYER IDENTIFICATION NUMBER | 1 WAGES & OTHER COMPENSATION 96,343.21 | 2 FEDERAL INCOME TAX WITHHELD 17,114.54 |
|---|---|---|
| C) EMPLOYER'S NAME, ADDRESS AND ZIP CODE **CITY OF NEW YORK 450 WEST 33RD STREET, 4TH FL. NEW YORK, NY 10001** | 3 SOCIAL SECURITY WAGES 99,900.86 | 4 SOCIAL SECURITY TAX WITHHELD 6,193.85 |
| | 5 MEDICARE WAGES 99,900.86 | 6 MEDICARE TAX WITHHELD 1,448.56 |
| D) CONTROL NUMBER | | 10 DEPENDENT CARE BENEFITS |

E) EMPLOYEE'S NAME, ADDRESS AND ZIP CODE

11 NONQUALIFIED PLANS

12 SEE INSTRUCTIONS FOR BOX 12

| CODE | AMOUNT |
|---|---|
| 12A DD | 8,579.51 |
| 12B | |

**VICKY WARE
80 PATTON AVENUE
WYANDANCH NY 11798**

13 [X] RETIREMENT PLAN

| 12C | |
| 12D | |
| 12E | |
| 12F | |

**2016 TAX YEAR** — **COPY B** — **TO BE FILED WITH EMPLOYEE'S FEDERAL TAX RETURN**

| 15 NAME OF STATE NEW YORK | 16 STATE WAGES, ETC 96,343.21 | 17 STATE INCOME TAX WITHHELD 5,622.12 | 14 OTHER IRC 414H 3,557.65 |
|---|---|---|---|
| 20A LOCALITY NAME NYC | 18A LOCAL WAGES, ETC | 19A LOCAL INCOME TAX WITHHELD | IRC 125 367.31 |
| 20B LOCALITY NAME | 18B LOCAL WAGES, ETC | 19B LOCAL INCOME TAX WITHHELD | FRINGE 619.96 |

---

DEPT. OF THE TREASURY - IRS OMB NO. 1545-0008

## Copy 2 (bottom right)

**W-2 WAGE & TAX STATEMENT**
A) EMPLOYEE'S SOCIAL SECURITY NO.
DUPLICATE*02/20/2018*72*0001

| B) EMPLOYER IDENTIFICATION NUMBER | 1 WAGES & OTHER COMPENSATION 96,343.21 | 2 FEDERAL INCOME TAX WITHHELD 17,114.54 |
|---|---|---|
| C) EMPLOYER'S NAME, ADDRESS AND ZIP CODE **CITY OF NEW YORK 450 WEST 33RD STREET, 4TH FL. NEW YORK, NY 10001** | 3 SOCIAL SECURITY WAGES 99,900.86 | 4 SOCIAL SECURITY TAX WITHHELD 6,193.85 |
| | 5 MEDICARE WAGES 99,900.86 | 6 MEDICARE TAX WITHHELD 1,448.56 |
| D) CONTROL NUMBER | | 10 DEPENDENT CARE BENEFITS |

E) EMPLOYEE'S NAME, ADDRESS AND ZIP CODE

11 NONQUALIFIED PLANS

12 SEE INSTRUCTIONS FOR BOX 12

| CODE | AMOUNT |
|---|---|
| 12A DD | 8,579.51 |
| 12B | |

**VICKY WARE
80 PATTON AVENUE
WYANDANCH NY 11798**

13 [X] RETIREMENT PLAN

| 12C | |
| 12D | |
| 12E | |
| 12F | |

**2016 TAX YEAR** — **COPY 2** — **TO BE FILED WITH EMPLOYEE'S STATE, CITY OR LOCAL TAX RETURN**

| 15 NAME OF STATE NEW YORK | 16 STATE WAGES, ETC 96,343.21 | 17 STATE INCOME TAX WITHHELD 5,622.12 | 14 OTHER IRC 414H 3,557.65 |
|---|---|---|---|
| 20A LOCALITY NAME NYC | 18A LOCAL WAGES, ETC | 19A LOCAL INCOME TAX WITHHELD | IRC 125 367.31 |
| 20B LOCALITY NAME | 18B LOCAL WAGES, ETC | 19B LOCAL INCOME TAX WITHHELD | FRINGE 619.96 |

---

**Do you have to file?** Refer to the Form 1040 Instructions to determine if you are required to file a tax return. Even if you do not have to file a tax return, you may be eligible for a refund if box 2 shows an amount or if you are eligible for any credit.

**Earned income credit (EIC).** You may be able to take the EIC for 2016 if your adjusted gross income (AGI) is less than a certain amount. The amount of the credit is based on income and family size. Workers without children could qualify for a smaller credit. You and any qualifying children must have valid social security numbers (SSNs). You cannot take the EIC if your investment income is more than the specified amount for 2016 or if income is earned for services provided while you were an inmate at a penal institution. For 2016 income limits and more information, visit www.irs.gov/eitc. Also see Pub. 596, Earned Income Credit. **Any EIC that is more than your tax liability is refunded to you, but only if you file a tax return.**

**Corrections.** If your name, SSN, or address is incorrect, correct Copies B, C, and 2 and ask your employer to correct your employment record. Be sure to ask the employer to file Form W-2c, Corrected Wage and Tax Statement, with the Social Security Administration (SSA) to correct any name, SSN, or money amount error reported to the SSA on Form W-2. Be sure to get your copies of Form W-2c from your employer for all corrections made so you may file them with your tax return. If your name and SSN are correct but are not the same as shown on your social security card, you should ask for a new card that displays your correct name at any SSA office or by calling 1-800-772-1213. You also may visit the SSA at www.socialsecurity.gov.

**Cost of employer-sponsored health coverage (if such cost is provided by the employer).** The reporting in box 12, using code DD, of the cost of employer-sponsored health coverage is for your information only. The amount reported with code DD is not taxable.

**Credit for excess taxes.** If you had more than one

employer in 2016 and more than $7,347.00 in social security and/or Tier 1 railroad retirement (RRTA) taxes were withheld, you may be able to claim a credit for the excess against your federal income tax. If you had more than one railroad employer and more than $4,321.80 in Tier 2 RRTA tax was withheld, you also may be able to claim a credit. See your Form 1040 or Form 1040A instructions and Pub. 505, Tax Withholding and Estimated Tax.

**Instructions for Employee**

**Box 1.** Enter this amount on the Wages line of your tax return.

**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.

**Box 5.** You may be required to report this amount on Form 8959, Additional Medicare Tax. See Form 1040 instructions to determine if you are required to complete Form 8959.

**Box 6.** This amount includes the 1.45% Medicare Tax withheld on all Medicare wages and tips shown in Box 5, as well as the 0.9% Additional Medicare Tax on any of those Medicare wages and tips above $200,000.

**Box 10.** This amount includes the total dependent care benefits that your employer paid to you or incurred on your behalf (including amounts from a section 125 (cafeteria) plan). Any amount over $5000 also is included in Box 1. Complete form 2441, Child and Dependent Care Expenses, to compute any taxable and nontaxable amounts.

**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E) and designated Roth contributions (codes AA, BB, and EE) under all plans are generally limited to a total of $18,000 ($12,500 if you only have SIMPLE plans; $21,000 for section 403(b) plans if you qualify for the 15-year rule explained in Pub. 571). Deferrals under code G are limited to $18,000.

However, if you were at least age 50 in 2016, your employer may have allowed an additional deferral of up to $6,000 ($3,000 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective deferrals. For code G, the limit on elective deferrals may be higher for the last 3 years before you reach retirement age. Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the "Wages, Salaries, Tips, etc." line instructions for Form 1040.

**Note.** If a year follows code D, E, G, AA, BB or EE, you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.

**D )** Elective deferrals to a Section 401(k) cash or deferred arrangement. Also includes deferrals under a SIMPLE retirement account that is part of a section 401(k) arrangement.

**E )** Elective deferrals under a section 403(b) salary reduction agreement.

**G )** Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan.

**AA)** Designated Roth contributions to a section 401(k) plan.

**BB)** Designated Roth contributions under a section 403(b) plan.

**DD)** Cost of employer-sponsored health coverage. The amount reported with code DD is not taxable.

**EE)** Designated Roth contributions under a governmental section 457(b) plan. The amount does not apply to contributions under a tax-exempt organization section 457(b) plan.

**Box 13.** If the "Retirement Plan" box is checked, special limits may apply to the amount of traditional IRA contributions you may deduct. See Pub.590-A, Contributions to Individual Retirement Arrangements (IRAs).

**Note.** Keep Copy C of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help protect your social security benefits, keep Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year.

Case 23-1, Document 76, 01/25/2023, 3458054, Page283 of 296

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

_____

In the Matter of the Application of

Vicky Ware Bey, In Proper Persona, Sui Juris

Plaintiff / Petitioner / Claimant

                                              **BILL OF PARTICULARS**

           V

                                              **Index #  152946 / 2019**

Melanie Whinnery, Executive Director
NEW YORK CIITY EMPLOYEE RETIREMENT SYSTEM

NEW YORK CITY EMPLOYEE RETIREMENT SYSTEM

Cynthia Brann, Acting Commissioner of the
NEW YORK CITY DEPARTMENT OF CORRECTIONS

NEW YORK CITY DEPARTMENT OF CORRECTIONS

CITY OF NEW YORK

Defendant(s) / Respondent(s)

_____

Please provide copies of the Plaintiff / Petitioner's / Clamant's entire personnel file and entire medical records from the NEW YORK CITY DEPARTMENT OF CORRECTIONS HEATH MANAGEMENT DIVISION. (The Plaintiff / Petitioner / Claimant has made good faith efforts to obtain these records prior to the commencement of this action).

Please provide the reason why Aaron Scarlett does not work for the NEW YORK CITY DEPARTMENT OF CORRECTIONS.

Was there any Law Suits lodged against the  NEW YORK CITY DEPARTMENT OF CORRECTIONS based upon Aaron Scarlett's conduct.  If so what was basis of the suit and was the NEW YORK CITY DEPARTMENT OF CORRECTIONS deemed liable for his conduct?

The Plaintiff / Petitioner / Claimant demands that the Defendants to provide the following information for process of service for the following NEW YORK CITY DEPARTMENT OF CORRECTIONS / CITY OF NEW YORK :

Case 23-1, Document 76, 01/25/2023, 3458054, Page284 of 296

The Names of the Commissioners and First Deputy Commissioners of the NEW YORK CITY DEPARTMENT OF CORRECTIONS in December 2014,and the entire years of 2015, 2016, 2017, 2018. If they are retired or no longer employed by the NEW YORK CITY DEPARTMENT OF CORRECTIONS / CITY OF NEW YORK, please state the reason and provide their last known residential address for legal process of service. Please state if they are still employed with the NEW YORK CITY DEPARTMENT OF CORRECTIONS or any other agency that operates under the CITY OR THE STATE OF NEW YORK.

The Names of the Deputy Commissioners the NEW YORK CITY DEPARTMENT OF CORRECTIONS / CITY OF NEW YORK in December 2014, and the entire years of 2015, 2016, 2017, 2018, and the names of all of the Deputy Commissioners of NEW YORK CITY DEPARTMENT OF CORRECTIONS APPLICANT INVESTIGATION UNIT in from 2006 -2017. If they are retired or no longer employed by the NEW YORK CITY DEPARTMENT OF CORRECTIONS / CITY OF NEW YORK, please state the reason and provide their last known residential address for legal process of service.

The Names of all of the Commissioners and Deputy Commissioners of NEW YORK CITY DEPARTMENT OF CORRECTIONS EQUAL EMPLOYMENT OFFICE 2006 - 2018, and their last known residential address for legal process of service if they are no longer employed by the NEW YORK CITY DEPARTMENT OF CORRECTIONS / CITY OF NEW YORK, please state the reason.

The Names of all of the Associate Commissioners NEW YORK CITY DEPARTMENT OF CORRECTIONS in December 2014, and the entire years of 2015, 2016, 2017,2018. If they are retired or no longer employed by the NEW YORK CITY DEPARTMENT OF CORRECTIONS / CITY OF NEW YORK, please provide their last known residential address for legal process of service.

The Names of the Assistant Commissioners NEW YORK CITY DEPARTMENT OF CORRECTIONS in December 2014, and the entire years of 2015, 2016, 2017, 2018. If they are retired or no longer employed by the NEW YORK CITY DEPARTMENT OF CORRECTIONS / CITY OF NEW YORK please provide their last known residential address for legal process of service.

The Names of the Chiefs NEW YORK CITY DEPARTMENT OF CORRECTIONS in December 2014, and the entire years of 2015, 2016, 2017, 2018. If they are retired or no longer employed by the NEW YORK CITY DEPARTMENT OF CORRECTIONS / CITY OF NEW YORK please provide their last known residential address for legal process of service.

The Names of all of the Bureau Chiefs for the NEW YORK CITY DEPARTMENT OF CORRECTIONS in December 2014, and the entire years of 2015, 2016, 2017, 2018.

If they are retired or no longer employed by the NEW YORK CITY DEPARTMENT OF CORRECTIONS / CITY OF NEW YORK please provide their last known residential address for legal process of service.

The Names of the Assistant Chiefs of Department in December 2014, and the entire years of 2015, 2016, 2017, 2018. If they are retired or no longer employed by the NEW YORK CITY DEPARTMENT OF CORRECTIONS / CITY OF NEW please provide their last known residential address for legal process of service.

The Names of the Chiefs of RIKERS ISLAND SECURITY in December 2014, and the entire years of 2015, 2016, 2017. If they are retired or no longer employed by the NEW YORK CITY DEPARTMENT OF CORRECTIONS / CITY OF NEW YORK please provide their last known residential address for legal process of service.

The Names of the Deputy Commissioners and all staff members assigned to the NEW YORK CITY DEPARTMENT OF CORRECTIONS / CITY OF NEW YORK INVESTIGATION DIVISION from 2006 – 2017. If they are retired or no longer employed by the NEW YORK CITY DEPARTMENT OF CORRECTIONS / CITY OF NEW YORK please provide their last known residential address for legal process of service.

The Names of all of the Division Chiefs in Division 1, 2, 3, 4, 5, 6, 7 employed by the NEW YORK CITY DEPARTMENT OF CORRECTIONS / CITY OF NEW YORK in December 2014, and the entire years of 2015, 2016, 2017, 2018. If they are no longer employed by the NEW YORK CITY DEPARTMENT OF CORRECTIONS / CITY OF NEW YORK, please provide their last known residential address for legal process of service.

The Names of the Deputy Warden in Command, or the Warden of the NEW YORK CITY DEPARTMENT OF CORRECTIONS TRANSPORTATION DIVISION in December 2014, and the entire years of 2015, 2016, 2017, 2018, 2019. If they are retired or no longer employed by the NEW YORK CITY DEPARTMENT OF CORRECTIONS / CITY OF NEW YORK for whatever reason, please provide their last known residential address for legal process of service.

The Names of all of the Wardens and Deputy Wardens, and Assistant Deputy Wardens and Captains assigned to the Otis Bantum Correctional Center in December 2014, and the entire years of 2015, 2016, 2017, 2018, 2019, If these staff members are retired or no longer employed by the NEW YORK CITY DEPARTMENT OF CORRECTIONS / CITY OF NEW YORK for whatever reason, please provide their last known residential address for legal process of service.

Does any of these staff members have criminal records? if so, state the nature of it which is contained in public records.

Case 23-1, Document 76, 01/25/2023, 3458054, Page286 of 296

The Plaintiff / Petitioner / Claimant demands that the Defendants answer within 30 days.

Failure to respond or to comply with this demand in a timely fashion or failure to comply fully with this demand in the bill of particulars  the Petitioner will move the court  to  compel compliance after thirty days of the Defendants receipt of this Bill of Particulars, if  such  failure  is  willful,  he imposition of  penalties pursuant to CPLR 3126 shall be applied.

Again, If the Defendants or any party, or a person who at the time of  a  deposition is  taken  or  an   examination  or  inspection  is  made  is  an officer, director, member,  employee or agent of a party  or  otherwise  under  a  party's control, refuses  to  obey  an order for disclosure or willfully fails to disclose  information which the court finds ought to have been disclosed  pursuant  to  this  article,  the court  may  make such orders with regard to the failure or refusal as are just, among them:

1. an order that the issues to which the information is relevant shall  be deemed resolved for purposes of the action  in  accordance  with  the  claims of the Plaintiff / Petitioner / Claimant obtaining the order; or

2. an order  prohibiting  the  Defendants / disobedient  party from supporting or opposing designated claims  or  defenses,  from  producing  in  evidence  designated things  or  items  of  testimony,  or  from  introducing any   evidence of  the  physical, mental  or  blood  condition  sought  to  be determined, or from using certain witnesses; or

3. an  order  striking  out  pleadings  or  parts thereof, or staying further proceedings until the order is obeyed, or rendering a judgment by default against the Defendant /  disobedient party.

The  Plaintiff / Petitioner / Claimant  hereby  incorporates  all  prior  documents in connect with this document including but not limited to the verified hybrid complaint and Petition.

Notice to the Principal is Notice to the Agent and Notice to the Agent is Notice to the Principal

Witness hereto before me on
The 11th day of July, 2019

Notary Public

CHRISTOPHER MONROE
Notary Public - State of New York
NO. 01MO6201290
Qualified in Suffolk County
My Commission Expires 5/17/21

Vicky Ware Bey,  In Propria Persona
Sui Juris, Authorized Representative
Vicky Ware, Ex Relatione
All Rights Reserved,U.C.C. 1-207, 1-308, 1-103

NOTE OF ISSUE

## NOTE OF ISSUE

| New York Supreme Court County of New York , _____ District | Index / Claim No. 152946-2019 **518540/2019** | |
|---|---|

| Vicky Ware Bey, In Propria Persona Plaintiff / Petitioner / Claimant | **Notice for trial** |
|---|---|

Vicky Ware Bey, In Propria Persona
Plaintiff / Petitioner / Claimant

-against-

Melanie Whinnery, Executive Director
NEW YORK CITY EMPLOYEES RETIRMENT
SYSTEMS

NEW YORK CITY EMPLOYEES RETIRMENT
SYSTEMS

Cynthi Brann, Acting Commissioner
NEW YORK CITY DEPARTMENT OF
CORRECTIONS

NEW YORK CITY DEPARTMENT OF
CORRECTIONS

CITY OF NEW YORK

Filed by attorney for _Plaintiff_
Date claim filed 3/19/2019
Date claim served 3/19/2019
Date issue joined 3/19/2019

Nature of action

Tort: Highway or motor vehicle negligence _____
Medical malpractice _____
Other tort (specify) _____
Appropriation claim _____
Small claim pursuant to article 6 EDPL _____
Public construction contract claim _____

Other contract  X
Other type of action (specify) _____
Amount demanded $ 17,231,158.16
Other relief _Injunctive_

Plaintiff / Petitioner /Claimant(s) Office and P.O. Address:

c/o 80 Patton Avenue, Wyandanch Territory, New York
Republic [11798]

Phone No. 347-869-8529

Attorney(s) for Defendant(s) Office and P.O. Address:

Corporation Counsel c/o 100 Church Street, New York
Territory, New York Republic [10007]

Phone No.

**NOTE:** Clerk will not accept this note of issue unless accompanied by a certificate of readiness and an affidavit of service on opposing counsel.

Case 23-1, Document 76, 01/25/2023, 3458054, Page289 of 296

NOTE OF ISSUE

**CERTIFICATE OF READINESS FOR TRIAL**

**(Items 1-6 must be checked)**

|  | Complete | Waived | Not Required |
|---|---|---|---|
| 1. All pleadings served and filed. | ...X...... | ......... | ......... |
| 2. Bill of Particulars served and filed. | .....X.... | ......... | ......... |
| 3. Physical examinations completed. | ......... | ......... | ..X....... |
| 4. Medical reports filed and exchanged. | ......... | ......... | ......... |
| 5. Expert reports filed and exchanged. | ......... | ......... | ...X. |
| 6. Discovery proceedings now known to be necessary completed. | ......... | ......... | ......... |
| 7. There are no outstanding requests for discovery.          YES | | | |
| 8. There has been a reasonable opportunity to complete the foregoing proceedings. | | | |
| 9. There has been compliance with any order issued pursuant to section 206.10 of this part. | | | |
| 10. The action is ready for trial. | | | |

Dated:

7-17-2019

(Signature) _Vicky L. Bey_ All Rights Reserved
                                   U.C.C. 1-207, 1-308, 1-103

Attorney(s)

for:_____Office  and

P.O. address:_____

# TED L. GUNDERSON & ASSOCIATES

6230-A Wilshire Blvd., Suite 6
Los Angeles, California 90048
Phone: (337) 344-8876

I, Ted L. Gunderson, hereby swear under the pains and penalties of
jury that the following statements are true and correct:

1.  My name is Ted L. Gunderson. I am the owner and operator of Ted
    L. Gunderson & Associates, an international security and
    consulting firm based out of Santa Monica, California. I am
    currently a licensed private investigator in the state of California. I
    have performed private investigation and security work for
    numerous individuals, companies, and governments worldwide
    since founding my firm in 1979. I have worked for, amongst
    others, F. Lee Bailey, Esq., The California Narcotics Authority by
    appointment of Governor Jerry Brown, The 1984 Los Angeles
    Olympic Committee, and The 1979 Pan American Games in San
    Juan, Puerto Rico by appointment of then U.S. Attorney General
    Griffin Bell.

2.  Previous to my work as a private investigator I spent nearly three
    decades in the F.B.I. Between 1951 and 1960 I was an F.B.I.
    Special Agent. In 1960 I was promoted as a supervisor at F.B.I.
    Headquarters in Washington, D.C., where I was in charge of
    Organized Crime and Racketeering investigations covering 26
    F.B.I. Field Offices nationwide. Following the assassination of
    President John F. Kennedy, I was re-assigned to Special Inquiry
    White House Matters at F.B.I. Headquarters. In 1965 I was
    promoted again to Assistant Special Agent-In-Charge of Internal
    Security and Anti-Terrorism of the F.B.I. New Haven, Connecticut
    Field Office. In 1970 I was promoted to Assistant Special Agent-
    In-Charge of the F.B.I. Philadelphia, Pennsylvania Field Office.
    On July 12, 1972 I successfully negotiated with two terrorist
    hijackers of National Airlines Flight 496 for the release of 119
    passengers at Philadelphia International Airport. In 1973 I was
    promoted to Chief Inspector at F.B.I. Headquarters. I also served

as Special Agent-In-Charge of the F.B.I. Memphis and Dallas Field Offices. I retired from the F.B.I. as Senior Special Agent-In-Charge of the Los Angeles Field Office of the F.B.I. with over 700 employees and a budget of over 22 million dollars in 1979.

3.   I have read the Complaint in the current action of Mr. Keith Labella against F.B.I. and D.O.J. It is my professional opinion, based on information, knowledge and belief that the information sought by Mr. Labella in this F.O.I.A. suit regarding "gang stalking", "gang stalking groups" and "gang stalking methods" reasonably describes an ongoing, active, covert nationwide program that is in effect today, and, based on my investigations and experience, has been operational since at least the early 1980's. Since the 1980's gang stalking has increased in scope, intensity and sophistication by adapting to new communications and surveillance technology. These programs are using the codenames Echelon Program, Carnivore System, and Tempest Systems. The Echelon Program is administered by the N.S.A. out of Fort Meade, Maryland, and monitors all email and phone calls in the world. Carnivore System is administered by the N.S.A. out of Fort Meade, Maryland, and can download any computer system without being traced or otherwise known to the owner. Tempest Systems can decipher what is on any computer screen up to a quarter of a mile away. These programs are negatively impacting thousands of Americans and severely abusing their civil rights on a daily basis.

4.   Based on my investigative work, which includes intelligence from sources such as active and former members of the Intelligence Services (including the F.B.I., the C.I.A., the N.S.A. and Military Intelligence), information from informants active in criminal enterprises, and, victim testimonies, I have come to the conclusion that thousands of victims have been targeted by an illegal government rogue criminal enterprise that is active 24 hours a day within the U.S. This conspiracy is far too active to be controlled or operated by private enterprise whose goals are achieving financial gain. These operations require extensive financing with no return on the investment. This program's operations are financed by illegal black operations, i.e., narcotics, prostitution, child

2

        kidnapping (children sell at covert auctions for up to $50,000 per child), human trafficking, gambling and other rackets.

5.     I have documentation and know that throughout the U.S., operating 24 hours-a-day and 7 days-a-week, there is a Central Command, located within the U.S., with multiple satellite offices, whose administrators can instantly initiate surveillance, phone taps and harassment against any individual in the country. They have the technology, financing and manpower to dispense illegal surveillance and harassment against anyone at any time, day or night. I have files on numerous cases of active, programmatic, illegal government harassment currently being conducted against thousands of Americans. This makes the F.B.I.'s former COINTELPRO program, which I worked on, including in a supervisory capacity, look like a Sunday school program by comparison.

6.     I firmly believe that most individuals working in the F.B.I., other intelligence agencies, and the government overall are honest, law-abiding public servants. However, a sophisticated network of rogue operatives has secretly infiltrated the F.B.I., other intelligence agencies including the C.I.A., and other key government positions. This rogue element seeks personal power and wealth and considers themselves above the law and the Constitution. They are carrying out the aforementioned surveillance and harassment activities in conjunction with organized crime, the cult movement in America including Satanic cults, other commercial and political interests, and even misguided civic organizations and neighborhood groups. This illegal surveillance and harassment program is being called gang stalking and organized stalking by the victims targeted by it. The victims are targeted for a variety of reasons including government and corporate whistleblowers, parties to financial and employment disputes, parties to marital disputes (usually divorced women), and even jilted paramours. Journalists covering controversial issues, and, even attorneys and private investigators representing unpopular clients or interests, have been targeted by this program.

7.     Individuals targeted by this program have been subjected to illegal and unconstitutional phone taps, illegal re-routing of business and

3

private phone calls for purposes of harassment, illegal audio "bugging", surreptitious entry into home, office, and vehicle, visual surveillance in the home conducted by illegal placement of miniature remote, wireless cameras (often accessible via internet), illegal internet spyware, illegal GPS tracking (often through their own mobile phones), regular fixed and mobile surveillance, mail misdirection, mail theft and tampering, financial and employment sabotage, slander campaigns and community ostracizing , internet disinformation and smear campaigns, poisoning, assaults and murder, illegal set-ups on drug charges and other felony charges, amongst many other civil rights abuses.

8.     In addition to high-ranking members of the F.B.I., other intelligence services, and the government overall, wealthy, powerful members of criminal syndicates, multi-millionaires and the corporate elite are using the government gang stalking program to harass enemies. They can get a targeted individual harassed for the rest of that individual's life (individual cases of gang stalking lasting for over a decade are common). The higher status members of the gang stalking conspiracy initiate the gang stalking and coordinate logistics and funding. Lower echelon government rogue operatives, lower ranking members of the military (in violation of Posse Comitatus), petty criminals and street thugs perform the actual grunt work of daily monitoring and harassment of individuals targeted by the program.

9.     Based on my professional experience, extensive intelligence information and belief, it is my professional opinion that the F.B.I. is involved in and has investigative files on the subject of gang stalking, related gang stalking methods, and gang stalking groups in the F.B.I.'s vast intelligence files, that are responsive to Mr. Labella's F.O.I.A. Complaint. Furthermore, I have personally referred numerous victims of gang stalking to the appropriate agents at the F.B.I. for investigation of their cases. I have also furnished the F.B.I. with documentation of an active, international child kidnapping ring probably operated by rogue C.I.A. agents. The F.B.I. has ignored my requests to investigate even though it is their responsibility to investigate kidnappings. I have a contact in Germany who advises me that the C.I.A. has set up secret operations on U.S. military bases for the kidnapping, sale and

4

trafficking of children worldwide. The F.B.I. may be using a
unique codename and nomenclature for the gang stalking
phenomenon in its records. However, this is a semantic difference,
and, in no way changes my professional opinion that the F.B.I. has
investigative files on the nationwide phenomenon of gang stalking
described in reasonable and specific detail in Mr. Labella's
F.O.I.A. Complaint. These F.B.I. files contain information
responsive to Mr. Labella's F.O.I.A. Complaint regarding the
subject of gang stalking. The F.B.I. and other intelligence agencies
are administering and covering up the rogue, covert, government
criminal enterprise of gang stalking. The gang stalking
phenomenon appears in the records of both the F.B.I. and the
N.S.A. in their records pertaining to the Echelon Program,
Carnivore System, and Tempest Systems. In addition, the gang
stalking phenomenon appears in the records of both the F.B.I. and
the N.S.A. in their records pertaining to information collected by
Narus systems. Narus is a wholly owned subsidiary of defense
contractor Boeing that produces sophisticated, mass surveillance
computer systems currently being used by both the F.B.I. and the
N.S.A.

Dated this _26_ day of _April_ 2011.

Los Angeles, California

Ted L. Gunderson
Ted L. Gunderson

_____

NOTARY

5

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _Los Angeles_

On _4-25-2011_ before me, _Robert R.S. Propp_
　　Date　　　　　　　　　　　Here Insert Name and Title of the Officer

personally appeared _Ted L. Gunderson_
　　　　　　　　　　　Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
　　　　　　Signature of Notary Public

Place Notary Seal Above

ROBERT R.S. PROPP
COMM. 1795936.
NOTARY PUBLIC CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires April 20, 2012

---

## OPTIONAL

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

### Description of Attached Document

Title or Type of Document: _Statement of Ted L. Gunderson Fasco iso_

Document Date: _4-26-2011_　　　　　　Number of Pages: _5_

Signer(s) Other Than Named Above: _____

### Capacity(ies) Claimed by Signer(s)

Signer's Name: _Ted L. Gunderson_
☑ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer Is Representing: _____

Signer's Name: _____
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer Is Representing: _____

©2007 National Notary Association • 9350 De Soto Ave., P.O.Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org　Item #5907　Reorder: Call Toll-Free 1-800-876-6827

# TED L. GUNDERSON
FBI Bureau Chief,
Senior Special Agent In Charge, (Ret.)
Head of the Los Angeles Office of the
Federal Bureau of Investigation
6230 A Wilshire Blvd.
Los Angeles, CA 90048
Direct Line: (337)344-8876
California Investigation License Number: 12878

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 1979 – Present | Ted L. Gunderson & Associates.<br>Founder, owner and operator of this international security consulting and investigation firm in 1979. Investigator for F. Lee Bailey Esq., Mr. Bailey describes Ted Gunderson as a person "whose investigative skills are unsurpassed by anyone I know or have known". At the time of retirement from the Federal Bureau of Investigations, Ted had 700 personnel under his command and he operated an annual budget of Twenty Two Million dollars (USD 22,000,000.00).<br><br>Ted is a renowned lecturer, published author and researcher. National Television and radio appearances include "The Geraldo Show", "48 Hours Mysteries", "Unsolved Mysteries" and "Larry King Live". He has been regularly featured on Discovery Channel and Lifetime. |
| 1984 | Los Angeles Olympics Committee Consultant. |
| 1981 – 1982 | California Narcotics Authority – Consultant appointed by Governor Jerry Brown. |
| 1979 | Pan American Games, San Juan, Puerto Rico – Security Coordinator<br>Special Appointee of United States Attorney General Griffin B. Bell. |
| 1951 – 1979 | Federal Bureau of Investigations |

| | | |
|---|---|---|
| | 1977 – 79 | Senior Special Agent-In-Charge, Los Angeles, California |
| | 1973 – 77 | Special Agent-In-Charge, Memphis, Tennessee and Dallas, Texas |
| | 1973 | Chief Inspector |
| | 1965 – 73 | Assistant Special Agent-In-Charge, New Haven, Connecticut and Philadelphia, Pennsylvania |
| | 1960 – 65 | Special Agent Supervisors – Federal Bureau of Investigations Headquarters, Washington, D.C. |
| | 1951 – 60 | Special Agent |

| | | |
|---|---|---|
| PUBLICATIONS | 1989 | "How To Locate Anyone Anywhere Without Leaving Home" – E.P. Dutton |
| EDUCATION | 1950 | Bachelor of Science – University of Nebraska |
| AWARDS | 1979 | Distinguished Alumnus Award in Recognition of Distinguished and Devoted Service to His Country – University of Nebraska |
| | 1977 | Alumni Highest Effort Award in the Field of law Enforcement, Sigma Alpha Epsilon Social Fraternity |
| | 1977 | Law enforcement Officer of the Year – AFL-CIO Metal Trades Counsel, Los Angeles, California |